**In The Matter Of:**


*Jason Jordan, et al.*
*vs.*
*Premier Entertainment Biloxi, et al.*

_____


*John Dixson*

*April 2, 2014*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF MISSISSIPPI
                    SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL DEATH
BENEFICIARIES OF UNBORN BABY JORDAN,
DECEASED; AND CHRISTOPHER SOUKUP        PLAINTIFFS


VS.            CIVIL ACTION NO. 1:13cv195 LG-JMR


PREMIER ENTERTAINMENT BILOXI, LLC d/b/a
HARD ROCK HOTEL & CASINO BILOXI; THE
CITY OF BILOXI, MISSISSIPPI; DOE
DEFENDANT ONE; JOSHUA HAMILTON, IN HIS
OFFICIAL AND INDIVIDUAL CAPACITIES;
DOE DEFENDANT THREE; DOE DEFENDANT
FOUR; DOE DEFENDANT FIVE AND DOE
DEFENDANTS 6-10                         DEFENDANTS


              DEPOSITION OF JOHN DIXSON
       Taken at the offices of Page, Mannino,
       Peresich & McDermott, 759 Howard Avenue,
       Biloxi, Mississippi, on Wednesday, April
       2, 2014, beginning at approximately
       12:58 p.m.


REPORTED BY:


       JANNA WHITE, CSR #1312
       Merrill Legal Solutions
       Post Office Box 14113 (39236)
       4400 Old Canton Road, Suite 160
       Jackson, Mississippi 39211
       Telephone:  (601) 366-9676
       Fax:  (601) 366-9756


       1(800)372-DEPO

APPEARANCES:

    THOMAS J. BELLINDER, ESQUIRE
    Martin & Bellinder
    351 Edgewood Terrace Drive
    Jackson, Mississippi 39206
    Telephone:  (769) 257-6052
    Fax:  (769) 257-6596
    Email:  Thomas.Bellinder@gmail.com
        ATTORNEY FOR THE PLAINTIFFS

    DAVID W. STEWART, ESQUIRE
    Copeland, Cook, Taylor & Bush, P.A.
    2781 C.T. Switzer, Sr. Drive
    Biloxi, Mississippi 39531
    Telephone:  (228) 863-6101
    Fax:  (228) 868-9077
    Email:  Dstewart@cctb.com
        ATTORNEY FOR PREMIER ENTERTAINMENT
        BILOXI, LLC, d/b/a HARD ROCK HOTEL
        & CASINO BILOXI

    AUSTIN CLARK, ESQUIRE
    Russell S. Gill, PLLC
    638 Howard Avenue
    Biloxi, Mississippi 39530
    Telephone:  (228) 432-0007
    Fax:  (228) 432-0025
    Email:  Rsgill@datasync.com
        ATTORNEY FOR THE JOSHUA HAMILTON

    TERE R. STEEL, ESQUIRE
    Page, Mannino, Peresich & McDermott
    759 Howard Avenue
    Vieux Marche Mall
    Biloxi, Mississippi 39533
    Telephone:  (228) 374-2100
    Fax:  (228) 432-5539
    Email:  Tere.steel@pmp.org

1          T-A-B-L-E O-F C-O-N-T-E-N-T-S

2

Examination by:                        Page

3

  Mr. Bellinder                          5

4

  Ms. Steel                            35

5

  Mr. Bellinder                        41

6

Stipulation                            4

7

Certificate of Reporter                46

8

Witness Signature Sheet                47

9

10

11                    EXHIBITS

12            (No exhibits were marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

STIPULATION

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by Janna White, C.S.R., Court Reporter and Notary Public, pursuant to the Federal Rules of Civil Procedure, as amended;

That the formality of READING AND SIGNING is specifically NOT WAIVED;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as this deposition, or any part thereof, may be used or is sought to be used in evidence.

---

1                    JOHN DIXSON,

2          having been duly sworn, was examined and

3          testified as follows:

4                    EXAMINATION

5    BY MR. BELLINDER:

6          Q.    Good afternoon, sir.

7          A.    Good afternoon.

8          Q.    My name is Thomas.  I am one of the

9    attorneys for a gentleman named Jason Jordan.  His

10   wife Alyssa Jordan, and another gentleman by the

11   name of Chris Soukup arising out of an incident

12   that happened at the Hard Rock back in

13   November 2011.

14   MR. BELLINDER:

15              For the record, again, this deposition

16   is being taken pursuant to the Federal Rules of

17   Civil Procedure.

18         Q.    Mr. Dixon, have you ever given a

19   deposition before?

20         A.    Yes.  Yes, I have.  When I last speak

21   it was about things going on when I was in the

22   army.

23         Q.    Do you know about when that was?

24         A.    Oh, yeah.  I got out of the army in

25   '92.  So that was '90.  Washington, D.C.

1     Q.    Okay.  Do you remember the

2 circumstances of that?

3     A.    It was just -- it was a deal with a

4 vehicle that got hit that was driving -- I had

5 driven the vehicle, and it was just how the

6 vehicle look when I drove it.

7     Q.    I got you.  You would have been giving

8 some testimony about what you saw and things like

9 that?

10    A.    Right.

11    Q.    Any other depositions that you gave?

12    A.    No.

13    Q.    Okay.  Well, the reason we ask is

14 actually I'm going to be asking you a series of

15 questions about that evening and what you remember

16 and what you recall.

17    A.    Sure.

18    Q.    And so naturally you saw -- the court

19 reporter swore you in prior to us getting started,

20 and so we like to explain that you're under oath

21 to tell the truth in the same way that you would

22 be if there was judge here, but it's a little less

23 formal.  We're sort of in a fact finding or what

24 we call the discovery phase to see about what we

25 know.

1    A.    Right.

2    Q.    I always tell folks if you will please

3 answer all of the questions to the best of your

4 knowledge.  You cannot be compelled to give

5 something -- to give a yes or no answer.  If you

6 don't know and I don't know is a perfectly good

7 answer.  But, naturally, you are under oath to

8 tell the truth.

9    A.    Sure.

10    Q.    Also, any time I ask you a question

11 about any specific event, a conversation,

12 somebody, something that happened, it will always

13 call for your personal knowledge.

14    A.    Right.

15    Q.    In the same way you can't be compelled

16 to say yes or no, you can't be compelled to

17 testify about something you don't have personal

18 firsthand knowledge of.

19    A.    Right.

20    Q.    One other thing that we'll do, she is

21 taking down everything that we say, and so to make

22 her job a little easier, casual conversation we

23 may nod our head, say uh-huh or huh-uh, you and I

24 know exactly what we're saying, but --

25    A.    Right.

1      Q.    -- she's got to take a record that we

2  may have to look back at later.  So if you will

3  answer audibly, I will try and do the same.  And

4  then, also, if you will allow me to finish my

5  question, I'll allow you to finish your answer,

6  that way we don't overlap and make her job next to

7  impossible.

8           Okay.  Great.  If you would, just give

9  me your full -- your full name?

10      A.    Johnnie Dixon, Jr.

11      Q.    John Dixon, Jr.

12      A.    Johnnie Dixon, Jr.

13      Q.    J-O-H-N-N-Y?

14      A.    I-E.

15      Q.    I-E.

16      A.    D-I-X-S-O-N.

17      Q.    I wondered about that.  I've seen it

18  spelled both ways and junior.

19      A.    Right.

20      Q.    Okay.  Mr. Dixson, where do you

21  currently reside?

22      A.    D'Iberville.

23      Q.    What is your current address there in

24  D'Iberville?

25      A.    4538 Magnolia Cove West, D'Iberville,

1   Mississippi, 39540.

2       Q.    How long have you lived there on

3   Magnolia Cove?

4       A.    Seven years.

5       Q.    Seven years.  Good.  Born in

6   Mississippi?

7       A.    Biloxi.

8       Q.    Okay.  What's your date of birth?

9       A.    October 16th, 1965.

10      Q.    My birthday is the 13th.  October.

11  Libras.  Currently married?

12      A.    No.

13      Q.    Ever been married?

14      A.    Yes.

15      Q.    Who was your -- what was your former

16  spouse's name?

17      A.    Joyce Brooks.

18      Q.    Brooks is her maiden name?

19      A.    Uh-huh.

20      Q.    Had you ever been married to anybody

21  other than Ms. Joyce Brooks?

22      A.    No.

23      Q.    Do you have any children?

24      A.    Yes.

25      Q.    Over the age of 18?

1      A.    Yes.

2      Q.    Okay.  Tell me their names.

3      A.    Dionna Brooks -- I mean Dionna Dixson.

4      Q.    D-E --

5      A.    D-I-O-N-N-A.

6      Q.    Dionna Dixson?

7      A.    Dixson, D-I-X-S-O-N.  And then Davina,

8  D-A-V-I-N-A, Dixson.  And Julian Dixson.

9      Q.    Dionna, Davina, and Julian all from

10  Ms. Joyce?

11      A.    Yes.

12      Q.    And you said they are all over the age

13  of 18?

14      A.    Yes.

15      Q.    Do you know -- do any of or all of them

16  reside in the Southern Mississippi area?

17      A.    Yes, both daughters do.

18      Q.    Okay.  They live in Biloxi or

19  D'Iberville?

20      A.    D'Iberville, and one daughter lives in

21  Gulfport.

22      Q.    Which one lives in Gulfport?

23      A.    Davina.

24      Q.    And then where does Julian live?

25      A.    Atlanta.

1    Q.    Atlanta.  The reason we ask these

2    questions, and I've said it four times already

3    today because we've been doing it already, wanting

4    to get to know you, to get to know a little

5    background, but also we want to make sure that

6    nobody -- in the event that we do have to pick a

7    jury on a case like this -- that nobody knows or

8    is closely related to any of the lawyers, the

9    parties, the witnesses, or anybody that's

10   important.

11       A.    Gotcha.

12       Q.    Do you have any close family -- when I

13   say close family -- mom and dad, brother, sister,

14   cousins, aunts, uncles who live in the southern

15   Mississippi area?

16       A.    Yes, my mom and my sister.

17       Q.    Okay.  What's your mom's name?

18       A.    Elsie Ruth Dixson.

19       Q.    O-S-I-E?

20       A.    E-L-S-I-E.

21       Q.    Elsie.

22       A.    Elsie.  And carol Dixson.

23       Q.    And Carol is your sister?

24       A.    Yes.

25       Q.    They live in --

```
 1       A.     Biloxi.

 2       Q.     Both in Biloxi?

 3       A.     Uh-huh.

 4       Q.     Anybody else you can think of?

 5       A.     No.

 6       Q.     Good deal.  Briefly for us, the

 7  highlights of your educational background.

 8       A.     High school education.  Then went in

 9  the army.  Went to medical logistics school,

10  medical supply, driving school.

11       Q.     Where did you go to high school?

12       A.     Biloxi.

13       Q.     Do you remember what year you enlisted

14  in the army?

15       A.     1984.

16       Q.     '84.  You say you did some medical

17  logistics supply type training?

18       A.     I was a medic also.

19       Q.     Okay, and then you said driving?

20       A.     Yeah.  I drove all the vehicles, all

21  the large vehicles, the forklifts and trucks.  I

22  had to do a driving course for that.

23       Q.     Gotcha.  Any other education you can

24  think of?

25       A.     No.
```

1       Q.    When were you discharged from the army?

2       A.    19 -- well, active duty 1992.  Then I

3 did six years reserve after that.

4       Q.    Discharged from active duty in '92?

5       A.    Uh-huh, April of '92.

6       Q.    April?

7       A.    Uh-huh.

8 MR. STEWART:

9          You've got to say yes.

10      A.    Yes, I'm sorry.

11 MR. BELLINDER:

12     Q.    You say you did six years in the

13 reserves?

14     A.    Reserves.

15     Q.    Honorably discharged from military

16 duty?

17     A.    Yes, honorably discharged.

18     Q.    And then you would have been done with

19 the Reserves about '98?

20     A.    '98.

21     Q.    Work background, same thing, just kind

22 of highlight for us.

23     A.    I work security at the Hard Rock.

24     Q.    Currently?

25     A.    Currently.  And currently employed at

1    Chevron Refinery in Pascagoula.

2        Q.    How long have you been with the Hard

3    Rock?

4        A.    Six years.

5        Q.    And how long have you been with

6    Chevron?

7        A.    Right at eight months.

8        Q.    What do you do at Chevron?

9        A.    Painter blaster.

10        Q.    Painter blaster.

11        A.    Painter blaster.

12        Q.    Prior to your six years at the Hard

13    Rock -- well, let me ask you this:  During that

14    six years, currently you've got another job, a

15    second job, had you ever had another job during

16    these past six years at Hard Rock?

17        A.    Yes.  Yes.  I worked construction at

18    B&M Construction and Aladdin Construction.

19        Q.    Basically what it sounds like

20    construction work?

21        A.    Yeah.  Construction work.  Building

22    federal buildings, casinos, courthouses,

23    hospitals.

24        Q.    Prior to your six years at the Hard

25    Rock, where did you work?

1      A.    Well, I was there -- I was at IP

2   Casino.

3      Q.    The IP?

4      A.    Uh-huh.

5      Q.    And that's here in Biloxi?

6      A.    Uh-huh.

7      Q.    And before I get too far, the -- your

8   six years have all been here in Biloxi for the

9   Hard Rock?

10     A.    Biloxi, uh-huh.

11     Q.    How long did you work with the IP?

12     A.    Right at five years security.

13     Q.    Security.  That was my next question.

14   Do you remember your job title with them?

15     A.    Security officer.

16     Q.    Security officer.  Prior to the IP,

17   where did you work?

18     A.    I was doing construction then.

19     Q.    Construction.  Had you ever had any

20   other security positions prior to the IP?

21     A.    No.

22     Q.    And then what was your job title when

23   you came to work for the Hard Rock?

24     A.    Security.

25     Q.    Has your job title changed at all in

1    your six years?

2         A.    No.

3         Q.    And so you were employed by the Hard

4    Rock November 27, 2011, as security guard?

5         A.    Yes.

6         Q.    And you're paid by them as an employee?

7    You're not like an independent contractor?

8         A.    No.

9         Q.    You don't get a separate 1099.  You're

10   an employee.

11        A.    Right.

12        Q.    Training when you came to work for

13   either -- let's talk about the Hard Rock.  Were

14   you trained to provide security?  Were you trained

15   in your duties and if so, how?

16        A.    Well, we were told how to handle

17   security.  I had been security before, like I

18   said, at the IP, and I was known by the guys that

19   employed me at the Hard Rock.  They had asked me

20   to come over to them.  They knew me from the IP

21   Casino.  I had worked there six years -- five

22   years.  In security they know me as pleasant and

23   kind customer service and brought me over.

24        Q.    Wasn't any type of formal course or --

25        A.    No.

1    Q.    -- just sit down and go through formal

2    training?

3    A.    No.

4    Q.    It's just, you know, explain to you how

5    it's done?

6    A.    That's it.

7    Q.    Okay.  Great.  Prior to this particular

8    date, did you know Jason or Alyssa Jordan or this

9    guy Chris --

10    A.    No.

11    Q.    -- Soukup?

12    A.    No.

13    Q.    Have you ever been convicted of a crime

14    in the last ten years?

15    A.    No.

16    MR. STEWART:

17         Felony.

18    MR. BELLINDER:

19    Q.    Felony?

20    A.    No.

21    Q.    Okay.  Have you seen the video, the

22    surveillance footage of this incident subsequent

23    to it taking place?

24    A.    Yes.

25    Q.    When was the last time you saw it?

1          A.     This weekend.

2          Q.     This weekend.  When was the first time

3     you saw it; do you remember?

4          A.     Wow.  I can't remember the date.  It

5     was a while back.

6          Q.     Did you review any documents in getting

7     ready for your deposition today?

8          A.     No.

9          Q.     Aside from the lawyer for the casino,

10    have you talked to anybody about what happened?

11         A.     No.

12         Q.     Have you talked to John Brown or Amanda

13    or Mr. Strong or anybody?

14         A.     No.

15         Q.     Okay.  Do you specifically remember

16    independent -- strike that.  Do you have an

17    independent recollection of this night and these

18    events?  And what I mean by that is --

19         A.     Yes, I do.

20         Q.     In other words, you remember this stuff

21    aside from having to look at the video to refresh

22    you or look at something else, talk to somebody,

23    you actually remember what happened?

24         A.     Yes.

25         Q.     Tell us, if you would, what you

1   remember about --

2        A.    What I remember, the problem was

3   brought about because the talk of the police --

4   someone was filming on their phone.  But I

5   remember the guy -- I remember all the fights in

6   the casino, you know, and I remember this incident

7   for sure.

8        Q.    Okay.  Tell us what you remember about

9   it.

10       A.    I remember the fight.  The guy, holding

11  him down.  Because basically what he was saying to

12  me that he kept repeating over and over, If I had

13  my bayonet, I'd cut your blah, blah head off.

14  Over and over and over.  And I replied to him in a

15  joking manner, Well, why would you do that?

16  Trying to calm him down.  Why would you do that?

17  You know.  And he was saying it over and over and

18  over.  Trying to calm him down some and letting

19  him know he wasn't any type threat.  Calm him down

20  saying, You know, why would you do that?  Because

21  I was army, too, so -- I was military, too, so I,

22  you know.  So I kept saying, Okay.  Calm down.

23  Why would you want to do that?  He kept saying it

24  over and over and over.  So that kind of thing was

25  said.

Q.    Okay.  Anything else you remember about
that particular night?

A.    Just the fight you know.  Just a brawl.
Just the way it went down, you know.  All of a
sudden they all calm and then boom, explode, you
know.

Q.    Do you remember the particular people
involved in the incident?

A.    Just the guy and his wife, what he was
doing, you know.  Just a crowd of guys, you know.
Military guys.  I was military.  They were out
there having a good time.  I remember the guy
saying, coming to me saying, Hey, Man, my guy is
fighting with his wife.  I need to get him out.  I
say, Sure.  So I opened the door so he could go
out.

Then all of a sudden one guy goes to
the guy and says to him, Man, you don't hit a
woman.  We don't do that in the military.  We
don't do that.  And he punched that guy.  So then
I break them up and get that guy out.  I'm on the
ground holding his arm.  His wife comes up, and he
hits her like three times in the face.  He swings
around me to hit her in the face.

So I pull him out in the -- in the

1  casino, you know.  You will see we have a front

2  entrance.  I pull him up there.  I hold him down.

3  And he is bucking and that's when he said, If I

4  had my bayonet, I'd cut your blah, blah head off.

5  Blah.  Blah.  And I'm trying to calm him down and

6  then she comes over there to talk to him.  And you

7  watch, you see a quick struggle because he calls

8  her a blah, blah, blah.  You F'ing blah, blah,

9  blah.  Get her away.

10          Then some guys comes up and grabs her

11  and backs her up.  I don't know the guy that grabs

12  her -- I don't know if he was -- I don't know the

13  whole party.  He grabbed her and backed her up,

14  and I'm just holding him down until Biloxi PD

15  came.  That's when I let him go.

16      Q.    And so that's you that can be seen on

17  the video --

18      A.    Yes.

19      Q.    -- as far as having him, I call it,

20  pinned to the ground?  You've kinda got your

21  weight on him.

22      A.    Yes.

23      Q.    Do you remember about how big he was?

24      A.    Yeah, maybe about 155, 160.

25      Q.    Security at Biloxi, y'all aren't

1    trained to make arrests; is that right?

2         A.    No.  We don't arrest anybody.  We hold

3    them until Biloxi PD comes.

4         Q.    Had you ever seen -- I'm sorry.  I

5    didn't mean to cut you off.  Had you ever seen a

6    security guard or a manager or an employee of the

7    casino arrest somebody before?

8         A.    No, never arrest.  I've seen them

9    handcuff to detain them for -- if they're being

10   real -- they're fighting back a lot.  They have to

11   for safety.  But only they have handcuffs.  We

12   don't -- we're not cops, you know.  So I have seen

13   that.

14        Q.    And who is they?

15        A.    Jason Strong.  He is -- when I'm there,

16   he's -- well, there is two officers.  There is a

17   Willie.  I'm not sure what his last name is.  He

18   is there when I get there.  Then they change

19   shifts at 12:00.  So mainly when I'm in the club,

20   I see Jason.

21        Q.    Okay.  So Jason would be the one who

22   carries handcuffs?

23        A.    Right.

24        Q.    Do you know if he is a cop or not --

25        A.    No.

1       Q.     -- an officer?  He's just somebody with
2    the casino that has --
3       A.     He is the one that calls the police.
4    We can never call the police.  He -- the
5    supervisor has to be one to call the police.  Our
6    main objective is to get them calm and get them
7    out.  You know, we never try to ever hold nobody,
8    nothing like that.  And I always tell guys, you
9    know, Hey, come on.  You don't need this, you
10   know.  The police come.  You're gonna go to jail.
11   You'll spend the weekend in jail.  You've got to
12   see a judge.  Just calm down and go, you know.
13              And that's what I did in there.  I just
14   pointed to the -- you see me pointing to the door
15   to the guy.  I say, If you get him out of here,
16   fine.  And I opened the door, and that's when they
17   start arguing.  Usually our thing is to get them
18   out calmly.  We want them to come back.  So we
19   don't want nobody to get in trouble and get 86'd,
20   something like that, you know, so...
21      Q.     Now, were you asked to do any type of
22   report or give a statement or anything in writing
23   subsequent to this incident of this night?
24      A.     I'm trying to remember.  No, I don't
25   believe I -- no.

1      Q.    Would you have been asked any questions

2  just informally by somebody with the casino?

3  Somebody just come to you and say --

4  MR. STEWART:

5            Other than the attorney after the

6  lawsuit was filed.

7  MR. BELLINDER:

8            Yeah, not the attorney, of course.

9      Q.    Any questions I ask you, we're not

10  entitled to know what you and the attorney for the

11  casino talked about.

12     A.    No.

13     Q.    Anybody in the higher ups with the

14  casino come to you and say, --

15     A.    No.

16     Q.    -- John, what happened that night in

17  the casino?

18     A.    No, not at all.

19     Q.    Anybody from any other agency?  Anybody

20  from the police department, sheriff's department,

21  bureau of investigation, or anybody with the

22  military, anybody ever come to you and ask you

23  what did you see, what happened that night?

24     A.    Yes.  Biloxi PD.  One of them

25  investigators did call and ask what did I see, and

1    I told them same thing.  I guess they were caught

2    in this also.  Asked what I remembered were their

3    actions while I was there.  One of the

4    investigators called and asked if I was there.

5        Q.    Do you remember the investigator's name

6    by any chance?

7        A.    No.

8        Q.    Male or female?

9        A.    Male.

10        Q.    Do you remember about time frame wise

11    it was after this incident that that guy called

12    you?

13        A.    I would say a week or two.  It was

14    after, I guess, the film came up on You Tube or

15    whatever I guess.  I never saw the You Tube thing,

16    but I heard someone with their phone that did film

17    some of it.  But even when they filming, I wasn't

18    there.  I was still upstairs at the club, so I

19    don't know what went on out there.

20        Q.    The guys -- and there were multiple

21    guys that were involved in that -- in that You

22    Tube.  Did you say you have seen it or you haven't

23    seen it?

24        A.    I haven't seen the You Tube.

25        Q.    Okay.  Matthew Martin, you haven't

1    heard that name before?

2        A.    No.

3        Q.    Did they -- tell me about the

4    conversation you had with the investigator.  What

5    all --

6        A.    He asked me what had happened.  Did I

7    think the police officers were appropriate in how

8    they acted.  I just saw the guys as they came up

9    the stairs.  And I knew the guy and what he was

10   saying to me, he was saying as soon as the

11   guy -- the officer who tapped me on the shoulder

12   said, John, I got him.  They all know me.  They

13   said, John, I got him.  So I backed away because

14   they got him.

15             And the first thing the guy was saying,

16   I would kill you all.  If I had my bayonet, I'd

17   cut your blah, blah head off.  He -- I don't know

18   where that came from.  Just over and over he kept

19   saying that.  And they told him to calm down, and

20   he wouldn't.  And he starting kick, and they had

21   to take him downstairs.

22       Q.    After you were tapped on the shoulder

23   by the officer, did you have any other involvement

24   in the situation at all?

25       A.    No.  All I did was back up the crowd.

1    Moved the crowd to give them more room to get him

2    downstairs.

3        Q.    Did you talk -- and I may have asked

4    you this already.  After that tap and you back up

5    and the officers takes Jordan away, have you seen

6    or talked to Jason Jordan at any point after that?

7        A.    No.

8        Q.    Seen or talked to Alyssa Jordan at any

9    point after that?

10        A.    No.

11        Q.    Seen or talked to this guy Chris

12    Soukup?

13        A.    No.

14        Q.    At any point, did you come in contact

15    with that guy Chris?

16        A.    No.

17        Q.    Did Amanda communicate with you at all

18    during this time frame that we're talking about?

19    When this altercation starts, when you detain

20    Jordan, at any point does Amanda communicate with

21    you?

22        A.    No.  I remember she was talking to a

23    guy, I guess, by the wall.  I guess that's -- I

24    don't really know their names.  The one guy she

25    was talking to -- I had got down.  And she had

1    that guy talking to him.  And he was saying that

2    he was their leader.  Whoever this guy was.

3    Saying that he was in charge and he knows those

4    guys and blah, blah, blah, and that was it.

5        Q.    Okay.  But you didn't ever talk to --

6    the guy that she was talking to, did you ever have

7    any interaction with him whatsoever?

8        A.    No.

9    MR. STEWART:

10            Other than what he's already testified

11   to about pulling him out of the initial fight when

12   he said -- are you talking about -- you're

13   mischaracterizing the testimony.  He has already

14   previously testified that he pulled the initial

15   guy out of the fight.

16   MR. BELLINDER:

17       Q.    Do you remember exactly which guy it

18   was that you pulled out initially?

19       A.    One guy that was fighting had a black

20   shirt.  That was the guy that was saying, You

21   don't hit a woman.  You don't hit a woman.  You

22   don't hit a woman.  The guy in the white shirt was

23   there and then backed him off while I get the

24   Jordan guy.  And that was after he, the Jordan

25   guy, had hit John Brown in the eye and knocked off

1    his glasses.  They brought a wheelchair up to get

2    him out, and he turned around and hit John Brown

3    in the eye and knocked his glasses off.

4              So then I moved the guy in the white

5    shirt, made him back up.  And then I get the

6    Jordan, I guess, Jordan guy.  Then the guy in the

7    black shirt comes up saying, You don't hit a

8    woman.  We don't do that in the military.  He kept

9    saying that.  Supposedly Jordan got punched by

10   that guy in the face.  He said, You don't hit a

11   women.  He hit him in the face.  So he tried to

12   fight the Jordan guy, I guess.  Is Jordan the guy

13   that we got?  Is that Jordan?  I don't know who is

14   who.

15        Q.    They called him something else that

16   evening.  But from what we can reference on this,

17   the guy that --

18        A.    The guy I had pinned, is that Jordan?

19        Q.    That's Jordan.  The guy that the police

20   removed, that's Jordan.

21        A.    When he punched the guy, the guy

22   says --

23        Q.    You're talking about the guy with the

24   black shirt?

25        A.    Black shirt, yes, sir.  You don't hit a

1    woman.  We don't do that in the military.  You

2    don't hit a woman.  And as I pull him off --

3         Q.    That's the black shirt guy?

4         A.    Right.  And then that's when I had

5    Jordan down the first time.  And I had his arm.

6    I'm pushing this guy back.  Jordan's wife comes

7    up, and she's saying.  What are you doing?  And he

8    reach around my arm, and he hits her three times

9    in the face.  Then I pull him into the entrance

10    out there, and I hold him down.  And that's when

11    he is saying, If had a bayonet, I'd blah, blah,

12    blah your head.  I'm trying to -- you know, Why

13    would you do that?  Calm down.  And she comes and

14    talks to him again.  He calls her an F'ing B,

15    F'ing B, blah, blah.  And some guy reaches -- a

16    guy in a white shirt, actually, reaches up and

17    grabs -- but it's not that guy.  It's a different

18    guy.

19         Q.    Different white shirt?

20         A.    Different white shirt.  Puts his arm

21    around her and pulls her back.  That guy says,

22    Ma'am, you need to back up.  You need to back up.

23    And this guy grabs her -- I don't know -- like I

24    said, I don't know who's all in the party.  I

25    don't know if he knows her, but he grabs her and

1  pulls her back.  I'm holding him down.  And you

2  can see when she comes up, I'm holding him down.

3  And I'm trying to calm him, told him to Relax.

4  Relax, Man.  And when she is talking to him,

5  and he calls her the F'ing B, you will see me

6  do -- I'm like this.  That's when he is trying to

7  hit her again.  I'm not letting his arm go.  And

8  then the guy pulls her back.  And then soon after

9  that, that's when Biloxi police came up and the

10  guy taps me on the shoulder.  I let him grab him,

11  and I backed up.  That's it.

12      Q.    At any point, did you contact the guy

13  in the first white shirt?

14      A.    I pulled him out of the crowd, yes.

15  Pulled him out of the crowd.

16      Q.    You pulled him out of the crowd?

17      A.    After Jordan hit John Brown in the eye,

18  he tried to -- he was try -- they're friends, but

19  they were trying to fight the Jordan guy.  And

20  then so I get him back.  But it was just simple

21  back up.

22      Q.    Did you ever see him swing?

23      A.    He grabbed at him.  He grabbed at him

24  and just tried to grab him.  And then when I

25  grabbed him back, you know, everyone gets mad when

1  you grab them.  So I backed him up, and then I get

2  this Jordan guy down.  And he punches -- the guy

3  in the black shirt says, You don't hit a woman.

4  He hit him.  Then I put Jordan down.  Well, they

5  fall on the ground because they're fighting.  I

6  pull him off, and that's when, you know, he hits

7  his wife, and I pull him off.

8       Q.    Okay.  Have you ever had any police

9  training?

10      A.    I have trained police.  I have trained

11  army, special forces.  What it was, I was in

12  martial arts a long time, and so they -- I went to

13  Russia a lot and trained with the special

14  discipline forces, and I've trained guys in

15  hand-to-hand.

16      Q.    Any other training that you can think

17  of?

18      A.    No.

19      Q.    What's your -- what's your rank in

20  martial arts?  Do you have a belt?

21      A.    Grand master.

22      Q.    Do you remember hearing any of these

23  other folks -- you've described the conversations

24  pretty detailed.  Did you ever hear the first

25  white shirt guy say anything?

1      A.    No.

2      Q.    Did you ever hear -- aside from briefly

3 what you told us the second white shirt guy, do

4 you ever remember him saying anything?

5      A.    No.  The guy that grabbed the girl?

6      Q.    Right.

7      A.    No.  I wasn't sure who he was, you

8 know.  He just grabbed her.  I don't know who all

9 was in that party.  Whether he was a friend or

10 what.

11     Q.    Do you ever remember anybody -- did you

12 ever remember hearing someone tell the guy on the

13 ground the ground he was under arrest?

14     A.    No.  The officers did tell him to stop

15 fighting, stop fighting, stop fighting.  And he

16 kept yelling the bayonet thing to them.

17     Q.    You never told him that he was under

18 arrest when you were detaining him?

19     A.    No.  We can't arrest nobody, so we

20 never say that.

21     Q.    This all took place about 2:30 in the

22 morning?

23     A.    Uh-huh.

24     Q.    Yes?

25     A.    Yes, I'm sorry.

1    Q.    As far as any injuries that may or may

2  not have occurred or come about as a result of

3  this, you haven't been told by anybody -- of

4  course aside from the lawyer for the casino -- but

5  have you been told by anybody as far as injury

6  that Jason Jordan, Alyssa Jordan, or Chris Soukup

7  may have --

8    A.    Only from the lawyers.

9    Q.    Nobody else has told you?

10    A.    Nobody else.

11    Q.    Have you told us all of your -- all of

12  the training or instruction that the Hard Rock

13  folks gave you when you came to work and came to

14  be a part of the security team there at the Hard

15  Rock?

16    A.    Uh-huh.

17    Q.    That was a yes?

18    A.    Yes.

19    Q.    Did you ever hear somebody talk about

20  an ambulance or call an ambulance; do you

21  remember?

22    A.    No, if they did, that was done

23  downstairs.  I stayed in the club.  My post was

24  the club.  So when they get them down the stairs,

25  I don't know what happened down there.

```
 1    MR. BELLINDER:

 2            Okay.  I think that's it.  That's all I

 3    have got for you.

 4    MS. STEEL:

 5            I have got a few questions.

 6                    EXAMINATION

 7    BY MS. STEEL:

 8        Q.    You testified that someone punched that

 9    guy three times in the face?

10        A.    No.  Punched the wife.

11        Q.    He punched the wife.

12        A.    Yeah.  He hit the wife three times in

13    the face?

14        Q.    Was that Jason Jordan?

15        A.    Yes, ma'am.

16        Q.    Okay.  He hit the wife in the face?

17        A.    He hit the wife, yes, ma'am.

18        Q.    Did you see any punches thrown?

19        A.    Those I did.

20        Q.    Other than those?

21        A.    No.  Well, I'm sorry.  I saw him hit

22    John Brown.  He knocked John Brown's glasses -- he

23    hit John Brown in the eye.

24        Q.    Was that Jason Jordan?

25        A.    Jason Jordan, yes.
```

1      Q.    The altercation between Mr. Jordan and

2  his wife and the other people who were involved

3  took place inside the club?

4      A.    Yes, ma'am.  Inside the club, yes,

5  ma'am.

6      Q.    And you said that you pulled him to the

7  entrance and pinned him down?

8      A.    Yes, ma'am.

9      Q.    That -- where -- what are you

10 calling -- is that the foyer area?

11     A.    In the foyer area, yes, ma'am.  When

12 you come up the stairs, yes, ma'am.

13     Q.    All right.  And that is different

14 from -- that is apart from the club?

15     A.    Yes, ma'am.

16     Q.    You saw the Biloxi police arrive,

17 correct?

18     A.    Yes, ma'am.

19     Q.    And when the Biloxi police arrived and

20 came inside, was Jason Jordan on the floor in the

21 foyer?

22     A.    I had him on the floor in the foyer.

23     Q.    Okay.  When the police approached Jason

24 Jordan, was Jason Jordan moving around?

25     A.    Yes, ma'am.

1      Q.    Was he talking?

2      A.    Yes, ma'am.

3      Q.    Did you see the police attempt to

4    handcuff Jason Jordan?

5      A.    Well, they may have, but he was

6    fighting so much, you know.  I don't know.  I was

7    getting the crowd back.  So I don't know if they

8    tried to turn him over or whatever, but I know he

9    was fighting and he yelled out the whole bayonet

10   thing, so...

11     Q.    All right.  At any point after the

12   police arrived, when the police office arrived and

13   after, did you see Jason Jordan lose

14   consciousness?

15   MR. BELLINDER:

16            Object to the form.

17     A.    No, ma'am.

18   MS. STEEL:

19     Q.    At any time after the police came, did

20   you see Jason Jordan stop talking and stop moving

21   around?

22     A.    No, ma'am.  You know, he just yelling

23   that, you know, over and over and over what he

24   would do.  And I knew that was -- you know, I was

25   like, Man, that's going to get you in more

1    trouble.  Saying what he would -- he kept saying,

2    I'm going to kill everybody.  He kept saying that

3    over and over about if I had a bayonet, I'd cut

4    your head off and all that.  He said it to me.  He

5    said it to them, too, over and over and over.

6         Q.    When the police -- scratch that.  After

7    the police got Mr. Jordan handcuffed, did you stay

8    around in that area?

9         A.    I stayed in the club.  I stayed in the

10   club.

11        Q.    Did you see the police get Mr. Jordan

12   up off the floor?

13        A.    They picked him up and took him

14   downstairs.

15        Q.    Did the police give Mr. Jordan an

16   opportunity to stand up?

17   MR. BELLINDER:

18             Object to form.

19        A.    Yes.

20   MS. STEEL:

21        Q.    When -- just so it don't throw you off,

22   we -- as attorneys, we object to the form of the

23   question.  And it's not directed to you.  It's

24   more directed at the other attorney.

25        A.    Okay.

1     Q.    Okay.  So you did see the police give

2  Mr. Jordan an opportunity to stand up?

3     A.    Uh-huh.

4  MR. BELLINDER:

5          Object to form.

6  MS. STEEL:

7     Q.    Did you say yes?

8     A.    Yes, ma'am.

9     Q.    Could you give me an estimation of how

10  many people were in the club when the altercation

11  occurred?

12     A.    It's hard to say, ma'am.  It was a

13  crowd, but I don't know.

14     Q.    Would you say a hundred or more?

15     A.    Yes.

16     Q.    And was the club shut down?

17     A.    No, ma'am.  The club closes at 3:00.

18  It was around 2:30 when this happened.

19     Q.    Okay.  So the club wasn't shut down?

20     A.    Right.

21  MR. STEWART:

22          Do you mean after this or are you

23  talking about at the time of this?

24  MS. STEEL:

25     Q.    At the time of this or immediately

1  after --

2      A.    Oh, immediately after --

3      Q.    -- the time of the confrontation?

4      A.    -- immediately after, it was shut down.

5      Q.    Okay.  So after -- was it before the

6  police arrived or after?

7      A.    No.  When -- when I got them out, they

8  started yelling last call and closing up then.

9  They was closing and some people were going in

10 closing tabs or whatever, but they was closing

11 down.

12     Q.    So that's what was going on when the

13 police arrived?

14     A.    Yes, ma'am.

15     Q.    Patrons were leaving?

16     A.    Right.

17     Q.    Did you see the Biloxi police strike

18 Mr. Jordan?

19     A.    No, ma'am.

20     Q.    Did you see the taser being used?

21     A.    I did not.  I did not see that, no,

22 ma'am.  I know someone said that, but I didn't see

23 that.  I was getting the crowd back.

24 MS. STEEL:

25          That's all I have.

1   MR. CLARK:

2           I don't have anything.

3                   EXAMINATION

4   BY MR. BELLINDER:

5       Q.    Real quick just to follow up with you.

6   We mentioned -- she asked you about the punches

7   that were thrown.  You say you saw essentially

8   four punches that Jordan punched his wife three

9   times and punched Mr. Brown once?

10      A.    Yes.

11      Q.    You say you've seen the video.  And so

12  the time frame when this would have allegedly

13  occurred is at a time where Jordan cannot be seen

14  on the video; is that right?

15      A.    No.  You can see him punch his wife.

16      Q.    Okay.  You say you can see him?

17      A.    You can see him and his wife, yes.

18      Q.    Do you remember specifically where it

19  is on the video where you see him?

20      A.    He was on the floor, and I was

21  breaking -- fighting the guy with the black shirt,

22  and you see him hit his wife three times.

23      Q.    Is this the video you think you saw it

24  on the one with the four?

25      A.    Yes.

1      Q.    I'm trying to skip ahead to save some

2   time.  This is 2:34.  If you will, just let us

3   know when you see it.  Make that a little bigger.

4   MR. CLARK:

5              What's the time right now?  Where are

6   we at?

7   MR. BELLINDER:

8              This is 2:34:36 seconds.

9   MR. CLARK:

10             All right.

11  MR. BELLINDER:

12     Q.    This is Mr. Brown, is it not, that you

13  just walked out the door on the top, right?

14     A.    Yeah.  That was -- it's when I had him

15  on the floor right at the beginning of the club.

16  Yeah.  That's where he hit her, and her friend was

17  consoling her, taking her out.

18     Q.    So we need to go back some.

19     A.    No, no, no.  It's way after that.

20  You'll see the girl --

21     Q.    Okay.  You're saying he hit --

22     A.    You'll see the friend grabs her.

23  Supposedly the guy was saying he had punched her,

24  and that's why they were fighting because he said,

25  You don't hit a woman.  You don't hit a woman.

1    Q.    But you didn't see that in --

2    A.    No.  I was outside.

3    Q.    We don't have that on this?

4    A.    That's what the guy was telling me.

5    And she was holding her face, and her friend was

6    taking her out.  Then one of them -- the guy comes

7    to me and says, Hey, Man, my friend, him and his

8    wife is fighting.  I want to get them out.  I

9    said, Okay, sure.  Go ahead and get them out.  And

10   then --

11   Q.    Do you see yourself on here anywhere?

12   A.    No, not yet.

13   MR. STEWART:

14         Just for the record, there is four

15   quads going at the same time.

16   MR. BELLINDER:

17   Q.    We are mainly looking at the bottom

18   left.

19   A.    The front door was there.

20   Q.    Spins and then comes back to the --

21   A.    It would be down here.

22   Q.    Tell us who is -- who is what?

23   A.    I'll tell.  Amanda.

24   Q.    That's Amanda right there.  We're

25   looking at 2:36:27 seconds.

1       A.      Uh-huh.

2       Q.      Amanda talking to -- I think we have

3    referred to him as the first white shirt guy?

4       A.      Right.

5       Q.      And then up here in the top right, now

6    we've got another little scuffle going on?

7       A.      Okay.  Yes.

8       Q.      Let's maybe back that up a little bit

9    and look.

10      A.      I got -- watch and you will see.  Okay.

11   That's when he is fighting the guy and saying, You

12   don't hit a woman.  You don't hit a woman.  That's

13   me right there.  And this is the other guy.  You

14   see me hold his arms.  His wife comes up, and you

15   watch he swings one, two, and hit her the third

16   time and knocked her back.

17      Q.      This is the point you're talking about

18   that --

19      A.      That's when I take him out.  And he

20   swings around me to hit her.  When I had his

21   hand, he swings around my arm to hit her three

22   times.

23   MR. BELLINDER:

24          Okay.  I think that's all I have got.

25   MR. STEWART:

1            Anybody else?  We're done.

2            (Deposition concluded at 1:41 p.m.)

```
 1            CERTIFICATE OF COURT REPORTER

 2            I, Janna White, CSR #1312, do hereby

 3    certify that the foregoing pages contain a true

 4    and correct transcript of the testimony of the

 5    witness as taken by me at the time and place

 6    heretofore stated and later reduced to typewritten

 7    form by computer-aided transcription under the

 8    authority vested in me by the State of Mississippi

 9    to testify to the truth and nothing but the truth

10    in this cause and was thereupon carefully examined

11    upon this oath.

12            I further certify that I am neither

13    attorney or counsel for nor related to or employed

14    by any of the parties to the action in which this

15    deposition is taken and further that I am not a

16    relative or employee of any attorney or counsel

17    employed by the parties hereto or financially

18    interested in the action.

19            Witness my signature, this the _____ day

20    of_____, 2014.

21

22

23                    _____

                      Janna White, CSR #1312

24

25
```