# In The Matter Of:

## *Jason Jordan, et al.*
## *vs.*
## *Premier Entertainment Biloxi, et al.*

_____

## *Amanda Flannigan*

## *April 2, 2014*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

```
           UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF MISSISSIPPI
                 SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL DEATH
BENEFICIARIES OF UNBORN BABY JORDAN,
DECEASED; AND CHRISTOPHER SOUKUP      PLAINTIFFS


VS.            CIVIL ACTION NO. 1:13cv195 LG-JMR


PREMIER ENTERTAINMENT BILOXI, LLC d/b/a
HARD ROCK HOTEL & CASINO BILOXI; THE
CITY OF BILOXI, MISSISSIPPI; DOE
DEFENDANT ONE; JOSHUA HAMILTON, IN HIS
OFFICIAL AND INDIVIDUAL CAPACITIES;
DOE DEFENDANT THREE; DOE DEFENDANT
FOUR; DOE DEFENDANT FIVE AND DOE
DEFENDANTS 6-10                       DEFENDANTS


        DEPOSITION OF AMANDA FLANNIGAN
    Taken at the offices of Page, Mannino,
    Peresich & McDermott, 759 Howard Avenue,
    Biloxi, Mississippi, on Wednesday, April
    2, 2014, beginning at approximately
    10:49 a.m.


REPORTED BY:


    JANNA WHITE, CSR #1312
    Merrill Legal Solutions
    Post Office Box 14113 (39236)
    4400 Old Canton Road, Suite 160
    Jackson, Mississippi 39211
    Telephone:  (601) 366-9676
    Fax:  (601) 366-9756


    1(800)372-DEPO
```

```
1   APPEARANCES:
2
        THOMAS J. BELLINDER, ESQUIRE
3       Martin & Bellinder
        351 Edgewood Terrace Drive
4       Jackson, Mississippi 39206
        Telephone:  (769) 257-6052
5       Fax:  (769) 257-6596
        Email:  Thomas.Bellinder@gmail.com
6            ATTORNEY FOR THE PLAINTIFFS
7
        DAVID W. STEWART, ESQUIRE
8       Copeland, Cook, Taylor & Bush, P.A.
        2781 C.T. Switzer, Sr. Drive
9       Biloxi, Mississippi 39531
        Telephone:  (228) 863-6101
10      Fax:  (228) 868-9077
        Email:  Dstewart@cctb.com
11           ATTORNEY FOR PREMIER ENTERTAINMENT
             BILOXI, LLC, d/b/a HARD ROCK HOTEL
12           & CASINO BILOXI
13
        AUSTIN CLARK, ESQUIRE
14      Russell S. Gill, PLLC
        638 Howard Avenue
15      Biloxi, Mississippi 39530
        Telephone:  (228) 432-0007
16      Fax:  (228) 432-0025
        Email:  Rsgill@datasync.com
17           ATTORNEY FOR THE JOSHUA HAMILTON
18
        TERE R. STEEL, ESQUIRE
19      Page, Mannino, Peresich & McDermott
        759 Howard Avenue
20      Vieux Marche Mall
        Biloxi, Mississippi 39533
21      Telephone:  (228) 374-2100
        Fax:  (228) 432-5539
22      Email:  Tere.steel@pmp.org
23
24
25
```

1                  T-A-B-L-E O-F C-O-N-T-E-N-T-S

2

Examination by:                              Page

3

   Mr. Bellinder                             5

4

   Ms. Steel                                53

5

   Mr. Clark                                60

6

   Mr. Bellinder                            61

7

Stipulation                                  4

8

Certificate of Reporter                     67

9

Witness Signature Sheet                     68

10

11                        EXHIBITS

12    (Exhibits 1 and 2 were marked in Jason Strong's

13              deposition and are not attached.)

14

Exhibit 3 - Hard Rock Casino Statement Form    41

15

16

17

18

19

20

21

22

23

24

25

1                        STIPULATION

2          It is hereby stipulated and agreed by and

3    between the parties hereto, through their

4    respective attorneys of record, that this

5    deposition may be taken at the time and place

6    hereinbefore set forth, by Janna White, C.S.R.,

7    Court Reporter and Notary Public, pursuant to the

8    Federal Rules of Civil Procedure, as amended;

9          That the formality of READING AND SIGNING

10   is specifically NOT WAIVED;

11         That all objections, except as to the form

12   of the questions and the responsiveness of the

13   answers, are reserved until such time as this

14   deposition, or any part thereof, may be used or is

15   sought to be used in evidence.

16

17                        ---

18

19

20

21

22

23

24

25

1                   AMANDA FLANNIGAN,

2          having been duly sworn, was examined and

3          testified as follows:

4                      EXAMINATION

5     BY MR. BELLINDER:

6          Q.    Good morning.

7          A.    Good morning.

8          Q.    We met just a moment ago.  My name is

9     Thomas Bellinder.  I represent Mr. and Mrs Jordan

10    and Mr. -- I call him Chris.  Soukup?  I mess his

11    name up.

12         A.    Soukup.

13         Q.    Soukup, as it relates to some incidents

14    that took place at the Hard Rock back in

15    November of 2011.

16               Again, for the record, the deposition

17    is being taken per the Rules of Civil Procedure.

18    I'm going to be asking you a series of questions

19    about your involvement and what you remember about

20    that particular incident.

21               Have you ever given a deposition like

22    this before?

23         A.    No.

24         Q.    I don't like talking rules because that

25    seems a little too binding.  These are more so

1  guidelines about what this is and what we are

2  doing today.  This is a deposition.  We are doing

3  this, it's sworn under oath, the same way as if we

4  were in front of a judge, but very -- a less

5  formal process.  We're all here to sort of gather

6  some facts about what took place that day.  You

7  are under oath and sworn to tell the truth.  The

8  same way as if we were in court.  But the process

9  will be a little less formal.

10         If you would, just please answer the

11  questions to the best of your knowledge.  Don't

12  ever feel compelled to give a yes or no answer.

13  If you don't know the answer to a particular

14  question, I don't know is a perfectly fine answer.

15  If you would -- and I have a bad problem with this

16  and a lot of people do.  We may get into sort of a

17  casual conversation, and so we have a tendency to

18  nod our head yes or no.  We may say uh-huh or

19  huh-uh, where you and I understand exactly what we

20  are saying.  She's got to take down a record, so

21  that way in the event we need to look back on it,

22  we need to see exactly what it is.  So if you will

23  answer audibly, I'll try to do the same.

24         Also, we have a bad problem with this.

25  Sometimes you'll know what I'm about to ask you,

1    and you'll go ahead and start answering or I'll

2    preempt your answer with another question, which

3    is a very bad practice.  She's also got to

4    separate our questions and answers.  So if you

5    will give me a chance to finish my question, I'll

6    do everything I can to give you a chance to finish

7    your answer.

8         A.    Sure.  No problem.

9         Q.    Then, also, to speed things up a little

10   bit, anytime I ask you any questions about a

11   conversation you had, something you saw, a person

12   you talked to, anything, it will always call for

13   your personal knowledge of that particular subject

14   matter area.  You can't be compelled to give

15   testimony about something you don't have personal

16   knowledge of.

17        A.    Okay.

18        Q.    Sound good?

19        A.    Uh-huh.

20        Q.    Okay.  If you would, state your full

21   name for us.

22        A.    Amanda Flannigan.

23        Q.    Ms. Flannigan, where do you currently

24   reside?

25        A.    Ocean Springs, Mississippi.

1    Q.    How long have you lived there in Ocean

2  Springs?

3    A.    A year.

4    Q.    Before -- if you don't mind, what's

5  your address?

6    A.    292 McCool Street, Ocean Springs,

7  Mississippi.

8    Q.    Before Ocean Springs, or before that

9  address, where did you reside?

10    A.    In D'Iberville.

11    Q.    How long did you live in D'Iberville?

12    A.    Six years.

13    Q.    The same address in D'Iberville -- or

14  did you live at one address in D'Iberville?

15    A.    Yes, only one address.

16    Q.    Prior to D'Iberville, where did you

17  reside?

18    A.    In North Carolina.

19    Q.    How long did you live there?

20    A.    Seventeen years.

21    Q.    Are you currently married?

22    A.    Yes.

23    Q.    Who is your current spouse?

24    A.    Michael Flannigan.  We are separated

25  though, so.

1        Q.    Had you ever been married prior to

2    Michael?

3        A.    No.

4        Q.    Do you have any children?

5        A.    One.

6        Q.    Let me ask you this:  Is your child

7    over the age of 18?

8        A.    No.

9        Q.    And a lot of what we do -- and I like

10   to preface this, too, because if it sounds funny,

11   two things, of course, to get to know some of

12   these background questions.  But then, also, in

13   the event that we would ever have to pick a jury

14   on the case like this, we've got to make sure that

15   nobody within a close relation to us or that has

16   some type of special relationship is related to

17   any of the lawyers, the parties or the witnesses.

18   Depending on what day it is, I may want my wife on

19   the jury, I mean, it just kind of depends on what

20   took place that morning.  But that's sort of why

21   we do all this.

22            Let me ask you like this:  Do you have

23   any close relatives, mom and dad, cousins, aunts,

24   uncles, anyone who resides in the South

25   Mississippi area?

1    A.    I have a father.

2    Q.    What's your dad's name?

3    A.    Joseph McCaleb.

4    Q.    M-C?

5    A.    M-C-C-A-L-E-B.

6    Q.    Anybody else that's a close relation to

7    you that resides in South Mississippi?

8    A.    No.

9    Q.    What is your date of birth?

10    A.    2/7/75.

11    Q.    Tell me just briefly your educational

12    background.  You can hit the highlights.  You

13    don't have to tell me --

14    A.    Graduated high school.

15    Q.    Where did you graduate from?

16    A.    Winder Park High School in Florida.

17    Q.    Did you go to college?

18    A.    No.

19    Q.    Military background?

20    A.    No.  My father was in the Marine Corps,

21    so I grew up on military bases.

22    Q.    After high school, did you have any

23    post-graduate education?

24    A.    No.

25    Q.    Any coursework, tech schools, anything

1    like that?

2         A.    I was a restaurant manager for Burger

3    King, so I did restaurant training.

4         Q.    Same way as we did with your education,

5    if you will hit the highlights of your work

6    background.

7         A.    Fifteen years at Burger King.

8         Q.    Is that in Florida?

9         A.    No.  In North Carolina.  And two years

10   at the IP Casino in the hotel.

11        Q.    Is that the IP here in Biloxi?

12        A.    Yes, Mississippi, yeah.  And the Hard

13   Rock.

14        Q.    How long have you been at the Hard

15   Rock?

16        A.    Since 2010 maybe.

17        Q.    The two years you did at IP, that was

18   directly before the Hard Rock?

19        A.    Yes.

20        Q.    What was your job title at the IP?

21        A.    Front desk manager.

22        Q.    That was your position the whole time?

23        A.    Uh-huh.

24   MR. STEWART:

25             Answer yes.

1          A.     Yes, I'm sorry.  I was a front desk

2     clerk before I became a manager, though.

3          Q.     So you were front desk clerk and then

4     became manager?

5          A.     Yes.

6          Q.     How long were you manager at IP?

7          A.     Probably a year and a half.  I think I

8     was only a clerk for maybe six months.

9          Q.     When you came to the Hard Rock in 2010,

10    what was your position at that point?

11         A.     Security officer.

12         Q.     Were you a security officer this day,

13    November 27, 2011?

14         A.     Yes.

15         Q.     Are you still in that same position?

16         A.     No.

17         Q.     What is your position now?

18         A.     A beverage supervisor.

19         Q.     Tell me what was your, we call them,

20    duties, but just your day-to-day responsibilities

21    as security officer when you started in 2010 up

22    through the time of this incident.  What would

23    your day-to-day responsibilities be?

24         A.     Just depending on what position I was

25    in.  Sometimes if I was the officer that was

1    scheduled to be outside in the parking garage, I'd

2    patrol the garage.  If I was scheduled on the

3    casino floor, I would do fills, tend to guests,

4    if, you know, there was a call about a stolen

5    ticket or something.  If I was scheduled to work

6    the door, I would check I.D.'s at the door.  It's

7    just depending on what position I was put at,

8    pretty much everything, dispatch.

9         Q.    Depending on what particular position

10   within the security realm that you would have been

11   doing that day, that's what depended or your

12   duties?

13        A.    Exactly.

14        Q.    How would you receive you duties for

15   that day?  Were you trained on them initially, or

16   do you each day -- say, okay, today you're going

17   to be working the door and so today I need you to

18   do X, Y and Z?

19        A.    You're trained on them initially, and

20   then if you know what you're doing, then you're

21   moved to other positions.

22        Q.    They train you on the whole gamut as

23   far as each position goes when you first come in?

24        A.    Yes.

25        Q.    And then, from that point on -- from

1    that point on, do you have any follow-up or

2    continuing training, continuing education type of

3    deal to help you in what you do as a security

4    officer?

5         A.    I'm not understanding something.

6         Q.    Do they have you submit to periodic

7    follow-up training or, you know, classes,

8    coursework, anything like that?

9         A.    Well, it depends.  There is follow-up

10   CARE training.  There is follow-up first aid

11   training.  There is report writing classes.  It's

12   just depending on what training you're

13   specifically talking about.

14        Q.    Anything related to specifically to

15   providing security for the hotel?

16        A.    Well, that would be what the training

17   is initially, I would assume.

18        Q.    Follow-up care, that's involving

19   guests, how to deal with guests?

20   MR. STEWART:

21             CARE is C-A-R-E.  It's an acronym.

22   MR. BELLINDER:

23        Q.    Tell me what the acronym stands for.

24        A.    I couldn't tell you.  I'd have look at

25   my card.  I don't even know if I have that card

1    with me.  I really don't know to be honest.

2          Q.    Just generally.  We're not going to --

3          A.    It's basically how to look for any kind

4    of things out of the ordinary, guest behavior,

5    signs of anything.

6    MR. STEWART:

7                I know the acronym if you want it.

8    MR. BELLINDER:

9                Go ahead.

10   MR. STEWART:

11               Controlling Alcohol Risks Effectively.

12   MR. BELLINDER:

13         Q.    How often is that CARE course given; do

14   you know?

15         A.    I think we are good for two years

16   maybe, I think they only have to be renewed every

17   two years, but I'm not quite sure on that.

18         Q.    Is that like a certificate or a --

19         A.    You get a certificate.  You also get a

20   card that you carry with you.

21         Q.    About every two years?

22         A.    I'm not quite sure, but I'm thinking

23   that.

24         Q.    Had you been through the CARE program

25   prior to this particular incident?

1        A.    I'm not sure.

2        Q.    Okay.  Report writing, that was a

3   formal course that they took you through?

4        A.    Later on.  I don't think before this

5   incident because -- yeah, I don't think -- I was

6   just a guard then, a security officer.

7        Q.    You wouldn't have went through the

8   report writing course before this, you said?

9        A.    No.

10        Q.    Any other training or subsequent things

11   that you would have went through to aid in your

12   duties as a security officer?

13        A.    No.

14        Q.    Do you remember about how long your

15   training was initially?

16        A.    I don't remember.

17        Q.    Prior to this, did you know Chris in

18   any way?

19        A.    Chris?

20        Q.    Chris --

21        A.    No.

22        Q.    -- Soukup?

23        A.    No.

24        Q.    Did you know Jason Jordan prior to

25   this?

1      A.    No.

2      Q.    Did you know Alyssa Jordan prior to

3  this?

4      A.    No.

5      Q.    Never met any of them?

6      A.    No.

7      Q.    Did you know Matthew Martin prior to

8  this?

9      A.    No.

10      Q.    At the time when this took place, you

11  were an employee of Premier Entertainment Biloxi,

12  LLC, I think is the corporate name?

13      A.    Yes.

14      Q.    You're not an independent contractor,

15  or you don't receive like a 1099 as a separate

16  wage?

17      A.    No.

18      Q.    You're an actual employee in the

19  meaning of the word?

20      A.    Yes.

21      Q.    On the day when this -- November 27,

22  2011, you were and today you are an employee?

23      A.    Yes.

24      Q.    Have you been convicted of any crime in

25  the last ten years?

1          A.    No.

2          Q.    You were present on this evening.  You

3    were on duty; is that right?

4          A.    Yes.

5          Q.    Were you on the swing shift or the

6    grave shift, I think you call it?

7          A.    I was a little bit of both.  I would

8    come in sometimes at 4:00 in the evening and work

9    until the club closed, being it may be 3:00, it

10   may be 4:00.  Because I would also do the concerts

11   and then the nightclubs.

12         Q.    The club that's involved in this is

13   called The Ledge?

14         A.    Was.

15         Q.    Was called The Ledge.  It's got some

16   other name now.

17         A.    Yes.

18         Q.    Do you remember on this particular

19   night, do you remember what the hours of the

20   nightclub were, when it opened and when it closed?

21         A.    Probably would have opened it after a

22   concert being that it was on a Friday or a

23   Saturday, correct --

24         Q.    Yes.

25         A.    -- the night in question?  Normally we

1  have concerts, so I would think probably 9:30,

2  10:00, whenever the concert was over.

3      Q.    And it would have closed at what time?

4      A.    I'm not quite sure.  Sometimes 3:00,

5  sometimes 2:00.

6      Q.    It didn't having a set closing time; it

7  would have been dependent on --

8      A.    No, based on the demand of business.

9      Q.    Right.  Traffic.

10     A.    Pretty much, yeah.

11     Q.    So do you remember exactly what time

12 you got to work that day or night, on the day

13 before I guess?

14     A.    No.  It could have been anywhere

15 between 4:00 p.m. and 8:00 p.m.

16     Q.    And you've seen the surveillance videos

17 of this particular incident?

18     A.    Yes.

19     Q.    When was the last time you saw them?

20     A.    Yesterday.

21     Q.    In preparing for your deposition, did

22 you review any documents?

23     A.    My statement.

24     Q.    Other than your statement, did you

25 review any other documents?

1        A.    No.

2        Q.    Did you talk to anybody?  And I'll

3    preface it by saying we're not entitled to know

4    what you talked to the lawyer for the casino

5    about.  Did you talk to anybody else who was there

6    that night, any other family members, anybody else

7    that you confide in, did you talk to anybody about

8    the incident?

9        A.    No.

10        Q.    Do you have what we call an independent

11    recollection of the incidents that night?  What I

12    mean by that is, aside from looking at the video,

13    aside from looking at your statement, do you

14    specifically remember things about that night?

15        A.    Vaguely.

16        Q.    Tell me what you specifically remember

17    about it.  And then we'll talk about some other

18    specifics.

19        A.    I remember working that night, and I

20    remember the night club.  And I can remember the

21    altercation a little bit.  That's about it.

22        Q.    Tell me what you remember seeing as it

23    relates to the altercation.

24        A.    I just remember seeing Soukup hitting

25    Jordan.  I pulled Soukup.  And that's about it.  I

1    put Soukup -- you know, talked him over.  And

2    that's it.  And I remember the wife yelling.

3    That's probably about all.

4         Q.    Do you remember or have you seen on the

5    video, does it reflect anywhere someone putting

6    their hands around Soukup's throat?

7         A.    I'm not understanding.

8         Q.    Do you recall him being up against the

9    wall and one or more of the security guards having

10   their hands around his throat?

11        A.    No, not at all.

12        Q.    At what point during the altercation

13   did you actually arrive on scene?  Did you see the

14   altercation begin?

15        A.    Well, from what I saw that was, I

16   thought was the beginning, I assume was the

17   beginning, was when Soukup was hitting Jordan, I

18   think is his name.

19        Q.    The guy that was --

20        A.    The male.

21        Q.    -- drug out by the police, the one that

22   was on the floor?

23        A.    Yes.

24        Q.    That's Jordan.  And so --

25   MS. STEEL:

1          Object to the form.

2     MR. BELLINDER:

3          Q.    Go ahead.

4               Okay.  So when you arrived, tell us

5     where you arrived from.  What were you doing just

6     before this incident took place; do you remember?

7          A.    There is no telling.

8          Q.    So you arrive on scene, and you see --

9     you say you saw Chris hitting Jason, Soukup

10    hitting Jordan.  Were they on the floor; were they

11    standing?

12         A.    They were on the -- Soukup had him on

13    the floor.  He was on the floor.  Soukup was

14    hitting him.  I pulled them apart.

15         Q.    Is this reflected on the surveillance

16    footage?  Have you seen that part of it actually

17    on the video?

18         A.    No.

19         Q.    What happened immediately after you

20    arrived?  What actions did you take?

21         A.    I came in for a wheelchair because I

22    was going to get someone out of the club that was

23    intoxicated initially.  And then, when I got in

24    there, bringing the wheelchair in, that's when

25    Soukup was hitting Jordan.  And I pulled Soukup

1    off and then went to talk to him over at the wall

2    to find out exactly what was going on.

3         Q.    So you physically removed Soukup from

4    Jordan?  See what I mean by that?

5         A.    I physically removed --

6         Q.    Pulled him off.  You physically grabbed

7    him and separated them.

8         A.    Yes, I separated them.  I separated

9    them.

10         Q.    The wheelchair you brought, you say you

11    brought it in for an intoxicated patron?

12         A.    Yes, probably.

13         Q.    Was that one of these individuals, or

14    was that somebody else?

15         A.    It could have been someone else.

16         Q.    Okay.

17         A.    Yeah.

18         Q.    It's not necessarily that the

19    wheelchair was brought for Jordan or brought for

20    Soukup?

21         A.    No.  It could have been brought for

22    anyone because -- yeah.

23         Q.    You just had it.

24         A.    I would have got called.  The only time

25    I bring wheelchairs is if I get called if there is

1   a guest that's either throwing up, could be sick.

2   So I came in with a wheelchair when I --

3       Q.   We don't know for certain if it was

4   brought for Jordan or anybody else?

5       A.   I don't remember.

6       Q.   Okay.  Then you pull Jordan.  You

7   separate them.  And then what happens next?

8       A.   I talk to him.  Tell him -- you know, I

9   was trying to find out what's going on.  That's

10  all I remember, is talking to him, just trying to

11  find out exactly what's going on.

12      Q.   Was he being violent at that point?

13  MS. STEEL:

14           Object to form.  Who are we talking

15  about?

16  MR. BELLINDER:

17      Q.   Talking about Chris.  We're talking

18  about Soukup, the one that you restrained.  You

19  just said you had -- you were talking to Chris,

20  right?

21      A.   Uh-huh.

22      Q.   Was he being violent?  Was he being --

23  what was his demeanor at that point?

24      A.   I -- well, it just really depends on

25  how you mean "violent."

 1       Q.    Was he being aggressive towards you?

 2       A.    He was very upset and irritated and

 3   yelling.  And I'm trying to calm him down.  She

 4   was also yelling.  They were very -- he was very

 5   pumped up, and I just kept saying, what is going

 6   on, you need to calm down, tell me exactly what's

 7   going on.

 8       Q.    She, you meant Alyssa?

 9       A.    The wife, his wife, yes.

10       Q.    Chris's wife?

11       A.    Soukup's wife, yes.

12       Q.    She's also there.

13       A.    Yes.

14       Q.    So, at this point, is he putting

15   anybody else in danger?

16       A.    He's threatening.

17       Q.    What is he threatening?

18       A.    I distinctly remember him using the

19   phrase, This is how we handle stuff in the

20   military.

21       Q.    So you took that to mean putting

22   someone else in danger or --

23       A.    Because I asked him, What is going on,

24   why are you hitting this guy.  He said, This is

25   how we handle stuff in the military.  And I said,

1    This is not how we handle stuff at the Hard Rock.

2         Q.    So what do you do at that point during

3    this --

4         A.    I'm still keeping him separate.  I'm

5    just talking to him.  I don't know how much time

6    went by.

7         Q.    Where is Jordan at this point?

8         A.    I have no idea, to be honest with you.

9         Q.    Did you see Jordan -- after you

10   separate them, you've got Chris on the other side,

11   do you see Jordan at any point?

12        A.    I don't recall.

13        Q.    At some point you called -- or you got

14   on the radio?

15        A.    Yeah, I had a mic on.

16        Q.    Do you remember, what did you say when

17   you got on the radio?

18        A.    I don't know.

19        Q.    Fight involved or --

20        A.    I don't know.  I probably would have

21   said 416, a fight.  That's probably what I would

22   have said on the radio.  That's normally what I

23   would do per protocol.

24        Q.    Then, at some point, did somebody else

25   come to help you?

1      A.     Yes.

2      Q.     Who came to help you?

3      A.     Other guards.  Jason, my security

4   manager.

5      Q.     That would be Jason Strong?

6      A.     Uh-huh.

7   MR. STEWART:

8          Yes?

9      A.     Yes.  I'm sorry.

10  MR. BELLINDER:

11     Q.     Do you remember the other security

12  guards that came, also?

13     A.     Like from memory, I wouldn't remember.

14  But from seeing the video, some of the video

15  yesterday, it was Cleo, John Brown, and then Beau

16  Hooks, I think.  John Dixson, he was also there

17  during that particular time.

18  MR. STEWART:

19          So I don't forget, there was a guy we

20  identified as Prentiss, somebody.  We don't

21  think -- looking at that, that was based on just

22  looking at the video.  Showing it to her, she

23  doesn't remember.  That probably is not the same

24  person.

25  THE WITNESS:

1           No.

2    MR. BELLINDER:

3           I may just show her briefly --

4    MR. STEWART:

5           Do you understand what I'm saying?

6    MR. BELLINDER:

7           Yes.

8    MR. STEWART:

9           She said that guy, that's why he is

10   listed.  But looking at it again, that's probably

11   not who --

12   MR. BELLINDER:

13          It may not be the same guy.  No

14   problem.

15      Q.   Okay.  What do you remember happening

16   after that?

17      A.   I don't really remember.

18      Q.   Let me just help you and to speed

19   things up a little bit, I'll show you a little

20   piece of this.  And now, for the record, what we

21   are referencing is going to be, it's called

22   monitor one or each of the files is numbered one

23   through ten.  So this will be one.

24   MS. STEEL:

25          Are you going to show her?

1    MR. BELLINDER:

2            Yeah, we are going to show her.

3        Q.    We are going to start it about 1:20.

4    Can you see that?

5        A.    Yeah.

6        Q.    That's as big as I can make it.

7    MR. STEWART:

8            Is that the extended view?

9    MR. BELLINDER:

10            That's full screen.

11    MR. STEWART:

12            Go to the right, right click on it, put

13    your cursor on it and right click.  Hit that.

14    MR. BELLINDER:

15            Will I still be able to skip?

16    MR. STEWART:

17            Yes, it pops up.

18    MR. BELLINDER:

19        Q.    So we start about 1:20.  11/27.  The

20    clock says 2:36.  Appears to be a scuffle going on

21    there.  And then, if we back it up just a bit --

22            Right here, is this you with the pony

23    tail?

24        A.    That's me.

25    MS. STEEL:

1          We've got glare over here.

2    THE WITNESS:

3          There we go.  That's me with the bun,

4    yes.

5    MR. BELLINDER:

6         Q.    With the bun is you.  This appears to

7    be Chris Soukup.

8         A.    Soukup.

9         Q.    Is that his wife behind him?

10        A.    Yes, I would assume, yes.

11        Q.    So 2:36:36 seconds, we've got you --

12   this is essentially, he is apart.  He is not near

13   where Jordan is; is that right?

14        A.    No.

15        Q.    That's up against the wall.  And there

16   is the wheelchair that we've been talking about.

17             Okay.  This appears to be the scuffle,

18   the altercation.  Who is this gentleman here?

19   Looks like -- I can't tell the color.  It may be a

20   gray shirt.

21        A.    I'm not sure.

22        Q.    You're not sure who that is?

23   MR. STEWART:

24             Which guy are you pointing to?

25   MR. BELLINDER:

1          This guy, right here.  The guy that has

2     Jordan's hands.

3          Q.    Do you know who either of these two

4     gentlemen are?

5          A.    That one, the first one that you told

6     me, looks like John Dixson.

7          Q.    The bigger guy is John Dixson.  What

8     about the second big man that comes in?

9          A.    John Brown.  Looks like John Brown,

10    John Dixson.

11         Q.    Okay.  And then, the third guy?

12         A.    I don't know.  I don't have any idea

13    who that is.

14    MS. STEEL:

15          Point to the third guy.

16    MR. BELLINDER:

17          The guy from the floor, appears to be

18    around his feet.

19    MR. STEWART:

20          And you're basing this just on her view

21    of the video, not --

22    MR. BELLINDER:

23         Q.    Right.  You don't remember this --

24    well, to be specific, you're on the other -- how

25    far away is where you're standing from where this

1    is going on?

2        A.    Probably from the end of this table to

3    that door maybe.

4        Q.    Maybe 15 feet?

5        A.    Fifteen, 20 feet probably.

6        Q.    And per the video and per your memory,

7    you're facing Soukup.  So your back would be to

8    whatever else was going on.

9        A.    Yeah, I wouldn't have seen that.

10        Q.    You're talking to Soukup at this time,

11    but this is only per viewing the video.

12        A.    Yes.

13        Q.    Okay.  So you say you did know the

14    third guy that was around his feet.  But that

15    appears to be John Brown, John Dixson, the bigger

16    guys that came into the frame?

17        A.    Yeah.

18        Q.    That's you again?

19        A.    Yeah.

20        Q.    We are flashing back and forth.  But

21    that's your -- you're having a conversation that

22    we talked about with Soukup.

23        A.    Yes.

24        Q.    At this point, you're here, and there

25    appears to be -- there is some movement.  Walk

1    from the original location to a different

2    location.  Okay.  And here we see, this appears to

3    be a security guard here.  Is that right?  Can you

4    tell?  It's kind of a reverse view of him but --

5    MS. STEEL:

6              What is the time on the video?

7    MR. BELLINDER:

8              2:38 and five seconds.  With the

9    smaller version, I can actually tell you how far

10   in it is.

11   MR. STEWART:

12             You can exit out if you want to.

13   MR. BELLINDER:

14             About three minutes in.  Yes, we are

15   about three minutes in.

16        Q.   Now, what I wanted to ask you about a

17   little earlier, during all this flashing around,

18   here we see, you're pointing, and you guys are

19   leaving the area where you were.  Do you remember

20   this part of the conversation?

21        A.   I don't.

22        Q.   At this point, did you tell him to

23   leave?

24        A.   No.  I would have said, Let's go out

25   here so we can figure out what's going on.  That's

1   normally what I would do.

2       Q.    Out here, is leaving The Ledge, leaving

3   the night club?

4       A.    You go outside of the night club where

5   you can go into what's like a foyer, I call it, a

6   corridor, and you can close the glass doors where

7   you can actually hear.  But you can't really hear

8   too much with the music going on.

9       Q.    When you first initiate conversation

10  with Soukup, you guys are inside the actual

11  nightclub?

12      A.    Yes.

13      Q.    And then, from here we're walking

14  outside the nightclub to the foyer?

15      A.    The foyer, yeah.

16      Q.    Are these also security guards here?

17      A.    Yes.

18      Q.    Do you recognize them?

19      A.    Cleo and Nathan, yes.

20  MS. STEEL:

21          What time is that?

22  MR. BELLINDER:

23          This is three minutes, 17 seconds, into

24  the video.  It's 2:38 and 21 seconds.

25      Q.    This is Jordan on the floor here,

1   correct?

2        A.    Yes.

3        Q.    Who is this gentleman; do we know?

4        A.    I don't know.  I have no idea.

5        Q.    Do we know this guy here?

6        A.    That's Jason Strong.

7        Q.    That's Jason.

8        A.    Yes.

9        Q.    That's you talking to a female?

10       A.    Yes.

11       Q.    Do you recall your conversation with

12  her?

13       A.    I don't.

14       Q.    Because we don't have an audio of this,

15  right?

16       A.    We don't.

17       Q.    These cameras don't have audio.

18            Do you know either of these two people?

19  Were these two ever identified?

20       A.    I don't know.  The one is the girl

21  friend or wife, I guess, of Jordan.

22       Q.    Of Jordan.  And you're talking to her

23  at this point, right?

24       A.    Yeah.  I'm telling her to calm down

25  probably.  I don't remember the conversation, but

1    I'm sure that's probably what I was telling her.

2         Q.    Do you remember what she was saying?

3         A.    No.

4         Q.    Do you know the guy behind her?

5         A.    I don't know him.

6         Q.    Or this guy that walked up with the

7    vest on?

8         A.    I don't know him either.

9         Q.    So what have we've got going on with --

10   that's Brown or Dixson.  We're not sure who he is.

11   He's got, it looks like, his knee in Jordan's

12   lower back --

13   MR. STEWART:

14            Object to the form.

15   MR. BELLINDER:

16        Q.    -- and his weight on the rest of his

17   body.  You're kind of standing behind him right

18   there.  Do you remember that?

19        A.    I don't remember it.

20        Q.    Okay.  So you're still here with

21   Jordan.  Do you have any other communications with

22   Chris Soukup?

23        A.    No.  I don't think -- I wouldn't think

24   I did.  I don't recall.

25        Q.    Do you recall Jordan's condition at

1    this point?

2         A.    Yelling and screaming and being very

3    boisterous with foul language.

4         Q.    What's he's saying?

5         A.    Yelling a lot of obscenities and, you

6    know, leave me alone, pretty much.  But his wife

7    was trying to calm him down, as well.

8         Q.    Do you know whether or not he was

9    injured at this point?

10        A.    I don't recall.

11        Q.    Do you remember -- and these are --

12   these appear to be the police; is that right?  Is

13   this Biloxi police here?

14   MS. STEEL:

15             What's the frame?  What time is it?

16   MR. BELLINDER:

17             5:58 in.  We're about 2:41 in the

18   morning.

19        A.    Yeah, I guess -- yeah, it looks like

20   the police.

21        Q.    And what are you doing at this point?

22        A.    Probably just helping keep people from

23   around.  I don't -- where am I at?  Oh, I see now.

24   I'm trying to direct people.  That's me pointing.

25        Q.    Pointing --

1      A.    Yeah.

2      Q.    -- to clear the area?

3      A.    To get them out of the way, yeah.  And

4  that's Brian Mobley, another guard.

5      Q.    This one here?

6      A.    Yes.  And he's -- I'm blocking the door

7  so no one can come up.

8      Q.    So once the police arrive, they are

9  sort of -- I guess we'd call it jurisdiction.  But

10  they take over any incidents once the police are

11  there; is that right?

12      A.    Yes.

13      Q.    Anything that's -- you've got a guest

14  issue, if there is somebody being disorderly, if

15  there is somebody drunk, if the police get there,

16  then the security are secondary or do what the

17  police ask them to do?

18      A.    Yes.

19      Q.    So now, at this point, this is where we

20  begin the issue of him being drug through the

21  casino.

22  MS. STEEL:

23          Object to the form.

24  MR. BELLINDER:

25      Q.    You don't have any involvement in this;

1    is that right?

2         A.    No.  I am involved by walking with him

3    and --

4         Q.    You're walking with him.  At this point

5    it looks like you're reaching down.

6         A.    Trying to pull his pants --

7         Q.    Pull his pants up.

8         A.    -- around the belt loop, I guess.

9         Q.    Is that Alyssa with you?

10        A.    That's, I guess, his wife.

11        Q.    Jordan's wife?

12        A.    I guess.  I don't recall.  Yeah.  I

13   guess that's Jordan's wife.

14        Q.    Do you remember what she was saying at

15   this point?

16        A.    Yelling and screaming and threatening

17   and just --

18        Q.    Threatening, what did she say?

19        A.    Well, she is just yelling, screaming,

20   quit, don't make me have to hurt -- you know, quit

21   hurting my husband.

22        Q.    She said, Don't hurt my husband or

23   don't make me have to hurt you?

24        A.    Don't make me have to hurt you for

25   hurting my husband, pretty much.  I kept telling

1   her to calm down.

2       Q.    What was your thought process at this

3   point?  What was going through your mind?

4   MS. STEEL:

5           Object to the form.

6   MR. BELLINDER:

7           What's the grounds?

8   MS. STEEL:

9           It calls for speculation.

10  MR. BELLINDER:

11          It's her state of mind when this is

12  going on.  She can testify about what she's seen.

13  MS. STEEL:

14          If she recalls.

15      A.    I really don't recall.

16  MR. BELLINDER:

17      Q.    You don't remember what was going

18  through your mind?

19      A.    I don't recall.

20      Q.    And so what involvement, if any, did

21  you have subsequent to this point?

22      A.    Just escorting.

23      Q.    You just walked with him?

24      A.    It just -- yeah, it just looks like

25  escorting.

1       Q.    Did the police ask you anything at this

2  point?

3       A.    I don't recall.

4       Q.    Did they ask you what you saw; did they

5  ask you --

6       A.    I don't remember.

7       Q.    You did an incident report as it

8  relates to this incident?

9       A.    Uh-huh.

10  MR. STEWART:

11        A statement or an incident report?

12  MR. BELLINDER:

13       Q.    What did you do; did you do a

14  statement?  Did you do a --

15       A.    I did a statement.

16       Q.    Have you had a chance to review your

17  statement since this --

18       A.    Yes.

19  MR. BELLINDER:

20        We are going to mark that as next, 3.

21        (Exhibit 3 was marked.)

22  MR. BELLINDER:

23       Q.    Okay.  You gave this statement.  It's

24  signed by you at the bottom, is that right, two

25  pages?

 1       A.    Yes.

 2       Q.    Do you remember when you gave this

 3   statement?

 4       A.    It looks like 11/30/11 on the

 5   statement.

 6       Q.    That's at the bottom of Page 1 and 2?

 7       A.    Yes.

 8       Q.    This would have been three days later?

 9       A.    Yes.

10       Q.    Who would have requested that you give

11   this statement?

12       A.    Probably Jason Strong.

13       Q.    Is that his signature at the bottom of

14   each page also?  Do you recognize?

15       A.    I don't know.

16       Q.    That's not your handwriting there for

17   those signatures, and that's not your handwriting

18   at the top, correct?

19       A.    My handwriting is at the top.

20       Q.    You see the very top, 11-043, under --

21       A.    Oh, no.  That's not my --

22   MR. STEWART:

23            Page 1 or --

24   MR. BELLINDER:

25       Q.    They're both pages.

1      A.    Page 1 and 2, no, that's not mine --

2      Q.    That's not your handwriting?

3      A.    -- on the top line.

4      Q.    But then everything else is your

5  handwriting, correct?

6      A.    Yes.

7      Q.    And you said that there was a statement

8  writing class where everything -- they trained you

9  on making statements?

10     A.    No.

11     Q.    Subsequently to this incident, you

12  would have went to that class?

13     A.    No.  I went to a report writing class

14  after this incident.

15     Q.    Report writing class.

16     A.    It's report writing for when you have

17  incidents, not statements.

18     Q.    So what's the difference between a

19  statement and a report?

20     A.    A statement is your perception, I

21  guess, of what happened.

22     Q.    The incident report would have been

23  what Strong did subsequent to this?

24     A.    An incident report is what we would do

25  for everything, you know, include everyone's

1    statement and stuff.

2        Q.    That's this, Exhibit 2?

3        A.    Yes.

4        Q.    This would have been the incident

5    report.  That's a statement.

6        A.    Yes.

7        Q.    So you had been trained after this

8    incident, you had been trained on doing these?

9        A.    Yes.

10        Q.    Did you ever have any training on doing

11    an incident report -- on a statement?

12        A.    No.

13        Q.    You just put it in there, just what you

14    remember?

15        A.    Yes.

16        Q.    And you're thorough, accurate, complete

17    with what you've given, right?

18        A.    Yes.

19        Q.    Let me ask you about this:  About the

20    third line down, it says, Noticed a guy -- well,

21    inside The Ledge, the first line.  I noticed a guy

22    who was being punched in the face by another guy.

23    I pulled them apart.  John took the victim out

24    into the corridor, and I put the other guy -- the

25    other one on the wall.

 1            Now, the victim, according to what

 2    you're saying, would have been Jordan, right?

 3        A.    Yes.

 4        Q.    So he would have been inside the

 5    nightclub still?

 6        A.    Jordan?

 7        Q.    Right.

 8        A.    Yeah.  He would have been in the

 9    nightclub.  You know, usually when we pulled them

10    apart, we separate them.  One of us takes one into

11    the corridor and the other one --

12        Q.    Per the video, Jordan was never taken

13    into the corridor before being --

14        A.    But I didn't know that.

15    MS. STEEL:

16            Object to the form.

17    MR. BELLINDER:

18        Q.    Where did you get this information?

19        A.    This was what my gist of the night was.

20        Q.    Your gist was that the victim, Jordan,

21    was taken out into the corridor?

22        A.    Yes.

23        Q.    But that wasn't done at this time.

24        A.    I wasn't aware of that.  At that

25    time --

1    Q.    Your back was to -- you thought he had

2    been taken out?

3    A.    Yes.

4    Q.    But now, you see where you're there,

5    where the security guard is holding him on the

6    ground?

7    A.    Yes.  In the corridor, yeah.

8    Q.    So the area where this took place is

9    the corridor?

10    A.    The area where what took place?

11    Q.    Where this entire incident, where we

12    just watched this video, that's the corridor?

13    MR. STEWART:

14         Objection.  Multiple.

15    MR. BELLINDER:

16    Q.    What is the corridor that you're

17    referencing there?

18    A.    The corridor is where the podium is, at

19    the time top of the stairs, where the video you

20    showed me, where BP came in and I was standing.

21    Q.    That's the corridor.  Okay.  That's

22    what I was trying to clarify.  That area is called

23    the corridor?

24    A.    Well, I call it -- like a foyer, I

25    guess.  I call it the corridor.

1      Q.    Then you reference when Jason got

2  there, that's Jason Strong, he took the one that

3  you had for holding.  That's Soukup.  How did you

4  find out that he was taken to holding?

5      A.    Only because at that point he was the

6  aggressor.  When Jason got there, I told him he

7  was the aggressor.  Jason talked to him and took

8  him to the interview room, I guess.

9      Q.    You told Strong -- we have more than

10  one Jason.  You called Jason Strong that this guy,

11  Soukup, was the aggressor.  And, at that point,

12  Strong took over?

13      A.    At that point when Jason came up there

14  to ask me what was going on, I said that Soukup

15  would have been -- was the aggressor, not -- you

16  know, I don't know exactly what happened.  I

17  couldn't tell you.  I would have just told him

18  this was the aggressor.  This was my -- the victim

19  from my assessment of it.

20      Q.    Okay.  And so, then, Strong would have

21  taken over at that point?

22      A.    Yes.

23      Q.    As far as Soukup was concerned?

24      A.    Yes.

25      Q.    Do you recall seeing Strong handcuff

1    Soukup?

2        A.    No, I don't.

3        Q.    Do you know if he ever handcuffed him

4    or not?

5        A.    I don't know.

6        Q.    Are you or is security trained on

7    arrests?

8        A.    No, not officers.

9        Q.    Security is not police officers?

10       A.    No, not at all.

11       Q.    And that's in the policy.  It says --

12       A.    Not at all.

13       Q.       -- specifically y'all are not police

14   officers?

15   MR. STEWART:

16            Let him finish.

17   MR. BELLINDER:

18       Q.    It says that in the policy, right?

19       A.    Uh-huh.

20       Q.    And so anything as far as a citizen's

21   arrest or an actual physical arrest of somebody,

22   that's not within y'all's training, it's not in

23   your purview; you don't do that?

24       A.    I don't, no.

25       Q.    Do you recall an ambulance being called

1  at some point?

2      A.    I don't remember.

3      Q.    Do you remember seeing an ambulance?

4      A.    I don't recall.

5      Q.    Have you ever seen somebody drug out of

6  a casino like this before?

7  MS. STEEL:

8          Object to the form.

9  MR. BELLINDER:

10      Q.    Had you ever seen somebody drug out of

11  a casino like this before?

12  MS. STEEL:

13          Object to the form.

14  MR. BELLINDER:

15      Q.    You can answer.  Had you ever seen

16  this?

17      A.    No.

18      Q.    Have you ever seen it since?

19      A.    No.

20      Q.    After this was over, were you

21  approached by anyone with the casino to -- in the

22  course of the investigation, did anybody come up

23  to you -- and now, we talked about Strong.  We

24  believe this to be Strong that asked you to do a

25  written statement; is that right?

1          A.      Probably.

2          Q.      Anybody other than Strong come up to

3     you and ask you what happened?

4          A.      No.

5          Q.      Any police come up and communicate with

6     you about this?

7          A.      I don't recall.

8          Q.      Do you know who Matthew Martin is?

9          A.      No.

10         Q.      Other than this report, did you do any

11    other type statements, any other reports, any

12    affidavits besides this one that we looked at?

13         A.      No.

14         Q.      Besides the one we looked at as it

15    relates to this particular set of incidents?

16    MR. STEWART:

17              Exhibit 3 is what you're pointing to.

18    MR. BELLINDER:

19         Q.      Exhibit 3.

20         A.      No.

21         Q.      Have you seen or talked to Jason Jordan

22    since this?

23         A.      No.

24         Q.      Same question for Alyssa Jordan?

25         A.      No.

1      Q.     And the same question for Chris Soukup?

2      A.     No.

3      Q.     Were you requested to look at or review

4   any of the other documents as it relates to the

5   incident report form here?

6      A.     No.  I've only seen my statement.

7      Q.     And that's your only involvement in any

8   type of investigation is just your statement?

9      A.     Yes.

10      Q.     Were you ever asked to come to the

11   police station for any issue involving this?

12      A.     I don't recall.

13      Q.     Do you remember, was there anybody else

14   with you that would have seen Soukup be the

15   aggressor as we've described it?

16      A.     I don't recall.  I'm sure people in the

17   club.

18      Q.     And what I mean, anybody else with the

19   casino, any other security personnel that happened

20   to be with you at that time that would have seen

21   the same thing you saw?

22      A.     Oh, I don't remember.

23      Q.     Anything else you can recall about this

24   incident that we haven't looked at on the video

25   and we haven't talked about?

1        A.    No.

2        Q.    Let me just ask you, the surveillance

3    incident report for this references you

4    restraining the white male patron later identified

5    as Chris Soukup and security officers Brown and

6    Dixson attempting to separate two males that were

7    apparently fighting.  Do you recall who that other

8    male was?

9        A.    I don't.

10        Q.    Do you recall there being another male

11    fighting with Jordan?

12        A.    I don't recall.

13        Q.    There is a reference to a Travis Hart.

14    Did you ever hear somebody say the name Travis

15    Hart that night?

16        A.    I haven't heard that name.

17        Q.    Later -- it seemed to be a

18    misidentification.  Later, the person they were

19    calling Travis Hart was actually Jordan.  But you

20    didn't hear any of that?

21        A.    Not that, no.

22        Q.    You didn't actually arrest or put

23    handcuffs on anybody?

24        A.    No.

25        Q.    Just a moment.  I think I'm done.

1          You're not aware of any injuries or

2    any -- were you made aware or did anybody tell you

3    about any injuries on behalf of any of those three

4    people we have talked about?

5    MR. STEWART:

6          Outside of conversations with counsel.

7    MR. BELLINDER:

8       Q.   Like we talked about before, we

9    can't -- aside from --

10      A.   I don't recall, no.

11   MR. BELLINDER:

12         Okay.  I think that's it.

13   MS. STEEL:

14         I have some questions.

15                    EXAMINATION

16   BY MS. STEEL:

17      Q.   I'm Tere Steel, and I represent the

18   city of Biloxi in the case.  I'm going to ask you

19   some questions.  If you don't understand my

20   questions, tell me and I will try to rephrase.

21         Was the altercation between Mr. Soukup

22   and Mr. Jordan in the foyer area?

23      A.   No.

24      Q.   Where did the altercation take place?

25      A.   In the nightclub outside of the

1   corridor, foyer.  In between the bar and the

2   corridor.

3        Q.   Now, you saw the police arrive,

4   correct?

5        A.   On the video, yes.

6        Q.   Well, you were there when they arrived?

7        A.   Yes.

8        Q.   You saw them in person that night --

9        A.   Yes.

10       Q.   -- or that morning, rather --

11       A.   Yeah.

12       Q.   -- arrive?

13            The police didn't go into the club, did

14   they?

15       A.   No.  They were in the corridor.

16       Q.   The corridor equals the foyer; is that

17   correct?

18       A.   Yes.

19       Q.   And you wrote in your report the

20   corridor.

21       A.   Yes.

22       Q.   When you wrote in your report "the

23   corridor," were you referencing the foyer?

24       A.   The foyer, yes.

25       Q.   Now, when you saw the altercation, you

1    saw Jason Jordan being punched; is that correct?

2         A.    Yes.

3         Q.    What part of Jason Jordan's body was he

4    punched?

5         A.    He was hitting his face.  Soukup was

6    hitting Jordan's face.

7         Q.    With what part of Soukup's body was he

8    hitting Jordan's face?

9         A.    His fist.

10        Q.    Thank you.

11              When the police arrived, did you see

12   Jason Jordan?

13        A.    Yes.

14        Q.    He was lying on the floor in the foyer;

15   is that correct?

16        A.    Yes.

17        Q.    Was he moving around?

18        A.    Yes.

19        Q.    Was he talking?

20        A.    Yes.

21        Q.    When the police approached him, did you

22   see Jason Jordan resist --

23   MR. BELLINDER:

24              Object to the form.

25   MS. STEEL:

1      Q.      -- their efforts?

2              Let me rephrase.  When the police

3      approached Jason Jordan, did you see any efforts

4      by the police to handcuff Jason Jordan?

5      A.      Yes.

6      Q.      Did Jason Jordan cooperate or did --

7      A.      No.

8      Q.      Thank you.

9   MR. BELLINDER:

10             Object to the form.

11  MS. STEEL:

12     Q.      At the time the police attempted to

13     handcuff Jason Jordan, was Jason Jordan moving?

14     A.      Yes.

15     Q.      Was he talking?

16     A.      Yes.

17     Q.      And did you see Jason Jordan tasered?

18     A.      I don't recall.

19     Q.      At any point, did you see Jason Jordan

20     lose consciousness?

21     A.      No.

22     Q.      After the police handcuffed Jason

23     Jordan, did you see the police get him up?

24     A.      Yes.

25     Q.      Did the police give Jason Jordan an

1    opportunity to stand up?

2    MR. BELLINDER:

3            Object to the form.

4        A.    Well, yes, because they kept saying,

5    Stand up.  And he kept saying, No, F you.

6    MS. STEEL:

7        Q.    Now, as you were walking, you were

8    walking behind the police officers carrying Jason

9    Jordan, correct?

10        A.    I wasn't carrying -- oh, I was walking

11    behind the police officers, yes.

12        Q.    Yes, ma'am.  And while you were in that

13    position of walking behind, did you hear Alyssa

14    Jordan make any comments to her husband, Jason

15    Jordan?

16        A.    Yes.

17        Q.    What was she saying?

18        A.    She kept telling him to calm down and

19    listen and, you know, stop fighting, like, you

20    know, stop -- like not being cooperative, I guess

21    you could say.

22        Q.    Okay.  Now, as Biloxi police officers

23    carried Jason Jordan out through the casino and

24    out of the casino, was Jason Jordan moving around?

25        A.    Yes.

```
 1        Q.    Was he saying anything?

 2        A.    Yeah, just -- I don't recall exactly

 3   what was said, but I just remember him being very

 4   loud.

 5        Q.    As Biloxi police officers carried Jason

 6   Jordan out, did you see them intentionally drop

 7   him?

 8   MR. BELLINDER:

 9             Objection.

10        A.    No, I don't recall.

11   MS. STEEL:

12        Q.    Did you at any point see the officers

13   use what you would call excessive force on Jason

14   Jordan?

15   MR. BELLINDER:

16             I'm going to object to the form.  That

17   calls for a legal conclusion.  She's not qualified

18   to give that.

19   MS. STEEL:

20             Then, can she go ahead and answer?

21   MR. STEWART:

22             Yeah, if you have an --

23        A.    Did I feel like they were being --

24   MS. STEEL:

25        Q.    Did you feel like -- did you see
```

1    anything that led you to believe or made you think

2    that the police were using too much force on Jason

3    Jordan?

4    MR. BELLINDER:

5          Object to the form.

6          A.    No, not from my perception, I guess.

7    MS. STEEL:

8          Q.    Ms. Flannigan, what's your estimation

9    of how many people were in the club when the

10   altercation occurred?

11         A.    I don't know.

12         Q.    More than 100?

13         A.    Probably more than 100, yeah.

14         Q.    And all those people had to leave the

15   club after the altercation, correct?

16         A.    I don't recall, but surely.

17         Q.    Do you recall if the club was shut

18   down?

19         A.    Yeah, I'm sure it was, but I don't

20   recall.

21         Q.    Okay.  And the foyer was a means for

22   the patrons to exit the club; is that correct?

23         A.    Yes.  That's the only exit that guests

24   would be aware of, I guess, without being an

25   emergency.

1      Q.    Did you see any attack of Alyssa Jordan

2   by the Biloxi police officers?

3   MR. BELLINDER:

4            Object to the form.

5      A.    Are you saying did she attack them, or

6   did they attack her?

7   MS. STEEL:

8      Q.    Well, I was asking whether -- I'm going

9   to rephrase that.

10     A.    Okay.  Sorry.

11     Q.    Thank you for pointing that out.

12           As you were following behind, did you

13   see a Biloxi police officer physically attack

14   Alyssa Jordan?

15     A.    No.

16     Q.    Did you see a Biloxi police officer

17   make any physical contact with Alyssa Jordan,

18   other than to apply handcuffs?

19     A.    No.

20   MS. STEEL:

21           That's all I have.

22                 EXAMINATION

23   BY MR. CLARK:

24     Q.    My name is Austin Clark.  I'm

25   representing Joshua Hamilton.  I want to go back

1    up to the altercation, you said you saw Soukup

2    hitting Jordan.

3         A.    Uh-huh.

4         Q.    Do you recall how many times when you

5    walked into the club, how many times you saw

6    Soukup hitting him?

7         A.    I don't recall, no.

8         Q.    And he was physically on top of him or

9    was he standing?

10        A.    He was like on -- had him on the ground

11   and hitting him.  So I really don't recall.  I

12   just remember rushing over there, pulling them

13   apart and pushing Soukup to the wall.  That's it.

14   Trying to talk to him.

15        Q.    Did you know any of the other -- did

16   you know any of the Biloxi police officers that

17   arrived on the scene?

18        A.    No.  Just from coming to the Hard Rock,

19   that's about it.

20        Q.    You didn't know any of them personally?

21        A.    No.

22   MR. CLARK:

23             Okay.  That's all I have.

24                  EXAMINATION

25   BY MR. BELLINDER:

1      Q.    Just to clarify a few things.  You
2  don't have any police training, right?
3      A.    No.
4      Q.    Don't have any background in use of
5  force training?
6      A.    No.
7      Q.    You don't have any legal background,
8  any law school, anything like that?
9      A.    No.
10      Q.    Okay.  You have been a security guard
11  or a security officer there, you said, since 2010?
12      A.    Yeah.
13      Q.    The better part of -- we'll call it
14  four years?
15      A.    Probably three years.  I have been in
16  beverage maybe a little over a year.
17      Q.    In this nightclub and casino, you've
18  probably seen countless number of fights; is that
19  fair?
20  MR. STEWART:
21          Object to form.
22  MR. BELLINDER:
23      Q.    Could you quantify how many fights,
24  altercations that you've seen or heard of, caught
25  wind of?

1        A.    No.

2        Q.    It's a lot?  Is it fair to say a lot?

3   MR. STEWART:

4             Object to the form.

5        A.    No, I wouldn't say a lot.

6   MR. BELLINDER:

7        Q.    Once a week, twice a week, how often

8   does an altercation break out in the casino?

9        A.    At that time?

10       Q.    Since you've been there.

11  MR. STEWART:

12            Object to the form.  Did you say in the

13  casino?

14  MR. BELLINDER:

15       Q.    Casino or the nightclub.  In the Hard

16  Rock Hotel and Casino Biloxi.

17       A.    I don't know.

18       Q.    About on average?

19       A.    Maybe one every six months.  I don't

20  know.

21       Q.    One fight every six months?  That's

22  pretty good.

23       A.    Maybe.  I -- yeah, I couldn't give you

24  a number.

25       Q.    People being drunk probably happens

1    nightly, don't you think?

2    MR. STEWART:

3             Object to form.  Calls for speculation.

4    MR. BELLINDER:

5        Q.    You've been there four years.

6        A.    Yes.

7        Q.    You see somebody drunk, the afternoon

8    sometimes depending on --

9        A.    My perception of them being

10   intoxicated, yeah, I guess.

11       Q.    Even people resisting security, people

12   resisting police, you've seen that on the premises

13   before?

14   MS. STEEL:

15            Object to the form.

16   MR. BELLINDER:

17       Q.    Go ahead.  You've seen people

18   resist security; you've seen people resist police

19   before, right?

20       A.    Yes.

21   MS. STEEL:

22            Object to the form.

23   MR. BELLINDER:

24       Q.    Ballpark, how many times do you think

25   you've seen that?

1       A.      People resist?

2       Q.      Yes.

3       A.      Don't want to do what we ask them to?

4       Q.      All the time, right?

5       A.      I would say, yeah, a few times, yes.

6       Q.      But this is the only time you've ever

7   seen somebody drug out like that, right?

8   MS. STEEL:

9           Object to the form.

10  MR. BELLINDER:

11      Q.      Go ahead.  You can answer.

12          You testified earlier you had never

13  seen somebody drug out before -- before this or

14  since this?

15  MS. STEEL:

16          Object to the characterization --

17  MR. BELLINDER:

18      Q.      Go ahead.  That was your testimony --

19  MS. STEEL:

20          Let me finish my objection.  Object to

21  the characterization of her testimony and object

22  to the form.

23  MR. BELLINDER:

24      Q.      You testified earlier that you had

25  never seen anybody drug out like this before and

1   you hadn't seen anybody drug out like this since,

2   right?

3   MS. STEEL:

4           Same objection.

5   MR. BELLINDER:

6       Q.    Right?

7       A.    That I have seen.

8       Q.    Right.

9       A.    No.

10      Q.    Have you heard of anybody being drug

11  out like this since?

12  MS. STEEL:

13          Same objection.

14      A.    No.

15  MR. BELLINDER:

16          That's all I have got.  Thank you so

17  much.  We appreciate your time.

18          (Deposition concluded at 11:50 a.m.)

19

20

21

22

23

24

25

1              CERTIFICATE OF COURT REPORTER

2          I, Janna White, CSR #1312, do hereby

3     certify that the foregoing pages contain a true

4     and correct transcript of the testimony of the

5     witness as taken by me at the time and place

6     heretofore stated and later reduced to typewritten

7     form by computer-aided transcription under the

8     authority vested in me by the State of Mississippi

9     to testify to the truth and nothing but the truth

10    in this cause and was thereupon carefully examined

11    upon this oath.

12          I further certify that I am neither

13    attorney or counsel for nor related to or employed

14    by any of the parties to the action in which this

15    deposition is taken and further that I am not a

16    relative or employee of any attorney or counsel

17    employed by the parties hereto or financially

18    interested in the action.

19          Witness my signature, this the _____ day

20    of_____, 2014.

21

22

23                    _____

                      Janna White, CSR #1312

24

25