# In The Matter Of:

*Jason Jordan, et al.*
*vs.*
*Premier Entertainment Biloxi, et al.*

_____

# *Jason Strong*

## *April 2, 2014*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL DEATH
BENEFICIARIES OF UNBORN BABY JORDAN,
DECEASED; AND CHRISTOPHER SOUKUP        PLAINTIFFS

VS.            CIVIL ACTION NO. 1:13cv195 LG-JMR

PREMIER ENTERTAINMENT BILOXI, LLC d/b/a
HARD ROCK HOTEL & CASINO BILOXI; THE
CITY OF BILOXI, MISSISSIPPI; DOE
DEFENDANT ONE; JOSHUA HAMILTON, IN HIS
OFFICIAL AND INDIVIDUAL CAPACITIES;
DOE DEFENDANT THREE; DOE DEFENDANT
FOUR; DOE DEFENDANT FIVE AND DOE
DEFENDANTS 6-10                        DEFENDANTS

DEPOSITION OF JASON STRONG
Taken at the offices of Page, Mannino,
Peresich & McDermott, 759 Howard Avenue,
Biloxi, Mississippi, on Wednesday, April
2, 2014, beginning at approximately
9:05 a.m.

REPORTED BY:

JANNA WHITE, CSR #1312
Merrill Legal Solutions
Post Office Box 14113 (39236)
4400 Old Canton Road, Suite 160
Jackson, Mississippi 39211
Telephone:  (601) 366-9676
Fax:  (601) 366-9756

1(800)372-DEPO

```
1    APPEARANCES:
2
         THOMAS J. BELLINDER, ESQUIRE
3        Martin & Bellinder
         351 Edgewood Terrace Drive
4        Jackson, Mississippi 39206
         Telephone:  (769) 257-6052
5        Fax:  (769) 257-6596
         Email:  Thomas.Bellinder@gmail.com
6             ATTORNEY FOR THE PLAINTIFFS
7
         DAVID W. STEWART, ESQUIRE
8        Copeland, Cook, Taylor & Bush, P.A.
         2781 C.T. Switzer, Sr. Drive
9        Biloxi, Mississippi 39531
         Telephone:  (228) 863-6101
10       Fax:  (228) 868-9077
         Email:  Dstewart@cctb.com
11            ATTORNEY FOR PREMIER ENTERTAINMENT
              BILOXI, LLC, d/b/a HARD ROCK HOTEL
12            & CASINO BILOXI
13
         AUSTIN CLARK, ESQUIRE
14       Russell S. Gill, PLLC
         638 Howard Avenue
15       Biloxi, Mississippi 39530
         Telephone:  (228) 432-0007
16       Fax:  (228) 432-0025
         Email:  Rsgill@datasync.com
17            ATTORNEY FOR THE JOSHUA HAMILTON
18
         TERE R. STEEL, ESQUIRE
19       Page, Mannino, Peresich & McDermott
         759 Howard Avenue
20       Vieux Marche Mall
         Biloxi, Mississippi 39533
21       Telephone:  (228) 374-2100
         Fax:  (228) 432-5539
22       Email:  Tere.steel@pmp.org
23
24
25
```

1          T-A-B-L-E O-F C-O-N-T-E-N-T-S

2

Examination by:                          Page

3

   Mr. Bellinder                          5

4

   Ms. Steel                             83

5

   Mr. Clark                             85

6

   Mr. Bellinder                         85

7

Stipulation                              4

8

Certificate of Reporter                 87

9

Witness Signature Sheet                 88

10

11                    EXHIBITS

12

Exhibit 1 - Victim Statement            55

13

Exhibit 2 - Five page report            68

14

15

16

17

18

19

20

21

22

23

24

25

1                    STIPULATION

2           It is hereby stipulated and agreed by and

3    between the parties hereto, through their

4    respective attorneys of record, that this

5    deposition may be taken at the time and place

6    hereinbefore set forth, by Janna White, C.S.R.,

7    Court Reporter and Notary Public, pursuant to the

8    Federal Rules of Civil Procedure, as amended;

9           That the formality of READING AND SIGNING

10   is specifically NOT WAIVED;

11          That all objections, except as to the form

12   of the questions and the responsiveness of the

13   answers, are reserved until such time as this

14   deposition, or any part thereof, may be used or is

15   sought to be used in evidence.

16

17                        ---

18

19

20

21

22

23

24

25

1                  JASON STRONG,

2          having been duly sworn, was examined and

3          testified as follows:

4    BY MR. BELLINDER:

5        Q.    Good morning, sir.

6        A.    Good morning.

7        Q.    My name is Thomas Bellinder.  We met a

8    moment ago.  I am the attorney of record for

9    Mr. and Mrs. Jordan, and Mr. Soukup in this

10   particular matter involving City of Biloxi police

11   officers and the Hard Rock Hotel and Casino.

12   MR. BELLINDER:

13              For the record, the deposition is being

14   taken pursuant to the Federal Rules of Civil

15   Procedure for all permissible uses thereunder.

16   Read and sign?

17   MR. STEWART:

18              Yes.

19   MR. BELLINDER:

20              For everybody today?

21   MR. STEWART:

22              Yes.

23   MR. BELLINDER:

24       Q.    Mr. Strong, I'm going to be asking you

25   a few questions here today about some of the

1   incidents that took place there that night at the

2   casino and then some other sort of issues.  I

3   don't like to call them rules.  These are more so

4   guidelines to help you understand a little bit

5   about what we are doing.  Have you ever given a

6   deposition before?

7       A.    Yes.

8       Q.    You kind of understand the process a

9   little bit?

10      A.    Yes.

11      Q.    Tell me about the previous depositions

12  that you've given.

13      A.    To be honest with you, it's been

14  several years ago when I working at the IP.  It

15  was involving a -- I think a lady stepped on a

16  piece of glass.

17      Q.    Just one deposition you have given?

18      A.    That's it.

19      Q.    That was sort of in a what we call a

20  fact witness capacity.  You were doing that to

21  tell -- in the context of a lawsuit, but to tell

22  about what you knew and what you had seen as it

23  related to that incident where the lady stepped on

24  the glass?

25      A.    Right.  It was just like this same

1  setting.

2      Q.    Have you ever been a in a litigation

3  before?  Have you ever been a plaintiff or a

4  defendant in a lawsuit or ever been a party to a

5  divorce or a bankruptcy or anything like that

6  before?

7      A.    Yes.

8      Q.    Okay.  Tell us a little bit about your

9  experience with that.

10     A.    Which one?

11     Q.    Whichever applies.  Have you ever been

12  divorced before?

13     A.    Yes.

14     Q.    Okay.  How many times?

15     A.    Once.

16     Q.    What was your former spouse's name?

17     A.    Rudellia, R-U-D-E-L-L-I-A, Valentina

18  Crank, C-R-A-N-K.

19     Q.    Where was that proceeding?  Was that

20  here in Harrison County?

21     A.    It was actually in Leesville,

22  Louisiana.

23     Q.    Have you remarried since her?

24     A.    Yes.

25     Q.    Okay.  What's your -- and you're

1   currently married?

2        A.    Yes.

3        Q.    What is your spouse's name?

4        A.    Suzanne Elizabeth Strong.

5        Q.    Okay.  Other civil type actions --

6   those are your only two marriages?

7        A.    Yes.

8        Q.    Other civil type actions that you've

9   been involved in?  Any bankruptcies?  Any

10  foreclosure type actions?  Anything that involves

11  the --

12       A.    I've had two bankruptcies.

13       Q.    Okay.  What years were those?

14  MR. STEWART:

15            Object to the relevance.  You can

16  answer.

17       A.    One was after my first divorce, and it

18  was probably in '93, '94.

19  MR. BELLINDER:

20       Q.    And your second one?

21       A.    Probably '05.

22       Q.    Are you currently in any bankruptcy

23  proceeding?

24       A.    No.

25  MR. STEWART:

1          Same objection.

2    MR. BELLINDER:

3        Q.    The reason I ask, with some familiarity

4    with the process, you kind of understand where we

5    are at.  So I will briefly hit the highlights of

6    what we call -- I don't even call them rules.

7    It's more guidelines.  If you would, just answer

8    all of the questions today to the best of your

9    knowledge.  Don't feel compelled to give a yes or

10   no answer if you don't know a yes or no to any

11   particular question.  I don't know is a perfectly

12   fine answer in this setting.

13          The court reporter swore you in before

14   we got started, so naturally you're under oath to

15   tell the truth the same way you would be if we

16   were in court.  If you will answer the questions

17   aloud, that will help her take a clean record.  We

18   may get into a casual conversation setting where

19   uh-huh and huh-uh, and we may shake our heads.  I

20   may understand completely what you're saying, but

21   she's got to take down a clear record that way if

22   we have to look back at this, we will be able to

23   fully understand what's being said.

24          Also to speed things up a little bit,

25   any time I ask you any specific question whether

1   it be a conversation you had with an individual,

2   policy, something you remember, it will always

3   call for your personal knowledge of that

4   particular subject matter area.  Can't be

5   compelled to give testimony outside of what you

6   have personal knowledge of.  Is that fair?

7        A.    Right.

8        Q.    Okay.  We already got into some of your

9   background stuff.  If you would, just state your

10   full name for us for the record.

11        A.    Jason Frank Strong.

12        Q.    Mr. Strong, what's your current

13   address?

14        A.    4809 Courthouse Road, Gulfport,

15   Mississippi 39507.

16        Q.    How long have you lived there in

17   Gulfport?

18        A.    It's going to be 13 years.

19        Q.    Good deal.  13 years.  How old are you?

20        A.    Right now I'm 45.

21        Q.    Born here in the United States?

22        A.    Yes.

23        Q.    Hit the -- hit the very brief

24   highlights of your educational background.

25        A.    Educational background.  I graduated

1    from Biloxi High School in 1986.  I have some

2    criminal justice at Mississippi Gulf Coast

3    Community College that I haven't completed yet and

4    then prior army experience.

5        Q.    Tell us about -- first tell us a little

6    bit about Gulf Coast.  You say you had some study

7    in criminal justice that hadn't been completed?

8        A.    Right.

9        Q.    Credit hours, do you know about how

10    many credit hours you have?

11        A.    I believe it's just three.

12        Q.    And that's towards a -- I guess you

13    call it an associate's degree?

14        A.    Right.

15        Q.    It was just a general study.  It wasn't

16    specific to any subject matter.  You just

17    basically took a class in criminal justice?

18        A.    It was intro.

19        Q.    Military background.  Tell us a little

20    bit about that.

21        A.    Military background, I joined in 1987,

22    and I was out by November of '93.  And that was in

23    reference to my first divorce.  I gained custody

24    of my three daughters.

25        Q.    Okay.  Were you honorably discharged

1  from the military?

2       A.    Yes, I was.

3       Q.    Branch, did you say army?

4       A.    Army.

5       Q.    Do you -- you were honorably discharged

6  '93.  Tell us, if you would -- now, before I move

7  on to that, any other education, training,

8  vocational or trade school, any other

9  post-graduate type education that you've been

10 through?

11      A.    Other than things that I did in the

12 army.  CPR.  First Aid.  AED.

13      Q.    Tell us that again.  AED?

14      A.    Yes.

15      Q.    What is that?

16      A.    The automatic defibrillator.

17      Q.    Okay.  The -- call them shock panels?

18      A.    Yes.

19      Q.    Layman's knowledge of it?

20      A.    Right.  And then multiple classes along

21 the lines of customer service and those type

22 things in the casino industry.

23      Q.    Okay.  We will get to that in just one

24 second.  Now, tell me -- the same way you hit the

25 highlights on your education background, do the

1    same for me for your work history?

2         A.    Work history.  For the past 18 years,

3    it's been casinos.

4         Q.    Good deal.

5         A.    It's been casino security.

6         Q.    You want to start earliest to now or

7    now?  Whichever is easiest for you.  If you want

8    work backwards or --

9         A.    Do you just want casino years?

10        Q.    Well, you said 18 years.  So that's

11   plenty far back.

12        A.    Right.  So seven of it going back from

13   now would be the Hard Rock.

14        Q.    Worked for the Hard Rock here in Biloxi

15   the last seven years?

16        A.    Right.

17        Q.    Okay.  Prior to -- you have always

18   worked -- these last seven years, you've always

19   worked for the location here in Biloxi?

20        A.    Right.

21        Q.    Before that -- tell us about your --

22   where you worked before that?

23        A.    Well, before that, it was the time out

24   for Katrina.  And I did some FEMA trailer park

25   stuff.  I did flood grants up at the prime

1    outlets.  And then I also worked at the Grand

2    Casino.

3         Q.    Was that -- was that here on the Coast?

4         A.    Briefly, yes.  And the Grand Casino was

5    less than a year.

6         Q.    Prior to --

7         A.    Prior to that was the Imperial Palace

8    for about six years.

9         Q.    That's the IP right here up the road?

10        A.    Yes, sir.

11        Q.    You said six years?

12        A.    Yes, sir.

13        Q.    Okay.

14        A.    And then three years prior to that is

15    Boomtown.

16        Q.    And that's also here in Biloxi?

17        A.    Yes, sir.

18        Q.    You mentioned the Katrina stuff.

19    That's sort of a government -- you're essentially

20    employed by the government at that time doing the

21    trailer park, flood grants, that type of stuff?

22        A.    It was contract work for, yes, the

23    government, HUD, or whoever was initially in

24    charge of that.

25        Q.    Now, for these last seven years, your

1    employment here at the Hard Rock Casino, are you

2    an employee of -- I guess the corporate entity is

3    Premier -- are you an employee of Premier?

4        A.    Yes, sir.

5        Q.    Okay.  You receive benefits as an

6    employee?  You don't have a separate independent

7    contract or agreement; is that right?

8        A.    No, sir, no separate contract.

9        Q.    Okay.  Describe for us what your job

10   title and your basic duties have been over these

11   last seven years.  And then if they've changed at

12   all, just sort of describe that for us.

13       A.    Security shift manager for the --

14   responsible for safety and security the entire

15   casino for both guests and employees.  Staffing.

16   Training.  And ensuring that everybody is up on

17   our customer service and awareness of everything

18   that's going on.

19       Q.    Your job title would be security shift

20   manager?

21       A.    Yes, sir.

22       Q.    Has it been that consistently for the

23   past seven years?

24       A.    Yes, sir.

25       Q.    Okay.  And you have done basically

1    these things that you have mentioned to us,

2    overseeing security, staffing, training, customer

3    service, awareness type things, that's been your

4    duty the whole time?

5        A.    Yes, sir.

6        Q.    Prior to your employment here with the

7    Hard Rock when you worked for the Grand, IP, and

8    Boomtown, were your positions similar when you

9    worked for those prior casinos?

10       A.    The Grand I was security shift manager

11   as well.

12       Q.    Would that have been for that entire

13   roughly a year that you were there?

14       A.    Yes, sir.

15       Q.    Basically the same type duties?

16       A.    Yes, sir.

17       Q.    IP?

18       A.    IP I was the assistant director of

19   security.

20       Q.    And same question, essentially similar

21   duties, you're securing the premises, you're

22   ensuring compliance with the rules?

23       A.    Except in that position I was

24   responsible for the entire property as well as all

25   three shifts.  My direct supervisor was the

1  director of security.

2      Q.    And so as security shift manager, for

3  example, current that would be instead of being

4  responsible for the entire property and all of the

5  shifts, you would be responsible for your shift;

6  is that right?

7      A.    Yes.  I am just responsible for my

8  shift currently.

9      Q.    And so then there would be a supervisor

10  or somebody that you'd report to?

11      A.    Yes, the director of security.

12      Q.    And who is that person currently?

13      A.    Currently it's Dwight Savell.

14      Q.    How do you spell that last name?

15      A.    S-A-V-E-L-L.

16      Q.    And he is the director of security?

17      A.    Yes, sir.

18      Q.    Was he the director of security back

19  November 27, 2011?

20      A.    Yes, sir, he was.

21      Q.    Okay.  Boomtown, what was your position

22  with Boomtown?

23      A.    I was also a security shift manager.

24  Prior to that, there was a brief time that I was

25  training officer.  And then because that's where I

1   got my start, there was a short period of time

2   where I was an officer.

3        Q.    Officer meaning a security officer?

4        A.    Yes, sir.

5        Q.    Okay.  Security shift manager, you're

6   overseeing the officers themselves?

7        A.    Yes, sir.

8        Q.    Okay.  As security shift manager there

9   at Boomtown, you're essentially doing the same

10  type duties as what you're doing now and there

11  with IP and the Grand?

12       A.    Right.

13       Q.    In your capacity as a training officer

14  and an officer, you would be implementing what it

15  is that the security shift manager oversees; is

16  that right?

17       A.    Implementing?

18       Q.    Walk me through it if there is a

19  complaint, if there's a problem, if there's an

20  issue, I guess the chain of responsive actions.

21  How does that take place from the officer to the

22  security shift manager to the director?  Who does

23  what in that -- in that --

24  MR. STEWART:

25            Are you talking about -- what type of

1   complaint?  Are you talking about if --

2   MR. BELLINDER:

3       Q.    A fight, for example.  Say there is a

4   fight or an altercation or a disturbance in the

5   nightclub or something like that.  Similar to what

6   happened here.  What I'm asking is who does what

7   in that chain of individuals that we've got from

8   officer to your position of security shift manager

9   to director?

10      A.    Well, what I'm wondering on that is

11  where did the complaint originate?  Did it

12  originate on top?  Did it originate at the bottom?

13  It would all depend.

14      Q.    Yeah.  That's a little too broad.  We

15  will get to that as it relates specific to the

16  incident.  We won't get there -- we will try to

17  move in a logical -- in a logical format.

18          Now, with each of these positions that

19  you've held, was there some training involved when

20  you came to accept those positions?

21      A.    Yes, sir.

22      Q.    Okay.  Tell us specifically to the Hard

23  Rock.  What was your training and how was that

24  involved when you accepted the security shift

25  manager position about seven years ago?

1      A.    We were taken through a class by the

2  now assistant chief of police in Ocean Springs,

3  Mark Dunston.  He took us through an extensive

4  class on handling situations.  Also included

5  handling of aggressive patrons, fights, takedowns,

6  handcuffing, things of this sort.

7      Q.    About how long was that class?

8      A.    The class -- I do not recall exactly

9  how long it was, but it was pretty extensive.

10     Q.    Okay.  Do you know about when that was,

11  time frame?

12     A.    It was around our opening time around

13  '07.

14     Q.    Okay.  As soon as you came on, this

15  class was performed?

16     A.    Yes, sir.

17     Q.    Any continuing educational type

18  classes?  Any yearly, monthly, weekly, refresher

19  courses or anything that's continued to educate

20  you in your position or the security officers in

21  how to do what it is that y'all do?

22     A.    Are we talking about me specifically or

23  the security officers?

24     Q.    You specifically.

25     A.    Okay.  No.

1      Q.    Okay.  What about the officers

2  themselves?

3      A.    The officers themselves have a security

4  training checklist as they arrive, and we go

5  through that and make sure that they are aware of

6  their position and their responsibilities.  And we

7  do have a follow-up on that to make sure that they

8  are following up on those procedures, and it's all

9  documented.

10     Q.    Okay.  And that's done daily?

11     A.    I'm sorry.

12     Q.    Is that done daily with the officers?

13     A.    No, sir.

14     Q.    Okay.  How often is that done with the

15  officers, the security training checklist?

16     A.    The checklist is a 90 day probational

17  period whenever they first hire in, and then it's

18  up to the shift supervisor to follow up on that as

19  needed.

20     Q.    Okay.  And, now, you were the shift

21  supervisor for this particular shift as it relates

22  to this incident; is that right?

23     A.    Yes, sir.

24     Q.    Okay.  When was the last time you had

25  reviewed the checklist with the specific officers

1    that were working that night?

2        A.    The officers working that night are

3    actually assigned -- the ones that I see that are

4    in the shot are assigned actually to the swing

5    shift.  It would be under a different security

6    manager.

7        Q.    Okay.  And tell us what is the -- we

8    heard the term swing shift on Monday I guess in

9    the military type, but it may mean the same thing.

10   What exactly is the swing shift?

11       A.    4:00 p.m. to midnight.

12       Q.    Okay.  And so this incident would have

13   actually occurred after those officers shift was

14   over?

15       A.    Yes, sir.

16       Q.    Would there have been -- and I'm

17   assuming there would have been a new shift that

18   would have come on scheduled to begin at 12:00?

19       A.    That's my shift.

20       Q.    And then go to when?

21       A.    To 8:00 a.m.

22       Q.    And what's that shift called?

23       A.    Grave.

24       Q.    Grave shift.  Okay.  So the incident

25   would have actually occurred on your shift but

 1    involved officers from the prior shift?

 2        A.    Yes, sir.

 3        Q.    And the reason why they were still on

 4    duty or still present there to respond to this?

 5        A.    The clubs are covered on a regular

 6    basis by overtime.  Either officers staying over

 7    or officers that are in a part-time position.

 8        Q.    Okay.

 9        A.    Now, having said that, I probably had a

10    few officers that did respond from the casino

11    floor which were on my shift which would be a

12    normal response to a fight.

13        Q.    So would you have ever went through the

14    security checklist with these particular officers

15    that are seen on the video?

16        A.    No, sir.

17        Q.    Considering they're not on your shift,

18    you would have never actually went through it?

19        A.    No, sir.

20        Q.    Do you have any knowledge about whether

21    or not their -- tell me this first.  Who is their

22    shift supervisor; do you know?

23        A.    Willie Adam.

24    MR. STEWART:

25            Just so we're clear, you're talking

1   about the ones who are not on the shift that he

2   described who might have responded?

3   MR. BELLINDER:

4          Right.

5     Q.   And we may or may not take a look at

6   the video in little while, but the ones -- let me

7   ask you this:  You have seen the video subsequent

8   to this incident?

9     A.   Yes.

10     Q.   Okay.  Have you seen it recently?

11     A.   Yes.

12     Q.   How recently?

13   MR. STEWART:

14          You mean the entire video or parts of

15   the video?

16   MR. BELLINDER:

17     Q.   Yeah.  There's a lot of video, so I

18   guess the relevant portions.  I guess the incident

19   and the response and the police action and the

20   subsequent actions by the hotel folks and police.

21     A.   The entire video?

22     Q.   I guess what's pertinent.  There's a

23   lot of --

24     A.   About a week.

25     Q.   About a week ago.  Okay.  So where we

1    were, Willie Adam would have been the individual

2    who -- shift supervisor for the folks who -- and

3    we are talking about the ones who initially

4    respond to the altercation?

5        A.    Yes.

6        Q.    He would have been their shift

7    supervisor?

8        A.    Yes.

9        Q.    Okay.  Is he still employed by Premier?

10       A.    Yes, he is.

11       Q.    Have you ever had any contact or

12   interaction with these particular individuals

13   prior to this evening?

14   MR. STEWART:

15            Who?

16   MR. BELLINDER:

17       Q.    This particular evening.  The

18   individuals that are seen initially responding to

19   the altercation.

20   MR. STEWART:

21            Security?

22       A.    I don't understand.

23   MR. BELLINDER:

24       Q.    We may need to look at the video before

25   we can get all this done.

1    MR. STEWART:

2            Just so we are clear.  You're talking

3    about security employees?

4    MR. BELLINDER:

5        Q.    Security.  I'm not talking about the

6    officers, not the Biloxi police officers, but the

7    initial responding what appear to be security

8    guards on the video?

9        A.    Have I had any issues?

10        Q.    Have you had any supervisory authority

11    or supervisory actions as it relates to them prior

12    to this particular evening November 27, 2011?

13        A.    The security officers in the video?

14        Q.    Right.

15        A.    Currently right now I don't have any

16    knowledge of that.  I would have to research that

17    in my records.

18        Q.    Okay.  Their -- okay.  That's good.  Do

19    you have any children over the age of 18?

20        A.    Yes.

21        Q.    Tell me their names.

22        A.    Samantha.

23        Q.    Last name is Strong?

24        A.    Her name is actually -- I'm drawing a

25    blank.  Montgomery.

1        Q.    Does Samantha reside in southern

2   Mississippi?

3        A.    Madison.

4        Q.    In Madison.  Up north.  Okay.  Any

5   other children?

6        A.    Yes, the second one is going to be

7   Misty.  Her last name is Strong.

8        Q.    Where does Misty reside?

9        A.    Misty resides in Biloxi.

10       Q.    Is Misty married?

11       A.    No, she's not.  Samantha is.  And then

12   Sylvia.

13       Q.    S-Y-L-V-I-A?

14       A.    S-I-L-V-I-A.

15       Q.    Strong also?

16       A.    McNew, M-C-N-E-W.  She's in the Air

17   Force at Barksdale, Louisiana.

18       Q.    Any other close relatives who reside in

19   the southern -- go ahead.

20       A.    I have another child.

21       Q.    Okay.  I interrupted.

22       A.    Jaycee.  She's 12, and she lives at

23   home with us.

24       Q.    Any other close relatives over the age

25   of 18 who reside in the southern Mississippi

1   area?

2       A.    Over the age of 18?  My mother.

3       Q.    Parents?

4       A.    My mother.

5       Q.    What's her name?

6       A.    Deanna.

7       Q.    D-E-A?

8       A.    D-E-A-N-N-A Strong.

9       Q.    Okay.  Anybody else?  She resides in

10  Biloxi?

11      A.    Yes.

12      Q.    Anyone else?

13      A.    Well, you said parents.

14      Q.    Parents, cousins, close relatives?

15      A.    Have you got all day?

16      Q.    I don't.  To be honest with you, I

17  don't.  Last name.  You want to just start with

18  last name.  Somebody that you may be related to.

19  Mostly strong.  Is that a family name?

20      A.    Strong is, and then Hardy.  Hardy is my

21  mom's maiden name.

22      Q.    H-A-R-D-Y?

23      A.    It is.

24      Q.    The reason we ask some of these

25  questions is we like to preface sometimes because

1    it seems like what are we talking about.  In the

2    event that we had to choose a jury in this case,

3    we would need to know anybody who is related to

4    parties, lawyers, witnesses, just depending on

5    what day it is you may want -- you know, they may

6    be a good juror, but they may not be the right

7    juror for our case.

8           Okay.  Other last names that may

9    reflect a relationship?

10    A.    I don't know.  My aunt is a -- my aunt

11    is a Walters.

12    Q.    Walters.

13    A.    W-A-L-T-E-R-S.  That's her maiden name.

14    So it's going to be mainly Strong and Hardy.

15    Q.    Have you ever been convicted of a

16    crime?

17    MR. STEWART:

18           Talking about in the last ten years

19    involving --

20    MR. BELLINDER:

21           Yeah, last ten years.

22    A.    No.

23    MR. BELLINDER:

24    Q.    Okay.  You mentioned that you had

25    reviewed the video in this video footage about --

1    you said about a week ago.  Any other documents or

2    information that you reviewed to get ready for

3    your deposition today?

4        A.    My report.

5        Q.    You did look at the report?

6        A.    Yes.

7        Q.    Did you bring anything with you?

8        A.    No.

9        Q.    Okay.  Other than your report, did you

10   look at anything else, any other documents?

11       A.    No.

12       Q.    Okay.  Now, other than your attorneys

13   which we are not entitled to speak to -- I say

14   your attorney.  The attorney for the casino for

15   your employer.  Any other conversations that had

16   you to refresh your memory about what happened

17   that evening?

18       A.    Yes.

19       Q.    Okay.  Who else did you speak to?

20       A.    Other than the attorney?

21       Q.    Right.  We are not entitled to know

22   what you spoke to the attorney for the casino

23   about.  But anybody else?  Any other witnesses,

24   anybody else that was there that you spoke to?

25       A.    I made sure that both John Dixson, John

1  Brown, and Amanda Flannigan knew what time their

2  depositions were.  Other than that, we didn't have

3  any discussions.

4        Q.    No discussions about the substance of

5  what took place or remembering about that

6  evening?

7        A.    No, sir.

8        Q.    Okay.  Now, tell us where you were that

9  evening?  Were you actually on the premises?

10        A.    I was on the premises, yes, sir.

11        Q.    Where were you in relation to that

12  nightclub?

13        A.    I don't recall exactly.

14 MR. STEWART:

15            What time?

16 MR. BELLINDER:

17        Q.    This incident took place right after

18  midnight.  Do you recall where you were when the

19  altercation began?

20        A.    (Witness shook head.)

21        Q.    You don't?

22        A.    I really don't.

23        Q.    How did you first learn that there was

24  and incident taking place?

25        A.    There was a call for assistance over

1    the radio.

2        Q.    When was that call received?

3        A.    Well, it's going to be -- my

4    recollection is around 2:32.  2:30, 2:32.

5        Q.    A.m.?

6        A.    Yes, sir.

7        Q.    That's a specific time.  Do you know

8    how or where you get that time frame?

9        A.    From my report.

10        Q.    Now, do you have independent

11    recollection of this evening?  And what I mean by

12    independent is absent from -- looking at the video

13    absent from your report.  Do you specifically

14    remember the events that took place?

15        A.    Yes, sir.

16        Q.    Okay.  Tell me what you specifically

17    remember about that evening.

18        A.    The call was made that a fight was in

19    progress in The Ledge.  And I arrived and made

20    contact with Amanda Flannigan first, and she

21    immediately tells me that Soukup is the aggressor.

22    And they have him outside against the wall.  And

23    he was fighting with a guy that was currently

24    being detained on the floor.

25            I said, What do you mean aggressor?

1    And she says, He was hitting this guy repeatedly.

2    I said, The guy on the floor.  And she said, Yes.

3    So immediately I called for an ambulance because I

4    don't know what his condition is.  Soukup being

5    the aggressor, I immediately told him that he was

6    under arrest and handcuffed him to remove him from

7    the situation and to get him out of the room.

8          AMR was en route as well as BPD, and

9    then I sent the order out for the lights and the

10   music to be killed.  And then I proceeded to

11   escort Soukup to the interview room.

12        Q.    Anything else you can remember about

13   that night?

14        A.    Well, after arriving in the interview

15   room and on the way -- let's go back to on the way

16   because specifically I remember as we're walking

17   to include in the elevator and in the room, Soukup

18   is very adamant about the fact that he took care

19   of business.  His friend apparently was choking

20   his wife out, and he had had enough.  And he is

21   one of his guys.  And he is going to take care of

22   business in the ranks.

23          And then we are talking, and even as we

24   arrive in the room and we continue the

25   conversation, he is not showing any remorse, and

1   he is telling me the story all over again in more

2   detail about how they take care of business on

3   their own.

4          I even said to him, I understand.  I

5   was in the military.  I understand where you're

6   coming from that you want to take care of your

7   guys in the ranks and that kind of stuff.  I get

8   that.  However, here on this property in my

9   position, that's just absolutely not going to be

10  allowed.  You have created a hostile situation and

11  disrupted our business and that will not be

12  tolerated.  And for that, I'm placing you under

13  arrest for disorderly disruption of a business.

14     Q.    Okay.  Anything else you recall about

15  that evening?

16  MR. STEWART:

17         You got a specific question or is it

18  the whole episode?

19  MR. BELLINDER:

20         My question is what else he

21  specifically remembers.

22     A.    Well, I do know that at the end of the

23  night, and my report will indicate this, I do know

24  that there was another arrest what turned out to

25  be Jordan.  I wasn't involved in that.  I know

1    that he went to jail.  And later I went to the

2    station to sign charges against Soukup.

3         Q.    Okay.  This would have been after

4    everybody involved would have been removed from

5    the premises?

6         A.    Right.

7         Q.    Anything else you can recall

8    specifically about that evening?

9         A.    Without a specific question on that,

10   that's --

11        Q.    That's about all you remember; is that

12   right?

13        A.    In terms of --

14   MR. STEWART:

15             That pretty much calls for his

16   recollection without a specific question.

17   MR. BELLINDER:

18        Q.    Okay.  Let me ask you a few specific

19   questions about that -- about what you have told

20   us so far.  You mentioned you get the call over

21   the radio that there was a fight in progress.  You

22   arrive on scene, and the first person you come in

23   contact with is Amanda Flannigan; is that right?

24        A.    Yes.

25        Q.    At the time when you contacted Amanda

1   Flannigan, was the fight over with?

2       A.    It appeared to be other than Jordan was

3   being restrained and Soukup was against the wall.

4       Q.    So when you arrive, the fight is done;

5   is that correct?

6       A.    Yes.

7       Q.    You haven't seen the fight itself?

8       A.    No.

9       Q.    You haven't seen the video prior to

10  arriving on the scene?

11      A.    No.

12      Q.    You didn't have time to stop and check

13  the tape and then go?

14      A.    No.

15      Q.    You respond right away.  You get there.

16  You contact your employee, and the fight is over

17  with.  Both parties are being restrained?

18      A.    Yes.

19      Q.    Tell me where is Jordan at this time.

20      A.    Jordan is on the floor being

21  restrained.

22      Q.    Okay.  Who is restraining Jordan?

23      A.    John Dixson.

24      Q.    And so Flannigan tells you that Soukup

25  was the aggressor?

1      A.    Right.

2      Q.    Okay.  We know that to be incorrect

3  now?  Hindsight 20/20, we understand that he was

4  not the aggressor?

5  MR. STEWART:

6            Object to form.

7  MS. STEEL:

8            Object to the form.

9  MR. BELLINDER:

10     Q.    Is that right?  Is that your

11 understanding of what took place?

12     A.    No, it's not.

13     Q.    You say you've seen the video?

14     A.    Yes.

15     Q.    At what point in the video is Soukup

16 seen to be the aggressor?

17     A.    He is not on the video.

18     Q.    He's not.  And the video captures the

19 entire incident; is that correct?

20 MR. STEWART:

21            Objection.

22     A.    Negative.

23 MR. BELLINDER:

24     Q.    What part of the incident did the video

25 not catch?

1        A.      Soukup being aggressive and hitting the

2    guy.

3        Q.      So your testimony is that Soukup was

4    the aggressor because Amanda told you so, right?

5        A.      Not just Amanda.

6        Q.      Okay.  Somebody else told you?

7        A.      Yes.

8        Q.      Who else told you that Soukup was the

9    aggressor?

10       A.      Fisher.

11       Q.      Who is Fisher?

12       A.      Nathan Fisher who is now a Jackson

13   County sheriff's deputy.

14       Q.      Okay.  Where was he?

15       A.      He was in the club as well.  He was

16   actually right behind me as I was handcuffing

17   Soukup.

18       Q.      Okay.  And so where did Fisher -- at

19   what point does Fisher tell you Soukup is the

20   aggressor?

21       A.      It's happening at the same time.  As

22   I'm arriving on scene, I talked to Amanda and then

23   he's there.  He's telling me the same thing.  So

24   I've got a corroborating story that this guy is

25   the aggressor.

1    Q.    Gotcha.  Did Fisher tell you where he
2  was positioned in reference to the incident?
3    A.    We didn't have time to discuss that.
4    Q.    At any point does he tell you where he
5  was?
6    A.    No.
7    Q.    Did you ask him where he was?
8    A.    No.
9    Q.    Did you ask him, Well, did you actually
10 see the incident or did Amanda tell you and you
11 told me?
12   A.    He told me that he seen it.
13   Q.    Okay.  But you didn't follow up and see
14 where he was?
15   A.    No, sir.
16   Q.    Okay.  Anybody else who told you Soukup
17 was the aggressor?
18   A.    Not that I recall at this time.
19   Q.    And you said the video doesn't show
20 that?
21   A.    The video doesn't show it, but he said
22 he was the aggressor.
23   Q.    You say he took care -- he told you he
24 took care of business?
25   A.    Yes, sir, he did.

1     Q.    So did he tell you he was taking care

2  of business, or did he tell you I was the

3  aggressor in the fight?

4     A.    He said they take care of business.

5  This is his guys and that's the way they take care

6  of things.

7     Q.    Did you know Soukup prior to this?

8     A.    No.

9     Q.    Had you ever met him before?

10     A.    I had not.

11     Q.    Had you ever met Jordan before?

12     A.    No, sir.

13     Q.    Had you ever met his wife before?

14     A.    Not that I'm aware of.

15     Q.    Okay.  Information that you received

16  regarding him fighting or him hitting the guy

17  repeatedly, that would have been told to you by

18  someone else?

19     A.    Yes.

20     Q.    You say you immediately called for the

21  ambulance?

22     A.    Yes.

23     Q.    And then at that point, after you

24  called the ambulance, you told Soukup he was under

25  arrest?

1      A.    Yes.

2      Q.    And you handcuffed him?

3      A.    Yes.

4      Q.    Okay.  Tell me what authority do you

5 have to arrest someone, period?

6 MR. STEWART:

7            Object to the extent that calls for a

8 legal opinion.

9 MR. BELLINDER:

10     Q.    What authority in your position do you

11 have to arrest someone?

12     A.    We make citizens arrests in providing

13 safety and security for all guests on the Hard

14 Rock Casino property.  It is authorized from time

15 to time to make a citizen's arrest.

16     Q.    Authorized by whom?

17     A.    Well, it's just --

18     Q.    Go ahead.  Who authorizes you to make a

19 citizen's arrest?

20     A.    I guess the State of Mississippi.

21     Q.    Okay.  You say you guess.  Have you

22 ever been trained in what it takes to arrest

23 someone?

24     A.    Have I been trained specifically in

25 arresting?

1      Q.    Yeah.

2      A.    Yes.

3      Q.    By who?

4      A.    Mark Dunston.

5      Q.    Okay.  Mark Dunston trained you to make

6  arrests?

7      A.    Yes, sir.

8      Q.    Okay.  You've seen the -- I'm assuming

9  you have seen the policy as it relates to the --

10  as it relates to the Hard Rock?

11      A.    Yes, sir.

12  MS. STEEL:

13          Have you got a copy of those?

14  MR. BELLINDER:

15          I did not copy it.  I was instructed

16  not to copy it per court order.

17  MS. STEEL:

18          Okay.

19  MR. STEWART:

20          Outside the use of this case.

21  MR. BELLINDER:

22          Right.

23  MS. STEEL:

24          Do you mind stopping and letting us --

25  MR. BELLINDER:

1            No.  If you want it, that's fine.

2    MS. STEEL:

3            David, is that okay?

4    MR. STEWART:

5            Yeah, I meant to bring them.  I had

6    them on my desk and I forgot.

7            (A short break was taken.)

8    MR. BELLINDER:

9        Q.    Okay.  Mr. Strong, we were talking

10   briefly before we took a break about the security

11   policies and procedures for the Hard Rock.  You're

12   familiar with those?

13       A.    Yes, sir.

14       Q.    Those basically govern your actions as

15   the security shift manager?

16       A.    Yes, sir.

17       Q.    And so your policy states, the security

18   department is geared toward a public relations

19   approach and is not run like a police department

20   or the military.  You're aware it says that?

21       A.    Yes, sir.

22       Q.    Okay.  And then later on it references

23   that officers are reminded they are not police

24   officers but are security officers acting in the

25   best interest of and on behalf of the Hard Rock.

1    You're aware of that as well?

2        A.    Yes.

3        Q.    Okay.  But you told us that you

4    arrested Chris Soukup that evening?

5        A.    Yes, sir.

6        Q.    That you placed him in handcuffs and

7    lead him to an interrogation room?

8        A.    Yes.

9        Q.    Okay.  And you say your only training

10   for --

11   MR. STEWART:

12           Object to characterization.

13       Q.    Okay.  Is that your testimony?

14   MR. STEWART:

15           As to the word interrogation.

16   MR. BELLINDER:

17       Q.    Okay.  What was the room called that

18   you took him to?

19       A.    Interview room.

20       Q.    To an interview room; is that right?

21       A.    Yes.

22       Q.    And so you say your only training as to

23   arrest was this class you had when you first

24   started by now Assistant Chief Mark Dunston; is

25   that right?

1      A.    Yes.

2      Q.    Now, going back to that, could you tell

3  me how long that class was?

4      A.    I can't recall.

5      Q.    Can't recall.  Ballpark, was it a day

6  or week or month?

7      A.    It was pretty extensive, so it was

8  probably a whole day.

9      Q.    A whole day.  So you get one day, and

10 you say you started back when the Hard Rock

11 opened?  '07.

12     A.    '07.

13     Q.    Okay.  So you get one day of training

14 as to arrests in '07.  Nothing since?

15     A.    No, sir.

16     Q.    No continuing training as to how to

17 apply handcuffs?

18     A.    No.

19     Q.    No continuing training as to what

20 constitutes a citizen's arrest?

21     A.    No.

22     Q.    No training as it relates to reasons

23 for a lawful arrest?

24     A.    No.

25     Q.    Okay.  While you were heading down

1    this -- while you were escorting him to the

2    interview room, do you recall Mr. Soukup --

3    Chris -- do you recall Chris complaining about the

4    way the handcuffs were applied?

5        A.    I don't recall anything along those

6    lines.

7        Q.    At any point during the walk, during

8    the ride down the elevator, or while he was in the

9    interview room, do you recall him mentioning the

10   handcuffs aren't applied properly?

11       A.    I don't remember that specific thing,

12   but I do remember him complaining in the interview

13   room, and I adjusted them.

14       Q.    Okay.  And you're aware that -- or are

15   you aware that applying handcuffs improperly can

16   injure someone?

17       A.    Yes.

18       Q.    So it would be important to be trained

19   on those things to prevent injuries when you're

20   handcuffing someone?

21       A.    Yes.

22       Q.    At any point during your arrest process

23   did you read Chris Soukup his Miranda Rights?

24       A.    I did not.

25       Q.    Do you know what Miranda is?

1        A.    Yes.

2        Q.    Were you trained on Miranda?

3        A.    I had that in my criminal justice

4    course.

5        Q.    That one class you took at -- at Gulf

6    Coast?

7        A.    Yes, sir.

8        Q.    So what is your understanding of

9    Miranda?

10    MR. STEWART:

11            Objection to the extent it calls for a

12    legal conclusion.

13    MR. BELLINDER:

14        Q.    Your personal knowledge of Miranda to

15    the extent you remember it from your class.

16        A.    Well, I don't recall exactly the

17    verbiage that is in the Miranda, but is it

18    something that a police officer is required to

19    read to someone.

20        Q.    Those are rights that an individual has

21    that are required to be read to them when someone

22    is arresting them?

23        A.    By a police officer.

24        Q.    Now, what is your understanding of a

25    citizen's arrest and in what circumstances can a

1    citizen's arrest can be made?

2        A.    In a situation to where they're highly

3    aggressive and other patrons or employees are in

4    danger.

5        Q.    And so it's -- go ahead.

6        A.    We also arrest on theft, things of this

7    sort.

8        Q.    So you say in a situation where someone

9    is highly aggressive or putting someone else in

10   danger?

11       A.    Right.

12       Q.    Then you have the authority to make a

13   citizen's arrest?

14       A.    Yes.

15       Q.    Is there an announcement that you have

16   to make when you're making a citizen's arrest?

17       A.    Yeah.  I advised him that he was under

18   arrest.

19       Q.    You told him that he was under a

20   citizen's arrest?  Did you tell him you were a

21   police officer making an arrest?

22       A.    I told him he was under citizen's

23   arrest for disorderly disruption of a business.

24       Q.    Okay.  Now, at the time when you

25   arrested him, this is after you came in contact

1    with Amanda and she told you what she told you,

2    was Mr. Soukup being highly aggressive?

3         A.    No, he wasn't.

4         Q.    Was Mr. Soukup placing other patrons in

5    danger at that point?

6         A.    Not at that point.

7         Q.    Okay.  So you had no authority to

8    arrest him?

9    MR. STEWART:

10            Object to form.

11    MR. BELLINDER:

12         Q.    Okay.  If he's not being highly

13    aggressive -- you told us earlier that to make a

14    citizen's arrest you can make one when someone is

15    being highly aggressive or placing other patrons

16    in danger, right?

17         A.    I'm going to make sure that he is not

18    aggressive again.

19         Q.    But you don't know -- you can't see in

20    the future?  You don't know that he is going to do

21    that?

22         A.    No, sir.  But I have to prepare to

23    protect guests and employees.

24         Q.    Right.  And in fact, Amanda had told

25    him to leave?

1       A.    I don't have any knowledge of that.

2       Q.    You were standing right there?

3       A.    No, sir.

4       Q.    You weren't standing there?

5       A.    I don't have any knowledge of that.

6       Q.    You recall him when he was up against

7    the wall walking away at some point?

8       A.    No, sir.

9       Q.    Okay.  So when you arrive, you arrest

10   him?

11      A.    Yes.

12      Q.    Based on not what you saw but what

13   somebody else told you?

14      A.    Yes.

15      Q.    And you said at that point he was not

16   being aggressive and he was not placing anyone in

17   danger?

18      A.    Yes.

19      Q.    And you arrested him based on your

20   experience of a criminal justice course at

21   Mississippi Gulf Coast College and a one-day class

22   seven years prior?

23      A.    I arrested him based on he was an

24   aggressive person and was placing other guests and

25   employees in danger.

1    Q.    Right.  But you said he wasn't at that

2    time?  When you saw him, he wasn't?

3    A.    But I had -- it's my responsibility to

4    make sure that he doesn't again.

5    Q.    Uh-huh.  But you were told that by

6    somebody else.  You hadn't seen him be aggressive

7    at all?

8    MR. STEWART:

9            Asked and answered.

10    A.    Yes, sir.

11    MR. BELLINDER:

12    Q.    You had not seen him be aggressive at

13    all that evening?

14    A.    That's correct.

15    Q.    He was compliant with what you asked to

16    do?

17    A.    Actually he wasn't.  He didn't want to

18    be handcuffed.

19    Q.    Okay.  Before you handcuffed him, did

20    you tell him you were arresting him?

21    A.    Yes.

22    Q.    Describe what you said.

23    MR. STEWART:

24            Object to the form.  Asked and

25    answered.

1    MR. BELLINDER:

2        Q.    Go ahead.  Describe what you told him

3    prior to putting the handcuffs on him.

4        A.    You're under citizen's arrest for

5    disorderly disruption of a business.

6        Q.    Uh-huh.

7        A.    I went to place the handcuffs on him,

8    and he went to pull them away.

9        Q.    Okay.  What is disorderly disruption of

10   a business?

11   MR. STEWART:

12           Object to form.  It calls for a legal

13   conclusion or opinion.

14   MR. BELLINDER:

15       Q.    You say you arrested him for disorderly

16   disruption of a business at least twice, right?

17       A.    What do you mean?

18       Q.    At least twice today you say you

19   arrested him for disorderly disruption of a

20   business, correct?

21       A.    Yes.

22       Q.    What is that?

23       A.    Well --

24       Q.    Is that a crime in Mississippi?

25       A.    It is.

1        Q.    Go ahead.

2   MS. STEEL:

3            Object.  Y'all are talking over each

4   other.

5   MR. BELLINDER:

6        Q.    Go ahead.

7        A.    Yes.

8        Q.    Yes what?

9        A.    Yes, it is a crime.

10       Q.    Okay.  How do you know that's a crime?

11       A.    Because we have arrested people before

12  for the same thing.

13       Q.    Okay.  Now, tell me this.  You did an

14  affidavit you said against Mr. Soukup, correct?

15       A.    Yes.

16       Q.    This is a misdemeanor affidavit?

17       A.    Yes.

18       Q.    A misdemeanor that was not committed in

19  your presence, correct?

20       A.    Yes.

21       Q.    It was information that was given to

22  you by somebody else, and then you filed the

23  charge against him?

24       A.    Yes.

25       Q.    You were -- in the course of filing

1    this affidavit, you gave sort of an affidavit

2    which is a sworn statement, correct?

3        A.    Yes.

4        Q.    You understand that that's what an

5    affidavit is?

6        A.    Yes.

7        Q.    And the affidavit you actually filed

8    has some penalties essentially describing what it

9    is that an affidavit or I guess the penalty for

10   withdrawing an affidavit, right?

11   MR. STEWART:

12              Object to the form.  The document

13   speaks for itself.  You have not identified it for

14   the record.

15   MR. BELLINDER:

16              This is HR03.

17   MR. STEWART:

18              Is that an exhibit to this deposition?

19   MR. BELLINDER:

20              It's not.  We can make it one.

21   MR. STEWART:

22              It's your deposition.

23   MR. BELLINDER:

24       Q.    Now, in your -- in your this is called

25   a victim's statement.  Do you recall giving this?

 1      A.    Yes.

 2      Q.    Have you looked at this subsequent to?

 3  Have you looked at this since you actually gave

 4  it?

 5      A.    No.

 6  MR. BELLINDER:

 7          Okay.  Let's -- we can make this one.

 8          (Exhibit 1 was marked.)

 9      Q.    I'm going to hand you what's been

10  marked as Exhibit 1 to your deposition.

11  Specifically I'm going to ask you about that

12  second page, that victim statement down there.

13          Okay.  Do you recall making that

14  statement?

15      A.    Yes.

16      Q.    Or making that statement.  Writing that

17  statement?  Giving that statement to the police?

18      A.    Yes.

19      Q.    That's my copy right here.

20  MS. STEEL:

21          Could you tell us what Exhibit 1 is,

22  what document?

23  MR. BELLINDER:

24          04.  03 and 04.

25  MS. STEEL:

1          I don't have any --

2   MR. STEWART:

3          This is the affidavit in the city court

4   file.

5   MS. STEEL:

6          Thanks.

7   MR. BELLINDER:

8      Q.    Now, it says victim statement, but

9   you're not the victim, right?  You were not

10  accosted or assaulted by Mr. --

11     A.    I represent the Hard Rock.

12     Q.    Right.  And so the Hard Rock is the

13  victim here?

14     A.    Yes.

15     Q.    It says when you arrived, your officers

16  advised that Soukup had punched an unknown white

17  male that was unconscious laying face down on the

18  floor, correct?

19     A.    Yes.

20     Q.    And so it's your sworn testimony that

21  Jason Jordan was unconscious laying face down on

22  the floor?

23     A.    Well, in looking at that now, I don't

24  know that he was unconscious.

25     Q.    Okay.  But my question is:  This was an

1  affidavit, right, sworn for you to tell the truth,
2  right?
3      A.    Right.
4      Q.    And in your affidavit, you say Jason
5  Jordan was unconscious laying face down on the
6  floor?
7      A.    Well, somebody told me that he was
8  possibly but he was definitely injured, and that's
9  when I called for an ambulance.
10     Q.    And this would have been while Soukup
11 was standing up before he had been handcuffed?
12     A.    Somewhere right in that same area, yes,
13 sir.
14     Q.    Okay.  You're not saying that you
15 submitted a false affidavit?
16     A.    No, sir.
17     Q.    Okay.  Ambulance.  What -- what do you
18 know about the ambulance?  Did it ever come?  Was
19 there ever a stretcher brought in?
20     A.    It was brought in from what I was told
21 later and then they left.
22     Q.    Okay.  Why did they leave?
23     A.    Well, that I don't have any knowledge
24 of.
25     Q.    You didn't tell them to leave?

1      A.    No, sir.

2      Q.    Do you know if anybody with the casino

3    told them to leave?

4      A.    I don't have any knowledge of that.

5      Q.    You haven't had any conversations about

6    that?

7      A.    No, sir.

8      Q.    At some point, there's been reference

9    to a wheelchair?

10     A.    Right.

11     Q.    Okay.  Do you know anything about that?

12    Was there a wheelchair brought there at some

13    point?

14     A.    There was a wheelchair brought in.

15     Q.    Is that visible on the video?

16     A.    Yes, sir.

17     Q.    At what point is the wheelchair brought

18    in?  Well, let me ask this:  Who asked for the

19    wheelchair?

20     A.    That I don't have knowledge of, but

21    it's a standard procedure when someone is injured

22    to initially ask for a wheelchair, and it's

23    usually prerequisite if AMR is responding be on

24    standby in case.

25     Q.    And so you saw the wheelchair prior to

1    handcuffing Chris?

2        A.    No, sir, I can't say that.

3        Q.    When did you see the wheelchair?

4        A.    I didn't see the wheelchair.

5        Q.    You only saw it on video?  You didn't

6    see the wheelchair while you were actually there?

7        A.    Right.

8        Q.    Okay.  Per looking at the video, when

9    was the wheelchair brought to the scene, to the

10    scene of the incident?

11        A.    Exact time?

12        Q.    In relation to Jordan as we see him on

13    the video, where and when is the wheelchair

14    brought in?

15        A.    That I don't recall exactly, but I do

16    recall seeing the wheelchair brought in.

17        Q.    It was brought in prior to the police

18    arriving?

19        A.    Yes.

20        Q.    Okay.  So somebody with the Hard Rock

21    would have known Jordan was injured prior to the

22    police coming, that's why a wheelchair was

23    brought, right?

24        A.    I'm not sure.  I don't know.

25        Q.    That's the only reason a wheelchair

1    would have been brought, right?

2         A.    I can't say who asked for it.

3         Q.    Okay.  Why would you somebody have

4    called for a wheelchair, you said because somebody

5    would be hurt, right?

6    MR. STEWART:

7              Objection.  Calls for speculation.

8         A.    It could have been a -- it could have

9    been a bartender that asked for it.  I mean, I

10   don't know.

11   MR. BELLINDER:

12        Q.    Right.  But they wouldn't have brought

13   it for anyone other than Jordan, right?

14        A.    Once again, I don't have any knowledge

15   of that.

16        Q.    You didn't call for the wheelchair?

17        A.    No, sir.

18        Q.    Travis Hart.  Who is Travis Hart?  How

19   did that -- there is reference to a Travis Hart

20   made in incident files and police reports, and so

21   I'm wondering who is -- how did that name come

22   about?

23        A.    I was advised by the officers on the

24   scene that the other guy was Travis Hart.  That

25   turned out to be Jordan.

1      Q.    Police told you that the guy on the
2  floor was Travis Hart?
3      A.    Right.
4      Q.    But that was later found out to
5  actually be Jordan?
6      A.    (Witness nodded head.)
7      Q.    Do you recall which police officer it
8  was that told you that's Travis Hart?
9      A.    That I don't remember.
10      Q.    Do you remember was it while -- well
11  let me ask you this.  When was the first time you
12  actually talked to a police officer?
13      A.    I don't recall that neither, but it was
14  later in the -- later in the night probably.
15      Q.    Same evening?
16      A.    Yes.
17      Q.    Okay.
18      A.    In fact, it's probably going to be when
19  the officer arrived in the interview room is when
20  we had our first discussion?
21      Q.    Okay.  So you think it was at that
22  point he told you that Travis Hart was the guy on
23  the floor?
24      A.    I'm not sure.  But obviously it got
25  twisted.

1      Q.    The video itself, there is no audio

2  available on that?

3      A.    There's no audio.

4      Q.    Is that standard with the security film

5  that it's video only without sound as far as

6  what's being heard?

7      A.    No, sir.

8      Q.    No that's not standard?

9      A.    It's not standard.

10      Q.    Normally it has audio?

11      A.    Yes.

12      Q.    Okay.  Why does this one have audio?

13  Do you have any idea?

14      A.    I can't answer that.

15  MR. STEWART:

16            Which one?

17  MR. BELLINDER:

18            All of them.

19  MR. STEWART:

20            All -- the entire video?

21  MR. BELLINDER:

22            Uh-huh.

23      Q.    Any idea why this wouldn't have audio?

24      A.    Well, we don't have audio on the entire

25  video, it's just the interview room that would

1    have audio.

2        Q.    Okay.  So standard is the video, the

3    surveillance that looks into the club, the casino

4    and the other areas where we see the hallways,

5    that does not have audio ever?

6        A.    That is correct.

7        Q.    Okay.  The interview room has audio?

8        A.    Yes.

9        Q.    Okay.  Did you actually see the police

10   arrive to the nightclub?  Were you there at that

11   point or were you gone by then?

12       A.    I was gone.

13       Q.    How many other arrests have you made in

14   your time with the Hard Rock Casino?

15       A.    That I -- we would have to go into the

16   records to look at that.  There is no way that I

17   could give you a number on that at this point.

18       Q.    What about a -- what about a ballpark?

19   Have you arrested more than five people?

20       A.    Yes.

21       Q.    More than ten people?

22       A.    Yes.

23       Q.    Have you ever had somebody complain of

24   an injury due to the way that you arrested them

25   before?

1      A.    Yes.

2      Q.    Okay.  Who is that?

3      A.    All I remember is the guy's last name

4   of Sanford.

5      Q.    Sanford.  Do you remember about when

6   that was?

7      A.    I don't recall actually.

8      Q.    This year?  Last year?

9      A.    Probably approximately three years, but

10  that's a guess.

11     Q.    2011?

12     A.    Don't want to swear to that.

13     Q.    Did you ever talk with any of the

14  witnesses to what was going on?

15     A.    As far as when their depositions were

16  or?

17     Q.    Let's talk about the night of.

18  MR. STEWART:

19          What do you mean witnesses?

20  MR. BELLINDER:

21     Q.    Did you ever talk to somebody -- did

22  you ever ask anybody some questions on the scene

23  there when you arrested Chris?

24     A.    Well, there was no time to ask anybody

25  on the scene.  I was removing him.

1       Q.    It was time to arrest him and get him

2  out.  So you didn't talk to anybody before

3  arresting Chris other than Amanda, other than

4  Fisher?

5       A.    Amanda and Fisher.

6       Q.    What about afterwards, did you ever go

7  back and talk to any witness?

8       A.    Well, I talked to my guys that were on

9  the scene, but the best account of it was from

10 those two.  And at the time that that report was

11 published, I think that's what I indicated.

12      Q.    You say you talked to your guys on

13 scene?  Who did you talk to?  What guys?

14      A.    That would be Amanda and Fisher.

15      Q.    Okay.  Nobody -- had you spoken with

16 anybody else?  That's what I thought you were

17 referencing was somebody other than Amanda and

18 Fisher.  Other than Amanda and Fisher, did you

19 talk to anybody else?

20      A.    You will see Oliver Waits was listed on

21 there I believe, John Brown, John Dixson, and

22 everyone corroborated the story that this guy was

23 the aggressor.

24      Q.    When did you talk to Oliver Waits; do

25 you remember?

1      A.    I don't remember exactly.  I want to

2  say it was later in the night.

3      Q.    And so what did Waits tell you?

4      A.    Other than the guy was the aggressor.

5      Q.    And when you say the guy, that's Chris

6  Soukup?

7      A.    Right.

8      Q.    Waits told you Chris was the aggressor?

9      A.    Right.  But I can't testify as to

10 whether or not somebody told him.

11     Q.    Okay.  But that's just what Waits told

12 you?

13     A.    Right.

14     Q.    When you talked to Brown, what did

15 Brown say?

16     A.    Brown pretty much along the same lines,

17 but I don't remember the exact conversation.

18     Q.    Do you remember when it was?

19     A.    No, I don't.

20     Q.    What about Dixson?

21     A.    Same thing.  They were sure that that

22 was the guy.

23     Q.    Okay.  What role did you have in the

24 investigation on behalf of the casino -- on behalf

25 of Premier in this particular incident?  What all

1     were you required to do?

2          A.     You're holding it in your hand.

3          Q.     Just the incident report?

4          A.     The incident report.  State the facts.

5     Forward that up.  And then continued on the next

6     night when the supplement was attached that says

7     that the guy ended up being Jordan that was face

8     down.  I straightened that out on a supplement.

9          Q.     Who is Matthew Zachary Martin?

10         A.     Matthew Zachary Martin from what I

11    understand -- I didn't have any contact with

12    him -- that was something that was found in the

13    investigation as well.  He ended up being involved

14    in filming a second arrest from the casino that

15    was eventually posted on You Tube.

16         Q.     He was the guy holding the camera?  Or

17    was the guy that was --

18         A.     I didn't see that.  That's what I was

19    told.

20         Q.     His name -- actually his driver's

21    license and his picture are in your -- in your

22    incident report?

23         A.     We identified him from video.

24         Q.     Okay.  Did you ever actually talk to

25    him?

1      A.    I did not.

2      Q.    Where did you actually receive

3 information about him?

4      A.    That I don't recall.

5      Q.    From a source I guess is what I mean.

6      A.    That I don't recall.  We were able to

7 obtain his name, but I can't speculate on that.

8      Q.    Okay.  And naturally, I mean, we --

9 while I'm asking you about it.  Let's just make

10 your report -- make your report exhibit next, and

11 we are referencing HR38 through 42.

12           (Exhibit 2 was marked.)

13      Q.    Okay.  Have you seen -- I'm going to

14 hand you what's been marked as Exhibit 2.  Have

15 you seen that since you filled it out?

16      A.    Yes.

17      Q.    And that's your -- that's a five page

18 report based on that evening and as far as what

19 would have taken place; is that right?

20      A.    Yes, sir.

21      Q.    And so you see where -- you see where

22 it references Martin?  Would have began with

23 December 2nd.

24      A.    December the 2nd.  Okay.

25      Q.    Where would you have received that

 1   information?

 2        A.    Once again, that I don't recall.

 3        Q.    Is it standard that you would recall

 4   where you gathered information in the course of an

 5   investigation?

 6   MR. STEWART:

 7             Object to form.

 8   MR. BELLINDER:

 9        Q.    Go ahead.  Do you typically not recall

10   where you receive this information?

11   MR. STEWART:

12             Object to form.

13   MR. BELLINDER:

14             Go ahead.

15        A.    I -- usually it would happen in

16   conjunction with surveillance, based on possibly

17   play.

18        Q.    Are you trained to document where you

19   received the information that you put in the

20   report?

21        A.    No, sir.

22        Q.    You're not trained on that?

23        A.    No, sir.

24        Q.    You just put it in there?

25        A.    Yes.

1        Q.    You say you called the ambulance

2   because there was an injury on site?

3        A.    Possible.

4        Q.    Possible injury.  And you said the

5   reason that a wheelchair would have been called

6   was for a possible injury?

7        A.    Or for a drunk.

8        Q.    And everybody -- you and your security

9   folks are trained on that, right?

10        A.    Yes.

11        Q.    If somebody is hurt, you call an

12   ambulance, get a wheelchair, help them?

13        A.    Sometimes somebody is just intoxicated,

14   and they bring a wheelchair.  I say that because

15   it could have very well been for something else.

16   I'm not sure.

17        Q.    Describe -- describe The Ledge for us.

18   There is reference to the corridor.  Reference to

19   the wall.  There is reference to down to holding.

20   All those different things.  Explain to us just

21   briefly, if you can, describe the setup for us.

22        A.    Well, um --

23        Q.    And it may be -- would it help to

24   reference that?

25   MR. STEWART:

1           It doesn't have an interior detail.

2   I've got something that I've located that I should

3   be able to produce.  If we need it, I can try to

4   get it.

5   MR. BELLINDER:

6       Q.    Well, just generally.  I'm not going to

7   hold you to it.  But generally can you describe

8   The Ledge nightclub, the bar, the wall where

9   Soukup is being held, the holding areas.

10      A.    Well, there is a stairwell that leads

11  up, and then there's a foyer as you enter.  There

12  is a glass wall that is the wall for the foyer.

13  Okay.  And then there are some glass doors that

14  leads into the actual club.  There is two bars

15  inside, DJ booth, dance floor.  And the corridor

16  that they're referring to would be the corridor

17  leading out the back of the club past the

18  restrooms that would go into our back hallway and

19  to the service elevator where he was escorted into

20  the interview room.

21      Q.    Do you remember asking Amanda if she

22  saw the tasing by the police?

23      A.    I don't recall.

24      Q.    Do you recall a David Creel?

25      A.    Yes.

1       Q.    Who is David Creel?

2       A.    David Creel is one of my ex-employees.

3       Q.    Okay.  He is no longer with the casino?

4       A.    He is not.

5       Q.    What were the circumstances of his

6    separation?

7       A.    I do not recall.

8       Q.    Do you remember about when it was that

9    he separated?

10      A.    No, I don't.

11      Q.    Did you ever talk to him about this?

12      A.    About?

13      Q.    About the incident.

14      A.    He -- he probably.  Yeah, later on.

15   Yes.  Yeah.  He was another one that I talked to.

16   And he actually assisted with what turned out to

17   be Jordan, carrying his feet.

18      Q.    He helped carry Jordan's feet?

19      A.    Yes.

20      Q.    And he was an employee you said?

21      A.    Yes.

22      Q.    Tell us about what security wears.

23   What were you wearing?  What was Brown and Dixson

24   wearing?  What did Amanda have on that night?

25      A.    They are wearing black slacks with blue

1  short sleeve shirts with the Hard Rock logo and

2  security.  Had security on the sleeve.

3      Q.    The word security is on the front you

4  said?

5      A.    It's on the sleeve.

6      Q.    The word security is on the sleeve?

7      A.    Yes.

8      Q.    The Hard Rock emblem is on the front?

9      A.    Right.

10      Q.    Do they have a badge?  Do they have

11  anything else that identifies them as security?

12      A.    A badge.  But there is a security

13  officer in uniform in the foyer that everyone has

14  to pass upon entry wearing that same uniform.

15      Q.    Say that again.

16      A.    There is a security officer in the

17  foyer on a regular basis for ID check purposes

18  wearing that same uniform that everyone has to

19  pass in order to enter the nightclub.

20      Q.    Did that individual respond to this

21  incident?

22      A.    Yes.

23      Q.    And what was that individual's name?

24      A.    John Dixson.

25      Q.    Okay.  So John Dixson had this

1    identifying -- I don't know what you call it.

2    What did you refer to it as?

3        A.    The security uniform.

4        Q.    The uniform.  Okay.  And it actually

5    identifies him as a security guard?

6        A.    Yes.

7        Q.    Who was the security guard that pinned

8    Jordan to the ground?  You said you've seen the

9    video, right?

10        A.    I did.

11        Q.    Which security guard was it that pinned

12    Jordan to the ground for the timeframe?

13        A.    I don't know if I would call it pinned,

14    but it was John Dixson that detained him.

15        Q.    What would you call it?

16        A.    He detained him or restrained him.

17        Q.    Okay.  We will talk about that.  Have

18    you talked to any of the security guards -- let me

19    ask you this:  You said you have not talked to any

20    of the security guards since this incident

21    happened?

22    MR. STEWART:

23            Object to form.  Based on his prior

24    testimony, I think he's mentioned several people

25    that he talked to that night and thereafter.

1    MR. BELLINDER:

2        Q.    Okay.  After that evening, have

3    you talked to anybody about this?

4        A.    My boss.

5        Q.    Who is your boss?

6        A.    Dwight Savell.

7        Q.    Okay.  Tell us what you told Dwight

8    about this or what you and Dwight talked about.

9        A.    Explained exactly what happened in the

10   report.

11       Q.    And what did he say?

12       A.    As far as we could tell, everything was

13   handled good.

14       Q.    Nobody was disciplined for this?

15       A.    No.

16       Q.    None of the security, none of the

17   Biloxi employees were disciplined in any way for

18   this incident?

19       A.    I can't speak for --

20   MS. STEEL:

21            Object to the form.  Biloxi employees?

22   MR. BELLINDER:

23            I'm sorry.  Premier employee.  You get

24   mad at me because I made a Freudian slip.  I'm

25   sorry.  We've got more than one -- one defendant.

1    I'm sorry.

2        Q.    Any of the Premier employees, none of

3    them were disciplined as a result of this; is that

4    right?

5        A.    No.

6        Q.    You didn't have any participation?  You

7    weren't contacted by any outside agency as it

8    relates to an investigation into this; is that

9    right?

10       A.    As far as?

11       Q.    Anybody else who was investigating

12   this?  Nobody called you and said, Mr. Strong, we

13   want to take your statement; we want to talk to

14   you about this?

15       A.    No, not that I recall.

16       Q.    Did you ever talk to an individual

17   named Dorack?

18       A.    Don't know the name.

19       Q.    Naturally you didn't talk to him?

20       A.    Not that I'm aware of.

21       Q.    Didn't talk to anybody named Pennick?

22       A.    Not that I'm aware.

23       Q.    Did you talk to Alyssa Jordan any time

24   during or after this incident?

25       A.    Not that I recall.

1      Q.    Bear with me.  Had you had anything to

2  drink that night?

3      A.    No.

4      Q.    Y'all are not allowed to drink on duty,

5  right?

6      A.    That's correct.

7      Q.    Same with illegal substances?

8      A.    Yes.

9      Q.    How about tobacco, are y'all allowed to

10  smoke or use tobacco while on the scene -- while

11  on duty?

12      A.    No.

13      Q.    No cigarette breaks, nothing like that?

14      A.    Yes.  We can take cigarette breaks.

15      Q.    You can take cigarette breaks?

16      A.    Yes.  I don't smoke.

17      Q.    Me either.  Bad habit I'm glad I never

18  picked up.

19            When you arrested Chris, did you search

20  him for weapons, anything dangerous?

21      A.    No.

22      Q.    Never searched him?

23      A.    No.

24      Q.    About how long was he in your custody?

25      A.    That I'm not sure.  You'd have to look

1   at the video to get the exact time.

2        Q.    We can look at the video to get the

3   exact time as to your detention of Chris, right?

4        A.    Right.  If I gave you a time right now,

5   I couldn't be exact.

6        Q.    But the video would give us that exact

7   time?

8        A.    Yes.

9        Q.    But you're saying the video does not

10  exactly show the incident involving Chris or

11  Jason?

12       A.    I didn't see that.

13       Q.    Okay.  Your testimony is you didn't see

14  Chris being the aggressor to Jason?

15       A.    Yes.

16       Q.    And so there was -- at the alleged time

17  when Chris would have been the aggressor, there

18  would have been video surveillance of that area

19  where this allegedly occurred, right?

20       A.    I can't speak for surveillance.

21       Q.    Typically in your experience as

22  security shift manager, this area is right in

23  front of the bar; is that right?

24       A.    That depends on what right in front of

25  is.

1      Q.    Well, to your knowledge and what you

2  have been told and your investigation, where did

3  the incident involving Jason and Chris take

4  place?

5      A.    Well, it would have been to the -- what

6  I would refer to as the south side of the bar.

7      Q.    South side of the bar.

8      A.    Right.  Which is almost directly in the

9  center of the club.

10      Q.    South side of the bar, center of the

11  club, there would have been a camera there,

12  right?

13      A.    I can't --

14      Q.    In your experience, has there typically

15  been a camera that faces that area?

16      A.    I believe there is a camera, yes.

17      Q.    And we've got what's alleged to be

18  portions of the incident right there on tape,

19  right?

20      A.    Right.  Now, some of these are PTZs

21  that you speak of.

22      Q.    Say that again.

23      A.    Pan, tilt, and zoom cameras.  So to

24  stay that they're positioned a certain way, it's

25  hard to accurately say that for anyone.

1    Q.    Okay.  You said pan, tilt, and zoom?

2    A.    PTZ.

3    Q.    That's in reference to the cameras?

4    A.    Right.

5    Q.    You told me a minute ago I'd have to

6    talk to surveillance about it, but you just gave

7    me a PTZ, a pan, tilt, and zoom type of camera.

8    What's your knowledge of the pan, tilt, and zoom

9    camera?

10    A.    I didn't say you would have to talk to

11    them.

12    MS. STEEL:

13          Object to the form.

14    A.    I know what a PTZ is.

15    MR. BELLINDER:

16    Q.    How do you know?

17    A.    18 years.

18    Q.    How do you know?

19    A.    I just do.

20    Q.    You just do?

21    A.    Yes, sir.

22    Q.    And what is a pan, tilt, and zoom?

23    A.    A camera.

24    Q.    And why is that in relevant to the

25    question I asked you about whether there would

1    have been video of what took place?

2        A.    Because you asked if a specific camera

3    was on that spot and the cameras turn.

4        Q.    Okay.  So the camera that would have

5    been facing that would have turned?

6        A.    Possibly.

7        Q.    Okay.  Do you know that for sure?

8        A.    I don't know.

9        Q.    Chris would have been removed from the

10   premises by whom?  After your custody, he would

11   have been removed by?

12       A.    The Biloxi police.

13       Q.    Have you been made aware of any of

14   Chris' injuries after this incident?

15       A.    No, sir.

16       Q.    Have you been made aware of Jason's

17   injuries?

18       A.    No, sir.

19       Q.    Or Alyssa?

20       A.    No, sir.

21       Q.    No knowledge of their injuries?

22   MR. STEWART:

23            Not referring to conversations with me

24   about anything.  Independent of conversations with

25   me.  You can answer as to anything that someone

1    told you besides your attorneys.

2    MR. BELLINDER:

3              Or I guess it would be the attorneys

4    for the casino.  The attorneys for your employer.

5    MR. STEWART:

6              That's accurate.

7    MR. BELLINDER:

8         Q.    No, you have not been made aware of any

9    of their injuries; is that right?

10        A.    I know that there is an allegation of

11   something.

12        Q.    Okay.  You would have gotten that

13   information through the lawyer for the --

14        A.    Yes.

15        Q.    Your arrest of Chris, he put his hands

16   behind his back to allow you to handcuff him?

17   Chris we are talking about.

18        A.    Initially?

19        Q.    Uh-huh.

20        A.    I think he may have, but at the same

21   time he was a bit resistant.  He was pulling away

22   on both sides, and one of the other guys if not

23   two of them reached in, and we had to get in a

24   position to cuff him.

25        Q.    All right.  There would be video of

1  that?

2      A.    Yes.

3  MR. BELLINDER:

4          All right.  I think I'm done.

5  MR. STEWART:

6          Do you guys have anything?

7  MS. STEEL:

8          I do.  Just a few questions.

9                  EXAMINATION

10  BY MS. STEEL:

11      Q.    When you arrived in the area of the

12  club, Jason Jordan was on the floor, correct?

13      A.    Yes.

14      Q.    And did you call the area where he was

15  on the floor the corridor area?

16      A.    The foyer?

17      Q.    Is it the foyer or the corridor, or is

18  that two the same thing?

19      A.    I'm thinking we refer to the corridor

20  as the back hallway that we are walking down

21  en route to the interview, I would refer to that

22  as the foyer every time.  It's the entryway into

23  the club, security checkpoint area.

24      Q.    So when the patrons were leaving the

25  club, they would have used the foyer as a means of

1    exit?

2        A.    Yes.

3        Q.    When you came to the area of The Ledge,

4    you came to the foyer area?

5        A.    Yes.

6        Q.    You did not go into the club?

7        A.    No, ma'am.

8        Q.    And you testified, if I understood you

9    correctly, that you did not see a wheelchair?

10       A.    Right.  That's correct.

11       Q.    And you also testified that -- that --

12   I tried to write down what you said and you were

13   testifying about the wheelchair, and you said it

14   could have been for something else.  I'm not sure.

15       A.    Right.

16       Q.    What did you mean by that?

17       A.    Sometimes guests are intoxicated and

18   maybe some friends are there to walk them out.

19   That's always a good thing, right?  So we bring

20   over a wheelchair for assistance.  And that can

21   happen from time to time.

22       Q.    You don't know why the wheelchair was

23   requested or who requested it; is that right?

24       A.    That is correct.

25   MS. STEEL:

1           That's all I have.

2                   EXAMINATION

3    BY MR. CLARK:

4        Q.    I think I heard you right.  You said

5    you weren't present when Biloxi PD arrived?

6        A.    That's correct.

7        Q.    And you weren't in the vicinity when

8    they were taking Mr. Jordan out of the casino.

9        A.    No, sir.

10       Q.    You didn't witness any of that?

11       A.    No, sir.

12                  EXAMINATION

13   BY MR. BELLINDER:

14       Q.    Just to clarify.  You said the foyer is

15   not a part of the nightclub?

16       A.    I'm sorry.

17       Q.    Did you tell her that a foyer was not a

18   part of the nightclub?

19       A.    It's the entryway.  The security

20   checkpoint area.

21       Q.    And so how far is that in relationship

22   to the bar?

23       A.    From where the fight took place?

24       Q.    No.  No.  Where is the foyer in

25   relation to the bar?

1       A.    It's probably 15, 20 feet.

2       Q.    Is that whole area considered the

3   foyer?

4       A.    No.  It's separated by a glass wall.

5   There is a glass wall and glass doors that leads

6   out of the foyer into the club.

7       Q.    Okay.  So when you arrived, you were in

8   the foyer?

9       A.    I was initially in the club.  I came

10  out of the back hallway.  Initially in the club is

11  where I made contact with Amanda, and I stepped

12  out into the foyer where Soukup was against the

13  glass wall.

14      Q.    So Jordan would have been in the club,

15  and Chris would have been in the foyer?

16      A.    Jordan was laying in the floor in the

17  foyer.

18      Q.    How far was Jordan from the bar when

19  you got there?

20      A.    About 20 feet.

21      Q.    20 feet.  Okay.

22  MR. BELLINDER:

23          That's all I have got.

24          (Deposition concluded at 10:32 a.m.)

25

CERTIFICATE OF COURT REPORTER

1

2          I, Janna White, CSR #1312, do hereby

3   certify that the foregoing pages contain a true

4   and correct transcript of the testimony of the

5   witness as taken by me at the time and place

6   heretofore stated and later reduced to typewritten

7   form by computer-aided transcription under the

8   authority vested in me by the State of Mississippi

9   to testify to the truth and nothing but the truth

10  in this cause and was thereupon carefully examined

11  upon this oath.

12          I further certify that I am neither

13  attorney or counsel for nor related to or employed

14  by any of the parties to the action in which this

15  deposition is taken and further that I am not a

16  relative or employee of any attorney or counsel

17  employed by the parties hereto or financially

18  interested in the action.

19          Witness my signature, this the _____ day

20  of_____, 2014.

21

22

23          _____

                Janna White, CSR #1312

24

25