UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL
DEATH BENEFICIARIES OF UNBORN
BABY JORDAN, DECEASED;
AND CHRISTOPHER SOUKUP                         PLAINTIFFS

VS.                    CIVIL ACTION NO:  1:13cv195 LG-JMR

PREMIER ENTERTAINMENT BILOXI,
LLC d/b/a HARD ROCK HOTEL & CASINO;
THE CITY OF BILOXI, MISSISSIPPI;
DOE DEFENDANT ONE; JOSHUA HAMILTON,
IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; DOE DEFENDANT THREE;
DOE DEFENDANT FOUR; DOE DEFENDANT
FIVE AND DOE DEFENDANTS 6-10                    DEFENDANTS

-----------------------------------------------------------
DEPOSITION OF JOHN MILLER
30(B)(6) REPRESENTATIVE
CITY OF BILOXI
-----------------------------------------------------------

        Taken at 759 Vieux Marche Mall, Biloxi,
        Mississippi, Thursday, April 3, 2013,
        beginning at 9:10 a.m.

REPORTED BY:
JENNIFER RAY, RPR
Merrill Legal Solutions

1    APPEARANCES:
2

REPRESENTING PLAINTIFFS:
3            THOMAS J. BELLINDER, ESQUIRE
             Martin & Bellinder
4            351 Edgewood Terrace Drive
             Jackson, Mississippi  39206
5

6    REPRESENTING HARD ROCK HOTEL & CASINO BILOXI:
             DAVID W. STEWART, ESQUIRE
7            COPELAND COOK TAYLOR & BUSH, P.A.
             2781 C.T. Switzer Sr. Drive, Suite 200
8            Biloxi, Mississippi  39531
9

REPRESENTING THE CITY OF BILOXI:
10           TERE R. STEEL, ESQUIRE
             Page, Mannino, Peresich & McDermott, PLLC
11           759 Vieux Marche Mall
             Biloxi, Mississippi  39530
12

13   REPRESENTING JOSHUA HAMILTON:
             RUSSELL S. GILL, ESQUIRE
14           Russell S. Gill, PLLC
             638 Howard Avenue
15           Biloxi, Mississippi  39530
16
17
18
19
20
21
22
23
24
25

1                    TABLE OF CONTENTS

2

3    WITNESS:    JOHN MILLER                              PAGE:

4

     Examination by Mr. Bellinder ----------------------- 14

5    Examination by Mr. Stewart ------------------------- 89

     Examination by Mr. Gill ---------------------------- 90

6    Examination by Ms. Steel --------------------------- 91

     Reporter's Certificate ----------------------------- 93

7    Errata Sheet --------------------------------------- 94

8    ****************************************************

9    EXHIBITS

10   Exhibit 1:    City of Biloxi's Response and

                   Objections to Rule 30(b)(6) Notice

11                 and Rule 30(b)(2) Request for

                   Production of Documents Propounded

12                 By Plaintiffs ----------------------- 5

     Exhibit 2:    Biloxi Department of Police Law

13                 Enforcement Policies and Procedures --- 51

     Exhibit 3:    Affidavit Withdrawal Penalties Form --- 73

14

15

16

17

18

19

20

21

22

23

24

25

1                    STIPULATION

2              It is hereby stipulated and agreed

3    by and between the parties hereto, through

4    their respective attorneys of record, that

5    this deposition may be taken at the time and

6    place hereinbefore set forth, by Jennifer Ray,

7    RPR, Court Reporter and Notary Public,

8    pursuant to the Federal Rules of Civil

9    Procedure, as amended;

10              That the formality of READING AND

11   SIGNING is specifically NOT WAIVED;

12              That all objections, except as to

13   the form of the questions and the

14   responsiveness of the answers, are reserved

15   until such time as this deposition, or any

16   part thereof, may be used or is sought to be

17   used in evidence.

18

19

20

21

22

23

24

25

1          JOHN MILLER,

2       the witness, having been produced and

3   first duly sworn, testified as follows,

4   to-wit:

5                    - - -

6          MS. STEEL:  I'm Tere Steel for the

7   City of Biloxi.  For the record, the City of

8   Biloxi has served its response and objections

9   to the 30(b)(6) notice and the 30(b)(2)

10   request for production of documents propounded

11   by the plaintiffs, and I'm submitting those to

12   be made Exhibit 1 to the deposition.

13          MR. BELLINDER:  Now, are we

14   continuing the exhibits from the other day, or

15   do you just want to start over with the City?

16          MS. STEEL:  It's up to y'all.

17                    - - -

18          (Off the record.)

19          (Exhibit 1 was marked.)

20          MS. STEEL:  Plaintiff's counsel and

21   I have conferred, and many, if not all, of the

22   objections have been resolved for purposes of

23   this deposition.  It's my understanding that

24   the following agreements have been reached:

25          On Topic 2, the topic is limited to

1  the identification of persons with direct

2  knowledge of the Jordan and Soukup incidents

3  sued on and any supervisory officials with

4  indirect knowledge.

5          On Topic 3, the preparation and

6  designation of the City's representative is

7  limited to the documents in possession of the

8  City of Biloxi that were produced during

9  discovery in this lawsuit.  If other documents

10  are submitted to the 30(b)(6) representative

11  during the deposition, a statement will be

12  made that the document is not within the

13  City's possession and the document is not

14  considered information known to the City.

15          MR. BELLINDER:  And we will not

16  object -- from the plaintiffs' side, we will

17  not object as to the City having produced

18  insufficient or improper designees per

19  today --

20          MS. STEEL:  Right.

21          MR. BELLINDER:  -- in the event that

22  something does come up that is --

23          MS. STEEL:  Very good.

24          Now, in relation to Topic 3, we

25  raised the governmental privilege objection.

1    It's preserved as to the documents that are in

2    the custody of the City that would be

3    protected by it.  I'm gonna talk a little bit

4    more about that with regard to Topics 20

5    through 22.

6            Topic 5 is withdrawn.

7            Topic 6, 7, 9, 10, 11 and 12 are

8    outside the City of Biloxi's knowledge and,

9    therefore, no representative has been

10   designated to testify about those subjects,

11   and that is because the Hard Rock is a private

12   business and not owned or operated by the

13   City.

14           Topic 8 --

15           MR. BELLINDER:  And, also, not --

16   Biloxi police are not leased or lended to the

17   casino to provide any level of private

18   security.  As is done in certain

19   circumstances, that's not done as references

20   the Biloxi Hard Rock Hotel and Casino.

21           MS. STEEL:  Yes.  I mean, that's my

22   understanding, but if you want to ask the

23   designee that, that's fine.

24           MR. BELLINDER:  We may just confirm

25   that, but it sounds like from all of what

1    we've done, that's the case.

2         MS. STEEL:  I just want to make it

3    clear that I haven't designated someone

4    outside the City's knowledge to testify.

5         MR. BELLINDER:  Right.  And it

6    doesn't sound like we need it, but we may just

7    confirm that with him but --

8         MS. STEEL:  That's fine.

9         Topic Number 8, plaintiffs' counsel

10   has agreed to remove the eight-year time

11   period from that topic.

12        Topic Number 13, that topic has been

13   withdrawn from the 30(b)(6) deposition, but

14   counsel have agreed that the production of

15   related documents, which has been requested in

16   written discovery, will be revisited.

17        MR. BELLINDER:  And to the extent

18   that we need to supplement or to send a good

19   faith letter, a good faith certificate, you

20   know, file motions at that point, we'll deal

21   with that later on.

22        MS. STEEL:  Okay.

23        MR. BELLINDER:  We won't object to

24   improper designation.  We may need to just

25   reserve the right to talk to somebody else in

1     the event that we get into some area that --

2     is it Sergeant Miller?

3             THE WITNESS:  Chief Miller.

4             MR. BELLINDER:  -- that Chief Miller

5     is not prepared to talk about today.  Does

6     that make sense?

7             MS. STEEL:  I didn't follow you, and

8     I want to make sure --

9             MR. BELLINDER:  What we talked about

10    the other day is --

11            MS. STEEL:  I want to make sure,

12    Thomas, that you are not bringing sanctions --

13            MR. BELLINDER:  No, no, no.

14            MS. STEEL:  -- against the City of

15    Biloxi or making a motion to compel --

16            MR. BELLINDER:  No.

17            MS. STEEL:  -- this deponent to --

18            MR. BELLINDER:  This is the current

19    chief, and so he is prepared based on the

20    30(b)(6) notice and your prep of him --

21            MS. STEEL:  Exactly.

22            MR. BELLINDER:  -- to testify about

23    -- my understanding is everything that you and

24    I talked about the other day and I think

25    everything that I had to ask about.  To the

1    extent there's something that we get into --

2    we may stumble upon something that's outside

3    of the scope of the 30(b)(6) -- not the notice

4    but outside of the scope of what he's prepared

5    to testify about, we may need to send a

6    subsequent letter or file a motion or just

7    have somebody else produced that may can speak

8    to that area, but that's just --

9            MS. STEEL:  Well, now, let's make

10   clear that if you go outside the scope of the

11   30(b)(6) notice I'm gonna object --

12           MR. BELLINDER:  Of course.

13           MS. STEEL:  -- and say he's --

14           MR. BELLINDER:  Yeah.  That's why

15   our 30(b)(6) notice was broad, so that way --

16           MS. STEEL:  Okay.  All right.

17           MR. BELLINDER:  We contemplated

18   everything in getting ready.  He's here to

19   talk about, I think, everything that we've

20   addressed as being relevant to this case.

21           MS. STEEL:  Now, Topic Number 14, in

22   preparing for the deposition -- and this may

23   be my error in taking notes of what our

24   agreement was, but in addressing Topic Number

25   14, I was unable to narrow it down to the

1  scope -- to a workable scope, so I'm going to

2  stand on the City's objection --

3           MR. BELLINDER:  And 14 is the

4  prior --

5           MS. STEEL:  Prior complaints.  But

6  what I will submit to you is that you and I

7  can certainly try to narrow it down.  If we

8  get it narrowed down, we will submit to you a

9  list of cases, and then if you need to

10  question a City rep, we will certainly allow

11  that.

12           MR. BELLINDER:  And I think the best

13  way to probably handle that is just to ask him

14  about it as we go, and then what he knows,

15  what he's got on top of his head, that's fine,

16  and then we'll revisit the document

17  production --

18           MS. STEEL:  I have not designated

19  anyone to testify on Topic Number 14.

20           Now, 16, Topic Number 16 has been

21  withdrawn.

22           Topic Number 18, the plaintiffs'

23  counsel will accept the 30(b)(6) rep's

24  testimony as the explanation of the City.

25           Topic Number 19, plaintiffs' counsel

1   has withdrawn subsequent complaints from the

2   scope of the topic, and he has confined the

3   topic to the identification of prior

4   complaints of excessive force on the officers

5   who had direct involvement with these

6   plaintiffs.

7          Topic Numbers 20, 21 and 22, we

8   remain committed that those things are

9   overbroad and irrelevant because they refer to

10  incidents other than this one, and even as

11  regards to this one, they're protected from

12  disclosure by the governmental privilege.

13  However, plaintiffs' counsel has agreed that

14  the general background and scope of the

15  internal investigation can be testified to

16  today without him raising a waiver of the

17  governmental privilege.

18          If y'all agree to that as well, then

19  this designee will give general information

20  about the internal investigation.  Is that --

21          MR. BELLINDER:  We, of course, won't

22  waive the right of the plaintiffs to get into

23  that, but we'll accept Chief Miller's

24  designation for today's purpose.

25          MS. STEEL:  But you're not gonna

1    raise a waiver of the governmental

2    privilege --

3            MR. BELLINDER:  Right.

4            MS. STEEL:  -- if he testifies --

5            MR. BELLINDER:  That's something

6    that the judge would have to decide anyway.

7            MR. STEWART:  I don't think Hard

8    Rock would have a position either way, so I

9    don't have any objection to it.  I think Rusty

10   would.

11           MR. GILL:  Can we go off the record

12   and you and me talk a minute?

13           MS. STEEL:  Sure.

14                   - - -

15           (Off the record.)

16           MS. STEEL:  20, 21 and 22, we remain

17   committed to the governmental privilege

18   objection and overbroad and irrelevant, but we

19   have agreed that this representative can talk

20   generally about the internal investigation

21   that was done in the Jordan and Soukup

22   incident without plaintiffs' counsel or anyone

23   in the room hopefully raising a waiver of the

24   governmental privilege objection.

25           MR. GILL:  That's agreeable.

1          MS. STEEL:  Finally, 24, plaintiffs'

2     counsel has agreed for the deposition that

3     this topic is confined to information in the

4     City of Biloxi's file regarding Jordan and

5     Soukup incidents as it relates to crime

6     reports of the Hard Rock.  Again, counsel and

7     I are going to revisit that topic later, but

8     for purposes of 30(b)(6), we have not

9     designated Director Miller to testify about

10    that.

11          And, finally, Director John Miller

12    is the director of the City of Biloxi

13    Department of Police, and he's the City's

14    30(b)(6) representative for the remaining and

15    modified topics in the 30(b)(6) notice.

16                    - - -

17               (Off the record.)

18                  EXAMINATION

19    BY MR. BELLINDER:

20         Q.   Do I call you chief, director?

21         A.   Either one.  John, whatever you

22    want.  It doesn't matter.

23         Q.   Okay.  Good morning.  My name is

24    Thomas Bellinder.  We met just a moment ago.

25    Myself and some other lawyers represent Jason

1  Jordan, Alyssa Jordan and Chris Soukup as it

2  relates to some incidents that took place at

3  the Hard Rock Casino back in 2011.

4          MR. BELLINDER:  For the record, the

5  deposition is being taken pursuant to the

6  Federal Rules of Civil Procedure and all

7  permissible uses thereunder.

8  MR. BELLINDER:

9      Q.   I'm going to be asking you a series

10 of questions about those incidents and the

11 City's involvement in those and some other

12 areas that counsel addressed a moment ago.

13          Before we get started, have you ever

14 given a deposition before, Chief?

15     A.   I have.

16     Q.   So you kind of understand this

17 process.  The court reporter is here.  She's

18 sworn you in.  We're here to -- not in a

19 formal setting like we would be in a

20 courtroom, but real broad, to just sort of

21 have a conversation about some of the things

22 that happened.

23          You are under oath to tell the truth

24 to the extent you can.  However, your only --

25 the best of your knowledge is all we can ask

1  for today.  "I don't know" is a perfectly good

2  answer.

3          You've been designated as the Rule

4  30(b)(6) representative.  Do you basically

5  understand what that means?

6      A.   I do.

7      Q.   You are on behalf of the City and

8  giving us what the City's sort of position is

9  and what the City's knowledge is.

10          We will -- as we get going, we may

11  get into casual sort of conversation.  I may

12  ask you something you already know what I'm

13  gonna ask you, and so you may start answering

14  my question before I finish, or I may overlap

15  and start asking the next question before you

16  finish your answer.  That makes her job a

17  little tough.  So what we'll do is if you'll

18  allow me to finish, I'll allow you to finish,

19  and we'll keep moving.

20          Audible answers also is a help to

21  her.  You and I may say uh-huh or nuh-uh.  We

22  may nod our heads, and you and I understand

23  exactly what we're saying, but looking back on

24  the record, she's gotta have a clear audible

25  answer.

1       A.    Sure.

2       Q.    Also, to speed things up a little

3    bit, anytime I ask you any specific question

4    about a conversation that was had or an

5    individual or some set of circumstances, it'll

6    always call for your personal knowledge or the

7    City's knowledge of that particular subject

8    matter area and only what you know of or what

9    you've been made aware or what the City has

10   gathered as far as information.  Okay?

11      A.    Sure.

12      Q.    All right.  If you would, just tell

13   us your full name.

14      A.    John Brent Miller.

15      Q.    And, Chief Miller, where do you

16   currently reside?

17      A.    In Ocean Springs.

18      Q.    How long have you lived there in

19   Ocean Springs?

20      A.    Oh, about -- I guess about eight

21   years.  Well, actually I grew up in Ocean

22   Springs, but a current resident, about eight

23   years.

24      Q.    And you are the current -- tell us

25   your current position with the City of Biloxi.

1      A.    Director of police.

2      Q.    How long have you held that post?

3      A.    Since December of '09.

4      Q.    Were you with the City of Biloxi

5  Police Department before you took that

6  position?

7      A.    I was.

8      Q.    How long were you with the City of

9  Biloxi prior to accepting the position as

10  director of police?

11      A.    Let's see.  I hired in on December

12  17th, 1990.

13      Q.    That was your hire date?

14      A.    Yes.

15      Q.    What was your initial position there

16  in 1990?

17      A.    Patrolman.

18      Q.    Have you worked consistently from

19  December 17, 1990, through today with the

20  City?

21      A.    Yes.

22      Q.    Tell us a little bit about your

23  advancement within the department from there

24  as patrolman in 1990 to now as the director of

25  police.

1    A.    Hired on in 1990 as patrolman, went

2    through the police academy, went to patrol.

3    Q.    The --

4    A.    I'm sorry.

5    Q.    No.  Go ahead.  I didn't mean to

6    interrupt you.  I was gonna -- the academy is

7    there in Pearl on 468, is that the --

8    A.    No.  I went to a Long Beach academy.

9    Q.    Long Beach?

10    A.    Yeah, which no longer exists.

11    Q.    Okay.  Go ahead.  I didn't mean to

12    interrupt you.

13    A.    I went to patrol.  I think I stayed

14    on patrol until about '95.  In '95, I moved to

15    narcotics.  I stayed in narcotics for many

16    years, up until about -- I'm not real sure on

17    the dates, but I want to say about maybe 2008,

18    '7 -- maybe 2007 I moved to criminal

19    investigations, ran the criminal

20    investigations division.  Then I moved back to

21    narcotics for about a year, and then I ran

22    narcotics and criminal investigations

23    together.  During that time, I was promoted to

24    the rank of lieutenant and then to captain,

25    and then in December of 1990, I was appointed

1    director.

2         Q.    December '09?

3         A.    I'm sorry.  Yeah.

4         Q.    Okay.  And so what is your date of

5    birth?

6         A.    August 10th, 1959.

7         Q.    Currently married?

8         A.    Yes.

9         Q.    What is your spouse's name?

10        A.    Vondell, V-O-N-D-E-L-L.

11        Q.    Miller?

12        A.    Yes.

13        Q.    Ever married before Ms. Vondell?

14        A.    Was I married before?

15        Q.    Yes.

16        A.    Yes.

17             MS. STEEL:  I think we've given some

18   leeway on background, but he is 30(b)(60).

19   He's the City.

20             MR. BELLINDER:  But here's the

21   thing, I can't have the chief of police's

22   ex-wife on the jury.

23             MS. STEEL:  Okay.

24             MR. BELLINDER:  I can't have his

25   current wife on the jury.

1    MR. BELLINDER:

2        Q.    And let me preface this.  A lot of

3    times -- and I always skim over this.  I hate

4    to do it.  But these background questions are,

5    of course, to get to know you, and your

6    capacity is different than just a fact

7    witness, somebody who -- like our last few

8    days, we've been talking to people who were

9    actually there on the scene, so they're a

10   little different.  But in the event that we

11   would have to go all the way to pick a jury in

12   the case, we've gotta make sure that the

13   jurors that we select are the proper jurors

14   for the case.  They may be qualified as

15   jurors, but my wife, you know, counsel's wife

16   or the parties, the witnesses or anybody

17   relevant with the City or the casino, they may

18   be good jurors, they may just not be the right

19   jurors for our case.  That's the only purpose

20   for me asking some of the background --

21       A.    Ask what you'd like.  I'm an open

22   book.

23       Q.    Okay.  Prior to Ms. Vondell, had you

24   ever been married before?

25       A.    I had.

1      Q.    Okay.  Prior spouse's name?

2                      - - -

3                  (Off the record.)

4      A.    Tammy.

5  MR. BELLINDER:

6      Q.    Tammy's I guess maiden name or her

7  remarried name?  Let me ask, Ms. Tammy, does

8  she reside in the Southern Mississippi area?

9      A.    I kind of doubt that.

10      Q.    Okay.

11      A.    I have no idea where she resides,

12  but I don't think it's in the South.

13      Q.    Other than Ms. Vondell, Ms. Tammy,

14  any other prior spouses?

15      A.    No.

16      Q.    Do you have any children over the

17  age of 18?

18      A.    I have two stepchildren.

19      Q.    That's from Ms. Vondell?

20      A.    That's from Ms. Vondell.

21      Q.    Are they over the age of 18?

22      A.    Yes.

23      Q.    What are their names?

24      A.    Gretchen Vondell Warkintian.

25      Q.    W-A-R --

1      A.    -- K-I-N-T-I-A-N.

2      Q.    Okay.

3      A.    Wesley Richton Hall.

4      Q.    H-A-L-L?

5      A.    Yes.

6      Q.    Does Gretchen or Wesley reside in

7  the Southern Mississippi region?

8      A.    They both do.

9      Q.    Do you know where they reside?

10      A.    I don't know their addresses.

11      Q.    Biloxi, Ocean Springs?

12      A.    They both reside in Ocean Springs.

13      Q.    That's good.

14            Military background?

15      A.    No.

16      Q.    All right.  Now, the City -- certain

17  officers with the City of Biloxi were called

18  to the Hard Rock Hotel and Casino on or about

19  November 27th, 2011, to respond to a

20  disturbance.  Is that the City's or your

21  understanding of how those officers came to be

22  on the premises that night?

23      A.    That's correct.

24      Q.    They were called by a casino

25  employee in response to a disturbance?

1      A.    That's right.

2      Q.    What is your understanding of that

3   -- of those circumstances as they led up to

4   the officers actually being on the premises?

5      A.    It's my understanding they were

6   called there for a fight.

7      Q.    Did you ever determine what that

8   initial fight was?  And when I say "your," in

9   this sort of setting, your and the City is

10  kind of interchangeable.  So I may say "your."

11  It may not be you personally --

12     A.    Sure.

13     Q.    -- but on behalf of the City, the

14  department -- what the department learned

15  about the fight.

16           And what I mean is was that the

17  specific -- as we understand through the

18  witness testimony, there was an altercation

19  between Mr. Jordan and some other members of

20  the group he was with that night, his -- maybe

21  a squadron or something like that, the members

22  of his group.

23           Was there -- did the City ever

24  determine that that initial call came from

25  that altercation, or was it a different actual

1    altercation that was going on in that

2    nightclub?

3        A.    It was my understanding it was that

4    altercation.  It was actually an altercation

5    between -- I think it started between Mr.

6    Jordan and his wife.

7        Q.    How did the City receive that

8    information?  Do you know?

9        A.    No, I don't.

10       Q.    Now, there was also reference to

11   some other individuals being detained, and

12   there was a name for it.  I think it was the

13   interview room of the --

14       A.    It's customary for the casino

15   security to take people out if they're causing

16   a disturbance, or if they're disruptive,

17   they'll take them down to their interview

18   rooms.

19       Q.    And we're able to see it on some of

20   the surveillance tape.  I'll ask you just

21   briefly about that as well.  But the -- there

22   was some individuals in that interview room

23   when Mr. Soukup was brought down there by Mr.

24   Strong.  Do we have any idea about their

25   involvement or why they were down there or --

1      A.   I do not.

2      Q.   Okay.  Now, tell me what it was that

3  the City learned about these incidents and the

4  incidents involving Mr. Jordan and the City's

5  response or the City's officers response when

6  they got on the scene?

7      A.   Well, it's my understanding that Mr.

8  Jordan apparently, according to what we were

9  told, had assaulted his wife, and then Mr.

10  Soukup intervened on that, intervened in that

11  altercation, and then he and Mr. Soukup --

12  Jordan and Soukup apparently got pretty

13  physical with each other.

14      Q.   Do you know who it was that informed

15  the City that Mr. Jordan assaulted his wife?

16      A.   One of the security guards.

17      Q.   Were we able to -- ever able to

18  identify which security guard informed the

19  officers that --

20      A.   I'm pretty sure we did, but right

21  offhand, I don't remember which one it was,

22  but I'm pretty sure that we did.

23      Q.   Okay.  Officers arrive on the scene,

24  and then what is the City's understanding of

25  their response to the situation or what they

1    observed?

2         A.    Two officers arrived first, which

3    would have been Franevich and Hilliard, and I

4    think they were just outside the club.  That's

5    where the security had Mr. Jordan on the

6    ground.  The officers attempted to put Mr.

7    Jordan into handcuffs.  It was at that time

8    that Officer Hamilton arrived, and Mr. Jordan

9    refused to allow himself to be handcuffed, so

10   he received a drive stun from Mr. Hamilton's

11   Taser.

12        Q.    And before we go further, just for

13   laymen's purposes, tell us what a drive stun

14   is.

15        A.    A drive stun is basically using your

16   Taser, removing the cartridge and just

17   allowing the voltage to come directly from the

18   Taser into the subject.

19        Q.    You say remove the cartridge --

20        A.    The cartridge actually shoots two

21   barbs out that are connected to the Taser with

22   wire.

23        Q.    Gotcha.  So in other words,

24   sometimes we see on videos and TV and stuff

25   the prongs come out with the wire, and then

1    they attach to somebody, perhaps if somebody's

2    running or a distance away?

3        A.    That's right.

4        Q.    And so that part that would do that

5    was removed, and so it's literally the weapon

6    itself contacting --

7        A.    That's right.

8        Q.    -- the suspect's body?

9        A.    That's right.

10       Q.    Okay.  What is the City's

11   understanding of what happened next?

12       A.    Well, he complied.  Once he had been

13   drive-tased, he complied and put his hands

14   behind his back.

15       Q.    And at that point, what happened?

16       A.    At that point, they attempted to

17   take him out of the casino.  The preferable

18   way would have been for him to stand and walk

19   out away from the crowd preferably, but he

20   refused to do that.

21       Q.    Okay.  At this point, what are the

22   options as far as removing him from the

23   nightclub?  He is -- we said he's complied,

24   he's been tased at this point, he's

25   handcuffed --

1       A.    Well, he's complied with being

2   handcuffed, but he has not complied with

3   standing and walking on his own.

4       Q.    Did the officers request or did they

5   inquire as to his injuries at that point?

6       A.    I don't know if they inquired about

7   injuries or not.

8       Q.    Did they know if he could stand?

9       A.    Yes.  He was alert.

10      Q.    Okay.  So he was alert, but

11  physically were they aware of whether or not

12  he could stand or not?

13      A.    The officers believed that he could

14  stand and walk.

15      Q.    Okay.  And so what are the options

16  if he cannot walk, or if he does not walk,

17  what are the options at that point?

18      A.    Well, you become a bit limited.

19  You're gonna have to carry him out.  I know

20  there was some discussion about using a

21  wheelchair, which I absolutely would have

22  blown a gasket if they had put him in a

23  wheelchair and tried to take him down the

24  steps or the stairs.

25      Q.    Okay.  And why is that?

1      A.   I think that would be more dangerous

2  than carrying him.

3      Q.   Are you aware if there's an elevator

4  in the --

5      A.   There is an elevator.  The club at

6  that point had been shut down.  So you can

7  imagine, there's probably in excess of 150,

8  maybe 200 people in the club all trying to get

9  out at the same time.  And it's our policy

10  that you take a disruptive person away from

11  the crowd and not into the crowd.  That could

12  be a dangerous situation, not only for the

13  officers but for the suspect.

14      Q.   And so there is a -- there's a time

15  concern; in other words, he needs to be

16  removed from the general population, or the

17  people in the club need to be removed from him

18  as quickly as possible?

19      A.   Well, one way or the other.  I'm not

20  so sure that I would refer to it as a -- you

21  know, as a time concern.  I'm sure that the

22  time was of the essence to get him removed

23  from there.

24      Q.   And naturally, I mean, hindsight is

25  20/20.  We have the benefit of looking back --

1      A.    Sure.

2      Q.    -- you know, in the midst of a

3  circumstance, and I think the policy speaks to

4  that, I think the law speaks to that as far

5  as, you know, allowing some leeway.

6            But I guess my question would be, he

7  could have been placed in the wheelchair and

8  taken to the elevator and brought down at that

9  point?

10     A.    Well, he could have if there had not

11 been such a crowd in the club.  I think they

12 had shut the club down.  And at one point --

13 and this has never been confirmed -- at least

14 I haven't confirmed it -- that the elevator

15 was actually shut down for a period of time,

16 and that could have been for safety concerns.

17 You know, I don't know that to be a fact

18 but --

19     Q.    That would be my question.  Do we

20 know that evening, that particular time

21 whether or not the elevator was working?

22     A.    I do not.

23     Q.    Okay.  And so would you -- we talked

24 about your reaction should they have tried to

25 place him in a wheelchair and then take him

1  down the stairs, and actually that makes

2  sense.  If they would have say waited for the

3  other folks or even moved him to the side and

4  sort of created a barrier between the police

5  and the security to allow everybody to leave,

6  then put him in the wheelchair and take him

7  down the elevator, what would your reaction

8  have been at that point?

9       A.   Well, I think they did the right

10  thing by trying to get him away as quick as

11  they did.  The barrier that you're talking

12  about -- and no disrespect to you, but that's

13  a little bit ridiculous that you've got three

14  policemen that's gonna hold a barrier against,

15  you know, 100, 150 people.

16       Q.   And, look, that's not the first

17  ridiculous and won't be the last ridiculous

18  question I ask, I'm sure.  Thinking through

19  it, that's my only question on that.

20            Okay.  So, now, they've -- we talked

21  about a drive stun, handcuffed, and at that

22  point, they bring him through the casino.  We

23  sort of see him being taken down the stairs.

24  We see his arms -- and I think there's a term

25  for it, the way that the officers sort of lift

1    his arms.  He's handcuffed behind his back,

2    but they're sort of lifting his arms above his

3    head almost in a dragging motion.  Is there a

4    name for that?

5        A.    I'm not sure that -- I don't know of

6    a name for that, but I don't recall seeing

7    that either.

8        Q.    Have you seen the surveillance tape?

9        A.    I have, yes.

10       Q.    They sort of have him -- I guess as

11   you -- you may -- and we can show it to you,

12   of course, if it's necessary, but his arms are

13   sort of behind his back and then lifted above

14   his head, and they've got their arms sort of

15   underneath his and sort of pulling his arms up

16   almost in an unnatural position.  Do you

17   recall seeing that on there?

18       A.    I do recall seeing what you're

19   talking about, but I would dispute that you

20   would -- that it would be an unnatural

21   position.  It would be unnatural only in the

22   fact that he normally probably wouldn't put

23   his hands behind his back like that.

24            But, you know, an escort hold is an

25   escort hold.  If he'd have been on his feet

1    walking, the escort hold would have been hand

2    across the back of his shoulder, but since he

3    refused to walk, the escort hold would have

4    been around the arms here, keeping his body

5    weight up off of his arms.

6         Q.    And that's the term I was searching

7    for.  Tell us, what is an escort hold?

8         A.    An escort hold is simply a way to

9    move someone forward on their feet, you know,

10   if they're willing to, by taking your arm --

11   putting your arm between their arm and laying

12   your hand on the top of their shoulder.

13        Q.    Kind of like a half-Nelson almost in

14   wrestling?

15        A.    Yeah.  A little bit.  Yeah.  Which

16   works very well if you're dealing with someone

17   who isn't resistive.

18        Q.    Now, would he not have -- with his

19   hands behind his back, could the officers -- I

20   guess -- it may have been called an arm and

21   arm.  I think that's the way the officer

22   reference the Alyssa Jordan escort once she's

23   taken, and we'll get there in a moment.

24             An option for the officers could

25   have been to put their arms -- instead of

1  entering I guess at his side from the front

2  and his rib and going up, could they not have

3  come from behind his arms and sort of escorted

4  him -- there's two of them there, and we see

5  four later that come, but could they not have

6  just escorted him with their arms, both of

7  them, and then kind of pull him up, almost as

8  if he's standing?  Does that make sense?

9       A.   Well, I mean, it's -- I guess that

10  sounds feasible, but theoretically that's very

11  difficult.  You've got a man who's got dead

12  weight, and you've got officers trying to

13  carry him down the staircase.  I think they

14  had better control of him -- I know they had

15  better control of him in carrying him the way

16  they carried him.

17       Q.   And do we know how much Jason Jordan

18  weighed?

19       A.   I don't know, but anything over 100

20  pounds -- I guess Jason Jordan would probably

21  weigh somewhere around 170, 180 pounds.

22       Q.   Okay.  So he's brought down the

23  stairs and then kind of through a casino area,

24  and at certain points he's sort of let go or

25  put on the floor.  Do we know if that's -- the

1    reason for that, is that fatigue?  Is it --

2        A.   Oh, most definitely.  Not only would

3    they need to lay him down for themselves, but

4    they would need to lay him down occasionally

5    anyway.

6        Q.   And then at some point, Alyssa

7    Jordan is following, I guess.  She's -- maybe

8    the whole time -- she's there as well as a

9    representative -- or a few representatives of

10   the casino are also there, and then at some

11   point, there's an altercation between Alyssa

12   and the officers.  Can you tell us what the

13   City knows about that?

14       A.   I don't know if it was an

15   altercation.  I know that there was several

16   times that Alyssa was getting loud and telling

17   her husband -- I know at one point she told

18   him, you know, he was embarrassing himself, to

19   stand up and walk.  I know that was taking

20   place.  And I'm sure she was, you know,

21   hollering at the officers, also.

22       Q.   And you know that how; the officers

23   would have said that?

24       A.   Yes.  I read that in several

25   reports.

1      Q.   And so were you also -- was the City

2   also made aware that she was trying to pull

3   his pants up?  At some point, his pants had

4   come down.

5      A.   I don't recall.  I wouldn't doubt

6   that at all.  I wouldn't doubt that a bit.

7   I'm sure she wanted his pants up.  I know the

8   officers tried to pull his pants up a couple

9   of times, also.

10      Q.   And so she's taken into custody at

11   some point.  She's actually placed under

12   arrest and --

13      A.   That's correct.

14      Q.   -- put in handcuffs?

15      A.   That's correct.

16      Q.   Do we know whether or not at any

17   point Mr. Jordan or Mrs. Jordan were read

18   their rights, their Miranda?

19      A.   I wouldn't think that they would've

20   been read their rights.  I wouldn't see a

21   reason to read their rights to them.

22      Q.   Okay.  They were under arrest,

23   correct?

24      A.   They are under arrest, but that's

25   not a prerequisite, to read rights.  You would

1    only read someone their rights if you were

2    going to question them.  Beyond their --

3        Q.   And so --

4        A.   Beyond their -- I'm sorry.

5        Q.   No, no, no.  That was my fault.  Go

6    ahead.

7        A.   Beyond their -- you know, just their

8    basic information.

9        Q.   And so no questions were asked of

10   Alyssa or Jason at any point when the police

11   came and when Biloxi came in contact with

12   them?

13       A.   Oh, I'm sure they asked them

14   questions.  I'm sure they asked them to supply

15   identification.  I'm sure they asked them who

16   they were, you know.

17       Q.   Okay.  So she's taken into -- she is

18   -- handcuffs were placed on her, she's placed

19   under arrest?

20       A.   That's right.  The questions that I

21   was talking about are questions in relation to

22   the crime itself.  That's when you would need

23   to Mirandize someone.

24       Q.   What happened, what was going on,

25   why is this taking place, stuff like that?

1      A.    Yes.  I just wanted to clarify that.

2      Q.    Right.  Absolutely.

3            Okay.  So we're -- at this point,

4      Alyssa is in handcuffs, and then what happens

5      next, to your knowledge, to the City's

6      knowledge?

7      A.    Well, they're both transported to

8      the Biloxi Police Department.

9      Q.    At any point, was an ambulance

10     called, to the City's knowledge?

11     A.    I heard that there was an ambulance

12     that was called by the casino, but I didn't

13     know that until recently, but not by the

14     officers, no.

15     Q.    Okay.  Have you seen the part of the

16     video where Jason Jordan is outside the

17     nightclub, I guess it was in kind of the valet

18     part where --

19     A.    Yes.

20     Q.    Closest to the door would be valet,

21     where people can come and have their cars

22     parked for them.  Have you seen the part where

23     the ambulance comes up -- or the stretcher

24     comes up with the EMTs?  They actually bring a

25     stretcher up, and the police --

1        A.    I don't recall seeing that.

2        Q.    Okay.  At this point where Jason is

3    outside, do you know or was the City ever made

4    aware that Jason was complaining of pain, that

5    he was saying that he was hurt, stop hurting

6    me, things like that?

7        A.    No, I have not heard that.

8        Q.    That was never documented?

9        A.    I have not heard that.

10        Q.    And the video reflects the officers

11    -- when the stretcher comes up, he's on the

12    ground.  He's not moving.  Then they wave the

13    stretcher off.  Is that customary?  Is that

14    something that -- should they have allowed --

15    at that point, should they have allowed the

16    EMTs to look at Jason to see if he had

17    injuries, just to confirm or deny whether he

18    had injuries?

19        A.    No.  I doubt very seriously that he

20    was complaining that he needed a physician, or

21    they would have brought him one.  I mean,

22    that's just standard for us.  As a matter of

23    fact, they would have preferred to have put

24    him on a stretcher and brought him down from

25    upstairs.

1      Q.   Right.

2           And so if there was an ambulance or

3    an EMT on the way, that would have been the

4    preferred way to remove him from the club?

5      A.   If he was --

6      Q.   But -- I'm sorry.  Go ahead.

7      A.   If he was injured or unconscious.

8      Q.   But there was no confirmation as to

9    that prior to the drive stun and then taking

10   him downstairs?

11     A.   I'm not --

12          MS. STEEL:  Objection.  Object to

13   the form.

14   MR. BELLINDER:

15     Q.   Did the officers ask Jason or ask

16   anybody around him whether or not he had

17   sustained any injuries at that point?  Did

18   they inquire as to whether or not he was hurt?

19     A.   I can't answer that.  I don't know

20   if they did or not, to be honest with you.

21     Q.   And so if they would have inquired

22   as to whether he was hurt and if he was hurt,

23   the proper steps would have been get him in a

24   stretcher, take him down that way?

25     A.   Properly -- if he was injured, he

1    should have told them he was injured, unless

2    they saw something that they believed was an

3    injury.

4        Q.   And so whether or not he said you're

5    hurting me, you're hurting me, I'm hurt, is a

6    matter of he says he said it, they say he

7    didn't say it, basically, because there's no

8    audio on the video, we don't have any -- it's

9    one person's word against another, basically?

10        A.   Well, you say one person's word --

11        Q.   And then also hindsight 20/20, we

12    know he was hurt, so --

13            MS. STEEL:  Wait.  Object to the

14    form.

15            MR. STEWART:  Join.

16            MR. GILL:  Join.

17    MR. BELLINDER:

18        Q.   Okay.  And they may -- I'm sure --

19    you've seen a deposition.  They do that.

20    That's a bookmark because I may have asked a

21    bad question.  There may be an objection as to

22    the substance of what I'm saying.

23            Like I said, hindsight 20/20, we see

24    he had to have two wrist surgeries subsequent

25    to the incident.  But at the time, was it

1    policy or would it have been proper practice

2    for the officers to inquire as to whether or

3    not Jason Jordan had injuries before we take

4    him throughout the nightclub and into the

5    cruiser?

6              MS. STEEL:  Object to the form.

7    MR. BELLINDER:

8         Q.   Go ahead.

9         A.   Only if they believed that he had

10   injuries, if they could see injuries or that

11   he was telling them that he had injuries.

12        Q.   And so the officers did not -- and

13   it's not in their reports and they didn't

14   express whether or not he said that?

15        A.   No, it's not in the reports.

16        Q.   Did they tell their supervisors or

17   did they express to the City that they asked

18   about it?

19        A.   Not that I know of.

20        Q.   Okay.  So at this point, he's placed

21   into a cruiser.  The other -- Mrs. Jordan is

22   also placed into a cruiser.  And then there's

23   an incident with a gentleman outside of the

24   nightclub I believe that's caught on a cell

25   phone video.  Do you know the officer's name

1  that was involved in that incident?

2      A.   I do.

3      Q.   What is his name?

4      A.   Hamilton.

5      Q.   Hamilton was involved in the

6  altercation with the other gentleman?

7      A.   Yes.

8          MR. GILL:  Let me object to that

9  form.

10 MR. BELLINDER:

11     Q.   And so -- and let's ask it

12 generally.  Arising out of this incident --

13 these incidents and this evening, was there

14 any disciplinary action taken as a result of

15 any of the officers' conduct?

16         MR. GILL:  Let me enter an objection

17 on that as well.

18         MS. STEEL:  And, again, I think I've

19 made my objection known, but we contend that

20 that's governmental privilege.  He can, again,

21 under the same stipulations we talked about

22 testify very generally.

23         MR. BELLINDER:  And our response to

24 that is that the video itself begins with a

25 statement that says somebody was just drug out

1    like a pig, and then this defendant was

2    involved in this set of incidents that

3    occurred moments after, and that's my only --

4    and to -- my question asked whether anybody

5    had any disciplinary action out of that

6    evening.

7            MS. STEEL:  Yes, and you're talking

8    about the incident --

9            MR. BELLINDER:  No.  I'm talking

10   about that evening, and I understand what --

11           MS. STEEL:  And he is not prepared

12   to testify about that, but your question about

13   discipline, I mean --

14           MR. BELLINDER:  I know you want to

15   draw a line in the sand, you know, everything

16   before this particular moment in time was one

17   incident, then everything after was some

18   separate incident.

19   MR. BELLINDER:

20       Q.   But my question is was anybody

21   disciplined that evening?

22           MR. GILL:  Before you answer that,

23   to the extent you've asked him to comment on

24   hearsay, I object to that as well.

25   MR. BELLINDER:

1      Q.   And I'll show you what we're talking

2   about if you want to see it.  I'm sure you've

3   seen it already.  But go ahead.  To the extent

4   that you know, was anybody disciplined out of

5   this?

6           MS. STEEL:  Object to the form of

7   that question.

8           MR. BELLINDER:  We've got that

9   objection I think four times on the record.

10  MR. BELLINDER:

11     Q.   Go ahead.

12     A.   You made reference to draw a line in

13  the sand and try to make them two different

14  incidents.  They were absolutely two different

15  incidents.  They had nothing to do with each

16  other whatsoever.

17     Q.   So in other words, Officer Hamilton

18  acted properly up until this line that we've

19  drawn in the sand, and then he acted

20  improperly?

21     A.   There was no disciplinary action on

22  any officer that dealt with the Jordans or

23  Soukup or Ms. Jordan at all.

24     Q.   Okay.  So none of the officers that

25  were involved in that incident -- and I think

1   we've named at least three -- that would be

2   Hamilton, Franevich and Hilliard -- were

3   disciplined as of -- call it November 28th,

4   the next day, they were not disciplined as of

5   that day?

6       A.   In reference to --

7           MS. STEEL:  What?  Object to the

8   form.

9       A.   I need you to explain that better.

10  MR. BELLINDER:

11      Q.   They may have been disciplined in

12  reference to other things, but we're saying

13  there was no discipline out of this incident

14  for those guys, right?

15          MS. STEEL:  Object to the form, but

16  if you understand it --

17      A.   Well, I think I understand.  You're

18  saying -- when you refer to "this incident,"

19  you're talking about the incident --

20  MR. BELLINDER:

21      Q.   I'm talking about everything that

22  happened from the time when the officers

23  showed up to the Hard Rock to when the

24  officers left the Biloxi Hard Rock.

25      A.   Okay.  Yes, there was some

 1  discipline.

 2       Q.    Tell us about that discipline.

 3            MS. STEEL:  All right.  But, again,

 4  he's already testified they are separate

 5  incidents.

 6            MR. BELLINDER:  We got that.

 7  MR. BELLINDER:

 8       Q.    Go ahead and tell us --

 9            MS. STEEL:  And I will object to --

10  he is not prepared here today to testify about

11  the subsequent incident.

12  MR. BELLINDER:

13       Q.    Tell us what you know about their

14  discipline from that evening.

15            MR. GILL:  Well, let me join that

16  objection and make sure we're clear on this.

17  Your question presumes until they left the

18  scene, they left the casino, that would entail

19  the second incident.  We think that's

20  irrelevant.

21            MR. BELLINDER:  I know.  And that's

22  for the judge to decide.  As we sit today,

23  he's got knowledge of the discipline that took

24  place that night, and I think it's proper that

25  we ask him about it.

1    MR. BELLINDER:

2        Q.   Go ahead.

3        A.   Mr. Hamilton was disciplined for his

4    use of vulgar language.

5        Q.   No discipline -- we'll start with

6    Mr. Hamilton.  No discipline for Mr. Hamilton

7    as to the use of force at all that evening?

8        A.   It's kind of difficult to answer.

9    Mr. Hamilton used some language that I

10   personally don't accept and don't allow, and

11   that's what he was disciplined for on that

12   particular incident.

13       Q.   Okay.  Let me ask you some questions

14   about --

15           MR. BELLINDER:  Do y'all need a

16   break?

17           MS. STEEL:  No.

18   MR. BELLINDER:

19       Q.   You're aware of the policies and

20   procedures of the department; is that right?

21       A.   I try.

22       Q.   You are the -- yeah.  You are chief,

23   and so everybody within the department is

24   trained on all the policies and procedures and

25   the general orders of the department?

1       A.   That's correct.

2       Q.   And there's policies and procedures

3  on use of force, there's policies on a little

4  bit of everything; is that right?

5       A.   That's correct.

6       Q.   Their officers are also trained on

7  -- and while we're talking about the training,

8  officers are trained on completing police

9  reports; is that right?

10       A.   That's correct.

11       Q.   And generally they're trained that

12  those reports should be thorough, accurate and

13  complete; is that fair?

14       A.   That's correct.

15       Q.   In other words, they need to put in

16  there everything that's important, everything

17  that's relevant, everything that happened

18  about these incidents that they see; is that

19  right?

20       A.   That's correct.

21       Q.   Let me just ask you -- I'm

22  referencing page 5 of 9.  These are the law

23  enforcement policies, 5.1, Biloxi police,

24  response to resistance and deadly force.

25            MS. STEEL:  Do you mind if I -- I've

1    got those here.

2            MR. BELLINDER:  Yeah.  If you've got

3    an extra copy, we can attach it.  I was just

4    gonna reference them.

5                        -  -  -

6            (Off the record.)

7            (Exhibit 2 was marked.)

8    MR. BELLINDER:

9        Q.   Okay.  We've got Exhibit 2.  This is

10   the policy -- I think it's 5.1, City of

11   Biloxi, response to resistance, and that's the

12   reason for the stun.  The reason for the

13   removal of Mr. Jordan in the fashion he was

14   removed is that the City is claiming that he

15   was resisting arrest or resisting the attempts

16   to subdue him at that point; is that right?

17       A.   That's correct.

18       Q.   And so this policy would be relevant

19   to what it is that took place that evening --

20       A.   Yes.

21       Q.   -- is that correct?

22            Page 5, Response Options:  Officers

23   use -- I'm referencing -- this is under

24   Response Options.  That's the fourth paragraph

25   down.  It says:  Officers use handcuffs or

1    other restraining devices on all arrestees

2    unless it is obviously unnecessary or

3    impractical, e.g., example, the elderly,

4    young, juveniles, amputees, crippled, injured

5    or other applicable suspects.  Officers must

6    take reasonable precautions to protect

7    arrestees from injury caused by handcuffs or

8    other restraining devices.

9            Do you see that?

10    A.    I do.

11    Q.    These reasonable precautions to

12    protect the arrestees, what does that entail?

13    A.    Can you clarify that for me, what

14    you're asking?

15    Q.    The policy requires these officers

16    to take reasonable precautions to protect the

17    arrestees from injuries caused by the

18    handcuffs.  So based on the circumstances as

19    we see with Mr. Jordan, what were the

20    reasonable precautions that the officers

21    actually did take to protect him from injury

22    from the handcuffs?

23    A.    From Mr. Jordan?

24    Q.    Right.  In Mr. Jordan's case, in

25    that scenario.

1      A.    Well, the handcuffs were applied

2   correctly, and then they were double-locked so

3   that they wouldn't tighten up.

4      Q.    Okay.  Any other precautions that

5   they took to prevent injury?

6      A.    I think that would have been

7   sufficient.

8      Q.    The next sentence says:

9   Furthermore, officers are reminded that their

10  response to resistance should be adjusted

11  accordingly after the arrestee has been

12  subdued and/or handcuffed.

13          So my question would be did these

14  officers adjust their response to Jason

15  Jordan's resistance accordingly after he was

16  handcuffed?

17     A.    Yes.  I mean, his demeanor didn't

18  change.

19     Q.    At any point -- it's your testimony

20  that the City's position is that his demeanor

21  never changed?

22     A.    He was disorderly and resistive

23  throughout the process.

24     Q.    Rendering aid, that's that next

25  page, page 6 at the bottom.  Under rendering

1    aid, it says:  In incidents where an officer's

2    response measures result in the injury or

3    death of a suspect, the officer shall, in the

4    order most appropriate for the situation,

5    Number 1 is render first aid, and Number 2 is

6    call for medical assistance.

7              Of course now -- and I don't mean to

8    ask this in hindsight because we understand

9    Jason Jordan was injured now, but at any

10   point, did they inquire as to his injuries,

11   and at any point, did they respond by

12   rendering first aid or call for medical

13   assistance?

14             MS. STEEL:  I object to the form of

15   that question.  You know, you haven't

16   established with this witness that the

17   officers knew he was injured.

18             MR. BELLINDER:  That's what I'm

19   asking right -- that's literally the question

20   I just asked, was whether or not they knew or

21   that they asked whether he was injured.

22             MS. STEEL:  Okay.  Thank you.

23             MR. GILL:  Let me join in that

24   objection and make one to the extent of the

25   form of that question on ambiguity.  I don't

1    know that there's been any proof that his

2    alleged wrist surgeries are related to this

3    incident.

4            MR. BELLINDER:  Do you want to talk

5    to the doctor or the nurse prac. or anybody in

6    there?  I mean, they're gonna say -- I think

7    it's in the medical records, too, so --

8            MR. GILL:  Anyway, that's my

9    objection.  Go ahead.

10   MR. BELLINDER:

11       Q.   Go ahead.

12       A.   Okay.  Well, at this point, I still

13   -- and I don't believe the officers have any

14   evidence that he was injured or that he was in

15   pain.  He was alert.  He never told them he

16   was in pain.  He never told them he was

17   injured.

18       Q.   And his testimony or other

19   witnesses' testimony that he was saying that,

20   that would be disputed by these officers and

21   by the City?

22       A.   Yes.

23           MS. STEEL:  Object to the form.

24   MR. BELLINDER:

25       Q.   At no point did the City render

1  first aid to Mr. Jordan or call for medical

2  assistance for Mr. Jordan; is that right?

3       A.   That's correct.

4       Q.   And the reason being is because they

5  didn't believe that he was hurt?

6       A.   There was no indications.

7       Q.   No indication that he was injured?

8       A.   That he was injured or that he was

9  in pain.

10      Q.   Who is Sergeant Lessner?

11      A.   Sergeant Lessner would have been one

12 of the shift supervisors that evening.

13      Q.   Would he have been on the scene that

14 night?

15      A.   He was on the scene -- I don't know

16 if you're calling the whole casino the scene.

17      Q.   Was he at the casino that night?

18      A.   Yes.

19      Q.   Why would he have been there?  Do we

20 know?

21      A.   Oh, I'm sure he was handling -- he

22 was handling other -- it was -- you have to

23 keep in mind, there was a lot going on at the

24 casino at that time.  It wasn't just this

25 incident.

1     Q.   What else was going on that night?
2  Do you remember?
3     A.   Yeah.  They were trying -- they were
4  attempting -- there had been an incident I
5  think earlier than that, and they were also
6  attempting to shut down the club, from my
7  understanding.  So you would have had an awful
8  lot of people roaming around.
9     Q.   And so do we have any details about
10 the earlier incident?
11    A.   I do not -- I'm not prepared for
12 that now.
13    Q.   But that would have been why
14 Sergeant Lessner was there because we
15 mentioned --
16    A.   I don't think you can be that
17 specific because Sergeant Lessner would have
18 come to the casino along with the other
19 officers.
20    Q.   Franevich, Hilliard and Hamilton
21 would have come to the casino directly after
22 being called as a result of the Jordan
23 incident --
24    A.   That's right.
25    Q.   -- is that right?

1          And so other officers who would've

2     possibly been on the scene, they may have been

3     there for -- it's common for them to be there,

4     not an uncommon thing for other officers to

5     already be on the scene, like we said, there's

6     a lot going on?

7          MS. STEEL:  Object to the form.

8     MR. BELLINDER:

9          Q.   Go ahead.

10         A.   It's certainly common for

11    supervisors to respond to the scene.

12         Q.   Each officer would have done a

13    narrative or a written report as a result from

14    what they saw?

15         A.   That's correct.

16         MR. BELLINDER:  Bear with me one

17    minute.

18                    - - -

19              (Off the record.)

20    MR. BELLINDER:

21         Q.   There were charges filed against Mr.

22    Jordan as a result of this?

23         A.   Yes.

24         Q.   Do we know what happened with those

25    charges?

1      A.   It's my understanding that the

2   military took the charges.

3      Q.   The military has the authority to

4   take jurisdiction over certain things

5   involving military personnel, is that your --

6      A.   Not so much authority as it is

7   basically a -- kind of an agreement between

8   us.  We would prefer them to take care of

9   military people.

10      Q.   And Mrs. Jordan, was there a charge

11   filed against her?

12      A.   Public intoxication.

13      Q.   Do we know whatever happened with

14   that?

15      A.   I think it was expunged.  I really

16   don't -- I couldn't tell you if she pled or

17   what.

18      Q.   Right.  Gotcha.

19           Was there an investigation into

20   these -- the City's response to these

21   incidents?

22      A.   Other than the investigation that

23   was done by the officers that night?

24      Q.   Or an investigation into the City's

25   response to the actions of the officers?

1      A.    An internal investigation was done.

2            MS. STEEL:  And, again, I'm

3      preserving my objection.

4      MR. BELLINDER:

5      Q.    What can you tell us about the

6      internal investigation?

7      A.    Well, the internal investigation

8      initiated I think the following Monday, which

9      would have been the first workday.  I asked at

10     that time Lieutenant Jim Adamo, who is now

11     Captain Jim Adamo, who is our internal

12     investigator, Internal Affairs investigator --

13     Q.    How do you spell his name?

14     A.    A-D-A-M-O.

15     Q.    Go ahead.

16     A.    I had asked him to initiate an

17     Internal Affairs investigation to see if there

18     was any wrongdoing by our officers.

19     Q.    Is that a standard practice for an

20     investigation like that to be initiated?

21     A.    Pretty standard for me.

22     Q.    Okay.  What would have been the --

23     what would have been the -- what was your

24     thought process or why was an investigation

25     necessary as to this evening?

1    A.   Well, I probably initiate more

2  internal investigations than most do, but it

3  doesn't take much for me.  I can get a phone

4  call.  Someone can tell me over the phone that

5  one of my officers was driving too fast or

6  that one of them had used foul language.

7  Something like that I would usually go to the

8  shift level.  I would have their supervisor

9  investigate it first, get with them and let's

10  just determine if this happened or not.

11  Anything a little more in depth than that I

12  would go to Internal Affairs and ask them to

13  look into it.

14    Q.   Do you remember what specifically it

15  was that caused you to initiate this?

16    A.   I had received an e-mail, and I'd

17  say -- it wasn't anonymous.  I don't remember

18  the name, but it wasn't an anonymous e-mail,

19  but it was an e-mail from someone who was at

20  the casino.

21    Q.   And what did that e-mail say?

22    A.   Well, it was certainly very negative

23  towards the police department and the officers

24  that were there.  I don't remember the exact

25  content of it, but it basically said that the

1    officers had dragged a guy out of the casino,

2    and that was pretty well it.  It made

3    reference to that, and it made reference to

4    the incident that took place outside, also.

5              It was a little disconcerting to me

6    because there was -- and as you know, there

7    was some video, but there was no video of the

8    Jordan incident, and I couldn't understand

9    that.  So I wasn't really positive that the

10   writer of the e-mail had the knowledge that he

11   claimed that he had.

12       Q.   No video of the Jordan incident at

13   that point?

14       A.   Yeah.  I don't know why there

15   wouldn't have been, but...

16       Q.   Did you request the surveillance

17   video from --

18       A.   Yes.

19       Q.   -- the casino at that point?

20       A.   The video I'm talking about is like

21   a YouTube video of --

22       Q.   Right.  Nobody with a cell phone

23   that was there captured the Jordan incident?

24       A.   I didn't understand that.

25       Q.   Was there I guess what we'd call a

1    call to action in the e-mail?  Did the e-mail

2    -- did the drafter request something specific?

3    Were they requesting something to be done, or

4    what was the --

5        A.    That wouldn't have mattered to me.

6    I don't remember if they did or not, but that

7    wouldn't have mattered to me either way.  I

8    would have made the decision myself to look

9    into the matter.

10       Q.    Do you still have this e-mail

11   somewhere?

12       A.    I'm sure.  I'm sure we do.

13       Q.    If it's all right, can you find it

14   and maybe print it in some type of format and

15   just give it to your lawyer?

16       A.    Yes.

17       Q.    And you said you remember -- was

18   there a specific sender on that e-mail, like

19   an --

20       A.    There was.

21       Q.    -- address or a name or --

22       A.    Yes, but I don't remember who -- I

23   wasn't familiar with the person.

24       Q.    Okay.  What was the general result

25   of the investigation?  Do you recall that?  Do

1    you recall what came of it?

2         MS. STEEL:  Same objection, and

3    it's confined -- of course what he's here

4    today to testify about is confined to Jordan

5    and Soukup.

6    MR. BELLINDER:

7         Q.   Go ahead.

8         A.   Yeah.  There was no wrongdoing by

9    the officers in Jordan, Soukup or Ms. Jordan.

10        Q.   And so the investigation revealed

11   there was no wrongdoing by Soukup, by Chris

12   Soukup?

13        A.   No.  There was no wrongdoing by the

14   officers related to --

15        Q.   Related to.  Okay.  Gotcha.

16             Tell me about a citizen's arrest.

17   What is a citizen's arrest?  Let me just ask

18   that.  What is a citizen's arrest?

19        A.   Well, the citizen has a right to

20   place someone under arrest.  You would think

21   it would be a lot of detail to it, but there's

22   not.  It's simply them placing someone under

23   arrest, telling them that they're under

24   arrest.

25        Q.   And in what circumstances is a

1    citizen allowed to arrest someone?

2        A.   A citizen can pretty well arrest

3    someone when they want to.  That's the right

4    that they have.

5        Q.   Okay.  Now, as a citizen, I can't

6    arrest someone for something they didn't do,

7    correct?

8        A.   You can tell them that you're

9    placing them under citizen's arrest.

10       Q.   But they have a right to resist

11   that, correct?

12       A.   I would think that they would have a

13   right to resist it.  I think we would both

14   resist it if we hadn't done something.

15       Q.   And an individual has a right to

16   resist an unlawful arrest even when being

17   arrested by a police department; is that

18   right?

19           MS. STEEL:  Object to the question.

20   I think we're going outside the scope of the

21   30(b)(6).

22           MR. STEWART:  Calls for a legal

23   conclusion, also.

24   MR. BELLINDER:

25       Q.   You're the law, right?  You're the

1    chief of police.  Can you tell me about

2    whether or not a citizen can resist a

3    citizen's arrest?

4         MS. STEEL:  Same objection.  And,

5    again, I don't think he has to testify about

6    things outside the scope of the notice.  If he

7    does, that is certainly not the answer of the

8    City of Biloxi.

9    MR. BELLINDER:

10        Q.   Is it your understanding that Mr.

11   Strong made a citizen's arrest of Chris Soukup

12   that evening?

13        A.   Yes.

14        Q.   Okay.  In what circumstances is a

15   citizen allowed to make a citizen's arrest?

16   You said any.  They can just make an arrest?

17        A.   No, I didn't say they could make an

18   arrest.

19        MS. STEEL:  Same objection.

20   MR. BELLINDER:

21        Q.   Clarify it for me.

22        A.   What I said was they can advise

23   anyone that they're under citizen's arrest.

24        Q.   What happens at that point?  Is that

25   person under arrest?

1          A.    Not necessarily, no.  Usually an

2     officer is called.  When the officer gets

3     there, he tries to defuse a situation like

4     that and determine if there is -- if these

5     people are really actually warranted in their

6     arrest, and if they're not, they still have a

7     right, and what we usually tell them at that

8     point is that you're gonna need to go down,

9     file an affidavit and let's let a judge review

10    that.

11          It's not an officer's job to make

12    that determination there.  If he can defuse

13    it, he can defuse it.  And we're certainly not

14    going to place someone under citizen's arrest

15    if we don't believe it's warranted.

16          Q.    What is the police department's

17    stance on a citizen's arrest?  Is there a

18    rule?  Is there a policy on that?

19          A.    Well, the policy -- I'm not sure.

20    You're very vague.  The policy would be that

21    if you place them under citizen's arrest, then

22    the officer gets there -- which most people --

23    let me clarify.  Most people don't place

24    someone under citizen's arrest until the

25    police are there.  That's usually when they

1    place them under citizen's arrest.  They'll

2    call because of a disturbance.  When we get

3    there, then they'll place them under citizen's

4    arrest.  We usually advise them -- or we

5    always advise them that you're gonna need to

6    tell them that they're under citizen's arrest

7    and tell them what they're under citizen's

8    arrest for.

9         Q.   Are you aware of whether or not that

10   was done in the case of Mr. Soukup?

11        A.   Well, I wasn't there, but I can only

12   assume that that was done.

13        Q.   What would that assumption be based

14   on?

15        A.   Based on policy.

16        Q.   Whose policy?

17        A.   Our policy.

18        Q.   But I guess my question would be an

19   officer or the police department wouldn't make

20   a citizen's arrest, they'd make an arrest

21   because they're the officers of the City of

22   Biloxi, they would arrest someone on behalf of

23   the City?

24        A.   Well, at that point, we're actually

25   more of a transport.  If we're gonna tell the

1    affiant that, yes, you know, we believe that

2    this person is -- yes, you can arrest them for

3    a citizen's arrest, you're gonna need to come

4    to the police department and sign the

5    affidavit yourself.

6        Q.    And so in order to file an affidavit

7    against someone, citizen's arrest or

8    otherwise, the affiant would need to have

9    witnessed the crime; is that right?

10            MR. STEWART:  Object to all the

11   testimony about false arrest because it's not

12   relevant to any claims against Hard Rock

13   because all false arrest claims have been

14   dismissed, just for the record.

15            MS. STEEL:  Object to the form.

16   And, also, object -- this is way far outside

17   the 30(b)(6) notice, and it's calling for

18   legal conclusions on this officer's part.

19            MR. BELLINDER:  And for the record,

20   this is the law that we're talking to, not a

21   civilian.  We're talking to the chief of

22   police, so I think legal conclusions would be

23   within the scope of his personal knowledge.

24   That's his job title but --

25            MS. STEEL:  I don't know that they

1    are.  He follows the law --

2              MR. BELLINDER:  Tell me what --

3              MS. STEEL:  Excuse me.  He follows

4    the law --

5              MR. BELLINDER:  He enforces the law.

6              MS. STEEL:  -- and enforces the law,

7    but he is not the law, and he does not

8    interpret things.  He follows what courts say

9    about interpretation, so --

10             MR. BELLINDER:  And that's what I'm

11   telling -- that's what I'm asking for.

12             MS. STEEL:  If it gets -- I mean, I

13   don't know that he is prepared to answer this

14   question.

15   MR. BELLINDER:

16        Q.   Are you?

17        A.   Ask me the question, if you don't

18   mind.

19        Q.   Okay.  Tell me, what is your

20   understanding of an affiant filing a charge

21   against an individual?  Are they allowed to

22   file that charge when they didn't witness the

23   crime?

24             MS. STEEL:  Again, it's a legal

25   conclusion.

1          MR. BELLINDER:  I understand.

2     MR. BELLINDER:

3          Q.   Do you understand that question?

4          A.   I --

5          MS. STEEL:  If you do.

6          A.   I understand it.  I understand it.

7     MR. BELLINDER:

8          Q.   Go ahead and tell me.

9          A.   We would allow them to sign the

10    affidavit.  Again, that would be up to the

11    judge to determine.

12         Q.   Okay.  So you would allow them to

13    sign an affidavit against someone that they

14    didn't witness a crime, but then at that

15    point, it would be turned over to the judge as

16    far as what happened?

17         A.    It would be up to them to present

18    their evidence.

19         Q.   Have you seen the affidavit filed by

20    Mr. Strong?

21         MR. STEWART:  I'll just make a

22    continuing objection to the relevance in this

23    circumstance where there is no false arrest

24    claim against my client.

25    MR. BELLINDER:

1      Q.    Have you seen the affidavit filed by

2  Mr. Strong?

3      A.    Yes, I have.

4      Q.    The substance of it, have you seen

5  it before?

6      A.    Yes.

7      Q.    And you're aware in his affidavit

8  Mr. Strong references Mr. Jordan being

9  unconscious, laying face down on the floor?

10 Have you seen that?

11         MS. STEEL:  Just a second.  He needs

12 to see the affidavit.  That is not an

13 affidavit.  That's a statement.  The

14 affidavit -- here's the affidavit.

15         MR. BELLINDER:  Affidavit Withdrawal

16 Penalties Form at the top?

17         MS. STEEL:  Yeah.  That's not the

18 affidavit, is it?

19 MR. BELLINDER:

20     Q.    Is that a part of this document?

21     A.    No, it's actually not.  It's

22 something that --

23     Q.    This is separate?

24     A.    It is separate.

25     Q.    Is this sworn?

1        A.    I'm sorry?

2        Q.    Is this sworn?  Is it something that

3    would've been sworn under oath?

4            MR. GILL:  Can you make that an

5    exhibit so we know what we're looking at when

6    we're reading this deposition.

7            MR. BELLINDER:  Uh-huh

8    (affirmative), if I can get an extra copy of

9    it.

10       A.    I don't think this was anything that

11   was sworn.

12   MR. BELLINDER:

13       Q.    Have you seen this before?

14       A.    I have.

15           MR. GILL:  Can you identify for the

16   record what you're talking about?

17           MR. BELLINDER:  The victim's

18   statement signed by Jason Strong, 11/27/11, at

19   the top it reads Affidavit Withdrawal

20   Penalties Form.  It is not Bates stamped.

21           MS. STEEL:  Here's an extra copy of

22   this.

23           MR. BELLINDER:  Let's make that 3.

24                    - - -

25           (Exhibit 3 was marked.)

1              (Off the record.)

2     MR. BELLINDER:

3         Q.    Have you seen this where -- about

4     halfway down, first paragraph, victim's

5     statement, it says Chris Soukup had punched an

6     unknown white male that was unconscious laying

7     face down on the floor.  Do you see that?

8         A.    I do.

9         Q.    In response to that, did you review

10    this or -- did you take this into

11    consideration when making your decision to

12    bring -- or to initiate the internal

13    investigation?

14        A.    No.  I initiated the internal

15    investigation before I saw any of this.

16        Q.    Does it have --

17        A.    I --

18        Q.    Go ahead, if you weren't done.

19        A.    I'm interrupting you.  Go ahead.

20        Q.    No, no.  I didn't want to start

21    another question if you were still answering.

22            My only other question would be does

23    this have any bearing on whether or not the

24    officers should have called an ambulance or

25    should have inquired as to medical treatment

1    of Mr. Jordan?

2        A.    No, not to me.  I mean, my police

3    officers deal with this every day, and no

4    disrespect to Mr. Strong, he probably doesn't

5    deal with it that much.  And Mr. Strong is not

6    a medical professional.  He's not a doctor

7    that I know of.  I'm not even sure he's first

8    aid certified.

9        Q.    Also not police certified, he's not

10   a certified police officer either?

11       A.    No.

12       Q.    You would agree with me that

13   handcuffs are not intended to be used to

14   create unnecessary discomfort or abuse,

15   correct?

16       A.    Most certainly not.

17       Q.    You would agree with me that that

18   statement is true, that they're not to be

19   used --

20       A.    That's right.  Yes.

21       Q.    You'd also agree with me that

22   improperly-applied handcuffs and/or improper

23   manipulation of an individual's wrist and arms

24   may cause serious injury?  You would agree

25   with me?

1     A.   Yes, I would agree with that.

2     Q.   I guess the question would be is --

3 are the police officers not trained to --

4 that's a double negative.

5          How are the police officers trained

6 as it relates to dragging an individual by

7 their shoulders when the individual is

8 handcuffed behind their back?  Does that make

9 sense?

10          MS. STEEL:  Object to the form and

11 object to relevance.

12          MR. BELLINDER:  It's relevant.  It

13 happened.

14 MR. BELLINDER:

15     Q.   How are they trained as it relates

16 to dragging someone by their shoulders when

17 they're handcuffed behind their back?  Are

18 they trained that that's okay, it's not okay?

19 How are they trained in that?

20     A.   They're trained to carry people the

21 way that he was carried in the video, if

22 that's what you're asking me.  They're trained

23 to carry people --

24     Q.   The way Jason Jordan was carried?

25     A.   That's right.  They're able to lift

1    their arms up, lift their body weight up and

2    carrying them that way, yes.

3        Q.    The City of Biloxi officers,

4    specifically these officers in particular, are

5    they trained on the Law Enforcement Code of

6    Ethics?

7        A.    Yes.

8        Q.    They're trained not to -- not to

9    treat arrestees in a manner that would likely

10   cause injury, correct?

11       A.    That's correct.

12       Q.    And not to treat them -- an arrestee

13   in a manner that would likely cause

14   humiliation, also?

15       A.    That's correct.

16       Q.    Bear with me.  I'm getting close.

17            As a standard with police

18   involvement, the information -- the

19   information that the officers obtained that

20   evening would have been told to them by other

21   people until they arrived, they would not have

22   seen or had no personal knowledge of anything

23   prior to their arrival on the scene?

24       A.    That's pretty well the way it works

25   with -- anytime the police are called.

1    Q.    Right.  They can only see what they

2  see in person, they receive information from

3  other individuals and then respond

4  accordingly?

5    A.    That's right.

6    Q.    Was there ever an investigation by

7  the police department made into the

8  circumstances of Mr. Soukup's -- or just the

9  actions of Mr. Soukup that evening?

10   A.    I'm sorry.  Ask me again.

11   Q.    Did the police officers ever look

12  into what it was that Mr. Soukup did or did

13  not do that evening?

14   A.    No.

15   Q.    There's no audio on the video as it

16  relates to Mr. Jordan's entire incident,

17  correct?  Have you heard any audio on --

18   A.    I heard no audio.

19   Q.    Did the officers have any

20  microphones or any audio on them that would've

21  captured some of these conversations that were

22  being had?

23   A.    That's possible.  That's possible.

24   Q.    Can you find that out for us --

25   A.    Absolutely I can.  Yes.

1    Q.    -- just to make sure.  I think we've

2    asked for that.

3    A.    And if there was audio in the club,

4    it would not have been legible.  It would've

5    been --

6    Q.    And you naturally as chief of Biloxi

7    wouldn't have access to that.  What I'm asking

8    for is some type of a recording device or some

9    audio that would have recorded something maybe

10   on the officer's person that may have recorded

11   some of that.

12         Did the Mississippi Bureau of

13   Investigation ever contact you about these

14   incidents?

15   A.    No.

16   Q.    When I say "you," the police

17   department.  It may have been you or someone

18   else.

19   A.    Not to my knowledge, no.

20   Q.    Did any branch of the military

21   contact the police department about these

22   incidents?

23   A.    Yes.

24   Q.    Tell us about that.

25   A.    Actually, they talked to Assistant

1    Chief McGilvary, and I don't know what the

2    content of the conversation was, but I can

3    only tell you what normally it would be.  They

4    would want a copy of any tapes.  They'd want a

5    copy of the report.  And then the conversation

6    that I had with Assistant Chief McGilvary was

7    are they going to prosecute this case, or do

8    they want us to do it, and he told me they

9    would prefer that it be transferred to their

10   jurisdiction.

11       Q.    Spell McGilvary, if you would.

12       A.    M-C-G-I-L-V-A-R-Y.

13       Q.    Was there any other agency, any

14   other individuals or an agency who contacted

15   the police department about these incidents?

16       A.    Not to my knowledge, no.

17       Q.    And does the City train its officers

18   on the pressure point control tactics?

19       A.    We actually use controlled force.

20       Q.    Use controlled force?  Tell us --

21       A.    PPCT -- all the officers more than

22   likely have been through PPC training when

23   they were in the academy.  We're required to

24   do continuing education in the hands-on type

25   combat like that, so we move to controlled

1   force.  We use controlled force kind of in

2   conjunction with PPCT.  PPCT is more pain

3   compliance.  Controlled force is more using

4   the aggressor, if you will -- using their body

5   weight and their movement against them more

6   than it is pain compliance.  So officers would

7   be using both.

8                        - - -

9                  (Off the record.)

10  MR. BELLINDER:

11      Q.   When there is an incident, when

12  there is an Internal Affairs investigation,

13  the officers involved, are they drug tested,

14  are they tested for alcohol, are they tested

15  for any substance-type issues that may have

16  been present during the incident?

17      A.   The officers?

18      Q.   Yeah, the officers themselves.

19      A.   Only if there's something that

20  warrants that.  There has to be something --

21  you know, I don't think it's legal for us to

22  just drug test them randomly -- randomly we

23  could, but just an individual officer, unless

24  there's something that would indicate that

25  there had been some drug use or --

1          Q.    And so what type of things would

2     warrant -- what would it take for something

3     like that to happen?

4          A.    For an officer to be --

5          Q.    Right.

6          A.    We do drug testing quite often, but

7     like I said, it's --

8               MS. STEEL:   Object.   This is way

9     outside the notice, 30(b)(6).

10    MR. BELLINDER:

11         Q.    Go ahead.

12         A.    Like I said, we randomly -- the City

13    randomly tests all of its employees.   You

14    never know when that kind of test is gonna

15    take place.

16              Let's say there was an automobile

17    accident and the officer involved displayed

18    something that made us believe that he was

19    using something.   Then certainly a test would

20    be given then, or if an officer had, you know,

21    major personality swings or changes or

22    something like that.

23         Q.    Do you know whether or not any of

24    those type tests were done for the officers

25    involved in these incidents?

1        A.    There was no reason for any of that.

2        Q.    Were any of these personality swings

3   identified in any of the officers' actions

4   that evening?

5             MS. STEEL:   Object to the form.

6   MR. BELLINDER:

7        Q.   Go ahead.

8        A.    No.   There was nothing -- there was

9   nothing there to --

10       Q.    Nothing --

11       A.    I'm not -- I don't know if I

12   completely understand what you're asking.

13       Q.    In other words, none of them became

14   unreasonably angry at any point?   None of them

15   had any of those type reactions?

16       A.    No.   They handle themselves very

17   well through a difficult situation.

18       Q.    Were you aware or made aware of any

19   of the language used by the officers against

20   Mr. Jordan or Mrs. Jordan?

21       A.    I was not.

22       Q.    Has the City talked to any of the

23   other individuals who were there, any of the

24   witnesses as to what took place?

25       A.    Like citizens or security guards?

1       Q.    Either one.

2       A.    Yes.

3       Q.    Tell us who exactly it was that the

4   City talked with.

5       A.    Well, I know that the Internal

6   Affairs investigator would have talked to each

7   one of the security guards.

8       Q.    Talked with each of the security

9   guards?

10       A.    Yes.

11       Q.    Was the City ever made aware of the

12   substance of those conversations?

13       A.    They'd be in the internal

14   investigation, yes.

15            MS. STEEL:  I believe the City has

16   provided you with statements.

17            MR. BELLINDER:  Yeah.  I've got

18   written statements, but I also believe the

19   individuals yesterday denied having spoken

20   with anybody outside of their written

21   statements.

22       A.    Well, I mean, I could be wrong, but

23   I --

24   MR. BELLINDER:

25       Q.    Right.  We can confirm that later

1    on.

2          What about the witnesses, any of the

3    witnesses that saw what took place that night,

4    do you know whether or not the City contacted

5    any of them or spoke with them?

6          A.    I do not believe they did, no.

7    Witnesses, I'm not sure who you're talking

8    about.

9          Q.    Anybody who would have seen the

10   altercation, anything that took place that led

11   up to the arrest of these individuals.

12         A.    It almost sounds like that you have

13   some witnesses that they should have talked

14   to.  Is that --

15         Q.    Well, yeah.  But, I mean, what I'm

16   asking is did the City talk to any of those

17   folks --

18         A.    That's what --

19         Q.    -- that -- go ahead.

20         A.    That's what I'm trying to find out

21   is who -- I mean, who are you --

22         Q.    Did they talk to Officer Penick with

23   the Air Force?

24         A.    Yes.  Penick was spoke to, but

25   probably not during the internal

1    investigation.

2        Q.   When would Penick have been spoke

3    to?

4        A.   Penick was spoke to with McGilvary.

5    That was part of McGilvary's conversation with

6    the Air Force.

7        Q.   Who all did McGilvary speak to?

8        A.   That, I can't tell you.  I know he's

9    talked to Penick, and he may have talked to

10   the -- he probably would have talked to

11   Pignataro.

12       Q.   Anybody else?

13       A.   That would have probably been it.

14   Pignataro would have been responsible for the

15   off-duty airmen there.

16       Q.   Could you tell us the substance of

17   the conversations with Assistant Chief

18   McGilvary and Pignataro?

19       A.   That's when he would have asked

20   about being allowed to prosecute through the

21   Air Force.

22       Q.   What about the substance of the

23   alleged crime, the incident itself?

24       A.   I'm sure that was discussed.

25       Q.   But you don't know the specifics of

1    that?

2         A.    No.

3         Q.    Same with Penick?

4         A.    It would have been the same.  Penick

5    would have asked for a -- he did ask for a

6    copy of what we had as far as paperwork and

7    videos.

8         Q.    Anybody else that they would have

9    spoken with?

10        A.    Not that I know of, no.

11        Q.    Do you know whether or not Mr. or

12   Mrs. Jordan had any prior run-ins with the

13   law, any previous arrests or prior criminal

14   background?

15        A.    You know, I'm sure I looked at that,

16   but I don't recall if they did or not.

17        Q.    Have you been made aware of any

18   injuries and not -- have you been made aware

19   of any injuries of Mr. or Mrs. Jordan or Mr.

20   Soukup, not by the attorney for the City but

21   by any other witness, any other person, any

22   other individual?

23             What I mean is we're not allowed to

24   talk to you about what you talk with your

25   lawyer about.  So you and your lawyer may have

1    talked about some injuries that they may have

2    sustained.  Outside of what the lawyer has

3    talked with you about, have you been made

4    aware of any of their injuries?  Did you --

5         A.   No.

6         Q.   -- receive any information about

7    their injuries from some other individual?

8         A.   No, I did not.

9         Q.   Have you talked with representatives

10   from the casino or has the City talked with

11   representatives of the casino at any point

12   subsequent to this outside of what we've

13   already discussed?

14        A.   Not to my knowledge.

15             MS. STEEL:  And, again, I would

16   object to the extent that your question

17   includes conversations between attorneys.

18             MR. BELLINDER:  Of course.

19   MR. BELLINDER:

20        Q.   Like we said, I'm not allowed to

21   talk with you -- outside of the attorney for

22   the casino, any conversation between the

23   police department and the casino about this

24   particular incident?

25        A.   Not to my knowledge.  I mean, we

1    would have probably made a request for the

2    tape, you know, and like I said earlier --

3         Q.   We talked about.

4         A.    -- the internal investigation, you

5    know, questions probably would have been asked

6    there.

7              MR. BELLINDER:  All right.  That's

8    all I've got.  Thank you so much.  I

9    appreciate your time and coming and doing this

10   for us.

11                    - - -

12                  EXAMINATION

13   BY MR. STEWART:

14        Q.   Just on that one point, Chief.  I

15   won't ask any other questions.  In regard to

16   any discussions with Hard Rock security

17   officers, you mentioned that could have

18   happened, but you also said you could be

19   wrong?

20        A.   I could be wrong.  To be honest with

21   you, I don't remember how extensive the

22   internal was, and I could have absolutely --

23   he may have relied on their written reports

24   instead of speaking to them personally.

25        Q.   Yes, sir.

1          What's been produced were two copies

2    of Hard Rock statements written by Hard Rock

3    employees produced by the City.  Other than

4    those, are you aware of any written recorded

5    documentation of interviews with Hard Rock

6    employees?

7          A.   I am not.

8          MR. STEWART:  Okay.  Thank you, sir.

9    That's all I have.

10                    - - -

11                  EXAMINATION

12   BY MR. GILL:

13        Q.   Just a couple of follow-ups, Chief,

14   on the use of stun drive technique.  Is that a

15   universal technique used by most law

16   enforcement agencies?

17        A.   Oh, yes.  Yes.

18        Q.   And Biloxi police officers are

19   trained in the use of that technique?

20        A.   They are.

21        Q.   And that training occurs where?

22        A.   Well, initially it occurred -- they

23   usually get training through the academy, and

24   then we -- every two years we recertify.

25        Q.   And I take it you personally have

1    gone to that training?

2         A.    I have not.  I don't intend to.  We

3    certainly don't want to give an intermediate

4    weapon to someone who doesn't want to use it.

5    There's several other weapons they can use.

6    And I'm one of those people that -- I have no

7    desire to get --

8         Q.    If the officer is issued a Taser, I

9    take it they've been trained in the proper

10   use?

11        A.    Oh, absolutely.  Yes.

12        Q.    And you reviewed the video, correct?

13        A.    Yes.

14        Q.    You've done your own internal

15   investigation, correct?

16        A.    Yes.

17        Q.    And as far as Officer Hamilton's use

18   of the stun drive technique, was that

19   appropriate?

20        A.    Absolutely appropriate.

21             MR. GILL:  That's all I have.

22                       - - -

23                  EXAMINATION

24   BY MS. STEEL:

25        Q.    I have one question to clarify

 1    something.  You testified -- there was a lot

 2    of testimony about an option of using a

 3    wheelchair when the officers arrived at the

 4    Hard Rock.  Do you have -- what is your

 5    knowledge as to whether or not the officers

 6    knew there was a wheelchair?

 7        A.    The officers had no knowledge that

 8    there was a wheelchair.

 9            MS. STEEL:   Thank you.

10                        - - -

11        (Deposition concluded at 10:51 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF COURT REPORTER

2          I, Jennifer West Ray, Court Reporter,

3    and Notary Public in and for the County of Harrison,

4    State of Mississippi, hereby certify that the

5    foregoing pages, and including this page, contain a

6    true and correct transcript of the testimony of the

7    witness, as taken by me at the time and place

8    heretofore stated, and later reduced to typewritten

9    form by computer-aided transcription under my

10   supervision and to the best of my skill and ability.

11          I further certify that I placed the

12   witness under oath to truthfully answer the

13   questions in this matter under the power vested in

14   me by the State of Mississippi.

15          I further certify that I am not in the

16   employ of or related to any counsel or party in this

17   matter, and have no interest, monetary or otherwise,

18   in the final outcome of the proceedings.

19          Witness my signature this the _____ day

20   of _____, 2014.

21

                _____

22              JENNIFER WEST RAY, RPR

                My Commission Expires on 4/24/17

23

24

25