**In The Matter Of:**

*JASON JORDAN*
*vs.*
*PREMIER ENTERTAINMENT BILOXI, et. al.*

_____

*JASON JORDAN*

*March 31, 2014*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL
DEATH BENEFICIARIES OF UNBORN
BABY JORDAN, DECEASED;
AND CHRISTOPHER SOUKUP                    PLAINTIFFS

VS.                    CIVIL ACTION NO:  1:13cv195 LG-JMR

PREMIER ENTERTAINMENT BILOXI,
LLC d/b/a HARD ROCK HOTEL & CASINO;
THE CITY OF BILOXI, MISSISSIPPI;
DOE DEFENDANT ONE; JOSHUA HAMILTON,
IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; DOE DEFENDANT THREE;
DOE DEFENDANT FOUR; DOE DEFENDANT
FIVE AND DOE DEFENDANTS 6-10              DEFENDANTS

---------------------------------------------------------
                DEPOSITION OF JASON JORDAN
---------------------------------------------------------

         Taken at 759 Vieux Marche Mall, Biloxi,
         Mississippi, Monday, March 31, 2014,
         beginning at 2:29 p.m.


                    REPORTED BY:
                 JENNIFER RAY, RPR
               Merrill Legal Solutions

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    APPEARANCES:
2

    REPRESENTING PLAINTIFFS:
3            THOMAS J. BELLINDER, ESQUIRE
             Martin & Bellinder
4            351 Edgewood Terrace Drive
             Jackson, Mississippi  39206
5

6    REPRESENTING HARD ROCK HOTEL & CASINO BILOXI:
             DAVID W. STEWART, ESQUIRE
7            COPELAND COOK TAYLOR & BUSH, P.A.
             2781 C.T. Switzer Sr. Drive, Suite 200
8            Biloxi, Mississippi  39531
9

    REPRESENTING THE CITY OF BILOXI:
10           TERE R. STEEL, ESQUIRE
             Page, Mannino, Peresich & McDermott, PLLC
11           759 Vieux Marche Mall
             Biloxi, Mississippi  39530
12

13   REPRESENTING JOSHUA HAMILTON:
             ANDREW AUSTIN CLARK, ESQUIRE
14           Russell S. Gill, PLLC
             638 Howard Avenue
15           Biloxi, Mississippi  39530
16

17

18

19

20

21

22

23

24

25

1                          TABLE OF CONTENTS

2

3       WITNESS:      JASON JORDAN                         PAGE:

4

        Examination by Mr. Stewart ------------------------ 5
5       Examination by Ms. Steel -------------------------- 86
        Examination by Mr. Clark -------------------------- 113
6       Examination by Mr. Bellinder --------------------- 118
        Examination by Mr. Clark -------------------------- 121
7       Examination by Mr. Stewart ------------------------ 122
        Reporter's Certificate ---------------------------- 124
8       Errata Sheet -------------------------------------- 125

9

            *****************************************************
10

        EXHIBITS
11

        (No exhibits were marked.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1                          STIPULATION

2              It is hereby stipulated and agreed

3    by and between the parties hereto, through

4    their respective attorneys of record, that

5    this deposition may be taken at the time and

6    place hereinbefore set forth, by Jennifer Ray,

7    RPR, Court Reporter and Notary Public,

8    pursuant to the Federal Rules of Civil

9    Procedure, as amended;

10             That the formality of READING AND

11   SIGNING is specifically NOT WAIVED;

12             That all objections, except as to

13   the form of the questions and the

14   responsiveness of the answers, are reserved

15   until such time as this deposition, or any

16   part thereof, may be used or is sought to be

17   used in evidence.

18

19

20

21

22

23

24

25

1                    JASON JORDAN,

2          the witness, having been produced and

3    first duly sworn, testified as follows,

4    to-wit:

5                         - - -

6    BY MR. STEWART:

7          Q.    State your full name, please.

8          A.    Jason Christopher Jordan.

9          Q.    Where do you live, Jason?

10         A.    I live in Biloxi.

11         Q.    Are you in the military right now?

12         A.    Yes, I am.

13         Q.    What's your rank?

14         A.    I am a senior airman, E-4.

15         Q.    Senior airman?

16         A.    Yes.

17         Q.    Okay.  You sat through most of the

18   deposition, but you missed the beginning of

19   it, so I'm gonna kind of go back through.

20              If you would -- I'm the attorney for

21   Hard Rock, David Stewart.  We met briefly

22   before.  I'm gonna ask you a series of

23   questions.  If you would, just answer out loud

24   so the court reporter can take down what you

25   say, and try to verbalize your answer as

¹    opposed to head nods and things like that --

²         A.   Yes, sir.

³         Q.   -- that she can't take down.  It's a

⁴    lot more complicated if you do that.

⁵              If you don't understand something

⁶    I've asked you, just let me know, and I'll try

⁷    to clarify my question for you.  Okay?

⁸         A.   Yes, sir.

⁹         Q.   Have you ever been in a deposition

¹⁰   before?

¹¹        A.   No, sir.

¹²        Q.   Have you ever filed a lawsuit

¹³   besides this one?

¹⁴        A.   No, sir.

¹⁵        Q.   Have you ever given testimony

¹⁶   anywhere before?

¹⁷        A.   No, sir.

¹⁸        Q.   What's your current address?

¹⁹        A.   It is 121 O'Donnell,

²⁰   O-D-O-N-N-E-L-L, Drive, Biloxi, Mississippi

²¹   39531.

²²        Q.   How long have you been there?

²³        A.   Since December.

²⁴        Q.   And who lives there with you?

²⁵        A.   My wife, Alyssa.

1      Q.   Where does she work?

2      A.   She does not work.

3      Q.   What's the last job she's held?

4      A.   She worked at Java, a coffee shop in

5   Cadillac, Michigan.

6      Q.   Is there any reason she's not

7   working?

8      A.   I just got back from deployment, so

9   we just relocated back to Mississippi -- or

10  she just relocated back, and I just got back

11  to the States, so...

12     Q.   Where have you been?

13     A.   I was in Saudi Arabia.

14     Q.   What were you doing in Saudi?  What

15  type of job?

16     A.   Security, police work, base

17  security, patrol, QRF, Quick Reaction Force,

18  working with the Saudi military, Saudi police

19  training.

20     Q.   Were you at a particular base there?

21     A.   Eskan Village.

22     Q.   Is that close to Afghanistan?

23     A.   Not particularly.  It's -- it

24  borders Iraq.  Afghanistan is north.

25     Q.   Oh, okay.  I guess I'll get my

1  geography straight before I ask a question.

2         So it's more in support of anything

3  going on in that area, the Iraqi campaign to

4  withdraw and all that, or is that all over?

5      A.   It was in -- we did -- we did have

6  some troops forward deploy to Afghanistan, and

7  it was in support of the Syrian conflict.  So

8  if we needed to go to Syria, then we could

9  forward deploy to Jordan.

10      Q.   Do you have a driver's license?

11      A.   Yes, I do.

12      Q.   What state is that?

13      A.   Mississippi.

14      Q.   Do you have that with you?

15      A.   Yes, I do.

16      Q.   Could I get the driver's license

17  number, or do you happen to know it?

18      A.   I don't know it.  I just got it.

19  802649257.

20      Q.   Do you have any restrictions on your

21  license?

22      A.   No, sir.

23      Q.   Have you ever had a driver's license

24  suspended or revoked?

25      A.   No, sir.

1     Q.   What other states have you held a

2  driver's license in?

3     A.   Michigan.

4     Q.   Just Michigan?

5     A.   Yes.

6     Q.   What's your date of birth?

7     A.   January 28th, 1989.

8     Q.   Makes you how old?

9     A.   25.

10    Q.   How far did you go in school?

11    A.   As far as?

12    Q.   High school, college.

13    A.   I haven't graduated college, but I

14 have about 59, 60 credit hours, and I have a

15 certificate for 911 dispatching that I got

16 from Baker College.  It was for 911

17 telecommunications certificate.

18    Q.   911.  Okay.  Where did you go to

19 high school?

20    A.   Pine River.

21    Q.   Pine River in where?

22    A.   Le Roy, Michigan.

23    Q.   How long have you known Alyssa

24 Jordan?

25    A.   Since I believe 2009.

1     Q.   It would have been Alyssa something

2  else.  What was it before?

3     A.   What's that?

4     Q.   What was her maiden name?

5     A.   Sylvester.

6     Q.   Where did y'all meet?

7     A.   We worked together at a movie

8  theater.

9     Q.   And when did y'all get married?

10     A.   It was June 5th, 2011, the 5th or

11  the 6th.

12     Q.   You worked at a movie theater.  Was

13  that your job prior to going into the Air

14  Force?

15     A.   Yes.  I worked there and I worked at

16  FedEx at the same time.

17     Q.   How long did you work at those

18  places?

19     A.   I worked at the movie theater from I

20  think the end of 2008 until 2010, so about two

21  years, and the same for FedEx.

22     Q.   What kind of theater was it, like a

23  United Artist or something, or what was it?

24     A.   It was a Goodrich Quality Theaters,

25  just a five-screen, just a small theater.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    Q.   What location?

2    A.   Cadillac, Michigan.

3    Q.   Is that the only one there?

4    A.   Yes.

5    Q.   And where did you work for FedEx?

6    A.   In the same town.

7    Q.   Was it a facility there, you were a

8  driver?

9    A.   It was FedEx Ground.

10    Q.   What did you do for them?

11    A.   I loaded and unloaded trucks.

12    Q.   Did you work anywhere else before

13  you went in the military?

14    A.   I worked at Dairy Queen.

15    Q.   In Cadillac?

16    A.   Yes.

17    Q.   Did you have any issues, personal

18  issues or anything that led to your decision

19  to go into the military?

20    A.   No, sir.  Just sick of paying for

21  school, so...

22    Q.   College?

23    A.   Yes, for college.

24    Q.   And since then, you studied --

25  you've got some college credits?

1      A.   Yes, sir.

2      Q.   What were those in?

3      A.   Criminal justice.

4      Q.   And where is that?

5      A.   I went to Baker College, Community

6  College of the Air Force, Mississippi Gulf

7  Coast Community College.

8      Q.   Where is Baker College?

9      A.   Cadillac.

10     Q.   What about Community College of the

11  Air Force, where is that?

12     A.   I'm not exactly sure where the

13  headquarters are.

14     Q.   Is that something available to the

15  entire Air Force?

16     A.   Yes, it is.

17     Q.   Is it online, or how does that work?

18     A.   You get credits for attending --

19  like Security Forces Academy, you get credits

20  towards your associate's degree in criminal

21  justice, and then my credits from Baker

22  College would also fill into electives and

23  whatnot for the Community College of the Air

24  Force.

25     Q.   What about Mississippi Gulf Coast

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    Community College, where did you do that?

2        A.    Jefferson Davis Campus in Gulfport.

3        Q.    When did you start there?

4        A.    It was in -- I did one semester in

5    -- one or two semesters in 2012.  It was the

6    fall semester, I believe.

7        Q.    Did you finish those classes?

8        A.    Yes, I did.

9        Q.    Did you pass those classes?

10       A.    Yes.

11       Q.    What were those classes in?  What

12   type of criteria --

13           MR. CLARK:  Study?

14   MR. STEWART:

15       Q.    Study, field of study?

16       A.    Criminal justice, police

17   administration, criminal organization and

18   criminal investigations.

19       Q.    Have you ever studied Mississippi

20   law in any of those courses?

21       A.    No, sir.

22       Q.    Have you ever been married to anyone

23   besides Alyssa?

24       A.    No, sir.

25       Q.    Have you ever been separated from

1    her in terms of legal separation?

2         A.    No.

3         Q.    Before the incident at Hard Rock,

4    have you ever been charged with any form of

5    domestic violence or abuse by anyone?

6         A.    No, sir.

7         Q.    Have you ever been convicted of a

8    felony in the last ten years?

9         A.    No, sir.

10        Q.    Have you ever had any sort of

11   conviction related to alcohol consumption?

12        A.    No, sir.

13        Q.    Have you ever had any sort of

14   investigation in the military regarding

15   domestic abuse of anyone?

16        A.    No, sir.

17        Q.    Have you ever been -- other than the

18   facts of this incident, have you ever been

19   removed from a casino or other place of

20   business for any reason?

21        A.    No, sir.

22        Q.    Have you ever been trespassed from

23   any casino or other place of business?

24        A.    No, sir.

25        Q.    You're in the Air Force, right?

1          A.    Yes.
2          Q.    What's your -- I don't know what to
3     call it -- your division, squad, squadron, how
4     do you describe it?
5          A.    Squadron.
6          Q.    Which is what; the 81st?
7          A.    81st Security Forces Squadron.
8          Q.    How large is that?  How many people?
9          A.    Between two and three hundred.
10         Q.    Who is the commander?
11         A.    Major Fitzpatrick.
12         Q.    Was he the commander at the time of
13    this incident?
14         A.    No.
15         Q.    Who was then?
16         A.    Major Pignataro.
17         Q.    Do you know where he is now?
18         A.    He is -- the last I knew he was
19    overseas, but I don't know the exact location.
20         Q.    Can you spell his name?
21         A.    I could try, but I don't know how to
22    spell it.
23         Q.    You said he was overseas?
24         A.    The last I knew, but I'm not sure of
25    the exact location.

1      Q.   Do you know where he's from
2 initially, what he calls home?
3      A.   I believe in passing -- what I
4 remember, we were both from Michigan.  I think
5 he was from the UP, Upper Peninsula, but I'm
6 not for sure.
7      Q.   Okay.  And what's your exact job in
8 the military now?
9      A.   I'm a Security Forces policeman, and
10 I am the corrections supervisor, mid shift
11 corrections supervisor.
12      Q.   What is a corrections supervisor?
13      A.   For people that get court-martialed
14 and are convicted to -- or sentenced to time.
15 Anything under six months, then I am in charge
16 of supervising them, facilitating their days,
17 providing meals, just like in a regular jail
18 or prison, just a -- like a guard.
19      Q.   So you function like a warden or a
20 prison employee?
21      A.   Yes, sir.
22      Q.   Who actually is over that fully?
23 Who is your direct supervisor?
24      A.   Well, it -- do you want immediate
25 supervisor?

1      Q.   Who is your next up supervisor?

2      A.   Staff Sergeant O'Neal.  She is the

3   non-commissioned officer in charge of

4   confinement.

5      Q.   How many people are confined, or how

6   large is the facility, I guess?

7      A.   It's a Level 1 confinement facility.

8   It can house up to 20 people.

9      Q.   And that max's out at six months?

10     A.   Yes, sir.

11     Q.   And after that they go to

12  Leavenworth or someplace like that?

13     A.   Or Miramar, Leavenworth.

14     Q.   Okay.  And who is above Master

15  Sergeant -- Staff Sergeant O'Neal, is that

16  what you said?

17     A.   Staff Sergeant O'Neal.

18     Q.   Who is above her, him or her?

19     A.   Gonna be the op superintendent,

20  would be Captain Porta.

21     Q.   Spell that last name.

22     A.   P-O-R-T-A.

23     Q.   Okay.  Is that the same supervisor

24  who was over your security shift, active duty

25  shift on the date of this incident?

1      A.   He operates in -- not immediate
2  supervisor.  He's the second in charge of the
3  squadron, so he kind of facilitates --
4      Q.   Going back to the date of this
5  incident.  Who was over your squad of -- I'm
6  using the wrong term because I don't
7  understand all the relationships, but the
8  group of guys --
9      A.   It would be called a flight.
10     Q.   Flight.  Okay.  Who was over your
11 flight?
12     A.   It was Chris Soukup.
13     Q.   How many people constitute a flight?
14     A.   It just varies.  At that time, it
15 was approximately -- probably between 40 and
16 50 people.
17     Q.   Is it like a shift?
18     A.   Yes.
19     Q.   It's the equivalent -- military
20 equivalent of a sift?
21     A.   Military equivalent of a dayshift,
22 mid shift, swing shift.
23     Q.   So a tour of duty to me means you're
24 going overseas and coming back six months
25 later, but to y'all that means working in a

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    day, right?

2        A.    It can mean both.

3        Q.    I learned that this morning.

4              What shift were you working on the

5    day of this incident?

6        A.    I was working swings.

7        Q.    Is that considered a flight --

8        A.    Yes.

9        Q.    -- or that's your entire group?

10             Okay.  What time did you get off

11   work?

12        A.    I believe it was approximately 11:00

13   p.m.

14        Q.    Did you get off earlier than

15   expected?

16        A.    I had a -- I believe I was an early

17   post, so I posted an hour early, and then you

18   get relieved -- you still work the same amount

19   of time, but you go in an hour early and get

20   relieved an hour early.

21        Q.    Does any of your training involve

22   identifying people with signs of intoxication?

23   Have you ever been trained on that?

24        A.    Not in a certifying capacity, but

25   I've been trained on it generally.

1     Q.   As a security officer --

2     A.   Yes.

3     Q.   -- or a security airman?

4     What is your title?  What do you --

5 are you characterized as a police officer in

6 the military?  What do they call it, MP?

7     A.   Well, for the Air Force, it's called

8 SF, Security Forces, but it's -- you have

9 apprehension authority.  It's the same thing

10 as a MP.

11     Q.   Are you a sworn police officer in

12 the military?

13     A.   Yes.

14     Q.   Do you carry a badge?

15     A.   I have one for my uniform, but

16 there's no credentials that go with it.  It's

17 just a badge.

18     Q.   It's just part of the actual decor

19 of the uniform?

20     A.   Correct.

21     Q.   It's not a badge in the sense of a

22 police officer taking out a badge to show that

23 he's a police officer?

24     A.   It depends on the investigators in

25 our squadron.  They're given credentials, and

1    they can use that badge that goes in there

2    that -- there's an actual badge wallet for it.

3    But in our capacity, we don't have credentials

4    for it.  So it's just an identifying item on

5    our uniform so other people in the military

6    know that we're police.

7        Q.   When you are outside of the base or

8    other military complex, are you a police

9    officer outside in the world in any way, shape

10   or form?

11       A.   No, sir.

12       Q.   Okay.  You've never been sworn as a

13   police officer in any jurisdiction, have you?

14       A.   No, sir.

15       Q.   Have you ever received any awards or

16   medals in the military?

17       A.   I won -- I just recently won Airman

18   of the Quarter for the fourth quarter and air

19   expeditionary medal.

20       Q.   So what did it take to get Airman of

21   the Quarter?

22       A.   You have to -- you stand out from --

23   there's approximately 150 airmen, so you go

24   into competition with them.  It's volunteer

25   work, ratings on your -- how well you're doing

1  your job.  I was deployed at the time, so some

2  of the things I did -- I did training with the

3  EOD, bomb detection, just --

4       Q.    Going above and beyond what's asked

5  of you?

6       A.    Right.  That's right.

7       Q.    Would you characterize your career

8  currently in the Air Force as successful?

9       A.    Yes.

10      Q.    Okay.  Do you have any long-term

11 plans after the military?  What are you gonna

12 do after that?

13      A.    Hopefully retire out of there, and

14 then we'll see from there.

15      Q.    What's the retirement time for the

16 military?

17      A.    It's a minimum of 20 years.

18      Q.    How much do you have in?

19      A.    A little over three.

20      Q.    Have you ever been the subject of

21 any discipline by the military?

22      A.    Resulting from this incident, yes.

23      Q.    Any other?

24      A.    No other.

25      Q.    Okay.  What was the -- was there an

1    investigation with regard to this incident?

2         A.   I believe so, but I'm not sure to

3    the extent of how far the investigation went.

4         Q.   How did you know there was an

5    investigation at all?

6         A.   Just based on the punishment I

7    received, I assumed that they had to do some

8    sort of investigation to give me a punishment

9    for it.

10        Q.   What punishment did you receive?

11        A.   It was Art 5.

12        Q.   A what?

13        A.   It's an Article 15, nonjudicial

14   punishment.

15        Q.   What happened as a result of that?

16        A.   I was given 45 days of extra duty.

17        Q.   Did you have an opportunity to --

18   was there any sort of proceeding where you

19   testified or explained the facts?

20        A.   You can deny the Art 15, but then

21   you have to go to court-martial, or you can

22   accept the Art 15, and you're not admitting

23   guilt, but you're accepting that punishment

24   over going to court.

25        Q.   Who communicated those facts to you,

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1   those options?

2        A.    My commander, Major Pignataro.

3        Q.    Did he explain to you why you were

4   being given those options?

5        A.    Not specifically.  It's just -- I

6   think it's just their proceedings and

7   punishment.

8        Q.    So you were afforded the opportunity

9   to either take the punishment that was

10  determined to be appropriate to you, the 45

11  days of extra duty, or you could not accept

12  that and then have a full court-martial?

13       A.    That's right.

14       Q.    And you accepted to take the

15  punishment?

16       A.    Yes.

17       Q.    When was that?

18       A.    That was in January of 2012.

19       Q.    And your understanding was that was

20  as a direct result of the incident at the Hard

21  Rock --

22       A.    Yes.

23       Q.    -- at issue in this lawsuit?

24       A.    That's right.

25       Q.    Have you ever had any demotion in

1    your rank?

2        A.    No, sir.

3        Q.    Have you been promoted at all?

4        A.    Yes.

5        Q.    When was that?

6        A.    August 29th of 2013.

7        Q.    Were you suspended without pay when

8    -- I'm sorry -- when you -- the 45 days that

9    you worked, were you paid during that?

10       A.    Yes.

11       Q.    Have you consistently worked since

12   the date of this incident?

13       A.    Not in my job capacity, but I had to

14   show up -- I had to be at -- present for duty

15   every day, but I haven't been able to do my

16   job every day.

17       Q.    What do you mean?

18       A.    I was unable to arm-up due to

19   injuries and the punishment proceedings.

20       Q.    What do you mean -- I understand the

21   issue about injuries.  What do you mean

22   because of the punishment proceedings?

23       A.    I guess in the month leading up to

24   -- while they were doing their investigation

25   in the month of December, they relieve you of

1   duty so you can't carry a firearm.  If you

2   can't carry a firearm, then you can't complete

3   your job unless they send you in an

4   administrative capacity.

5       Q.   So how long were you not in a

6   position to carry a firearm because of the

7   discipline?

8       A.   30 days.

9       Q.   How long were you saying you were

10  not able to, as you say, arm-up otherwise?

11      A.   I have to think about it for a

12  minute.  It was about 13 months.

13      Q.   What did you do in those 13 months

14  in terms of your job?

15      A.   For the first -- for the first six

16  months, I was still assigned to my flight, but

17  I was doing administrative paperwork, filing,

18  cleaning, anything they needed me to do.

19      Q.   And what about after those six

20  months?

21      A.   Then I was assigned to the pass and

22  registration office, which is a visitor

23  center.

24      Q.   And then after 13 months, you went

25  back to full duty?

1      A.    Yes.

2      Q.    Have you got any limitations or

3  restrictions in what you can and can't do

4  physically as a matter of a doctor telling you

5  that?

6      A.    No pushups still.

7      Q.    Are you required to do pushups?

8      A.    Yes.

9      Q.    Are you excused from that

10  requirement in terms of -- I know there's

11  certain fitness things you have to do in the

12  military.  Is that something you're allowed to

13  not do because of that?

14      A.    It is for a short period of time,

15  and then anything over two years they begin

16  investigation of why you're still injured, and

17  then you can possibly be med boarded, which is

18  a medical disposition to see if you're still

19  fit to be in the military or if the injury is

20  preventing you from being physically capable

21  to continue your career.

22      Q.    Where do you stand on the two years

23  time-wise?

24      A.    This is the last -- it's called a

25  profile.  That's what you get from the doctor

1  that excuses you from pushups, situps, any
2  physical training.  I'm at the end of that.
3      Q.   What you do you mean the end?
4  Literally you're at the end of the two years?
5      A.   Yes.
6      Q.   Have you -- has a physician -- who
7  are you treating with for that?
8      A.   It's Dr. -- I'm not sure if she's a
9  doctor, but my primary care physician, Dr.
10 Corta.
11     Q.   Where is she?
12     A.   Keesler medical facility.
13     Q.   Have you expressed to her your
14 desire to test, to make sure that you can do
15 pushups, or is that even something y'all
16 discussed?
17     A.   It was something she's -- that I've
18 discussed and we've evaluated -- she's
19 evaluated.
20     Q.   What has she said about it?
21     A.   Just to continue trying to
22 strengthen it, do hand exercises.
23     Q.   Have you done any physical therapy?
24     A.   They didn't -- they didn't refer me
25 to do that.

1        Q.    When will your next profile occur?

2        A.    The one that I'm currently on

3    expires in April, and then I would need to get

4    another doctor's appointment in order to

5    extend that, or if I didn't go in, then it

6    would just -- then I would be required to do

7    pushups.

8        Q.    How long can it be extended, to your

9    knowledge?

10       A.    It can be extended for any amount of

11   time that they feel you are unable to do your

12   physical activity, but anything over that

13   amount of time, then you're possibly going to

14   be medically discharged.

15       Q.    Has anybody mentioned to you that

16   you're being considered for med boarding?

17       A.    Not at this time.

18       Q.    Other than not being able to do the

19   required pushups, is there anything else you

20   can't do since this incident?

21       A.    No, sir.

22       Q.    Other than the deployment we've

23   already talked about, have you ever been

24   deployed anywhere else?

25       A.    No, sir.

1       Q.   Do you have any children?

2       A.   No.

3       Q.   Does your wife have any children

4  from any prior engagement or marriage?

5       A.   No, sir.

6       Q.   Relationship?

7       A.   No.

8       Q.   Has your wife -- before this

9  incident, was she ever pregnant before?

10      A.   No, sir.

11      Q.   Have you ever had a girlfriend who

12  got pregnant?

13      A.   Yes, sir.

14      Q.   When was that?

15      A.   That was in April of 2010.

16      Q.   That was a different person than

17  Alyssa?

18      A.   Yes.

19      Q.   What was the end result of that?

20      A.   She miscarried, but I don't know the

21  details.

22      Q.   How far along was she?

23      A.   Approximately six to eight weeks.

24      Q.   Do you know why she miscarried?

25      A.   No, sir.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1      Q.   She wasn't involved in any injury or

2  anything, was she?

3      A.   No, sir.  I believe it had something

4  to do with a thyroid disease, but I'm not

5  sure.

6      Q.   Do you have any relatives who live

7  in South Mississippi?

8      A.   Not that I know of.

9      Q.   Have you ever had any other injuries

10  other than the injuries we're gonna talk about

11  after this incident?  Have you ever had any

12  medical conditions?

13      A.   No, sir.

14      Q.   Never been injured in any accidents

15  or anything like that?

16      A.   No, sir.

17      Q.   Have you ever injured your right or

18  left wrist before this incident?

19      A.   Yes, sir.

20      Q.   Where was that?

21      A.   It was in Le Roy, Michigan.

22      Q.   What happened?

23      A.   I fell on it.

24      Q.   During the course of what?

25      A.   We were like doing some MMA-type

<sup>1</sup> like grappling.

<sup>2</sup>     Q.   Is that something you've done a lot
<sup>3</sup> in your life?

<sup>4</sup>     A.   No, sir.

<sup>5</sup>     Q.   What inspired that episode?

<sup>6</sup>     A.   We had just seen it on TV, so...

<sup>7</sup>     Q.   Who was with you?

<sup>8</sup>     A.   Derek Syers.

<sup>9</sup>     Q.   Is that a friend of yours from home?

<sup>10</sup>     A.   Yes, sir.  He's deceased.

<sup>11</sup>     Q.   S-I --

<sup>12</sup>     A.   S-Y-E-R-S.

<sup>13</sup>     Q.   How did Mr. Syers die?

<sup>14</sup>     A.   Suicide.

<sup>15</sup>     Q.   When was that?

<sup>16</sup>     A.   That was in 2012 or 2013.  I can't
<sup>17</sup> remember.

<sup>18</sup>     Q.   Can you explain if you actually lost
<sup>19</sup> any wages after this incident?

<sup>20</sup>     A.   I was scheduled to deploy in July of
<sup>21</sup> 2012, but because of the injury, I was unable
<sup>22</sup> to deploy, so -- in a deployed environment,
<sup>23</sup> you have tax incentives and hazard duty pay,
<sup>24</sup> family separation pay.  So all that extra pay
<sup>25</sup> would have been something that I would

1    received but did not because I was unable to

2    go.

3         Q.   How often do you deploy?  How often

4    would that opportunity be presented to you?

5         A.   You can deploy up to as much as

6    every six months.  Six months home, six months

7    gone.  It's usually about a year in between.

8         Q.   How many times have you gone since

9    this incident?

10        A.   Once.

11        Q.   Is it your position that you would

12   have gone more than once?

13        A.   Yes.  I would have gone one more

14   time.

15        Q.   Are you gonna go again?

16        A.   If they need me to.

17        Q.   Have you requested deployment?

18        A.   No, sir.

19        Q.   Why not?

20        A.   You're in a window of deployment

21   opportunity.  So they select you from a

22   bucket, per se.  So once you're in your

23   bucket, you're either slotted to go or you're

24   not.  There's not really a volunteer

25   opportunity unless somebody is unable to go

1   and they need somebody to go right away, and
2   then you can volunteer, but that hasn't been
3   the case.
4        Q.   So the one time you went, that kind
5   of satisfied your opportunity, didn't it?
6        A.   Well, I was slotted to go within my
7   window.  It's a three-month window.  So if a
8   position for my rank and my duty title became
9   available -- so they pick you from a list, and
10  then you go.  So if it comes up again in a
11  year and they need somebody and it's my time
12  to go, then they'll pick me from the list
13  again.
14       Q.   So this happened at the end of '11.
15  You went in, what, '12?
16       A.   I went in '13.
17       Q.   '13.  So --
18       A.   I was supposed to go in '11, and
19  then I went -- I was slotted again for '13.
20  So I would've went in '11, then I would have
21  came back, and then I would've went again.
22       Q.   You're positive you were going
23  twice?
24            MR. BELLINDER:  Object to the form.
25       A.   It's not for certain, but...

1   MR. STEWART:

2        Q.   Did you have to have a physical

3   before you deployed?

4        A.   Yes, sir.

5        Q.   Did you pass that physical?

6        A.   Yes, sir.

7        Q.   Did that involve pushups?

8        A.   They had wavered it at that time, so

9   they allowed me to go.

10        Q.   What does that mean?

11        A.   They still allowed me to go without

12   -- I had a passing physical training test,

13   just -- they exempted me from pushups at that

14   time, so I was still able to go.

15        Q.   I'm assuming you didn't have any

16   trouble with pushups before this incident,

17   right?

18        A.   No, sir.

19        Q.   How many could you do before this?

20   Was it timed?

21        A.   Yes.  You have to do as many -- as

22   many as you can in one minute, and I believe

23   on my first PT test I did 40.  The requirement

24   is -- the minimum requirement is 33.

25        Q.   And when you try now, how many can

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    you do?

2         A.   Approximately 20 or less.

3         Q.   How often do you try?

4         A.   Probably two or three times a week

5    to try to strengthen the hand.

6         Q.   You've never made a claim for

7    disability in the military, have you?

8         A.   No, sir.

9         Q.   Before this incident, did you ever

10   go to any casino or lounges?

11        A.   Yes, sir.

12        Q.   Where did you go?

13        A.   Turtle Creek.

14        Q.   Where is that?

15        A.   It's in Williamsburg, Michigan.

16        Q.   That's a casino?

17        A.   Yes.

18        Q.   Did they have a nightclub?

19        A.   Yes, but I never went to it.

20        Q.   Did you ever go to any nightclubs

21   here on the coast?

22        A.   No, sir.

23        Q.   Anywhere else?

24        A.   No, sir.

25        Q.   Had you ever been to the Hard Rock

1  Casino before this incident?

2       A.   Yes, sir.

3       Q.   How many times?

4       A.   Approximately maybe three to five

5  times, but never to The Ledge.

6       Q.   You never went to The Ledge?

7       A.   No, sir.

8       Q.   Before this incident, other than the

9  MMA episode, have you ever been in a fight?

10      A.   No, sir.

11      Q.   Not ever in your life?

12      A.   No, sir.

13      Q.   Did you play football or anything?

14      A.   Yes, I played football.

15      Q.   Did you ever get in a fight on the

16 football field?

17      A.   No, sir.  Just the normal football

18 physical aspect, but no fights.

19      Q.   Did you ever injure your wrist

20 playing football?

21      A.   No, sir.

22      Q.   Did you ever play any other sports?

23      A.   Yes.

24      Q.   What other sports?

25      A.   Soccer, basketball, baseball.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

    Q.    Any sports injuries at all?

    A.    No, sir.

    Q.    Have you ever seen any sort of fight
at Hard Rock Casino or in The Ledge before
this incident?

    A.    No, sir.

    Q.    Have you been back?

    A.    No, sir.

    Q.    Has any of your training involved
defusing arguments so they don't turn into
altercations?

    A.    Yes, sir.

    Q.    When were you trained on that?

    A.    Beginning of May 2011 until
currently, but -- so from May until -- that
time period would be May to November.

    Q.    Is there a text that y'all teach out
of, that you learn out of?

    A.    Yes, sir.

    Q.    What is it called?

    A.    It's the Security Forces -- it's
like a -- Security Forces Academy, but I'm not
exactly sure what the book is.

    Q.    Is there one that's specific to
avoiding or defusing arguments?

1       A.    I believe it's a chapter.

2       Q.    Is there a chapter on use of force?

3       A.    Yes, sir.

4       Q.    Are you trained in the proper use of

5  force?

6       A.    Yes, I am.

7       Q.    Have you studied the use of force

8  continuum?

9       A.    Yes, but it's been awhile now.

10      Q.    Did you study that before this

11  incident?

12      A.    Yes, sir.

13      Q.    Have you ever gotten into any sort

14  of domestic fight or argument with your wife,

15  your current wife?

16      A.    No, sir.

17      Q.    Before this incident, were you aware

18  of the possibility that fights can happen in

19  lounges and bars?

20      A.    Yes, sir.

21      Q.    Do you know why that happens?

22            MR. BELLINDER:  Object to the form.

23      A.    Yes.  Late night tension, alcohol.

24  MR. STEWART:

25      Q.    Boys and girls?

1       A.   Boys and girls.

2       Q.   Was there an ongoing problem with

3  you and any other person at Keesler involved

4  in your security squad --

5       A.   No, sir.

6       Q.   -- before this incident?

7       A.   No.

8       Q.   Did you have a problem with a person

9  at Keesler -- I mean from Keesler who was at

10  the Hard Rock on the night of this incident?

11      A.   Not that I remember.

12      Q.   Do you remember this incident at

13  all?

14      A.   No, sir.

15      Q.   Not anything?

16      A.   Arriving.

17      Q.   Okay.  What time did you get off

18  work?

19      A.   It was approximately 11:00.

20      Q.   Where did you go after that?

21      A.   I went home.

22      Q.   And what did you do there?

23      A.   I changed.

24      Q.   Where was your home?

25      A.   It was in Gulfport.

1      Q.   Where was that?

2      A.   It was on the Biloxi/Gulfport line.

3   Would you like the address?

4      Q.   Please.

5      A.   828 Oakleigh, O-A-K-L-E-I-G-H,

6   Avenue, Gulfport, Mississippi.

7      Q.   Is that back behind Subway?

8      A.   Yes, it is.

9      Q.   You live north of Pass Road?

10      A.   It's south towards the bay.

11      Q.   Behind the Subway --

12      A.   Yes.  That's right.

13      Q.   -- towards JD?

14      A.   Yes, sir.

15      Q.   Okay.  Did you change clothes there?

16      A.   Yes, I did.

17      Q.   Did you pick up your wife?

18      A.   Yes.

19      Q.   And she was already home, or did you

20   have to wait for her?

21      A.   She was home.

22      Q.   And what time did y'all leave your

23   house?

24      A.   I don't remember.  I don't remember

25   the time.

1       Q.    Okay.  Do you know what time you got

2    to the Hard Rock?

3       A.    I don't remember.

4       Q.    Did you stay around the house for a

5    little while, eat dinner or anything like

6    that?

7       A.    I think we left fairly quickly.

8       Q.    Had you eaten dinner the day of this

9    incident before you went?

10      A.    I can't remember.

11      Q.    Did you eat anything at the Hard

12   Rock?

13      A.    No, sir, not that I -- I don't think

14   so.

15      Q.    Whatever time you got there, you and

16   your wife both got to the Hard Rock --

17      A.    Yes, sir.

18      Q.    -- where did y'all go at the Hard

19   Rock?

20      A.    What's that?

21      Q.    Where did you go once you got to the

22   Hard Rock property?

23      A.    Then we went to The Ledge.

24      Q.    You went straight into The Ledge?

25      A.    Yes, sir.

1        Q.   Do you recall going past security at
2   the front entrance to The Ledge?
3        A.   Yes, I do.
4        Q.   How many security people were there?
5        A.   I remember two working the ID stand
6   and then just various...
7        Q.   Do you recall seeing others inside?
8        A.   Yes.
9        Q.   Did they have blue uniforms, blue
10  shirts?
11       A.   It's like a -- it's either blue or
12  purple.
13       Q.   It's kind of a dark blue, lighter
14  than your shirt you have on today --
15       A.   Yes, sir.
16       Q.   -- but like a blueish --
17       A.   Yes, sir.
18       Q.   You recognized them to be security
19  personnel, correct?
20       A.   Yes, sir.
21       Q.   They're marked as security?
22       A.   Yes.
23       Q.   They had a little badge, insignia
24  badge, do you remember seeing that?
25       A.   I don't remember seeing it, but I

1    would assume so.

2         Q.   Okay.  There were -- so you saw

3    several.  You saw two, and there were some

4    inside, also, inside The Ledge?

5         A.   I don't remember any in The Ledge.

6    I just remember seeing them just walking

7    around the...

8         Q.   The property?

9         A.   Yes, sir.  And then at the entrance.

10   At the bottom of the stairs to The Ledge, I

11   remember somebody checking IDs, I believe, but

12   I don't remember any security guards upstairs.

13        Q.   Do you recall it being the top of

14   the stairs or the bottom of the stairs?

15        A.   I don't recall for sure.  I believe

16   it was at the bottom.

17        Q.   What did you do once you got there?

18        A.   I believe I made contact with like

19   the flight members that were there.

20        Q.   Okay.  Before I forget, did you know

21   your wife was pregnant at that time?

22        A.   I did not.

23        Q.   Did your wife know she was pregnant?

24        A.   No, she didn't.

25        Q.   Had she ever told you that she

1     suspected that she was pregnant?

2          A.    No, sir.

3          Q.    Okay.  Did you drink alcohol that

4     night?

5          A.    Yes, sir.

6          Q.    How many drinks did you have?

7          A.    I can't remember.

8          Q.    Do you have any idea?

9          A.    I have no idea.

10         Q.    Whatever drinks you did drink, that

11    was your decision to have it, correct?

12         A.    Yes, sir.

13         Q.    No one forced you or made you drink,

14    did they?

15         A.    That's right.

16         Q.    Did your wife drink alcohol that

17    night?

18         A.    Not that I know of.

19         Q.    Not any?

20         A.    No, sir.

21         Q.    Does your wife drink at all?

22         A.    Rarely.

23         Q.    Rarely?

24         A.    Yes, sir.

25         Q.    Are there any -- do y'all have

1    Facebook?

2         A.    Yes, sir.

3         Q.    Are there any pictures out there

4    that show y'all with alcohol in your hands in

5    those Facebook pictures?

6         A.    I believe so.

7         Q.    A lot of Facebook pictures with

8    alcohol in them?

9              MR. BELLINDER:  Object to the form.

10        A.    I'm not sure, sir.

11   MR. STEWART:

12        Q.    Okay.  Do you know if your wife was

13   abstaining from drinking for any particular

14   reason around the time and up to this

15   incident?

16        A.    She was the driver.

17        Q.    She was designated that night?

18        A.    Yes, sir.

19        Q.    This was your function, right?

20        A.    That's right.

21        Q.    She was gonna drive you home?

22        A.    That's right.

23        Q.    Your wife has had some injuries in

24   the past, a bad car wreck a long time ago?

25        A.    Yes, sir.

1      Q.   Did she have any pain problems
2  continuing because of that?
3      A.   Nothing significant.  Occasionally.
4      Q.   Did she ever take aspirin, Motrin,
5  Ibuprofen?
6      A.   She doesn't take anything.
7      Q.   No pain medications at all?
8      A.   No, sir.
9      Q.   Not even over-the-counters?
10     A.   No.
11     Q.   Does she take aspirin for headaches?
12     A.   I'm not sure.
13     Q.   Okay.  She didn't take any regular
14  medications before this incident?
15     A.   No, sir.
16     Q.   At what point do we have no memory?
17  You've gotten to The Ledge.  You recall
18  ingesting some alcohol.  You don't recall
19  what.  What's the last thing you remember?
20     A.   I just remember socializing.  The
21  last thing I remember was having a great time,
22  laughing and dancing.  I was introducing my
23  wife to some of the people that I worked with.
24  I was brand new there, so it's kind of a -- I
25  didn't really know anyone.  It was kind of an

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    indoctrination, get to know everybody outside

2    of work kind of a function.

3        Q.   Can you remember as we're sitting

4    here today who all was there, that you can

5    recall?

6        A.   The only people I knew, Sergeant

7    Miller, he was the one that kind of put it all

8    together.

9        Q.   What's his first name?

10       A.   Joshua.

11       Q.   Is he still at Keesler?

12       A.   No, sir.  He is no longer in the

13   military.

14       Q.   Where is he now?

15       A.   I'm not sure.

16       Q.   Do you know where he's from?

17       A.   I don't know.

18       Q.   Do you remember anyone else who was

19   present besides you and your wife?

20       A.   Chris Soukup.

21       Q.   Anyone else?

22       A.   His wife, Kayla Soukup.

23       Q.   Anyone else?

24       A.   Al Nicholson, Shawn Hargraves.

25       Q.   Do you recall these because they

1    were said in the deposition before, or do you

2    specifically --

3         A.   I do remember them.  And then

4    Courtney -- it was Courtney Nicholson at the

5    time, but it's Courtney Drain.

6         Q.   Courtney Nicholson, is that Al's

7    ex-wife?

8         A.   Yes.

9         Q.   What is it now?

10        A.   Drain.

11        Q.   D --

12        A.   D-R-A-I-N.

13        Q.   Where is she?

14        A.   I believe she's at Keesler, but

15   she's leaving soon.  She's changing stations.

16        Q.   She's in the military?

17        A.   Yes.

18        Q.   So husband and wife were both in the

19   military married?

20        A.   That's right.

21        Q.   And then they got divorced?

22        A.   Yes.

23        Q.   And he's -- Al is where?

24        A.   I believe he's deployed right now,

25   but I'm not sure where.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    Q.    What about Shawn?

2    A.    He's here.  He's at Keesler.

3    Q.    Active duty?

4    A.    Yes.

5    Q.    Do you still see him?

6    A.    No.

7    Q.    Is he in a different flight or squad

8  or squadron?

9    A.    He is -- I have like a specialized

10  job there, so I don't really see anybody that

11  normally comes and goes from the squadron

12  because I'm kind of excluded in the jail area,

13  so I'm not exactly sure where anybody works.

14    Q.    Anyone else you can recall who was

15  present?

16    A.    Well, I only know Dorack was there

17  because of the video.

18    Q.    We'll talk about him in just a

19  second.  I gave you the opportunity in the --

20    A.    Sergeant Reimer, he was there.

21    Q.    I'm sorry?

22    A.    Sorry to interrupt.  Sergeant

23  Reimer, I remember he was there.

24    Q.    I handed you the exhibits from Mr.

25  Soukup's deposition, and you had a chance to

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    look over those?

2         A.   Yes, sir.

3         Q.   Do you need to look at them again to

4    tell me whether you can identify any of the

5    people depicted in those photos?

6         A.   I mentioned everybody that I

7    recognized from the photos.

8         Q.   Okay.  And you indicated that you've

9    seen the video that shows Dorack?

10        A.   That's right.

11        Q.   Do you know who Dorack is now?

12        A.   I've seen him around the squadron,

13   but I don't know him on any level.  I've

14   never --

15        Q.   You've never had any conversation

16   with him since this incident whatsoever?

17        A.   No, sir.

18        Q.   You never said, hey, sorry about the

19   other night or let's talk about the other

20   night or anything like that?

21        A.   Never brought it up.

22        Q.   Okay.  Do you know his first name?

23        A.   I believe it's Wes, but I don't know

24   if it's Wesley or anything other than that.

25        Q.   Is he still at Keesler?

1     A.   I believe he is -- according to a
2  list I've seen, I believe that he's on a team
3  that's about to leave to go overseas.
4     Q.   To go where?
5     A.   I'm not sure.
6     Q.   When do they leave?
7     A.   They're in training to leave right
8  now, so within the next couple of weeks.
9     Q.   Do you recall any of your
10 interactions with Airman Dorack?
11    A.   I do not.
12    Q.   As we sit here right now, can you
13 testify under oath that you were assaulted by
14 him in any way, shape or form?
15    A.   Not that I can remember.
16    Q.   Having watched the video, did you
17 see any evidence that he assaulted you?
18    A.   It appeared that way.
19    Q.   You saw him coming at you?
20    A.   Yes, sir.
21    Q.   Okay.  Where did you see that in
22 terms of the location that you saw on the
23 video?
24    A.   I believe -- it looks like he comes
25 out of the bathroom, and I'm standing adjacent

1  to the bar, and he approaches me from there,
2  but there's sort of a group of people between
3  us.
4       Q.   What do you see on the video in
5  terms of what he does?
6       A.   Just looks like he's kind of just
7  staring at me in a provoking manner, making
8  hand gestures.
9       Q.   Did you see him strike you?
10       A.   No, sir.
11       Q.   Make any physical contact with you
12  at all?
13       A.   Not that I'd seen.
14       Q.   Did you make any physical contact
15  with him?
16       A.   I don't believe so.
17       Q.   Did you strike him?
18       A.   No, sir.
19       Q.   And this is all just based on the
20  video, you have absolutely no memory of the
21  events?
22       A.   I have no recollection.
23       Q.   From that time that you remember
24  having a good time and socializing --
25       A.   That's right.

1        Q.   -- from that time forward, do you
2    have any memory whatsoever of this evening?
3        A.   As I'm getting taken down the
4    stairs, I can remember -- I remember brief
5    like flashes of sort of like a flight -- fight
6    or flight, where I just wanted -- I wasn't
7    sure why everybody was on me, so I wanted to
8    get everybody -- just everybody stop.  Then I
9    remember being in pain from the handcuffs and
10   being dragged, so I was -- I can remember
11   yelling "stop" or saying "no" to try to just
12   -- I wanted the action to stop because I
13   didn't understand what was going on, but it
14   was only flashes of that.  I can't remember
15   any specific details.
16       Q.   Do you own a bayonet?
17       A.   No, sir.
18       Q.   Have you ever had a bayonet?
19       A.   No, sir.
20       Q.   Have you ever possessed a bayonet?
21       A.   No, sir.
22       Q.   Do you recall telling any of the
23   security people at Hard Rock that if you had a
24   bayonet, you could cut their head off with
25   expletives in the middle of that?

1           A.    No, sir.

2           Q.    Did you curse loudly at Hard Rock,

3     curse at all at Hard Rock?

4           A.    I don't remember.

5           Q.    Is it possible given the

6     circumstances that you cursed a lot at Hard

7     Rock?

8           A.    Possibly.

9           Q.    Did you punch anyone at Hard Rock?

10          A.    Not that I know of.

11          Q.    Have you looked at the video to see

12    -- to ascertain whether you struck anyone?

13          A.    Yes.

14          Q.    You didn't see any evidence that you

15    struck anyone?

16          A.    Yes.

17          Q.    You did not or you did see --

18          A.    I did.

19          Q.    You saw evidence of who?

20          A.    Of Alyssa --

21          Q.    Okay.

22          A.    -- on accident.  I believe that she

23    was -- I didn't know who she -- maybe I didn't

24    know who she was at the time of what was going

25    on.  So I believe that due to the

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    circumstances of being provoked and kind of

2    handled by security guards when I believed I

3    didn't do anything wrong, that I thought maybe

4    she was a security guard, and I was trying to

5    get myself free from everybody that was around

6    me.

7         Q.    And you struck her in the face?

8         A.    Yes.

9         Q.    How many times did you swing at her?

10        A.    I believe once, but I'm not sure.

11        Q.    Did she get struck by anyone else

12   that night?

13        A.    I don't believe so.

14        Q.    Did she get struck at any other

15   time?

16        A.    I'm not sure.

17        Q.    Did you see any evidence that you

18   pulled her to the ground?

19        A.    I think we fell to the ground.  I

20   don't think I pulled her intentionally to the

21   ground.

22        Q.    Why did you fall?

23        A.    I believe because of intoxication, I

24   just lost my footing.

25        Q.    Okay.  Not because of anything on

1  the floor, you just were drunk, fell down?

2      A.   Not that I know of.  I don't know if

3  there was anything on the floor or not.

4      Q.   And Hard Rock personnel were not the

5  first people that tried to control you, were

6  they?

7      A.   No.

8      Q.   Did you consider any of the efforts

9  to control you by Hard Rock something that

10  caused provocation to you?

11     A.   I believe everybody was probably

12  slightly intoxicated, and I just wanted

13  everybody to -- I would be fine if everyone

14  would just back off and let me just be, and I

15  believe they provoked me by just continuing to

16  grab me or try to get me to do something when

17  I didn't believe I was doing anything in the

18  first place, so...

19     Q.   That's what you thought at the time.

20  Is that what you think now?

21     A.   That's what I believe.  I would

22  think given my way of thinking now of how I

23  would have possibly thought in the moment.

24     Q.   Looking at it after the fact, how do

25  you feel about it?

1      A.   Well, given the circumstances, I

2   wish I would have just -- everything would

3   have just dissolved and been calm and would've

4   went on our ways.

5      Q.   For example, if someone would've

6   brought you a wheelchair, you wish you

7   would've gotten in the wheelchair and taken a

8   ride home?

9      A.   Yes.

10      Q.   Was that opportunity presented to

11   you?

12      A.   I am unsure.

13      Q.   You don't recall that from your

14   actual memories?

15      A.   That's right.

16      Q.   Having seen the video, do you see a

17   wheelchair brought to the area?

18      A.   I see it brought to the area, but I

19   don't see any efforts past that.

20      Q.   You don't see any indication over by

21   the column where people were kind of gathered

22   around, and while they go get the wheelchair,

23   they're bringing a wheelchair to get you in

24   it, do you recall seeing that?

25      A.   I do, but it looks like it's wheeled

1   up, and then nothing really happens with it.

2       Q.   At the time that Soukup is already

3   over by the column, there's a female security

4   officer there, a person.  Do you recall that

5   on the video?

6       A.   In the video, yes.

7       Q.   Just from the video.  And this is

8   the episode where I believe you indicated you

9   see evidence you struck your wife?

10      A.   Yes.

11      Q.   Where did you hit her?

12           MR. BELLINDER:  Object to the form.

13  MR. STEWART:

14      Q.   What part of her body, if you

15  recall?

16      A.   I believe it -- accidentally in the

17  face.

18      Q.   Did she ever explain to you why she

19  got down on top of you or close to you?

20      A.   I believe that she -- me and her

21  were the closest people to each other, so --

22  everyone else's efforts were obviously

23  failing, so maybe she thought she could talk

24  to me, but at the same time, security was

25  provoking me, so I didn't -- I was unsure of

1    what was happening.

2         Q.    Do you remember that?

3         A.    I don't.  Just from the video.

4         Q.    Okay.  You're speculating as to what

5    you were thinking?

6         A.    Yes, my way of thinking now of how I

7    think I would have thought during the

8    incident.

9         Q.    Did you strike any of your

10   co-workers before that occurred?

11        A.    No, sir.

12        Q.    Not any?

13        A.    No.

14        Q.    And the only people involved in

15   trying to -- that you saw on that video trying

16   to control you and bring you -- subdue you

17   were Hard Rock security people up until your

18   wife got involved?

19        A.    And Sergeant Reimer.

20        Q.    Why was he trying to do that?  Do

21   you know?

22        A.    Well, he is a police officer,

23   civilian police officer, also, and so I

24   believe that with his training, he was just

25   doing what he would do and try to resolve the

1  situation.

2      Q.   To try to keep anybody from getting

3  hurt?

4      A.   Yes, sir.

5      Q.   Including you?

6      A.   Yes.

7      Q.   And there were Hard Rock security

8  people engaged along with Sergeant Reimer at

9  the time that your wife felt like she needed

10 to do something, right, when she leaned down?

11     A.   I believe so.

12     Q.   She didn't feel like those guys

13 could handle it better than her?

14          MR. BELLINDER:  Object to the form.

15     A.   I believe she could probably tell

16 that I was scared and wasn't sure what was

17 going on, and so she was just trying to help

18 me and let me know that it was all right, and

19 then it was just given the circumstances

20 chaotic and out of control, so...

21 MR. STEWART:

22     Q.   Do you recall swinging and striking

23 anyone besides your wife at all?

24     A.   No, sir.

25     Q.   You haven't seen that anywhere on

1    the video?

2         A.   No, sir.

3         Q.   Did you see on video how you

4    actually were controlled eventually inside The

5    Ledge?

6         A.   Yes, I believe so.

7         Q.   What happened?

8         A.   I believe I was eventually taken

9    into the foyer area, and then a large security

10   guard sat on me for an extended period of

11   time.

12        Q.   How long was that period of time?

13        A.   According to the video, I believe

14   it's about between 10 and 15 minutes.

15        Q.   Did you ever see anybody tuck your

16   arms under your body?

17        A.   Not that I recall.

18        Q.   Do you recall -- other than just

19   looking at the video, do you recall that

20   episode, the person was applying pressure to

21   your -- was it on your back side or --

22        A.   On my -- I was laying on my stomach,

23   and the individual was on my back.

24        Q.   On your back or on your rear end?

25        A.   I think it was kind of a combination

1    of my rear end and lower back area.

2        Q.   Okay.

3        A.   It's hard to tell, and I can't

4    remember.

5        Q.   Do you recall your arms being tucked

6    before that?

7        A.   I can't recall.

8        Q.   Have you ever used the maneuver like

9    that in your pretend MMA career that you tuck

10   the arms under somebody and put the -- or in

11   your police career, frankly, to maintain

12   somebody by tucking their arms and putting a

13   knee on their back side?

14           MR. BELLINDER:  Object to the form.

15       A.   It just depends on -- depends on the

16   individual that perceives a threat for them,

17   but if you -- if you leave their arms under

18   their body, you can easily bring them out or

19   -- the best way would be to get their hands

20   secured behind their back.

21   MR. STEWART:

22       Q.   But you can do it by tucking if

23   you've got enough -- if you had the ability to

24   do that physically?

25       A.   If you're -- you have to be a lot

1    bigger than them, but, yes.

2         Q.   Was the person you saw in the video

3    substantially larger than you?

4         A.   Yes, sir.

5         Q.   You indicated that happened -- that

6    you stayed in that position for a long period

7    of time.  Do you recall how long it was?

8         A.   I believe it was between 10 and 15

9    minutes.

10        Q.   You were on the floor in the foyer

11   of The Ledge for 10 to 15 minutes?

12        A.   As I -- I believe so, according to

13   the video, but I'm not sure.  I don't

14   remember.

15        Q.   So you're not sure about that

16   answer?

17        A.   That's right.

18        Q.   It's just a matter of -- whatever

19   the video shows is accurate, right?

20        A.   That's right.

21        Q.   Did you have any other -- other than

22   the initial episode that you see Dorack come

23   out of the bathroom, going back to that, did

24   you have any other interactions with Dorack

25   that you could see on that video?

1      A.    Not that I could see, just -- it's
2 dark, and there's a lot of people, so it's
3 hard to tell.  You have to break it down.
4      Q.    Was he wearing a light-colored shirt
5 that night or what?
6      A.    I don't remember, and I don't
7 remember from the video either.
8      Q.    Okay.  Can you remember anything
9 about him at all?
10     A.    No, sir.
11     Q.    Do you remember his skin color?
12     A.    Caucasian.  He's white.
13     Q.    What does he look like?  You've seen
14 him since then, right?
15     A.    Probably about six foot, brown hair,
16 average build, maybe 160, 170 pounds, no
17 identifying marks that I could see.
18     Q.    Other than the one episode where
19 y'all kind of verbally engaged each other --
20 is that correct?  Is that an accurate
21 description?
22     A.    Yes, sir.
23     Q.    No physical contact, or did you make
24 contact with him that you know?
25     A.    I don't believe so.  Not that I

1    seen.  I don't remember.

2        Q.   Did some of your people in your

3    group try to move you away from the area?

4        A.   I believe so.  I think at that time

5    I feel down.  It looks like -- I think I

6    remember seeing in the video that I had

7    tripped and fell.

8        Q.   With your wife?

9        A.   That's right.

10       Q.   Okay.  Then you get up?

11       A.   Yes, sir.

12       Q.   At that point, did you make an

13   effort to go back toward Dorack, or did you go

14   -- did you try to leave and go home?

15       A.   I can't remember.

16       Q.   Did people try to move you away from

17   the area?  Do you recall that?

18       A.   I don't remember.

19       Q.   Do you recall seeing that on the

20   video?

21       A.   I can't -- I'm not exactly sure what

22   happened even in the video at this point.

23       Q.   If the video shows you trying to

24   turn and go back toward him, would that

25   surprise you?

1          A.    It may be that way.

2          Q.    Okay.  To your knowledge, did you

3    have any additional interaction with him?

4          A.    Not that I know of.

5          Q.    Okay.  Do you know what his duty

6    assignment is?

7          A.    I believe he's a -- he was a flight

8    armer, so he worked in the -- he was in charge

9    of issuing weapons before and after shift.

10              MR. STEWART:  In regards to

11   scheduling -- this can be off the record.

12                         - - -

13                   (Off the record.)

14   MR. STEWART:

15         Q.    Jason, do you know if there's any

16   indication that Hard Rock had any knowledge

17   that the initial exchange between you and

18   Airman Dorack was about to happen?

19         A.    I don't believe so.

20         Q.    Is there -- do you know if Airman

21   Dorack has ever had any problems at the Hard

22   Rock in the past?

23         A.    Not that I know of.

24         Q.    Have you ever had any such problems?

25         A.    No, sir.

1       Q.   Did you attempt to bring any sort of

2  criminal charges against Airman Dorack?

3       A.   No, sir.

4       Q.   Did you -- were you involved in any

5  investigation with regard to him?

6       A.   No, sir.

7       Q.   Do you know if there was such an

8  investigation?

9       A.   I don't know.

10       Q.   Do you know if he had any discipline

11  as a result of this incident?

12       A.   I don't believe so.

13       Q.   Do you know -- is it fair to say

14  that he was in the Keesler security squadron,

15  for lack -- am I saying that right?  He was?

16  Yes?

17       A.   What's that?

18       Q.   Was he in your squadron?

19       A.   Yes, sir.  The squadron is the

20  overall -- everybody is a part of the

21  squadron, and it's broken down into individual

22  flights.  The flights are like the shifts.

23       Q.   Okay.  So he was in your two or

24  three hundred people squadron?

25       A.   That's right.  Yes.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    Q.   In a different flight?

2    A.   Yes, sir.

3    Q.   Mid shift?

4    A.   That's right.

5    Q.   Aside from the security personnel

6    you've identified, was there anyone else in

7    The Ledge that you're aware of that you know

8    that night?

9    A.   Charlie Wright.  I remember him

10   being there, but I don't -- I don't even

11   remember talking to him or anything

12   significant around -- during this --

13   Q.   Charlie Wright?

14   A.   Charles or Charlie Wright.

15   Q.   Who was he?

16   A.   He was just a member of my flight.

17   Q.   So he was also there in response to

18   this group, this party?

19   A.   Yes, sir.

20   Q.   Is it fair to say that everybody

21   that was involved in this initial

22   confrontation between you and Dorack, their

23   response to that, up to the point that Hard

24   Rock security entered The Ledge to respond to

25   it was a member of your Air Force group?

1        A.    Yes, sir.

2        Q.    Okay.  There were no outside people,

3   no unexpected people got involved?

4        A.    No, sir, not that I know of.

5        Q.    Did your wife have any marks on her

6   after this incident?

7        A.    No, sir.

8        Q.    She didn't have a bruise on her face

9   or anything like that?

10        A.    No, sir.

11        Q.    What about you, did you have any

12   visible injuries or marks?

13        A.    Yes, I did.

14        Q.    Where was that?

15        A.    I had a -- I'm unsure of the word

16   for it, but around my neck, where it looks

17   like somebody had put their hands around your

18   neck, like bruising.  I had two black eyes.

19   The bridge of my nose was black and blue and

20   swollen.  I had a taser burn on my back from

21   getting drive stunned.  My ear was bruised.

22   It appeared that my tooth had almost went

23   through my bottom lip.  I had severe

24   lacerations in the inside of my mouth.  And

25   just overall general -- around my wrists where

1    the handcuffs were, were cut.  There was marks

2    that were there for a while.  My hands were

3    numb.  There was a spot on my head that was

4    numb.  Bruising all through my hair.  It was

5    just overall -- my whole face and neck and

6    upper body area was covered in bruises.

7         Q.   Did you have any stitches in your

8    mouth?

9         A.   No, sir.

10        Q.   As we sit here now, do you have any

11   memory of where any particular injury that you

12   described at what point was incurred?

13        A.   I do not.

14        Q.   Having watched the video, do you

15   have any specific memory of when the

16   particular injuries that you described

17   occurred, or do you have any -- do you

18   visualize -- I say do you have any memory.  Do

19   you see -- without guessing, do you see

20   specifically where things occurred on that

21   video?

22        A.   I believe perhaps when I was being

23   carried out, it looked like I might have been

24   a little heavy for them, so they would let me

25   go in not such a nice fashion.

1      Q.    Carried out from where?

2      A.    Through the casino by Biloxi PD.  So

3   in the area from The Ledge out to the valet.

4      Q.    Do you see any other injuries -- any

5   other things on that film that you believe you

6   can specifically tie a specific injury that

7   you described?

8      A.    Not specifically.  I don't know.

9      Q.    Has anyone else told you that they

10  saw any particular thing happen to you that

11  you tie to an injury?

12     A.    No, sir.

13          MR. BELLINDER:  Object to the form.

14  MR. STEWART:

15     Q.    By that I mean the injuries you've

16  described?

17     A.    Right.  No.

18     Q.    Have you been back to the Hard Rock

19  at all?

20     A.    No, sir.

21     Q.    Were you taking any medicine on the

22  date of this incident before the incident?

23     A.    No, sir.

24     Q.    Nothing at all?

25     A.    Nothing.

1        Q.   Have you been drinking at all since

2   this incident?

3        A.   What's that?

4        Q.   Have you been drinking at all since

5   this incident, alcoholic beverages?

6        A.   Have I had any since then?

7        Q.   Have you continued to drink alcohol

8   since then?

9        A.   Yes, sir.

10        Q.   How often do you drink now?

11        A.   Just occasionally.

12        Q.   Has anything about this incident

13   affected your thought process on drinking and

14   how much you drink?

15        A.   Yes, sir.  I went to ADAPT, which is

16   like the Air Force version of like a AA of

17   sorts.  I was mandated to go there.

18        Q.   What's it called?

19        A.   It's called ADAPT, A-D-A-P-T.  It

20   was mandated that I go there.

21        Q.   As part of your punishment?

22        A.   That's right.

23        Q.   Was there anything besides the hours

24   of work and this mandate that happened as a

25   result of this incident as punishment,

1    discipline?

2         A.   Not that I can -- I don't think so.

3         Q.   Did they explain to you why you had

4    to go to ADAPT?

5         A.   Anytime anyone is involved in an

6    alcohol-related incident it's mandatory.

7         Q.   It's mandatory?

8         A.   That's right.

9         Q.   Did you get a piece of paper that

10   said this is your requirement as a result of

11   this incident?

12        A.   I believe it's stored in my -- maybe

13   my military file, but I never received it

14   personally.

15        Q.   You saw earlier today there was an

16   investigative report that we were talking

17   about with regard to Mr. Soukup?

18        A.   That's right.

19        Q.   Do you have a similar investigative

20   report that was done about you in regards to

21   this incident?

22        A.   Yes, sir, by my area defense

23   counsel.

24        Q.   Who was that?

25        A.   Captain Cromwell, C-R-O-M-W-E-L-L, I

1    believe.

2            Q.    And where is Captain Cromwell?

3            A.    I am unsure if he's still at Keesler

4    or not.  He was my defense for my punishment

5    proceedings only during that time.

6            Q.    He was assigned by the military to

7    defend you?

8            A.    That's right.  I believe he wrote a

9    report of his findings.

10           Q.    Okay.  Do you know if that's been

11   submitted to your personnel file or some other

12   place?

13           A.    I believe so, but I don't know.

14           Q.    Do you know if there was an actual

15   adjudication or the explanation of the facts

16   that was documented in an investigative report

17   at some point?

18           A.    I'm not sure.

19           Q.    Okay.  Does your wife drink now?

20           A.    Rarely.

21           Q.    Occasionally?

22           A.    Every now and then.

23           Q.    What were you drinking on the night

24   of this incident?

25           A.    I think it was -- I remember having

1    beer and whiskey, but I can't remember

2    specifics.  I don't know.

3         Q.   Beer, you'd have a drink and then

4    another drink?

5         A.   What's that?

6         Q.   You would have -- you had a beer,

7    and you recall at least one whiskey drink?

8         A.   Yes.

9         Q.   Do you remember anything else?

10        A.   Not specifically.

11        Q.   Okay.  How were you paying for

12   those?

13        A.   I believe I took cash out, so I was

14   paying with cash so I didn't have to use my

15   debit card every time.

16        Q.   Did anybody buy drinks for you?

17        A.   Yes, but I can't remember who or

18   what -- who bought them or what they were.

19        Q.   People in your group?

20        A.   That's right, because I was the

21   brand-new guy, so...

22        Q.   Did Soukup buy you any drinks?

23        A.   I don't believe so, but I'm not

24   sure.

25        Q.   Do you recall anyone approaching you

1    and telling you to stop drinking so much?

2         A.    I don't remember.

3         Q.    Do you recall talking to the female

4    that Soukup described who he sent over there

5    to tell you to take it easy on your drinks and

6    to put your money away?

7         A.    No, sir.

8         Q.    You don't recall that at all?

9         A.    Not at all.

10        Q.    Have you seen that on the video?

11        A.    No, sir.

12        Q.    Do you recall speaking to any of the

13   security employees at the Hard Rock?

14        A.    Maybe greeting them when I went in,

15   but not specifically.

16        Q.    After that, you have no memory of

17   any of it?

18        A.    That's right.

19        Q.    What sort of medical treatment did

20   you get after this incident?

21        A.    I had a -- just reviewed and

22   documented all my injuries.  I had right wrist

23   surgery for a navicular fracture.  They took a

24   -- they did a bone graft, took some bone out

25   of the top of my wrist, put it in where the

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1    break was and put four pins in there.

2         Q.   Why did they have to do a bone

3    graft?

4         A.   I am not sure.

5         Q.   Did you have any prior damage to

6    your arm at that location?

7         A.   No, sir.

8         Q.   You didn't have any necrotic bone

9    that had been there for a long time?

10        A.   Not that I know of.

11        Q.   What's your first memory after this

12   incident?

13        A.   I woke up at about 9:00 -- between

14   9:00 and 10:00 in the morning in jail.

15        Q.   Where were you located?

16        A.   Harris County in a single cell by

17   myself.

18        Q.   Do you know if anyone assessed you

19   medically at the jail?

20        A.   I have no idea what happened to me.

21        Q.   Before you woke up?

22        A.   That's right.

23        Q.   What about after you woke up?

24        A.   No, no one assessed me after I woke

25   up.

1        Q.    How long were you in jail?

2        A.    I don't know what time I got there,

3   but I left between 9:00 and 10:00 in the

4   morning.

5        Q.    I meant to ask you this:  Did you

6   finish your ADAPT program?

7        A.    Yes, I did.

8        Q.    Did you get a graduation certificate

9   or something that says --

10       A.    I believe I got a certificate of

11   completion or some kind of report of mental

12   health findings or --

13       Q.    That's in your file?

14       A.    I believe so.

15       Q.    Mental health findings?

16       A.    It's like a -- not mental health but

17   their -- I guess -- I don't know the -- their

18   discovery or their --

19       Q.    Assessment?

20       A.    -- assessment of their findings with

21   my dependency for alcohol.

22       Q.    Is that something you still have in

23   your possession?

24       A.    I don't believe so.  I believe it

25   would be in my file.  I don't think I ever got

1    anything handed to me.

2         Q.   Did you request medical care at the

3    jail?

4         A.   Not once I woke up, but I don't know

5    if I did during the night or not.

6         Q.   Do you know if you woke up during

7    the night?

8         A.   I don't know.

9         Q.   I'm asking from your memory.  I'm

10   not asking you to suppose or guess.  When you

11   were awake, did you ask for any medical

12   assistance?

13        A.   No, sir.  I was mostly concerned

14   that I had no idea why I was there, and I

15   wanted to -- I didn't know where my wife was.

16   I wasn't concerned about any of my injuries at

17   that point.  I was concerned about assessing

18   the situation in general.

19        Q.   All right.  Before you went out that

20   night, you put on your own clothes, right?

21        A.   That's right.

22        Q.   Did you put on underwear?

23        A.   Yes.

24        Q.   Did you have underwear on during

25   this entire incident?

1      A.   Yes, I did.

2      Q.   Okay.

3           MR. BELLINDER:  I'm going to object

4    to the form on that last one, to the extent

5    that's inconsistent with anything on the...

6    MR. STEWART:

7      Q.   You've seen the video, right?

8      A.   Yes, sir.

9      Q.   Would you agree you didn't have your

10   underwear on the whole time after this

11   incident?

12     A.   I believe they were on, but I think

13   they came down.

14     Q.   Not in the same location, but your

15   memory is you had it on, it was just down your

16   pants or something?

17     A.   Yeah.  That's right.

18     Q.   Okay.  Have you sought any sort of

19   psychiatric care since this incident?

20     A.   No, sir.

21     Q.   Other than the treatment for your --

22   it was your right wrist?

23     A.   That's right.

24     Q.   Did you receive any other type of

25   surgery or recommendation with regard to any

1    procedures?

2         A.    I had multiple x-rays, MRIs, CT

3    scans for my shoulders and my head.  They were

4    monitoring for nerve damage, but the feeling

5    ended upcoming back eventually.

6         Q.    What feeling are you talking about?

7         A.    I had numbness in both my hands and

8    a spot on top of my head that was numb.

9         Q.    Did they tell you why -- did they

10   ever discern why that happened?

11        A.    I believe they put it in words that

12   I didn't understand so much, but it's in a

13   report.

14        Q.    What part of your body did they say

15   they were concerned with?  Your hand, your

16   arms, your head, your neck?

17        A.    They were concerned with like a --

18   perhaps a concussion or some nerve damage in

19   my hands, obviously the broken bone.

20        Q.    How long until the numbness went

21   away?

22        A.    It was about six months.

23        Q.    And was that after the last -- you

24   had two surgeries or one?

25        A.    I had two.

1      Q.   Okay.  The numbness went away after
2  the last surgery?
3      A.   It was in between the surgeries.
4      Q.   Between.  Okay.  When was the last
5  surgery?
6      A.   I believe it was the fall of 2012.
7  I can't remember the exact date.
8      Q.   Did anyone tell you that you needed
9  any additional medical treatment after that?
10     A.   I don't believe so.  Just as far as
11 keeping -- followed up with the pushups, but
12 nothing significant past that.
13     Q.   Has anyone ever told you how much it
14 cost to get this medical care?
15     A.   No, sir.
16     Q.   Have you ever seen any EOBs or
17 bills?
18     A.   I have seen some, but I never added
19 it up.
20     Q.   Do you still have those?
21     A.   I don't believe all of them, but
22 some of them.
23          MR. STEWART:  Same request that Tere
24 made.  I know you're working on it.
25          MR. BELLINDER:  Yeah.  If you can

1  get those to us, whatever you have, if
2  anything.
3  MR. STEWART:
4      Q.   Have you -- and I'm sorry if I asked
5  this already.  Have you quantified whether you
6  actually lost any wages as a result of this
7  incident?
8      A.   Just as far as not being able to go
9  on the deployment that I was scheduled to go
10  on.
11      Q.   But you were able to go to your
12  regular job, and you got paid for that?
13      A.   Well, I was present for duty, but I
14  wasn't able to perform my actual job.
15      Q.   You didn't get paid for the 42 hours
16  of discipline, did you?
17      A.   Yes, I did.
18      Q.   You got paid to do that?
19      A.   Yes.  And I was also on a suspended
20  bus, which means if you get in trouble again,
21  even a minor infraction, then you lose -- it
22  would be called losing a stripe, so you'd lose
23  a rank, a pay grade, but I had no further
24  discipline issues, so after that period was
25  over, I believe it was six months, then --

1    Q.   They call it a bus?

2    A.   Yes.  I don't know what it means.

3    Q.   And you didn't have any problems in

4  that six months?

5    A.   That's right.  No problems.

6    Q.   Have you had any since?

7    A.   No, sir.

8    Q.   You wouldn't be Airman of the

9  Quarter if you had problems, would you?

10    A.   I wouldn't assume so.

11    Q.   Have you had any kind of accident or

12  injury since this incident occurred?

13    A.   No, sir.

14    Q.   Do you recall going to Keesler

15  emergency services two days after this

16  incident?

17    A.   Yes, I do.

18    Q.   At that point, did you attribute any

19  of your injuries to Airman Dorack?

20    A.   Not at that time.  I still didn't

21  know what had happened.  I hadn't seen the

22  video.

23    Q.   Did Airman Dorack touch you?

24    A.   He never -- no.  No, sir.

25    Q.   He didn't cause any injury to you,

1    did he?

2         A.   That's right.  No.

3         Q.   And other than your observations

4    you've already described, you're not sure how

5    or when those injuries occurred, the injuries

6    you detailed to us, other than --

7         A.   I don't know.

8         Q.   -- somewhere in the course of the

9    night?

10        A.   That's right.  I believe at some

11   point being carried out from The Ledge to the

12   police vehicle to -- I don't know what

13   happened after that.

14        Q.   Or before, other than what you

15   described in terms of going in?

16        A.   That's right.

17             MR. STEWART:  Okay.  Give me one

18   more second.  I may be at the end here.

19                       - - -

20             (Off the record.)

21                  EXAMINATION

22   BY MS. STEEL:

23        Q.   Do you have an associate's degree?

24        A.   No.

25        Q.   Now, you got -- you were punished as

1    a result of the Hard Rock incident, correct?

2         A.    That's right.

3         Q.    What did you do that you were

4    punished for?

5         A.    I believe the charge was just

6    disorderly conduct, but I am not sure if the

7    -- I don't know if the military has a similar

8    crime that correlates to a civilian crime that

9    is worded differently, but I think that's what

10   it was, something along those lines.

11        Q.    So is it your understanding that

12   that -- that drinking had anything to do with

13   this punishment, your level of intoxication?

14        A.    It probably had something to do with

15   the influence of the decision.

16        Q.    You don't know, though?

17        A.    I don't know.

18        Q.    Okay.  What about the altercation

19   between you and Dorack that involved -- that

20   brought in others as well, was that connected

21   to the punishment you received?

22        A.    I don't believe so.

23        Q.    And what about the fact that you

24   were uncooperative with both casino security

25   and the police, was that connected to your

1    discipline?

2            MR. BELLINDER:  Object to the form.

3        A.   I think so.

4    MS. STEEL:

5        Q.   You do?

6        A.   I'm not sure.

7        Q.   Well, what is your understanding of

8    that?

9        A.   Will you restate it, please?

10       Q.   Well, I'm asking you if your conduct

11   with the police and with Hard Rock Casino

12   security was connected to why you got

13   punished?

14       A.    It was really up to my commander, so

15   I'm not sure what his justification was to his

16   thoughts.  I can speculate on what he thought,

17   but I'm not sure what --

18       Q.   Well, did he ever tell you why you

19   were being punished?

20       A.    It was -- they just offer you the

21   Art 15.  You were -- you were being tried

22   under Article 92, failure to obey whatever

23   lawful order.  Whatever the article was, I'm

24   not sure exactly but -- I lost my train of

25   thought.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1       Q.   Were you charged with failure to

2  obey an order?

3       A.   No.

4       Q.   Do you agree with me that you did

5  not cooperate with Hard Rock Casino security?

6            MR. BELLINDER:  Object to the form.

7       A.   I'm not sure.

8  MS. STEEL:

9       Q.   Why aren't you sure?

10       A.   I believe it's the -- just the

11  circumstances surrounding the event, that I

12  didn't believe I had done anything wrong to

13  warrant casino security to be involved with me

14  in the first place.  I just wanted everybody

15  to calm -- like everyone be calm, but I think

16  everyone was very provoking up in my personal

17  space, that maybe that's why I felt attacked

18  or --

19       Q.   I understand that's how you felt,

20  but that's not what I'm asking.

21       A.   Okay.

22       Q.   What I'm asking is were you

23  cooperative with Hard Rock Casino security?

24            MR. BELLINDER:  Object to the form.

25       A.   I don't remember, but according to

1    the video, it looks like no.

2    MS. STEEL:

3         Q.    And were you cooperative with the

4    Biloxi police officers who came to the Hard

5    Rock?

6              MR. BELLINDER:  Object to the form.

7         A.    Again, I don't remember from memory,

8    but according to the video -- in my -- in my

9    experience I was cooperative with them.

10   MS. STEEL:

11        Q.    What do you mean in your experience

12   you were cooperative?

13        A.    Well, I think their force -- the way

14   they handled the incident was over the top.

15   They had plenty of people to reconcile the

16   situation without...

17        Q.    Okay.  Let's go to -- you saw the

18   video, correct?

19        A.    Yes.

20        Q.    Okay.  Did you see yourself

21   struggling with the three Biloxi police

22   officers who arrived at the Hard Rock?

23        A.    Maybe minimally right when they

24   first arrived, but it's hard to tell in the

25   video.

1      Q.    So you were minimally struggling.
2  What did you see yourself doing?
3      A.    It's hard to say, but it looks like
4  when the security guard gets off me, that's
5  when the Biloxi police arrive, and it looks
6  like maybe when they try to change custody
7  from the security guard to the police officer,
8  that I might have tried to move around or get
9  away because, again, I didn't believe I had
10 done anything, so --
11     Q.    Well, you're a police officer
12 yourself, right?
13     A.    That's right.
14     Q.    And when a person that you're trying
15 to arrest believes that he hasn't done
16 anything wrong and so he's moving around, do
17 you call that resisting arrest?
18     A.    Yes --
19     Q.    Okay.
20     A.    -- if his arrest is warranted.
21     Q.    Okay.  Do you know what you were
22 charged with?
23     A.    Disorderly conduct, resisting arrest
24 and public intoxication.
25     Q.    Well, were you publically drunk?

1      A.   Yes.

2      Q.   Were you disorderly?

3      A.   I believe there was actions that led

4  to being disorderly, so, yes.

5      Q.   Okay.  And hold on a second.

6           Now, the third charge, I'll get to

7  that.  I don't recall it right now.

8           Resisting arrest, you've already

9  told me that you saw yourself struggling with

10  the police officers?

11      A.   Yes.

12      Q.   You saw how you were carried out of

13  the casino?

14      A.   That's right.

15      Q.   Do you believe that you would have

16  been carried that way had you gotten up and

17  walked?

18      A.   Well, it appeared to me that I was

19  unable to walk and wasn't really given the

20  opportunity because I was being dragged.

21      Q.   You were given the opportunity; were

22  you not?

23      A.   Well, I attempted to stand up, and

24  then at that time is when my -- they just kind

25  of took off walking, and my pants were pulled

1    down.

2         Q.   Could you walk?

3         A.   I don't know.

4         Q.   Were you physically capable of

5    walking?

6         A.   I don't know.

7         Q.   Well, had you -- why is it -- tell

8    me this, why is it that you can't remember

9    events that occurred at the Hard Rock?

10        A.   Because I was intoxicated.

11        Q.   Okay.  And how many drinks did you

12   have?

13        A.   I don't know.

14        Q.   And you said you attended the ADAPT

15   class?

16        A.   That's right.

17        Q.   I may have pronounced that

18   incorrectly.  But on the certification, you

19   said they made findings about --

20        A.   Well, they evaluate your lifestyle,

21   your drinking, and then they determine whether

22   you need to stay in the class for a longer

23   period of time or go to rehab or go -- they

24   place you in a bracket of some sort to

25   determine the level of help you needed, so...

1      Q.   And what were their findings with

2   regard to you?

3      A.   I had six -- I believe six mandatory

4   meetings, and then the findings came back that

5   I no longer -- they felt that their treatment

6   was complete.

7      Q.   In your past, have you ever had a

8   problem with your drinking?

9      A.   No, ma'am.

10      Q.   Have you ever had a problem with

11   drinking until you are intoxicated?

12      A.   Intoxicated, yes, but not to that --

13   not to that point of not remembering.

14      Q.   Okay.  So you think your -- to you,

15   your conduct, your level of intoxication at

16   the Hard Rock was something unusual?

17      A.   That's right.

18      Q.   And that is why you can't remember?

19      A.   Yes.

20      Q.   Is there any reason that you think

21   you might have been physically unable to walk

22   when the police got you up?

23      A.   Maybe just the level of

24   intoxication, maybe being unable to walk

25   because of that.  I don't know if I had had

1    any injuries at that point, a concussion or
2    anything that would make me unable to walk
3    because I hadn't been evaluated by medical
4    personnel at that time.
5         Q.   Okay.  So you might have suffered a
6    concussion before the police arrived?
7         A.   I am unsure.
8         Q.   Well, did you just -- I judge by
9    your previous answer that you consider it a
10   possibility?
11        A.   A possibility, but I don't know.
12        Q.   Okay.  And is that from the
13   altercation at the casino?
14        A.   Maybe with security or falling down
15   or something like that.
16        Q.   You fell down with security?
17        A.   Well, I fell on my own, and then I
18   believe I fell with security, and they pinned
19   me down.  Maybe I was in a state of
20   semi-unconsciousness when he was sitting on me
21   or I fell asleep or something like that
22   because I wasn't really moving around, so --
23   and then the next time I moved was when Biloxi
24   got there, and so maybe I was shocked and
25   surprised and didn't understand why I wasn't

1    being medically evaluated or why they didn't

2    attempt to put me in a wheelchair or why they

3    didn't bring in the stretcher that they had

4    outside in the valet area before they moved

5    me.

6         Q.   So you agree with me that according

7    to the video, the Hard Rock surveillance

8    video, you were not unconscious when the

9    Biloxi police officers arrived?

10             MR. BELLINDER:  Object to the form.

11        A.   I'm not sure.

12   MS. STEEL:

13        Q.   Did you see yourself moving around

14   when the Biloxi police officers were at The

15   Ledge?

16        A.   When they got there, but not for the

17   -- minimally during the 10 to 15 minutes where

18   I was under the custody of security.

19        Q.   Say that again.

20        A.   I was minimally moving when I was

21   under the custody of security before Biloxi PD

22   got there, the 10 to 15 minutes where I was on

23   the ground with the guy on top of me.  So I

24   don't know if at that point I fell asleep or

25   was unconscious or -- I have no idea.

1      Q.   Do you have any reason to believe
2  that you fell asleep when the security guard
3  had you on the floor and was on top of you?
4      A.   I wasn't moving, so I don't know if
5  I --
6      Q.   Well, do you think maybe you weren't
7  moving because he was holding you down?
8      A.   Well, I could still move my feet or
9  try to get up or anything, but I didn't try to
10  fight him or resist him at any further point.
11      Q.   And then when the police officers
12  came, you did move around?
13      A.   That's right.
14      Q.   You saw yourself move on the video?
15      A.   Yes.
16      Q.   So doesn't that indicate that you
17  were not unconscious?
18          MR. BELLINDER:  Object to the form.
19      A.   It would indicate I was unconscious
20  at that time when they -- when Biloxi got
21  there, but I don't know between those 10 to 15
22  minutes if I was conscious or not.
23          MS. STEEL:  Would you read his
24  answer back, Jenny?
25                    - - -

1          (Whereupon, the answer was read back

2           by the reporter.)

3    MS. STEEL:

4         Q.    Are you saying that you were

5    unconscious when Biloxi police arrived or not?

6              MR. BELLINDER:  Object to the form.

7         A.    In the 10- to 15-minute period

8    before they got there, possibly, but when they

9    arrived right before handcuff -- or tasering

10   and handcuffing me, I was obviously awake at

11   that time.

12   MS. STEEL:

13        Q.    All right.  Thank you.

14             Do you know that you were charged

15   with resisting arrest, public drunk and

16   disorderly conduct?

17        A.    Yes.

18        Q.    Did you ever go to trial on those

19   charges?

20        A.    No, ma'am.

21        Q.    What happened to those charges?

22        A.    They were nolle prossed.

23        Q.    Nolle prossed?

24        A.    Yes.

25        Q.    By whom?

1      A.   I went to -- I'm not sure what the
2  office is right over here.
3      Q.   City court?
4      A.   Yes.  And I submitted my -- they
5  submitted something to the judge, and then I
6  got a letter in the mail a few weeks later
7  that they had nolle -- whatever, nolle
8  prossed, not prosecuted.
9      Q.   Do you still have that letter?
10      A.   Yes, I do.
11           MS. STEEL:  We ask that that be
12  produced.
13  MS. STEEL:
14      Q.   All right.  So you -- what does
15  nolle prossed mean?
16           MR. BELLINDER:  Object to the form.
17      A.   I believe it means not prosecuted.
18  MS. STEEL:
19      Q.   Okay.  So you were not prosecuted?
20      A.   That's right.
21      Q.   You went to court, though?
22      A.   No.  I never went to court.
23      Q.   Never went to court?
24      A.   (Shakes head negatively).
25      Q.   Why didn't you go to city court?

1          MR. BELLINDER:  Object to the form.

2          A.   I was never given a court date or --

3    I can't remember exactly what had happened,

4    but I know I had received my bail money back

5    and then submitted a letter to the -- or the

6    judge, whatever he did, and then I got the

7    letter in the mail.

8    MS. STEEL:

9          Q.   You submitted a letter to the judge?

10         A.   No.  I went to the court over here,

11   and then I talked to the lady working the

12   desk, and she said it was up to the judge.  I

13   don't -- I don't -- I don't know the

14   proceedings or the way it works.

15         Q.   Well, did you submit a letter to the

16   court?

17         A.   No.

18         Q.   Did you have an attorney?

19         A.   No.

20         Q.   Did the military prosecute you on

21   those charges?

22         A.   I believe they took jurisdiction.

23         Q.   Of all of the charges?

24         A.   Yes.

25         Q.   And how did you know that to be the

1    case?  How did you learn of that?

2         A.    I had to meet with my commander.

3         Q.    And who is your commander?

4         A.    It was Major Pignataro at the time.

5         Q.    And what did y'all discuss in that

6    meeting?

7         A.    It was very formal, so I went in,

8    stood in front of his desk.  He read his

9    findings, offered me the Art 15.  I could

10   either accept the punishment he was offering

11   or I could decline it and then I could take it

12   to a court-martial.

13        Q.    So it's your understanding that the

14   Article 15 that you received was the

15   military's determination of the charges of

16   resisting arrest, disorderly conduct and

17   public drunk?

18             MR. BELLINDER:  Object to the form.

19        A.    I believe so, but I think they

20   dropped everything except disorderly conduct,

21   I believe.  It was either disorderly conduct

22   or public drunk that was still there, but they

23   dropped resisting arrest and the other --

24   whatever other one that they dropped.  I'm not

25   sure exactly what one.

MS. STEEL:

  Q. And when you went in and talked to the clerk at city court, were you telling her that this is what you wanted to happen, that you wanted the military to take jurisdiction of these charges?

  A. I believe my commanders or the JAG office, legal office had submitted a request to the court, Harrison County or the city, to request jurisdiction, and the city granted jurisdiction to the military.

  Q. Do you have a copy of that letter?

  A. I believe so.

  MS. STEEL: We ask that that be produced as well.

MS. STEEL:

  Q. Do you have any other documents that go along with the Article 15?

  A. I would have to look.  I'm not sure.

  Q. When you went to the clerk -- I thought you first said that you wrote a letter.

  A. I misworded -- I never wrote a letter.  I meant that the judge -- or the judge sent me a letter.  I don't know if the

1  clerk had to submit something, but I never

2  submitted anything.

3      Q.   Okay.  And you'll look for all those

4  documents and give them to your attorney?

5      A.   Yes.

6      Q.   Okay.  Great.

7           Have you ever been convicted of a

8  misdemeanor or a felony either before 11/27/11

9  or after?

10     A.   No, ma'am.

11     Q.   Did you have anything to drink

12 before you went to the Hard Rock?

13     A.   I believe I had one drink before we

14 left, and then my wife drove.

15     Q.   What did you have?

16     A.   Whiskey and -- I can't remember the

17 mixer.

18     Q.   Did Alyssa have anything to drink --

19     A.   No, ma'am.

20     Q.   -- at the house?

21     A.   No.

22     Q.   Did you take any medication that day

23 or night?

24     A.   No, I didn't.

25     Q.   Now, who were you meeting at the

¹    Hard Rock?

²         A.    Just my flight members in general.

³         Q.    And you've already given us their

⁴    names?

⁵         A.    That's right.

⁶         Q.    All right.  Is it your recollection

⁷    that you went to The Ledge and you didn't go

⁸    anywhere else during the entire time you were

⁹    at the casino?

¹⁰         A.    That's right.

¹¹         Q.    Are you right-handed or left-handed?

¹²         A.    Right-handed.

¹³         Q.    Okay.  And you've seen the video?

¹⁴         A.    Yes.

¹⁵         Q.    And you don't -- do you recall what

¹⁶    Dorack was wearing?

¹⁷         A.    I don't recall.

¹⁸         Q.    Was he on the floor with you?

¹⁹         A.    No.

²⁰         Q.    He never was?

²¹         A.    No, not that I -- not that I

²²    remember.  I don't believe so.

²³         Q.    When you watched the video, did you

²⁴    see another person on the floor with you who

²⁵    was not casino security or Alyssa Jordan?

1        A.    Sergeant Reimer.

2        Q.    Reimer?

3        A.    That's right.

4        Q.    And what was Reimer wearing?

5        A.    I think jeans and just a button-up,

6    but I can't remember what color it was.

7        Q.    Was it dark colored or light

8    colored, his shirt?

9        A.    I can't remember.  I think it was

10    light colored.

11        Q.    Do you remember anyone you were with

12    wearing a vest of any sort?

13        A.    No.

14        Q.    And you have no recollection of

15    being tasered by the Biloxi police?

16        A.    No.

17        Q.    Is it your understanding that the

18    police attempted to handcuff you when they

19    first arrived?

20        A.    Yes.

21            MR. BELLINDER:  Object to the form.

22    MS. STEEL:

23        Q.    So when you were moving around, you

24    were trying to keep from being handcuffed?

25        A.    Yes.

1      Q.   And according to the video, once the

2  taser was applied, you were then -- they were

3  then able to handcuff you?

4      MR. BELLINDER:  Object to the form.

5      A.   It's hard to see in the video, but

6  it appears that way.

7  MS. STEEL:

8      Q.   Okay.  In looking at the video, when

9  you were in the bar on the floor, did you see

10  your pants fall down there?

11      A.   No.  I don't believe they fell down

12  there.  I think my shoes came off there.

13      Q.   How did your shoes come off?

14      MR. BELLINDER:  Object to the form.

15      A.   I'm not sure.

16  MS. STEEL:

17      Q.   What kind of shoes were they,

18  lace-up or slip-on?

19      A.   They were slip-on, skateboard shoes.

20      Q.   You don't have any personal

21  knowledge of what occurred between the Biloxi

22  Police Department and Alyssa Jordan?

23      A.   Not -- no, not personally.

24      Q.   Have your pants ever fallen down

25  before?

1     A.   No.

2     Q.   Were your pants too large?

3     A.   No.

4     Q.   Were they loose?

5     A.   No.

6     Q.   Have you ever mooned anybody?

7     A.   No.

8     Q.   Have you ever run around naked

9 outside?

10    A.   No.

11    Q.   Now, you said you had two black

12 eyes?

13    A.   That's right.

14    Q.   And was that noted on the medical

15 records?

16    A.   I believe so.

17    Q.   Did you take any photographs of your

18 injuries?

19    A.   Yes, I did.  I took photographs from

20 the day after until the bruising went away.

21    Q.   Where are those photographs now?

22    A.   I have them at home.

23    Q.   Who took them?

24    A.   I took them.

25    MS. STEEL:  We need those produced

1   as well, Thomas.

2   MS. STEEL:

3      Q.   Two black eyes, obviously that's

4   resolved?

5      A.   That's right.

6      Q.   Any permanent damage from those

7   black eyes?

8      A.   No.

9      Q.   Okay.  You said the bridge of your

10  nose was black and swollen?

11     A.   That's right.

12     Q.   Has that resolved?

13     A.   Yes.

14     Q.   Any permanent damage from that?

15     A.   Not that I know of.

16     Q.   Okay.  Well, you had a CT scan of

17  your head, right?

18     A.   Yes.

19     Q.   Wasn't it essentially normal?

20     A.   I believe so.

21     MR. BELLINDER:  Object to the form.

22  MS. STEEL:

23     Q.   What was your answer?

24     A.   I believe so.

25     Q.   Okay.

1         A.   I haven't seen the results, but from
2    what I can remember.
3         Q.   Is that what they told you?
4         A.   As far as I can remember, yes.
5         Q.   You would expect the doctors to tell
6    you if your CT scan was not normal?
7         A.   I would hope so.
8         Q.   Yeah.  Me, too.
9              All right.  You said your ear was
10   bruised.  Has that resolved?
11        A.   Yes, it has.
12        Q.   Any permanent damage?
13        A.   No.
14        Q.   Taser marks, have those gone away?
15        A.   I believe -- the mark went away, but
16   I'm not sure if there's a scar or not.
17        Q.   Okay.  Why would you have a scar?
18        A.   It burned me.
19             MR. BELLINDER:  Object to the form.
20   MS. STEEL:
21        Q.   Burn?
22        A.   (Nods head affirmatively.)
23        Q.   Handcuff marks, have those gone
24   away?
25        A.   Yes.  I think there's light

1 scarring, though.

2        Q.   Show us.

3        A.   I believe you have to look pretty

4 hard, but there's two lines from the

5 handcuffs.  One was there, one was there

6 (indicating).  It's hard to see.

7        Q.   I don't see them.  Were they ever

8 more pronounced than what they are now?

9        A.   They were, yes.

10        Q.   You can't see them anymore with

11 ease?

12        A.   Right.

13        Q.   Okay.  And you said the feeling has

14 come back into your hands?

15        A.   Yes.

16        Q.   All right.  Your head, you said part

17 of it was numb?

18        A.   That's right.

19        Q.   Was that up around the hairline?

20        A.   It was just on one side.  It was

21 kind of like a softball size, like my head had

22 gotten hit on something.  I don't know what it

23 was from, but --

24        Q.   Was it on the side of your head or

25 the back?

1         A.    It was kind of on the top, just sort
2    of (indicating) --
3         Q.    Top, and that's the right side --
4         A.    That's right.
5         Q.    -- top right?
6               And has the feeling returned to your
7    head?
8         A.    Yes.
9         Q.    You said you were bruised into your
10   hairline, and have the bruises -- has the
11   bruise resolved?
12        A.    Yes.
13        Q.    The only injury you have that has
14   not resolved is your right wrist?
15        A.    That's right.  And then I also had
16   like a skid mark -- skinned my elbow, so
17   there's a scar from that.  I forgot that.
18   There's pictures of that, also.
19        Q.    Yeah.  You'll get us those.
20              You testified that you occasionally
21   drink, and could you tell me what frequency
22   occasionally means to you?
23        A.    Maybe -- maybe a few beers on my day
24   off or like holidays or events.
25        Q.    To mean once a week?

1       A.    Yes.

2       Q.    Once a week?

3       A.    That's right.

4       Q.    And what do you drink when you

5  drink?

6       A.    Beer.

7       Q.    Have you been hospitalized because

8  of any injury you suffered on 11/27/11?

9       A.    As far as like an extended stay

10 or -- only for the surgeries, same-day

11 surgeries.

12      Q.    Was it outpatient surgery?

13      A.    Yes.

14      Q.    So you haven't been admitted to the

15 hospital?

16      A.    Right.

17            MS. STEEL:  Almost through, Thomas,

18 if you'll just give me a second.

19 MS. STEEL:

20      Q.    You testified that you had a

21 previous injury to your right wrist when you

22 were MMA grappling?

23      A.    It was more like just a wrestling

24 thing but --

25      Q.    When was that?

1       A.    It was -- I can't -- I can't
2    remember the date.  It was prior to coming
3    into the military.  So prior to 2010.  Maybe
4    2009, 2008.  I can't remember.
5       Q.    One of those years you think?
6       A.    That's right.
7       Q.    Yes?
8       A.    Yes.
9            MS. STEEL:  That's all I have.
10                        - - -
11                    EXAMINATION
12   BY MR. CLARK:
13      Q.    I've got some.  I took a note
14   earlier.  I'm not trying to stick on the
15   pants, but I noticed you said pulled down.
16   Are you saying that somebody pulled your pants
17   down?  Do you recall that?
18      A.    I don't recall how they -- I'm not
19   sure how they came down.  I don't know if it's
20   on the video or not.
21      Q.    Do you think that somebody pulled
22   them down?
23      A.    I think they may have came off when
24   I was being taken down the stairs by my arms,
25   and my feet were dragging, so maybe they got

1    caught on -- I don't know if there's any kind

2    of grips or something on the stairs that go up

3    to The Ledge, but maybe they got hung up on

4    there, and as each stair went, they came a

5    little farther down.

6        Q.   You didn't see anybody in the video

7    pull them down?

8        A.   No.

9        Q.   I think you also testified earlier

10    that maybe you hadn't drank to this level of

11    intoxication before?

12        A.   Right.

13        Q.   When you have drank before, had you

14    ever had memories missing the next day of any

15    parts of the night before that you couldn't

16    recall?

17        A.   No, sir.

18        Q.   That had never occurred?

19        A.   That never occurred.

20        Q.   This was the first time you had an

21    issue recalling the events of the night when

22    you had been intoxicated?

23        A.   That's right.  That's the first time

24    I ever went to a nightclub before, so...

25        Q.   Do you have any independent

¹ recollection of what Josh Hamilton -- any

² injuries that he may have caused you that

³ you've alleged in this lawsuit?

⁴     A.   I don't know exactly where along the

⁵ course the injuries occurred, so I'm not -- so

⁶ I don't know if -- his exact role in injuries

⁷ or --

⁸     Q.   Do you even know who Josh Hamilton

⁹ is?

¹⁰     A.   Yes, I do.  Prior Security Forces at

¹¹ Keesler.

¹²     Q.   But on this night, do you know --

¹³     A.   I don't remember.  I didn't know who

¹⁴ he was.  I don't remember even seeing any

¹⁵ Biloxi police.

¹⁶     Q.   Have you seen the video?

¹⁷     A.   I've seen the video, yes.  I know

¹⁸ who he is in the video, but not from my

¹⁹ memory.

²⁰     Q.   Who do you think he is in the video?

²¹     A.   He's wearing the hat.

²²     Q.   Okay.

²³     A.   And --

²⁴     Q.   Based on statements made in your

²⁵ complaint, after reviewing the video, do you

1    still agree with your allegations against Josh

2    Hamilton?

3         A.   He was also the one that tased me,

4    so, yes, I believe so.

5         Q.   You agree with everything written in

6    this complaint alleged against Josh Hamilton?

7              MR. BELLINDER:  Object to the form.

8         A.   Yes.

9    MR. CLARK:

10        Q.   Okay.  I'll just ask this one more

11   time maybe in a different way, but this

12   complaint, is it in your mind an accurate

13   depiction of what Josh Hamilton did on the

14   night that this incident occurred?

15        A.   Yes.

16             MR. BELLINDER:  Object to the form.

17   MR. CLARK:

18        Q.   When you were -- you said you had a

19   medical -- you went to some doctor -- I think

20   -- some emergency care; is that right?

21        A.   I went to a Keesler emergency room.

22        Q.   And Dr. Cromwell, is that who

23   checked you out initially?

24        A.   He was actually my area defense

25   counsel.

1        Q.    I'm sorry.  I don't know if I wrote
2   his name down.  Do you recall who you saw
3   initially right after this incident occurred?
4        A.    I can't recall.  It's just the ER
5   doctor, not my regular provider, so I can't
6   remember who it was.
7        Q.    You may have said this earlier, but
8   did you give them any indication or did -- let
9   me back up.  Did they give you any indication
10  of how you might have got two black eyes and a
11  -- was your nose broken, did you say?
12       A.    It wasn't broken.  It was just
13  swollen across the bridge.
14       Q.    Did they give you any indication of
15  how that may have occurred?
16       A.    They didn't state it to me.  I don't
17  know if they put it in their notes or reports
18  or anything.
19       Q.    Did you tell them how you thought it
20  occurred?
21       A.    No.
22       Q.    And you don't recall specifically
23  from your independent recollection, do you?
24       A.    No.
25            MR. CLARK:  I think you covered most

<sup>1</sup> everything else.  That's all I have.

<sup>2</sup>                         - - -

<sup>3</sup>                   EXAMINATION

<sup>4</sup> BY MR. BELLINDER:

<sup>5</sup>      Q.    Just a few questions, just so we're

<sup>6</sup> clear.  You've been asked several times in

<sup>7</sup> several different ways about at what point you

<sup>8</sup> remember and don't remember certain things

<sup>9</sup> about that night, and it's my recollection of

<sup>10</sup> the testimony you remember up until being at

<sup>11</sup> the bar and having some drinks and some fun,

<sup>12</sup> some good times with the folks there?

<sup>13</sup>      A.    Right.

<sup>14</sup>      Q.    But you don't recall the actual

<sup>15</sup> incident involving Airman Dorack or any type

<sup>16</sup> physical altercation with them?

<sup>17</sup>      A.    That's correct.

<sup>18</sup>      Q.    You recall at some point possibly

<sup>19</sup> waking up and having some type of foggy

<sup>20</sup> memories of being drug down the stairs or at

<sup>21</sup> some point being in some pain --

<sup>22</sup>      A.    That's right.

<sup>23</sup>      Q.    -- but nothing specific?

<sup>24</sup>            And the next specific memory that

<sup>25</sup> you had was waking up in the jail cell at 9:00

1     or 10:00 a.m.; is that right?

2          A.   Yes.

3          Q.   And so any testimony that you give

4     regarding events of what actually occurred or

5     what you feel like or what you've seen as

6     taking place comes from looking at the video?

7               MR. STEWART:  Object to the form.

8     MR. BELLINDER:

9          Q.   Is that right?

10         A.   That's correct.

11         Q.   Okay.  And you don't have any

12    medical background; is that right?

13         A.   That's right.

14         Q.   You've never been trained -- never

15    been to medical school?

16         A.   Right.

17         Q.   You've never been trained as to

18    medicine or any type medical issue, correct?

19         A.   That's correct.

20         Q.   And so when we're talking about your

21    state of consciousness, whether you were

22    conscious or unconscious, you don't have any

23    specific training or ability to speak on that;

24    is that right?

25               MR. STEWART:  Object to the form.

21ecf098-eaee-4fe4-9a03-f561186a7ab7

1        A.    Yes, sir.

2    MR. BELLINDER:

3        Q.    When it comes to voluntary versus

4    involuntary physical movements, do you have

5    any training or ability to speak on that?

6            MS. STEEL:  Object to the form.

7    MR. BELLINDER:

8        Q.    Have you ever been trained on

9    whether or not a movement by a person by

10   looking at them on a video is voluntary versus

11   involuntary?

12       A.    No.

13       Q.    Have you ever been trained that

14   someone can have involuntary movements while

15   unconscious?

16           MR. STEWART:  Object to the form.

17           MS. STEEL:  Object.

18       A.    I've never been trained on that.

19   MR. BELLINDER:

20       Q.    And then for the record, you're

21   gonna find us, if you can, the nolle pros

22   letter that was sent to you by the judge, the

23   letter where the military accepted

24   jurisdiction and any photographs you have and

25   any bills that you may have in your

1    possession; is that right?

2        A.    That's right.

3            MS. STEEL:  Anything he has related

4    to Article 15.

5            MR. BELLINDER:  Right.

6    MR. BELLINDER:

7        Q.    And, also, anything you have related

8    to the Article 15 proceedings by the military?

9        A.    Yes.

10            MR. BELLINDER:  That's all I have.

11                    - - -

12            (Off the record.)

13                EXAMINATION

14    BY MR. CLARK:

15        Q.    On base, do you use tasers?  Do the

16    officers use tasers?

17        A.    Yes, we do.

18        Q.    Do you use a taser?

19        A.    I don't use one.  I use a baton.

20        Q.    Have you had any training with

21    tasers?

22        A.    No, not certification training, just

23    seeing them being around in general, but not

24    where I can say I'm certified on them.

25                    - - -

1                    EXAMINATION

2     BY MR. STEWART:

3          Q.    Have you ever been tased in that

4     process?

5          A.    No, sir.  That was --

6          Q.    Have you ever done it just with

7     other guys around just to see what it feels

8     like?

9          A.    No.

10         Q.    This is the only time in your life

11    you've ever been tased was the night of this

12    incident?

13         A.    That's right.

14              MS. STEEL:  I do want to state that

15    I would like to recess the deposition pending

16    getting these things because I may have more

17    questions.

18              MR. BELLINDER:  We won't object to

19    that.

20                        - - -

21         (Deposition recessed at 4:54 p.m.)

22

23

24

25

CERTIFICATE OF COURT REPORTER

1          I, Jennifer West Ray, Court Reporter,

2  and Notary Public in and for the County of Harrison,

3  State of Mississippi, hereby certify that the

4  foregoing pages, and including this page, contain a

5  true and correct transcript of the testimony of the

6  witness, as taken by me at the time and place

7  heretofore stated, and later reduced to typewritten

8  form by computer-aided transcription under my

9  supervision and to the best of my skill and ability.

10         I further certify that I placed the

11 witness under oath to truthfully answer the

12 questions in this matter under the power vested in

13 me by the State of Mississippi.

14         I further certify that I am not in the

15 employ of or related to any counsel or party in this

16 matter, and have no interest, monetary or otherwise,

17 in the final outcome of the proceedings.

18         Witness my signature this the _____ day

19 of _____, 2014.


_____
JENNIFER WEST RAY, RPR
My Commission Expires on 4/24/17

1                      ERRATA SHEET
2              I, JASON JORDAN, do hereby certify that I
    have read the foregoing deposition and that the same
3   is a true and accurate transcript of my testimony,
    with the exception of the changes noted below, if
4   any:
5   PAGE        WORD(S) TO BE     CORRECT      REASON FOR
    /LINE       CHANGED          WORD(S)       CHANGE
6
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
                    _____
17                  JASON JORDAN
18  State of _____
    County of _____
19
    Sworn to and subscribed before me
20  this _____ day of _____ 2014.
    _____
21  Notary public
    My commission expires:
22
23
24
25