# In The Matter Of:

# *JASON JORDAN*
## *vs.*
# *PREMIER ENTERTAINMENT BILOXI, et. al.*

_____

# *CHRISTOPHER SOUKUP*

## *March 31, 2014*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JASON JORDAN; ALYSSA JORDAN,
INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF UNBORN BABY JORDAN,
DECEASED AND ON BEHALF OF ALL OF
THE HEIRS AT LAW AND WRONGFUL
DEATH BENEFICIARIES OF UNBORN
BABY JORDAN, DECEASED;
AND CHRISTOPHER SOUKUP                    PLAINTIFFS

VS.                   CIVIL ACTION NO:  1:13cv195 LG-JMR

PREMIER ENTERTAINMENT BILOXI,
LLC d/b/a HARD ROCK HOTEL & CASINO;
THE CITY OF BILOXI, MISSISSIPPI;
DOE DEFENDANT ONE; JOSHUA HAMILTON,
IN HIS OFFICIAL AND INDIVIDUAL
CAPACITIES; DOE DEFENDANT THREE;
DOE DEFENDANT FOUR; DOE DEFENDANT
FIVE AND DOE DEFENDANTS 6-10              DEFENDANTS


---------------------------------------------------------
            DEPOSITION OF CHRISTOPHER SOUKUP
---------------------------------------------------------

          Taken at 759 Vieux Marche Mall, Biloxi,
          Mississippi, Monday, March 31, 2014,
          beginning at 10:17 a.m.




                    REPORTED BY:
                JENNIFER RAY, RPR
              Merrill Legal Solutions

1    APPEARANCES:

2

REPRESENTING PLAINTIFFS:

3              THOMAS J. BELLINDER, ESQUIRE
               Martin & Bellinder

4              351 Edgewood Terrace Drive
               Jackson, Mississippi  39206

5

6    REPRESENTING HARD ROCK HOTEL & CASINO BILOXI:
               DAVID W. STEWART, ESQUIRE

7              COPELAND COOK TAYLOR & BUSH, P.A.
               2781 C.T. Switzer Sr. Drive, Suite 200

8              Biloxi, Mississippi  39531

9

REPRESENTING THE CITY OF BILOXI:

10             TERE R. STEEL, ESQUIRE
               Page, Mannino, Peresich & McDermott, PLLC

11             759 Vieux Marche Mall
               Biloxi, Mississippi  39530

12

13   REPRESENTING JOSHUA HAMILTON:
               ANDREW AUSTIN CLARK, ESQUIRE

14             Russell S. Gill, PLLC
               638 Howard Avenue

15             Biloxi, Mississippi  39530

16

ALSO PRESENT:

17             JASON JORDAN

18

19

20

21

22

23

24

25

0b9b1392-b98b-4486-976a-4ab912ebf648

1                    TABLE OF CONTENTS

2

3    WITNESS:    CHRISTOPHER SOUKUP                    PAGE:

4

     Examination by Mr. Stewart ------------------------ 5
5    Examination by Ms. Steel -------------------------- 150
     Examination by Mr. Clark -------------------------- 182
6    Examination by Mr. Stewart ------------------------ 183
     Examination by Mr. Bellinder ---------------------- 185
7    Examination by Ms. Steel -------------------------- 188
     Reporter's Certificate ---------------------------- 191
8    Errata Sheet -------------------------------------- 192

9

        ****************************************************
10

     EXHIBITS
11

     Exhibit 1:    Photographs -------------------------- 5
12   Exhibit 2:    81st Security Forces Squadron Keesler
                   Air Force Base, Mississippi ----------- 55
13   Exhibit 3:    Prosecutor's Recommendation Form ------ 139
     Exhibit 4:    City of Biloxi Uniform Arrest/Booking
14                 Form --------------------------------- 141

15

16

17

18

19

20

21

22

23

24

25

1                        STIPULATION

2              It is hereby stipulated and agreed

3    by and between the parties hereto, through

4    their respective attorneys of record, that

5    this deposition may be taken at the time and

6    place hereinbefore set forth, by Jennifer Ray,

7    RPR, Court Reporter and Notary Public,

8    pursuant to the Federal Rules of Civil

9    Procedure, as amended;

10             That the formality of READING AND

11   SIGNING is specifically NOT WAIVED;

12             That all objections, except as to

13   the form of the questions and the

14   responsiveness of the answers, are reserved

15   until such time as this deposition, or any

16   part thereof, may be used or is sought to be

17   used in evidence.

18

19

20

21

22

23

24

25

1  CHRISTOPHER SOUKUP,
2      the witness, having been produced and
3  first duly sworn, testified as follows,
4  to-wit:
5              - - -
6  BY MR. STEWART:
7      Q.  Would you state your name for me,
8  please.
9      A.  Christopher Mark Soukup.
10     Q.  Soukup?
11     A.  Yes, sir.
12     Q.  I just want to make sure I'm saying
13  it right.
14         Mr. Soukup, do you have a -- are you
15  in the military right now?
16     A.  No, sir.
17     Q.  Okay.  Do you prefer to be called by
18  your rank, or do you prefer to be called Mr.
19  Soukup, or what's your preference?
20     A.  Chris is fine.
21     Q.  Okay.
22     A.  No worries.
23     Q.  What's your current address?
24     A.  1535 State Street, and that's in
25  Ely, Iowa, and the zip code for that whenever

0b9b1392-b98b-4486-976a-4ab912ebf648

1  you're ready is 52227.

2       Q.   Have you ever been in a deposition

3  before like this?

4       A.   No, sir.

5       Q.   Have you ever given testimony

6  anywhere?

7       A.   Yes.

8       Q.   Have you given testimony in a civil

9  proceeding like this, in a lawsuit or anything

10 like that?

11      A.   Yes.

12      Q.   What case did you testify in?

13      A.   It was a -- the case was -- as

14 military police when I was at Robins, it was a

15 domestic violence case.  I don't remember the

16 names involved.

17      Q.   Was it a criminal case?

18      A.   Yes.

19      Q.   You haven't testified in anything

20 like this, a civil lawsuit where somebody is

21 claiming injury against a business or

22 something like that?

23      A.   Oh, no.  No, sir.

24      Q.   When I'm saying civil, that's what

25 I'm referring to.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.    Okay.

2      Q.    Just a couple little quick ground

3  rules, and you're doing fine.  If you would,

4  always answer out loud.  It's hard for the

5  court reporter to take down affirmative nods

6  and things like that.

7      A.    Sure.

8      Q.    You're not from the South, so you

9  probably won't use the words uh-huh and nuh-uh

10  a lot, but if you do, I can't spell either one

11  of them, and when I read it on the record, I

12  have no idea what that means.  If the question

13  calls for a yes or no, would you please give

14  us a yes or no so that the transcript will be

15  clear.

16      A.    Yes, sir.

17      Q.    Okay.  And, also, I'll try to finish

18  my question and let you answer.  I'll try to

19  let you answer before I start another

20  question.  If we talk over each other, it

21  tends to cloud up our transcript really bad.

22  And I'm talking too fast already.  I'm gonna

23  get punched before it's over by this lady.

24          MR. STEWART:  This is an

25  authorization, Thomas, that came back from a

1   pharmacy provider, I think.  If we could get
2   him before he leaves -- nothing urgent -- just
3   to execute that for us.
4           MR. BELLINDER:  Some of this
5   stuff -- some of the specific entities that we
6   need records from -- the general release that
7   we did for them isn't sufficient, so we'll get
8   you to fill this out and sign it before you
9   leave.
10          THE WITNESS:  Sure.
11          MR. STEWART:  Are y'all gonna read
12  and sign?
13          MR. BELLINDER:  Yeah, we will.
14          That's the formal process where once
15  she's done with the transcript, she'll send it
16  to us.  You can read through everything and
17  see if there's any corrections or anything
18  that she took down inaccurately, and then
19  you'll sign it and send it back.
20          THE WITNESS:  Okay.
21  MR. STEWART:
22      Q.   Chris, what is your residential
23  history going back in time?  Where did you
24  live previous to where you live now?
25      A.   Last year I was in Afghanistan, so I

1    was deployed, and then in -- from 2010 to

2    2012, I was down here in Mississippi.

3         Q.   Where did you live before that?

4         A.   Iowa.  Cedar Rapids, Iowa.

5         Q.   Is that where you're from?

6         A.   Home of record.  Yes, sir.

7         Q.   Do you move around a lot?  Is that

8    what you mean of record or --

9         A.   For the military, that's where your

10   home is, and then when you get assigned to

11   your duty station, if anything were to occur,

12   they refer that as your --

13        Q.   Where are you originally from?  I

14   just did what I told you not to do.  I talked

15   over you.  Where are you originally from?

16        A.   Place of birth, is that what you're

17   asking?

18        Q.   Yes.

19        A.   Wahiawi, Hawaii.

20        Q.   You've gotta spell that.

21        A.   W-A-H-I-A-W-I.

22        Q.   Just like it sounds.

23        A.   Uh-huh (affirmative).

24        Q.   Okay.  So your address of record is

25   Cedar Rapids, is that what you said?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.    My home of record address is 495

2  Irish Court, and that's in Marion, which is a

3  suburb of Cedar Rapids.

4                       - - -

5             (Off the record.)

6  MR. STEWART:

7      Q.    You indicated that you were in

8  Afghanistan?

9      A.    Yes, sir.

10      Q.    And were you in the military at that

11  time or --

12      A.    It was a private military contract,

13  so I was a civilian contractor.

14      Q.    Who was your employer?

15      A.    Triple Canopy.

16      Q.    What did you do there?

17      A.    Armed security.

18      Q.    When were you last in the military?

19      A.    September of 2009 was my discharge

20  date.

21      Q.    Okay.  Were you honorably

22  discharged?

23      A.    Yes, sir.

24      Q.    What was the basis of your

25  separation, or was there an explanation for

1    it, or did you just choose to leave?

2        A.   That was a temporary disability

3    retirement listing.

4        Q.   And what was the basis of the

5    disability?

6        A.   The diagnosis that they had was

7    major depression, and I was being treated for

8    posttraumatic stress disorder.

9        Q.   Are you claiming as a result of the

10   incidents at Hard Rock that there was any

11   effect on your PTSD or depression diagnosis --

12            MR. BELLINDER:  Object to the form.

13            MR. STEWART:  To shorten the

14   deposition, I'm just trying to find out if

15   he's making that claim as to --

16   MR. STEWART:

17       Q.   Is any part of your claim about

18   mental injury or change in your diagnosis of

19   PTSD?

20       A.   Not related to the original

21   diagnosis, no.

22       Q.   Has any part of it -- do you have

23   any sort of claim of mental injury from the

24   incident at Hard Rock?

25            MR. BELLINDER:  Object to the form.

1        A.    No.

2   MR. STEWART:

3        Q.    That you're aware of?

4        A.    Not that I'm aware of.

5        Q.    What's your date of birth, please?

6        A.    14 January 1985.

7        Q.    How old are you?

8        A.    29.

9        Q.    How far did you go in school?

10        A.    Some college completion.

11        Q.    Where did you go to school?

12        A.    The military has a program called

13   Community College of the Air Force, and then

14   most recently Kirkwood Community College, and

15   that's in Cedar Rapids, Iowa, and the program

16   was a paramedic program.

17        Q.    Did you complete that?

18        A.    Yes, sir.

19        Q.    Are you a certified paramedic?

20        A.    EMT.

21        Q.    Okay.  In what state?

22        A.    Iowa.

23        Q.    Is that where you're gonna return

24   and stay or -- you're there now.  Are you

25   gonna stay there?

1        A.    Yes, sir.

2        Q.    Are you working as an EMT?

3        A.    I just got hired, so my start date

4   is the 7th.

5        Q.    Who is that company?

6        A.    Area Ambulance Service.

7        Q.    How long is that paramedic program?

8        A.    Two years.

9        Q.    And then you went through a state

10  certification?

11       A.    Yes, sir.

12       Q.    And passed?

13       A.    Yes, sir.

14       Q.    Passed the first time?

15       A.    Yes, sir.

16       Q.    Have you -- the date of this

17  incident, do you recall the date?

18       A.    On or about 27 November 2011.

19       Q.    Where were you working at that time?

20       A.    Department of the Air Force Civilian

21  Police Program, Keesler Air Force Base.

22       Q.    Civilian what?

23       A.    Police.

24       Q.    What does that entail?

25       A.    Basically it's a civilian program

¹  that augments the Security Forces or security
²  police for the Air Force.  It's a federal law
³  enforcement position.
⁴        Q.    Were you a sworn police officer on
⁵  that date?
⁶        A.    Yes, sir.
⁷        Q.    Did you have a badge that day?
⁸        A.    Not on my person.
⁹        Q.    Okay.  Did you have a badge in your
¹⁰ -- as part of your job that --
¹¹       A.    Yes, sir.
¹²       Q.    Did you have security -- did you
¹³ have your police credentials in your
¹⁴ possession at the Hard Rock?
¹⁵       A.    No, sir.
¹⁶       Q.    What was your role in that capacity?
¹⁷ What did you do for that project at Keesler?
¹⁸       A.    I was a shift supervisor and field
¹⁹ training officer.
²⁰       Q.    Who was your direct supervisor?
²¹       A.    Zastrow Perkins.
²²       Q.    And who was his?  Do you recall?
²³       A.    He worked directly for the
²⁴ commander.
²⁵       Q.    Who was that?

1      A.   At the time, it was Major Pignataro.

2      Q.   Can you spell that?

3      A.   I can try.

4      Q.   Just take your best shot.  We'll

5  understand.

6      A.   P-I-G-N-A-T-A-R-O.

7      Q.   Has he since left that post?

8      A.   I'm not assigned to him, so I'm not

9  sure.

10      Q.   He was there the whole time you were

11  there?

12      A.   Yes, sir.

13      Q.   How long were you in that position?

14      A.   From 2010 October to 2012 September,

15  so about two years there.

16      Q.   Why did you leave?

17      A.   As a result of this particular

18  incident, it was just getting to a point where

19  I was being scrutinized in my work center, so

20  I made a transition to leave.

21      Q.   Who was scrutinizing you?

22      A.   More so the active duty side of the

23  house.

24      Q.   Can you be specific?

25      A.   The actively duty chief, which I

1    don't recall his name.  Operations, I believe

2    at the time it was Master Sergeant Lisa

3    Phillips and Captain Porta and the commander.

4         Q.   P-O-R-T-A?

5         A.   Say again, sir.

6         Q.   Porta?

7         A.   Porta, yes, sir.  P-O-R-T-A.

8         Q.   Okay.  And Master Sergeant Lisa

9    Phillips?

10        A.   Yes, sir.

11        Q.   And you're talking about the base

12   commander?

13        A.   The squadron commander, Major

14   Pignataro.

15        Q.   He was the squadron commander.  Who

16   was the base commander at that time?

17        A.   I don't recall.

18        Q.   Okay.  Can you explain exactly what

19   sort of scrutiny you were receiving?

20        A.   Well, I was the shift supervisor.  I

21   had approximately 30 personnel assigned to me,

22   and part of my regular duties was management

23   and setting the like duty roster.  Immediately

24   following the incident, I was reduced down in

25   a duty position, which was basically a -- from

1    my subordinate perspective, just an open

2    display of punishment.  So, for example, going

3    from a shift supervisor to an entry

4    controller, working at a gate, they recognized

5    that as a form of punishment, although it was

6    not like in writing or anything like that, but

7    it was just something that is just common

8    knowledge within the career field, that

9    somebody who goes from a supervisory role to

10   an extreme subordinate role, where you have no

11   credentials.

12          So basically posting the following

13   day, I was in charge of developing an

14   emergency service team, or a civilian

15   equivalency would be SWAT.  I was redacted

16   from that position and was told that I was not

17   going to be able to because my judgment was

18   called into question, and this was without

19   having any review of any report at the time.

20   I hadn't been interviewed within my chain of

21   command from the active duty side nor civilian

22   side of the house, and I was automatically

23   informed that I was not going to be a part of

24   that project.

25          Q.   Who made the decision to change your

0b9b1392-b98b-4486-976a-4ab912ebf648

1   post?

2       A.   I believe that was Tech Sergeant

3   Thatcher, and he was another -- on the active

4   duty side, they refer to them as flight chief

5   versus -- we call ourselves shift supervisor.

6       Q.   Do you know if he's still with

7   Keesler locally here?

8       A.   I don't know if he's assigned

9   currently.  I believe he was getting orders at

10  that time.  So to be honest, I don't know

11  where he is currently.

12      Q.   And by getting orders, you mean he

13  was gonna be transferred out?

14      A.   Yes, sir.  To a different base.  He

15  wasn't leaving the military.  He was just

16  going to another location.

17      Q.   Okay.  And then Lisa Phillips, do

18  you know if she's still with Keesler locally?

19      A.   I believe she had separated.  She

20  had retired.

21      Q.   Do you know where she is now?

22      A.   No, sir.

23      Q.   And then Captain Porta, is that

24  person -- is that a male or a female?

25      A.   Male.

¹        Q.    Is he still with Keesler?

²        A.    Not to my knowledge.

³        Q.    Do you know who made the decision to

⁴    remove you -- I think you said redact -- you

⁵    mean remove from the SWAT team organization or

⁶    organizing.  Is that what it was?

⁷        A.    Yes.  They were basically starting a

⁸    team.

⁹        Q.    Right.  Who made the decision to

¹⁰   remove you from that?

¹¹       A.    Major Pignataro.

¹²       Q.    Did they document the post change in

¹³   writing to you?

¹⁴       A.    Yes, sir.

¹⁵       Q.    Did they give you an explanation for

¹⁶   it?

¹⁷       A.    No, sir.

¹⁸       Q.    Is that something you would normally

¹⁹   get when you got a change in post?

²⁰       A.    Yes, sir.  There's a duty roster

²¹   that comes out by the end of shift.

²²       Q.    Did you get different posts at any

²³   time while you were working at Keesler before

²⁴   this incident occurred?

²⁵       A.    Prior to my certification as a shift

1    supervisor, yes, sir.

2        Q.   Are you aware of any other shift

3    supervisors who had changes in post at Keesler

4    while you were there?

5        A.   In terms of -- I don't understand

6    your question.

7        Q.   Changing from one post position to

8    another?

9        A.   Not to that extreme, not from a

10   flight chief or shift supervisor to an entry

11   controller.

12       Q.   I don't know much about Keesler's

13   structure.  Can you explain the organizational

14   structure above where you were positioned?

15       A.   As far as leadership or operations?

16       Q.   Obviously there's two different

17   kinds of --

18       A.   Sure.

19       Q.   -- aspects.  Let's start with

20   operations.

21       A.   So starting from my position, I have

22   my liaison as a civilian police officer, which

23   would be a GS8, which has a title as shift

24   sergeant or just sergeant.  Then they report

25   to our program manager.  The program manager

<sup>1</sup> works directly with the commander, and that's

<sup>2</sup> when the transition occurs from the civilian

<sup>3</sup> to active duty within our particular unit.

<sup>4</sup>     Q.   Who was the sift sergeant above you?

<sup>5</sup>     A.   At the time, there was an interim.

<sup>6</sup> He hasn't official.  He was still awaiting

<sup>7</sup> paperwork, and I believe that was Seth

<sup>8</sup> Giddons.

<sup>9</sup>     Q.   Do you know if he's still there?

<sup>10</sup>     A.   He's not.

<sup>11</sup>     Q.   Do you know where he is now?

<sup>12</sup>     A.   I believe he's currently unemployed.

<sup>13</sup>     Q.   Where does he live?

<sup>14</sup>     A.   Biloxi.

<sup>15</sup>     Q.   He's local?

<sup>16</sup>     A.   I believe so.

<sup>17</sup>     Q.   Have you been in touch with him at

<sup>18</sup> all since this incident?

<sup>19</sup>     A.   Yes, sir.

<sup>20</sup>     Q.   And then going -- you said there was

<sup>21</sup> a program manager.  Who was that?

<sup>22</sup>     A.   Zastrow Perkins.

<sup>23</sup>     Q.   And then above that, the base

<sup>24</sup> commander?

<sup>25</sup>     A.   The squadron commander.

1      Q.    Who was -- who was that again?

2      A.    Major Pignataro.

3      Q.    Okay.  And then on the leadership

4  side -- and by operations, do you mean the

5  civilian program that you were involved in,

6  that's the operations side?

7      A.    We have basic functions.  So like

8  administrative function, operations function,

9  supply function.  So as far as the unit was

10  contained -- we fell under what's called S3,

11  which is operations, so S1 would be admin.  I

12  did not work in S1, so for me it was S3

13  operations.

14      Q.    Do you have a written document that

15  has this outline of leadership in operations

16  anywhere?

17      A.    Not with me.  They usually

18  self-contain that within the unit.

19      Q.    It's not something you possess at

20  your home or anyplace?

21      A.    No, sir.

22      Q.    Okay.  And then on the leadership

23  side, what's the chain of command starting

24  with you going up?

25      A.    On the active duty side?

1    Q.   That was over you.  Is there such a
2  thing?
3    A.   There was a program manager.  So
4  that's how we operated.  So Mr. Perkins
5  basically as the program manager outlined how
6  we conduct our operations and in what
7  capacity.
8    Q.   Mr. Perkins was not in the military?
9    A.   No, sir.
10    Q.   What was his -- he was a civilian
11  employee?
12    A.   Yes, sir.
13    Q.   Okay.  So he essentially ran the
14  program, you were a shift supervisor, and you
15  had other officers that answered to you?
16    A.   Yes, sir.
17    Q.   What was the role of -- what was
18  your role in general?  What did the augmentees
19  do?
20    A.   Mine in particular, how the shift
21  worked, I had both civilian police, which fell
22  under the Department of the Air Force Program,
23  and active duty enlisted personnel, airmen and
24  NCOs.  I would basically assign them to a
25  post, do any kind of mentorship, counselling,

1    training.  At the time, I was put in charge to

2    develop a field training officer program to

3    assist in transitioning the civilian police

4    and the active duty personnel to streamline

5    operations, the day-to-day work.

6         Q.   Did you have authority to give

7    orders to active duty personnel?

8         A.   Yes, sir.

9         Q.   Was that on base or anywhere?

10        A.   Well, for them, they fall under the

11   Uniform Code of Military Justice.  So, yes, on

12   or off base.

13        Q.   So your understanding is if an

14   active duty person was doing something that

15   you felt the need to give them an order about,

16   no matter where they were, you had the

17   authority to do that?

18        A.   Yes, sir.

19        Q.   Did you believe that you had

20   jurisdiction to arrest off base?

21        A.   No.

22        Q.   Okay.  Did you have jurisdiction to

23   do anything other than give an order to an

24   active duty person in terms of police powers?

25   Did you feel like you had -- could you make an

¹ arrest of an active duty person, for example,

² if that's who you saw?

³     A.    No.  We would do referrals to local

⁴ law enforcement.  We would coordinate with

⁵ them.

⁶     Q.    It's not something you would have

⁷ done on your own, you would not have actively

⁸ arrested someone -- even if they were active

⁹ duty base personnel, you didn't feel like you

¹⁰ had jurisdiction to make an arrest?

¹¹     A.    No.

¹²     Q.    Okay.  You never did that?

¹³     A.    No.

¹⁴     Q.    And you left when from this post,

¹⁵ this job?  I don't want to call it the wrong

¹⁶ word.

¹⁷     A.    I believe that was September 2012.

¹⁸     Q.    Where did you go from there?

¹⁹     A.    Being hired with Triple Canopy, I

²⁰ went to Harvey, Louisiana outside of Baton

²¹ Rouge for a predeployment training.

²²     Q.    What was your salary when you left

²³ -- what was your salary at the time of this

²⁴ incident?

²⁵     A.    We go off the GS code, so I was a

1  GS6, Step 2.

2       Q.   Do you know what that paid?

3       A.   Roughly 30,000 a year annual.

4       Q.   Did you get any salary increases

5  after 11/27/11 inside your job at Keesler?

6       A.   No.

7       Q.   Okay.  That was your ending salary,

8  too?

9       A.   Yes.

10      Q.   And then when you went to work for

11 Triple Canopy, how long was it from the time

12 that you left your job as augmentee to go to

13 work at Triple Canopy?

14      A.   If I'm understanding you correctly,

15 are you referring to a delay between --

16      Q.   Was there any time?

17      A.   Well, there was a tropical storm, so

18 my initial training date was set for about two

19 weeks prior to when I actually left, so I was

20 in -- I guess in lieu of training.

21      Q.   So you went straight to the job?

22      A.   Yes, sir.

23      Q.   That's what I'm trying to

24 understand.  There was no gap in time.  You

25 left the job at Keesler, and you went straight

1  to --
2       A.   Yes, sir, outside of the weather
3  conditions that prevented me to report to
4  training.
5       Q.   There was no reason why you delayed
6  in going to that other job?
7       A.   No.
8       Q.   What was your rate of pay at the
9  next job, at the Triple Canopy job?
10      A.   As a contractor, they were doing a
11 daily rate, so it was $200 a day.
12      Q.   Do you know how much money you
13 earned while you worked for them?
14      A.   That was seven months.  I couldn't,
15 unless I got a calculator and did the math on
16 it.
17      Q.   Seven months, every single day you
18 made $200?
19      A.   Yes, sir.
20      Q.   Seven days a week?
21      A.   It was seven days.
22      Q.   When did you actually go to
23 Afghanistan?
24      A.   That particular training was two
25 weeks of approximately 21 to -- 21 days to a

¹ month being in country because we were in

² Kuwait prior to getting to Afghanistan.

³     Q.    Okay.  So you went into Kuwait

⁴ first?

⁵     A.    Yes.  And that's protocol.  It's

⁶ just a staging area.  You wait for a flight,

⁷ and it's based off of priority.

⁸     Q.    How long were you in Kuwait?

⁹     A.    Approximately a week, a week and a

¹⁰ half.

¹¹     Q.    And then you went into where?

¹²     A.    Afghanistan.

¹³     Q.    What part of Afghanistan?

¹⁴     A.    Helmand Providence.

¹⁵     Q.    How long were you there?

¹⁶     A.    Approximately six months.

¹⁷     Q.    And what was your job there?

¹⁸     A.    Armed security.

¹⁹     Q.    At a particular location?

²⁰     A.    It was Forward Operating Base Camp

²¹ Leatherneck, and Joint Base Bastion, which was

²² a British base.

²³     Q.    Were you involved in any exchange of

²⁴ fire with any hostility at all?

²⁵     A.    Indirect fire, and we took RPG or

¹    IED blast just on occasion.

²         Q.    Were you injured in any of that?

³         A.    No, sir.

⁴              MR. BELLINDER:  Physically?

⁵              THE WITNESS:  No.

⁶              MR. BELLINDER:  Physically or --

⁷    MR. STEWART:

⁸         Q.    Well, physically, first?

⁹         A.    No, sir.

¹⁰         Q.    Did you receive any mental injury as

¹¹    a result of that?

¹²         A.    No, sir.

¹³         Q.    Was there any other kind of injury

¹⁴    I've left out that you received?

¹⁵         A.    No, sir.

¹⁶         Q.    Okay.  Then you -- that contract

¹⁷    ended?

¹⁸         A.    I had to terminate early.  I had a

¹⁹    death in the family, and my mother has had an

²⁰    ongoing cancer issue.  So her health was

²¹    basically getting worse, and I made a decision

²²    to terminate my contract early.

²³         Q.    Purely because of those events?

²⁴         A.    Uh-huh (affirmative).

²⁵         Q.    Yes?

1      A.   Yes, sir.

2      Q.   Who was the family member that

3  passed away?

4      A.   It was my grandfather.

5      Q.   Okay.  And where does your mother

6  live?

7      A.   In Marion, Iowa.

8      Q.   Since that time, you terminated that

9  contract -- was it a set time of contract

10 or --

11     A.   It was one year.

12     Q.   Okay.  Was there any repercussion

13 for early termination?

14     A.   No, sir.

15     Q.   They just let you out of it?

16     A.   Yes, sir.

17     Q.   And then what did you do in terms of

18 employment after that?

19     A.   I worked for my parents' business,

20 and it's banking logistics.

21     Q.   What does that involve?

22     A.   Basically coordinating ground and

23 air logistics for U.S. Bank, Wells Fargo.

24     Q.   Talking about supply movement or --

25     A.   Basically process checks.

1      Q.   That is a going business?

2      A.   Say again, sir.

3      Q.   It's an active business now?

4      A.   Yes, sir.

5      Q.   What's the name of it?

6      A.   USM.

7      Q.   What does that stand for?

8      A.   I believe it's U.S. Messenger.

9      Q.   Where is it physically located?

10     A.   I believe they're headquartered in

11   Chicago, Illinois.

12     Q.   Do your parents have a franchise?

13     A.   It's a contract with USM.

14     Q.   Is your father still operating that

15   business?

16     A.   Yes, sir.

17     Q.   Are you involved in it?

18     A.   Yes, sir.

19     Q.   Okay.  Do you currently work for

20   that business right now?

21     A.   Yes, sir.

22     Q.   Is that your main occupation?

23     A.   Currently.

24     Q.   Have you -- did you have any other

25   occupation after you came back from

0b9b1392-b98b-4486-976a-4ab912ebf648

1    Afghanistan besides USM?

2         A.   I was in the process of starting my

3    own business.

4         Q.   Okay.  Where was that?

5         A.   That was also in Iowa, Cedar Rapids

6    area, Iowa.

7         Q.   What was that?  What kind of

8    business?

9         A.   Consulting.

10        Q.   In what regard?

11        A.   Safety, firearms and medical.

12        Q.   And if I understood you, since that

13   time, you've now taken a job as a paramedic?

14        A.   Yes, sir.

15        Q.   Have we covered all of your

16   employment since the date of this incident?

17        A.   Yes, sir.

18        Q.   Okay.  Was there any loss of actual

19   wages to you as a result of this incident?

20        A.   If I were to -- if I was to stay on

21   as a civilian police officer, I would still

22   basically be employed.  So I lost health

23   benefits, insurance.  And as compared to what

24   I'm currently making, there's a reduction, but

25   as a contractor, probably -- was either about

1    the same or more.

2        Q.    Did the contractor job include any

3    form of benefits?

4        A.    Medical, but you had to pay for it.

5    You had to apply for it on your own.

6        Q.    Did you receive benefits from the

7    military without charge?

8        A.    After I was released?  If I'm

9    understanding you correctly --

10       Q.    While you were there, did you

11   receive free benefits?

12       A.    There was the Defense Base Act,

13   which basically if you were injured in combat,

14   it was combat related, they would provide

15   medical.

16       Q.    Were you receiving benefits in that

17   as a result of that?

18       A.    Yes.  That was it.

19       Q.    You're comparing your situation now

20   where you -- well, are you gonna have benefits

21   in your new job?

22       A.    We haven't discussed it, so I'm not

23   sure.  My orientation is on the 7th, so I

24   don't know what they offer.

25       Q.    Okay.  You've accepted that job,

<sup>1</sup> though, based on salary?

<sup>2</sup>      A.   Yes.

<sup>3</sup>      Q.   What's your salary?

<sup>4</sup>      A.   I believe it's starting at $10 an

<sup>5</sup> hour.

<sup>6</sup>      Q.   Do you know what kind of shift

<sup>7</sup> you're gonna work?

<sup>8</sup>      A.   Not at this time, I don't.

<sup>9</sup>      Q.   When you work -- let's see if I

<sup>10</sup> understand it.  Your civilian augmentee -- I'm

<sup>11</sup> probably gonna call it the wrong thing, so

<sup>12</sup> just -- we're talking about when you worked at

<sup>13</sup> Keesler as a civilian police officer, right --

<sup>14</sup>      A.   Yes, sir.

<sup>15</sup>      Q.   -- supervisor?

<sup>16</sup>           As part of that job, did they

<sup>17</sup> provide you with any medical benefits?

<sup>18</sup>      A.   Medical, yes.

<sup>19</sup>      Q.   Through the Defense Base Act or

<sup>20</sup> something else?

<sup>21</sup>      A.   No.  Defense Base Act was as a

<sup>22</sup> contractor.  On base it was medical.

<sup>23</sup>      Q.   I'm not understanding the

<sup>24</sup> distinction.  It was provided to you through

<sup>25</sup> your job?

1      A.   Yes.  As a civilian police officer
2   at Keesler, I received medical as part of the
3   job.  As a contractor, I had to pay for my own
4   medical, and that was under the Defense Base
5   Act.
6      Q.   So when you worked for Keesler --
7   you mean later you had to buy it?
8      A.   As a contractor, yes.
9      Q.   When you worked there, it was
10  provided to you as part of your job, period?
11     A.   Yes.
12     Q.   That's what I'm trying to
13  understand.
14          When you're saying as a contractor,
15  you're talking about when you went to
16  Afghanistan?
17     A.   Yes, sir.
18     Q.   Okay.  I misunderstood.
19          What other benefits did you receive
20  working for -- as a supervisor at Keesler?
21     A.   Optional dental.
22     Q.   Did you elect that?
23     A.   No, sir.
24     Q.   Did you have that as a contractor?
25     A.   Under Defense Base Act, if it was

1    combat related.

2         Q.   Did you have health insurance while

3    you were working as a contractor?  Did you

4    elect to get it?

5         A.   Yes, sir.

6         Q.   And also dental insurance?

7         A.   Yes.

8         Q.   Did you have any other benefits

9    working at Keesler?

10        A.   The life insurance.

11        Q.   That was provided to you by Keesler

12   free of charge?

13        A.    It was the Department of Defense.

14   It wasn't Keesler as Keesler Air Force Base.

15        Q.   Right.  All three of those were

16   provided to you through the Department of

17   Defense, the medical, dental and life

18   insurance -- or optional dental and life

19   insurance?

20        A.   Yes, sir.

21        Q.   What was the stated reason for your

22   -- whether from you or from Keesler for your

23   separation from the job at Keesler?

24        A.    I -- when filling out my paperwork,

25   I just said transition.

1      Q.   Did you complain about the fact that
2 you were being scrutinized, as you described,
3 to any of your supervisors?
4      A.   Yes, sir.
5      Q.   Who did you complain to?
6      A.   I talked to Seth Giddons.
7      Q.   Anyone else?
8      A.   Zastrow Perkins.
9      Q.   Anyone else?
10     A.   Chris Penick.
11     Q.   Was there anyone else?
12     A.   That's it, sir.
13     Q.   Did you -- what was Seth's response
14 to you?
15     A.   Him being in his position, he said
16 that it's not gonna go anywhere.  He was upset
17 with how things were going, but he just -- he
18 informed me it's a good ol' boy system, so I'm
19 just gonna have to deal with it.
20     Q.   What about Mr. Perkins, what did he
21 say?
22     A.   He informed me that it's just the
23 process, and he was very vague about it.
24          MR. BELLINDER:  I'm going to object
25 to the form, just on the last two.  Go ahead.

0b9b1392-b98b-4486-976a-4ab912ebf648

1          MR. STEWART:  Was there something
2    specific about the form?
3          MR. BELLINDER:  Just hearsay, but it
4    is discovery so --
5          MR. STEWART:  Form of the question.
6    I understand what you're saying --
7          MR. BELLINDER:  Yeah.  Just
8    discovery.  I certainly don't have any
9    objection to the substance, of course.
10   MR. STEWART:
11        Q.   In terms of Chris Penick, did he
12   give you a response to your -- you voiced
13   concerns to him.  Did he tell you anything
14   about why you were being scrutinized or give
15   you any explanation?
16        A.   Good ol' boy system.
17        Q.   Is Chris Penick still with Keesler,
18   as far as you know?
19        A.   No, sir, he's not.
20        Q.   Do you know where he is?
21        A.   No, sir.
22        Q.   What was his role there?
23        A.   He was a GS8 supervisor.
24        Q.   Okay.  We're gonna talk about him in
25   some more detail.  What was his role in the

1      structure of things at your job?  What --

2           A.   He was a dayshift supervisor at the

3      time.

4           Q.   Was he your equal?

5           A.   No, sir.

6           Q.   Was he above you?

7           A.   Yes, sir.

8           Q.   Okay.  Is there a protocol for

9      investigating incidents with that -- is it a

10     company?  The group that did the police

11     augmentation, is it a civilian company?

12          A.   It's the Department of the Air

13     Force.  So it's not like a third party

14     company.  It's an actual federal position.

15          Q.   Program?

16          A.   Yes, sir.

17          Q.   Okay.  These are federal employees

18     we're talking about?

19          A.   Yes, sir.

20          Q.   Everybody that you've described, Mr.

21     Perkins, Mr. Giddons and Mr. Penick are all

22     federal employees?

23          A.   At the time, yes, sir.

24          Q.   But not military?

25          A.   No, sir.

0b9b1392-b98b-4486-976a-4ab912ebf648

1     Q.   To your knowledge, was there a

2  protocol for complaints or appeals of

3  decisions like -- if you felt like someone was

4  scrutinizing you unfairly, did you have an

5  avenue to complain?

6     A.   Yes, sir.

7     Q.   What would that have been?

8     A.   From my perspective, I'd get with a

9  GS8 supervisor, which was for me Seth Giddons

10  at the time, and if he could not handle it,

11  would refer to the program manager, which was

12  Mr. Perkins, and if they felt needed, it would

13  go to the civilian personnel office, and I

14  believe they have a separate human resources

15  section there.

16     Q.   Okay.  Did you make any inquiry

17  aside from talking to these three gentlemen,

18  Chris Perkins and Giddons -- I'm sorry.  Seth

19  Giddons, Mr. Perkins and Mr. Penick, did you

20  make any additional inquiry beyond that?

21     A.   No, sir.

22     Q.   Did you ever file any kind of

23  written complaint with anyone?

24     A.   I initiated an inquiry with Seth

25  Giddons, and that's where I was informed that

0b9b1392-b98b-4486-976a-4ab912ebf648

1 the process wasn't going to go anywhere.

2      Q.   Was that written?  Did you write

3 down what happened or send it by e-mail or

4 anything?

5      A.   There was just -- it was verbal.  I

6 just walked in and talked to them.

7      Q.   Did you ever make a written

8 description of your complaints about being

9 unfairly scrutinized?

10      A.   No, sir.

11      Q.   Did you feel you were being unfairly

12 scrutinized?

13      A.   Yes, sir.

14      Q.   Okay.  And, again, the reason was --

15 why were you -- what's your understanding why

16 you were being scrutinized?

17      A.   I'm sorry?

18      Q.   I think you said lack of judgment.

19 What was the scrutiny, the focus of --

20      A.   My judgment was in question.

21      Q.   Did you ever have any other episodes

22 while you were working in that capacity or in

23 that program where anyone called your judgment

24 into question?

25      A.   No, sir.

1      Q.   And working in the military, did

2   that ever happen?

3      A.   No, sir.

4      Q.   Were you ever the subject of any

5   discipline in the military?

6      A.   No, sir.

7      Q.   Were you ever the subject of any

8   discipline while you were working at the -- in

9   this program at Keesler?

10      A.   No, sir.

11      Q.   We're gonna talk about a couple

12   things.  First I want to show you -- I'm gonna

13   go ahead and tell you these are not perfect

14   copies.  They are still shots off of video

15   footage.  My goal in showing you this is to

16   try to see if we can identify people.

17      A.   Sure.

18      Q.   I'm gonna make these Exhibit 1 A

19   through however many we have here, and let you

20   take a few minutes and look through them and

21   see if you can help us identify people who

22   were present over the course of this evening.

23           I'll just go ahead and give you this

24   stack, and we'll count the numbers up and see

25   how many letters that coordinates with.

0b9b1392-b98b-4486-976a-4ab912ebf648

1       MR. BELLINDER:  Also, for the
2   record, do we want to keep a continuing single
3   set of exhibits?  I know we've got eight or
4   nine depos set this week.  Do we want to just
5   keep one main set and keep adding exhibit next
6   for each deponent, or do we want to separate
7   them?  I don't know if that kind of helps.
8       MR. STEWART:  We can go off the
9   record.
10                  - - -
11              (Off the record.)
12   (Jason Jordan enters deposition room.)
13   MR. STEWART:
14       Q.   Chris, you've had an opportunity to
15   look at the screen shots that I gave you.
16   They're Exhibit 1 A through P.
17          Looking at those, can you -- are you
18   able to identify any individuals at all,
19   understanding that those were taken from a
20   video that's been produced in this case?
21       A.   There was one -- if I can find which
22   -- in G and H, if this is the same individual,
23   based off of the quality and just looking at
24   the clothing -- the individual wearing the
25   long sleeve and white plaid shirt --

1      Q.   Right.

2      A.   -- Shawn Hargraves, and it also

3  looks like he's in I.

4      Q.   Do you know what Shawn's -- was he

5  in the military?

6      A.   Yes, sir.

7      Q.   Was he assigned to Keesler?

8      A.   Yes, sir.

9      Q.   Was he in the security squad or the

10 security --

11     A.   Yes.  Yes, sir.  Active duty

12 military.

13     Q.   Is squad the right word for it?

14     A.   Squadron.

15     Q.   Squadron?

16     A.   Yes, sir.

17     Q.   Is he one of the guys who was in

18 your training group?

19     A.   He was assigned to my shift.

20     Q.   Okay.  How does that work?  Do you

21 have -- how many shifts were you over?

22     A.   I was -- just the one, one shift.

23     Q.   Which is what shift?

24     A.   Swings.

25     Q.   Swings.  Okay.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.   And as a field training officer, I
2  was responsible for all of the civilian police
3  training, so regardless of shift...
4      Q.   So essentially you were over all the
5  shifts as it pertained to civilian police
6  training?
7      A.   In regards to training, no actual
8  leadership, but just the training aspect.
9      Q.   Okay.  So did you know all of the
10 guys that were in the entire squadron?
11     A.   For the most part.  I knew by name,
12 but not personal relationship.
13     Q.   Okay.  And I believe you said Shawn
14 Hargraves.  Do you know is he still in the
15 military?
16     A.   Yes, sir.
17     Q.   Is he still here at Keesler?
18     A.   Yes, sir.
19     Q.   Have you communicated with him about
20 this lawsuit?
21     A.   No, sir.
22     Q.   Do you have his phone number or
23 anything?
24     A.   I do not.
25     Q.   Do you know anyone who would?

1          A.    The squadron.  I haven't talked to
2     him, so I don't know any way to get --
3          Q.    Do you have any contacts left with
4     the squadron at all?
5          A.    A few, but it's not like personal,
6     where we talk every day.
7          Q.    Who are your contacts that you still
8     have there?
9          A.    She's no longer within the squadron.
10    She's still at Keesler, but she had changed
11    career fields.  Melissa Bradley, and she works
12    at command post.  Warren Breckenridge, and he
13    is in training.  He's in the training section,
14    and he's civilian police.
15         Q.    Okay.  Were you able to identify
16    anybody else besides Shawn?
17         A.    This individual, looks like in N
18    circled, I believe that's David Reimer, and it
19    looks like also in O.
20         Q.    The blue circle in O and also in --
21    what did you say, N?
22         A.    Yes, sir.
23         Q.    Okay.  Now, where is Mr. -- did you
24    say Reimer?
25         A.    Yes, sir.  David Reimer.

1      Q.   Where is he now?
2      A.   I believe he is in the process of
3  transitioning out of the Air Force, but he is
4  still here at -- in the Keesler area, the
5  Keesler/Biloxi area.
6      Q.   Have you spoken to him?
7      A.   I saw him on Saturday.
8      Q.   Where did you see him?
9      A.   At the Base Exchange.
10      Q.   The BX?
11      A.   Yes, sir.
12      Q.   Did you discuss the facts of this
13  incident with him?
14      A.   No, sir.
15      Q.   Did you discuss the fact of a
16  lawsuit with him?
17      A.   No, sir.
18      Q.   Did you ask him if he was interested
19  in testifying for you or anything like that?
20      A.   No, sir.
21      Q.   No conversation about this at all?
22      A.   No, sir.  It was -- we were just
23  surprised to see each other.  I haven't seen
24  him in two years.
25      Q.   Just incidentally ran into him?

1        A.    Yes, sir.

2        Q.    Have you ran into any other people

3   that were present that night since it occurred

4   -- since you left the military, I should say,

5   or --

6        A.    No, sir.

7        Q.    -- since you left Keesler?

8             Okay.  Can you identify anyone else

9   that you see on these screen shots?

10        A.    In J, that also looks like Shawn

11   Hargraves, based off of his shirt.  And M also

12   looks like David Reimer, but just due to the

13   quality, I can't identify...

14        Q.    I understand.

15        A.    And if in A the blue circle is this

16   individual, I believe that is a Hard Rock

17   employee.

18        Q.    I actually was trying to go for

19   nonemployees.

20             There was a gentleman right above --

21   that's Amanda Flanagan who is in front of you.

22   There's a person that was to her left that was

23   apparently a nonemployee.  I know it's very

24   difficult.  Can you tell who that is?

25        A.    No, sir.

1       Q.   All right.  Are there any others
2   that you believe you have any identity that
3   you can provide to us?
4       A.   No, sir.
5            MR. STEWART:  We're gonna go ahead
6   and keep all these as an exhibit.  Just in the
7   interest of time, you may want to get Jason to
8   look at these so he can go ahead and we can
9   talk about them when we get to him.
10           MR. BELLINDER:  And if we could --
11  before we leave today, we'd like a copy.
12           MR. STEWART:  They're gonna get
13  worse when you copy them, but, yeah, you're
14  welcome to them.  I can't make them, but Tere
15  can if --
16           MR. BELLINDER:  If that's all right,
17  if you've got the capacity --
18           MS. STEEL:  A color copier?  We
19  probably can locate one.
20           MR. BELLINDER:  If you can.
21           MR. STEWART:  They're gonna get
22  progressively worse as you --
23           MR. BELLINDER:  And I'll try to put
24  these back in order.
25           MR. STEWART:  Please.

1   MR. STEWART:

2      Q.   Can you -- independent of that

3   process of looking at pictures, can you recall

4   other people who were present inside The Ledge

5   that night?

6      A.   Staff Sergeant Joshua Miller, who

7   was the one who invited me to this event.

8      Q.   Where is he now?

9      A.   I know he has since got out of the

10   military, but I don't know his current

11   location.  He had mentioned being in the St.

12   Louis area.

13      Q.   You haven't been in touch with him?

14      A.   No, sir.

15      Q.   No phone number?

16      A.   No, sir.

17      Q.   No cell number, no Facebook, no

18   nothing?

19      A.   No, sir.

20      Q.   Okay.  And who else?

21      A.   David Reimer.  Al Nicholson, I

22   believe he was a senior airman at the time,

23   and I have no idea where he is.

24      Q.   You may have already told us, but

25   Reimer was what?  Was he active duty military?

1        A.    Yes, sir.

2        Q.    He was a sergeant?

3        A.    I believe so.  He was a staff

4    sergeant at the time.

5        Q.    And then Al Nichols?

6        A.    He was a senior airmen.

7        Q.    He was present?

8        A.    Yes, sir.

9              MR. BELLINDER:  Was that Nichols or

10   Nicholson?

11             THE WITNESS:  Nicholson.

12   MR. STEWART:

13       Q.    Where does he live now?

14       A.    I don't know.

15       Q.    Do you know if he's still in the

16   military?

17       A.    I don't.

18       Q.    Any contact information with him?

19       A.    No, sir.

20       Q.    Okay.  Anyone else who was present

21   that night?

22       A.    After the fact, I learned -- and I

23   still don't know his first name, but Airman

24   Dorack, and I don't know if he's still

25   enlisted or his whereabouts either.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.    Do you have a first name for Airman
2   Dorack?
3      A.    No, sir.
4      Q.    Do you know if he was an active
5   duty?
6      A.    He was at the time, sir.
7      Q.    Do you know where he's from?
8      A.    No, sir.
9      Q.    Do you know what his job was?
10      A.    He was an armer, so he worked in the
11   arms room.
12      Q.    As part of the security --
13      A.    Security Forces, yes, sir.
14      Q.    Military side?
15      A.    Yes, sir.  Active duty.
16      Q.    Do you know anything about his
17   family, wife, anything at all?
18      A.    No, sir.
19      Q.    No idea where he's from in this
20   country --
21      A.    No, sir.
22      Q.    -- or in this world?
23      A.    He worked a different shift.  He
24   worked mids.  I worked swings.  I have no
25   idea.  Again, I don't know if he's still

1   enlisted or if he's gotten out.
2        Q.   Did you learn anything else about
3   him after the fact like you indicated?  You
4   indicated that you've just got his identity.
5   Who gave you that information?
6        A.   We worked in the same building, so
7   him being in the arms room, I just -- I've
8   seen him and through training.
9        Q.   Do you remember seeing him at the
10  Hard Rock on the night of this incident?
11       A.   Yes, sir.
12       Q.   Where was he located when you first
13  saw him?
14       A.   I believe he was at the bar.
15       Q.   Do you recall what he was wearing?
16       A.   No, sir.
17       Q.   Civilian clothes, obviously?
18       A.   Yes, sir.
19       Q.   Nobody was wearing uniforms, right?
20       A.   No, sir.
21       Q.   You didn't have on a uniform or
22  anything?
23       A.   No, sir.
24       Q.   Okay.  This was a civilian function,
25  correct?

1        A.    Yes, sir.

2        Q.    And you indicated I think you said

3   -- was it Mr. Nicholson --

4        A.    Yes, sir?

5        Q.    -- that invited everybody.

6        A.    No.  It was Joshua Miller.

7        Q.    He invited you?

8        A.    Yes, sir.

9        Q.    Did he talk to you personally, or

10  did he send an e-mail or a text or something?

11       A.    It was a text, and he had mentioned

12  it during the course of the shift.

13       Q.    What was the occasion?

14       A.    It was a like informal shift,

15  get-together, squadron get-together.

16       Q.    Do you know how much of the squadron

17  was present?

18       A.    No, sir.

19       Q.    Do you have any idea how many people

20  were there?

21       A.    I would approximately say ten.

22       Q.    How big would the squadron have

23  been?

24       A.    At that time, there was probably

25  close to 200 assigned.

1      Q.    Do you still have that text?

2      A.    No, sir.

3      Q.    Do you know if other people were

4   copied on that text?  Was it a stream text

5   that went to a lot of people?

6      A.    I don't recall.

7      Q.    Okay.  Let's take a second, if you

8   would, and read -- look at this document,

9   which we'll make our next exhibit, whatever

10   that would be.

11                   - - -

12          (Exhibit 2 was marked.)

13             (Off the record.)

14   MR. STEWART:

15      Q.    This document indicates that it's a

16   Report of Investigation; is that correct?

17      A.    Yes, sir.

18      Q.    And you produced this in discovery,

19   right?

20      A.    Yes.

21      Q.    How did you come to get this

22   document?

23      A.    Mr. Penick.

24      Q.    And what was the purpose of this

25   investigation?

1      A.   I believe it was just an inquiry by
2   the civilian police leadership and the active
3   duty leadership at Keesler.
4      Q.   Do you know if it was circulated
5   into the active duty hierarchy as a response
6   to the inquiry?
7      A.   I don't know, sir.
8      Q.   I notice it says status pending.
9   Was there any additional report or finding
10  that came out after this?
11     A.   Not to my knowledge.
12     Q.   And this was -- it says reviewed by
13  Zastrow Perkins.  It was actually prepared by
14  Chris Penick, right?
15     A.   Yes, sir.
16     Q.   Were you interviewed by Mr. Penick
17  with regard to this investigation?
18     A.   Yes, sir.
19     Q.   How long was that interview?
20     A.   I don't recall.  It wasn't a lengthy
21  process, in the course of a day, as far as
22  this aspect, the narrative, but due to the
23  circumstances that stemmed from the incident,
24  it was an ongoing process, as far as the
25  possibility of any disciplinary action and

1   movement of position within my duty title.

2        Q.   So this was just the civilian side

3   of the investigation, is that the best way to

4   say it?

5        A.   Yes, sir.  To my understanding, how

6   it was explained to me, was because Mr. Penick

7   was not my direct supervisor, he acted

8   basically as an internal affairs to initiate

9   the inquiry, give my perspective, conduct a

10  narrative.  I believe he was also attempting

11  to collect any information from Hard Rock.

12  Basically he was doing an in-house

13  investigation.

14        And how he explained it to me was

15  upon conclusion of his findings, he would

16  submit a report, I'm assuming this Report of

17  Investigation, to Mr. Perkins as our program

18  manager, and they would determine whether or

19  not it needed to go any further or routed to

20  any other agency.

21        Q.   Do you know if there were any other

22  vehicles for investigation besides the one

23  that was used in this investigation?

24        A.   There was an active duty

25  investigations unit assigned, but I never

1    talked to any of them.

2        Q.   Do you know if there was a protocol

3    for how to do an investigation like this

4    amongst this program that you were involved in

5    on the civil side?

6        A.   Not to my knowledge.

7        Q.   Okay.  They didn't have another

8    Internal Affairs Department that would come in

9    outside of your department?

10       A.   From how it was explained to me,

11   depending on the program manager's review of

12   this investigation, they would bring in

13   somebody from personnel if needed, and that's

14   civilian personnel not assigned to the 81st

15   Security Forces Squadron, but I had never

16   talked to anybody.  To my knowledge, it never

17   got routed to them.

18       Q.   Did you ever make any effort to take

19   it to that level?

20       A.   I was informed, as I mentioned

21   earlier, by Seth Giddons, Chris Penick and Mr.

22   Perkins that it wouldn't go anywhere.

23       Q.   Okay.  You understood that you had

24   an opportunity -- you could've called HR on

25   your own and --

1       A.   How it was explained to me, I had to
2  go through my channels within the 81st
3  Security Forces Squadron first.
4       Q.   Okay.  And they said no to any
5  further --
6       A.   Yes, sir.
7       Q.   -- inquiry from your end?
8       A.   That's correct.
9       Q.   Okay.  Were you disciplined as a
10  result of this investigation?
11       A.   No, sir, outside of the immediate
12  post change.
13       Q.   Was that specifically discipline
14  that was told to you that was a result of this
15  investigation?
16       A.   I was told that it was an informal
17  learning lesson.
18       Q.   Who told you that?
19       A.   Seth Giddons.
20       Q.   Did he -- is he the author of that
21  comment, or did someone above him tell him
22  that to tell you?
23       A.   He told me that.
24       Q.   And he said -- he's the author of
25  that?

 1          A.   Yes.

 2          Q.   He didn't say I heard from my boss

 3     or --

 4          A.   No.  He said that he had heard, but

 5     he didn't give names.  He just said this is

 6     what's happening.

 7          Q.   You assumed that came from his

 8     supervisors?

 9          A.   Yes, sir.

10          Q.   Mr. Penick or Mr. Perkins?

11          A.    The operations I had mentioned,

12     Master Sergeant Phillips, Chris Porta, the

13     chief.

14          Q.   Okay.  So it came from the military

15     side?

16          A.   Yes, sir.

17          Q.   Do you know if they did any form of

18     investigation as it pertains to your actions

19     on that night at the Hard Rock on the military

20     side?

21          A.   Not to my knowledge.

22          Q.   Do you know if they did an

23     investigation in regard to Jason Jordan?

24          A.   I believe so.

25          Q.   Do you know if any other airmen or

1   augmentee --

2       A.   The Civilian Police Program, sir.

3       Q.   Right.  Civilian police personnel

4   were the subject of any investigation either

5   by the Police Augmentee Program or by the

6   military as a result of this incident?

7       A.   Not to my knowledge.

8       Q.   Okay.  I noticed in the paragraph

9   under background 2-2 --

10      A.   Okay.

11      Q.   -- it indicates that Air Force level

12   inquiry on determining the actions reported by

13   Soukup in order to determine whether any

14   additional administrative action would be

15   required and to assist the 81st Security

16   Forces Squadron on disposition of

17   administrative action for the involvement of

18   active duty personnel.

19          Does that say to you that there was

20   an investigation on the Keesler side, on the

21   military side?

22      A.   Yes, sir.  And I believe that --

23      MR. BELLINDER:  Object to the form.

24      A.   I believe that regards to Mr.

25   Jordan.

MR. STEWART:

Q.    Okay.  Do you know if any other
person was investigated besides Mr. Jordan?

A.    Not to my knowledge.

Q.    Do you know if there was another
person involved in an altercation with him at
the Hard Rock who was part of the active duty
military?

A.    Airman Dorack.

Q.    Dorack?

A.    Yes, sir.

Q.    Do you know if any investigation was
conducted with regard to Airman Dorack?

A.    How it was explained to me by Mr.
Giddons that he was never interviewed.

Q.    At all?

A.    At all.

Q.    Do you know why?

A.    How it was explained to me is
because he didn't get arrested.  He wasn't
apprehended or anything like that, they
just...

Q.    Did you see him do anything in your
opinion that warranted an investigation?

A.    I believe he instigated the entire

1    incident.

2         Q.   Let's do this, let's take a second

3    and look at your narrative.  I'd like to read

4    through it and talk about it in some detail

5    about this factual description that's

6    contained in the narrative.

7         A.   Yes, sir.

8         Q.   I understand you did not author

9    that, correct?  You didn't actually write

10   this?

11        A.   That's correct.

12        Q.   Did you do any writing?  Did you

13   submit any writing in response to this

14   investigation?

15        A.   I asked Mr. Penick if he needed me

16   to accomplish a statement, and he said that

17   this would -- this was that document.

18        Q.   Okay.

19        A.   But I didn't write anything.

20        Q.   You spoke with him?

21        A.   Yes, sir.

22        Q.   Took notes on your conversation?

23        A.   Yes, sir.

24        Q.   Have you read this narrative before?

25        A.   Initially when he provided it to me,

0b9b1392-b98b-4486-976a-4ab912ebf648

1    but that was some time ago.

2        Q.   If you would, take a minute and read

3    it very carefully.  I'm going to ask you if

4    you agree with it generally, and then we'll

5    talk about some specifics.

6        A.   (Witness reviewing document.)

7        Q.   For our purposes, I'm just referring

8    to the narrative.

9        A.   Okay.

10       Q.   Just the narrative.

11       A.   Yes, sir.

12       Q.   I saw you turning beyond that.  What

13   I'm talking about is the narrative that begins

14   on page 2, under paragraph 3-1 --

15       A.   Yes, sir.

16       Q.   -- and runs through the top of page

17   4.  You've read that?

18       A.   Yes, sir.

19       Q.   Is that accurate as a description of

20   the events that night?

21       A.   Yes, sir.

22       Q.   Does that appear to be based on

23   information that you gave to Mr. Penick -- is

24   it Mr.?

25       A.   Yes, sir.

```
1        Q.   If I call somebody Mr. and they're
2   supposed to be named by rank, would you tell
3   me, please, because I'm gonna do it sooner or
4   later.  Y'all are confusing me with the
5   civilian military side.
6        A.   Yes, sir.
7        Q.   You agree that that's an accurate
8   description of the events?
9        A.   Yes, sir.
10       Q.   For example, it says you were
11  engaged by several personnel to attend the
12  flight level meeting.  Who else asked you to
13  attend?  Do you recall?
14       A.   Al Nicholson.
15       Q.   Anyone else?
16       A.   Hal Miller invited me.  He was like,
17  hey, a bunch of us, referring to our shift,
18  but that's just how he referred to it.  I
19  didn't get specific names.
20       Q.   Have we already covered Hal Miller?
21  Is that someone we talked about earlier?
22            MS. STEEL:  Nicholson.
23  MR. STEWART:
24       Q.   Joshua Miller?
25       A.   Yes, sir.
```

1     Q.   Did you say Hal?

2     A.   Al Nicholson.

3     Q.   Al.  I'm sorry.  Al said that.  I'm

4  sorry.  I misunderstood you.

5          Anyone else that you can recall who

6  was involved in inviting you or inviting

7  others?

8     A.   Not that I recall.

9     Q.   And it indicates that there was one

10 member of the training section who was also

11 present besides active duty members.  Who was

12 that?

13    A.   I believe that was Chelsea McCall.

14    Q.   Do you know where she is?

15    A.   I do not, sir.  No.

16    Q.   What was her role?

17    A.   She worked in the training section.

18    Q.   Is that with you?

19    A.   No, sir.

20    Q.   That was on the --

21    A.   Not at that time.

22    Q.   That was the civilian side?

23    A.   That was the active duty side.

24    Q.   Active duty side?

25    A.   Yes, sir.  I believe at the time she

1    was a senior airman.

2         Q.    Do you know where she is now?

3         A.    No, sir.

4         Q.    Do you know where she's from?

5         A.    No, sir.

6         Q.    It indicates that you arrived at

7    12:45 a.m.?

8         A.    Yes, sir.

9         Q.    Where had you been?  Where had you

10   come from?

11        A.    I went to my residence first.

12        Q.    What time did you get off work?

13        A.    I believe I got relieved shortly

14   before midnight.

15        Q.    What time would the prior shift --

16   you have three shifts a day, right?

17        A.    Yes, sir.

18        Q.    Do you call them their traditional

19   titles?

20        A.    Days, swings and mids.

21        Q.    Days, swings and mids?

22        A.    Yes, sir.

23        Q.    Mids is the equivalent of graves?

24        A.    Yes, sir.

25        Q.    Okay.  So what were the shift times

¹   that would apply to those?  Were they set

²   times?

³        A.   Yes, sir.

⁴        Q.   Okay.  What time would days start?

⁵        A.   I believe they were 6:00 in the

⁶   morning to 2:00 in the afternoon.  Swings

⁷   would be 2:00 to midnight.  And then I want to

⁸   say mids would come in from midnight, and

⁹   there was like a -- like changeover process,

¹⁰  so they would be there I believe until like

¹¹  7:00.

¹²       Q.   Okay.  And you were working on

¹³  swings, right?

¹⁴       A.   Yes.

¹⁵       Q.   Okay.  You indicated there was a

¹⁶  newly-assigned member of your shift, Jason

¹⁷  Jordan --

¹⁸       A.   Yes.

¹⁹       Q.   -- who was present, right?

²⁰       A.   Yes.

²¹       Q.   What does AC1 mean?

²²       A.   I believe it's supposed to read A1C.

²³       Q.   It says that.  I'm sorry.  A1C.

²⁴       A.   Airman first-class.

²⁵       Q.   Okay.  So that's his title?

1          A.    His rank, sir.

2          Q.    His rank?

3          A.    Yes, sir.

4          Q.    You're right.

5                And you indicate in this report --

6    it's indicated in this report based on your

7    comments to this investigator that Jason

8    Jordan appeared to be mildly intoxicated?

9          A.    Yes, sir.

10         Q.    Is that your recollection as we sit

11   here today?

12         A.    Yes, sir, as best I recall it.

13         Q.    When you arrived, he was mildly

14   intoxicated?

15         A.    Yes, sir.

16         Q.    Okay.  And it goes on to describe

17   the fact that he was displaying large sums of

18   money to the bartender?

19         A.    Yes, sir.

20         Q.    And attempting to order drinks?

21         A.    Yes, sir.

22         Q.    And that there were people watching

23   him that were not part of the group?

24         A.    That's correct.

25         Q.    And watching his hands and his

1  money?

2      A.   Yes, sir.

3      Q.   And you told him that he should put

4  his money away and to limit his alcohol

5  consumption?

6      A.   Yes, sir.

7      Q.   Why did you tell him that?

8      A.   Basic situational awareness.  I

9  didn't want him to be compromised in any type

10  of altercation, get robbed.  Because we had

11  just gotten off of work, based off of my

12  experience in law enforcement, you put in a

13  tour of duty and then you drink on top of it,

14  you know, just --

15      Q.   Tired and drinking?

16      A.   Yes, sir.

17      Q.   That was your concern?

18      A.   Yes, sir.

19      Q.   And so Mr. Jordan would have come

20  off shift the same time you did?

21      A.   Yes, sir.

22      Q.   Do you know what time he arrived at

23  The Ledge?

24      A.   I don't recall, sir.

25      Q.   Do you know if he had any alcohol

1    before he arrived?

2         A.    Not to my knowledge.  I don't

3    recall.

4         Q.    And according to this, he appeared

5    to disregard your advice about putting away

6    your money and not drinking so much, right?

7         A.    That's correct.

8         Q.    At which point you tried to get

9    assistance from the nearest recognizable

10   active duty member associated with the group?

11        A.    Yes, sir.

12        Q.    Who was that?

13        A.    She was a female airman.  She worked

14   a different shift.  I don't recall.

15        Q.    Can you describe her?

16        A.    Caucasian, dark brown hair shoulder

17   length, approximately five eight in height.

18        Q.    Any name at all?

19        A.    I don't recall.

20        Q.    Do you know her rank?

21        A.    I know she was not an NCO at the

22   time, so she was not a sergeant.  I believe

23   she may have been a senior airman.

24        Q.    Do you recall your exact

25   conversation with her?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.   Basically I was like can you tell
2  him to put his money away, basically just as
3  an assist take, can you help me out.
4      Q.   Why did you feel the need to
5  intervene in Jason Jordan's circumstances when
6  you did that?
7      A.   Well, one, out of direct concern.
8  He was on my shift, so I didn't want anything
9  to come back to harm his career.  Him being a
10 new airman, I didn't want a reputation of
11 negativity to impact, you know, possible
12 career progression, him being as new as he
13 was.
14           And the big concern was safety.  At
15 the time, our squadron was conducting
16 bystander intervention training, so it was
17 really at the forefront of my mind to utilize
18 my resources and make it applicable so the
19 other airmen could really make that training
20 apply to real-world circumstances.
21     Q.   So you took it as a training
22 opportunity?
23     A.   Well, initially it was safety
24 reasons, but being a field training officer,
25 if you can take anything and turn it into a

0b9b1392-b98b-4486-976a-4ab912ebf648

1    training application, then, yes.

2         Q.    Do you know who the people were that

3    were looking at his money?

4         A.    No, sir.

5         Q.    Was there any problem after this

6    that involved those people?

7         A.    I believe they were just like in our

8    area, which kind of struck me as odd because I

9    didn't know them.  Nobody in our direct group

10   interacted with them.  So basically they were

11   strange to me.  I perceived it as they were

12   strange to our group, being the active duty

13   military, our shift personnel.

14        Q.    Right.  My question was, was there

15   any problem involving those people at Hard

16   Rock?

17        A.    Not to my knowledge.

18        Q.    None of them assaulted anybody?

19        A.    I don't recall.

20        Q.    They weren't involved in the facts

21   that are operative to this lawsuit, were they,

22   in terms of --

23        A.    No.  No, sir.

24        Q.    -- doing something to somebody?

25        A.    No, sir.

1     Q.   The concerns you had did not come to
2  fruition with regard to those people?
3     A.   That's correct.
4          MR. BELLINDER:  Object to the form.
5  MR. STEWART:
6     Q.   Do you understand my question?
7     A.   I do.
8     Q.   What did the female airman do in
9  response to your instructions?
10     A.   I believe that she did engage and
11  interact with Jason Jordan, but it was a club.
12  You know, it was fairly crowded.  I couldn't
13  hear the exact wording, but it didn't look
14  confrontational.  There wasn't any aggression
15  from her, like I didn't -- what I would
16  interpret as aggressive behavior or putting
17  hands on him or taking his money or anything
18  like that.
19     Q.   Okay.  Did you feel like you didn't
20  have the authority to give him instruction
21  like that yourself?
22     A.   I believe I did as a supervisor, as
23  the shift supervisor, but it was bringing more
24  people in to help me out.
25     Q.   Was the person that you told -- and

0b9b1392-b98b-4486-976a-4ab912ebf648

1   you don't have her name, but was she a higher

2   rank than Airman Jordan?

3        A.   Yes, sir.

4        Q.   Okay.  Did she come back to you and

5   tell you he said whatever, any response?  Did

6   she give you a response of what he said?

7        A.   No, sir.

8        Q.   Did you follow up at all?

9        A.   Visually.

10       Q.   Okay.  How much time passed from

11  that conversation until what happens next,

12  which appears to be verbal confrontation with

13  someone else?

14       A.   Minutes.  It wasn't a long duration.

15       Q.   One or two minutes before, or do you

16  know?

17       A.   Maybe within less than five.

18       Q.   Okay.  And then you indicate that

19  there was a -- you observed a male airman from

20  mid shift -- is that Dorack?

21       A.   Yes, sir.

22       Q.   -- becoming verbally confrontational

23  and visibly agitated with Jordan?

24       A.   Yes, sir.

25       Q.   You actually hear what was said?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.   His physical display, body language,
2  from where I was standing due to the noise, I
3  just -- I took it as confrontational behavior.
4      Q.   Can you recall -- and I've asked you
5  this, but just to be clear, you don't know
6  what kind of attire he was wearing?
7      A.   I don't recall.
8      Q.   Was it dark or light colored?
9      A.   It may have been a light color
10 shirt, I believe maybe jeans.
11     Q.   Was he with anyone?
12     A.   He was with like his mid shift
13 personnel.  He was with the Security Forces
14 group of people.
15     Q.   And they were near the bar area?
16     A.   Yes, sir.
17     Q.   Have you seen the video of this
18 incident?
19     A.   I did.  Yes, sir.
20     Q.   Can you identify him on the video?
21     A.   I probably could, depending on the
22 quality of the video.
23     Q.   Is he one of the two guys --
24 eventually you see two guys leaning back on
25 the bar after things evolved where Jason ends

1   up on the ground with his wife.  Do you recall

2   that?

3       A.   Vaguely.

4       Q.   But it was before that that this

5   verbal confrontation occurred?

6       A.   Yes, sir.

7       Q.   And there are two guys with light

8   shirts leaning on the bar.  Do you think that

9   -- do you remember any of the guys, or do you

10   know?

11       A.   Memory is vague, but if I -- I'm

12   sure if I were to see it -- and, again, based

13   off quality -- I might be able to identify

14   him.

15       Q.   Okay.  Did you see any -- you said

16   there was a verbal confrontation and visible

17   agitation with Jordan.  Did you see any

18   visible agitation with Dorack?

19       A.   Yes.

20       Q.   What was he doing?

21       A.   It appeared that he was yelling.  He

22   was very animated with his hand and arm

23   gestures.  He closed in, as far as like

24   personal space, invaded Jason Jordan's

25   personal space.

1     Q.   How far were you from that when it

2  occurred?

3     A.   I would approximately say 15 to 20

4  feet.

5     Q.   And Jason Jordan hadn't done

6  anything out of the ordinary up to that point?

7     A.   No, sir.

8     Q.   He was perfectly well-behaved and

9  normal up to that point?

10     A.   Yes.

11     Q.   Then what happened?

12     A.   It appeared as if Dorack, in simple

13  terms, assaulted Jordan.  There was yelling

14  and kind of like what I would consider a

15  pushing match.  At which point, I interjected.

16  I remember David Reimer came to assist me as

17  far as like breaking up the fight.

18     Q.   Now, this is over by the bar, right?

19     A.   In that area.  If I recall --

20  because I haven't been really to the Hard Rock

21  since -- there was like a dance floor adjacent

22  to that area.  So there was a bar, and I

23  believe how we were positioned, to our right

24  was the dance floor and to the left was the

25  entrance to The Ledge.

1      Q.   Let me see if I'm -- the way it's

2   described here -- let me make sure this is

3   accurate.  You observed the mid shift airman

4   becoming verbally confrontational and visibly

5   agitated with Jordan?

6      A.   Yes, sir.

7      Q.   And then at that point, you

8   physically separated Jordan and the male

9   airman by standing between them?

10      A.   Yes, sir.

11      Q.   And you attempted to get Jordan out

12   of the nightclub?

13      A.   Yes.

14      Q.   Why did you want Jordan out of the

15   nightclub?

16      A.   He was my subordinate, if you will.

17      Q.   He was the only one that was your

18   subordinate?

19      A.   Al Nicholson was on my shift and

20   Josh Miller.  As a shift supervisor, they

21   worked for me.

22      Q.   Okay.  Did you instruct or ask that

23   anyone address Dorack's behavior?

24      A.   I believe some people from mid shift

25   like came to his proximity, but that was

1   pretty much -- I believe David Reimer may have
2   said something along the lines of like you
3   guys need to leave, too, but Jason Jordan, you
4   know, being my subordinate, I had more of a
5   matter of concern with him, getting him out of
6   the immediate area.
7        Q.   Did you see Mr. Jordan engage in the
8   verbal confrontation back?  Did he respond
9   back to it?
10       A.   It appeared that way, but I don't
11  recall dialogue.
12       Q.   It was a two-sided confrontation?
13       A.   Yes, sir.
14       Q.   Do you have any idea of the subject
15  matter of that confrontation?
16       A.   After the fact, what was explained
17  to me was the female who was initially
18  assisting me with trying to get Jordan to put
19  his money away, etcetera, had a relationship
20  with Dorack, and Dorack just I guess mistook
21  Jordan -- their conversation as maybe
22  something, you know, in the form of jealousy
23  or engaged in that regard.
24       Q.   Do you know if Dorack was in a
25  relationship with that girl at the time?

1      A.    Outside of what I was told after the

2   fact, but not going into that situation, no.

3      Q.    Who told you those facts?

4      A.    Seth Giddons.

5      Q.    So at this point, we have

6   essentially an argument between two Keesler

7   Air Force active duty personnel?

8      A.    Yes, sir.

9      Q.    Inside of The Ledge?

10      A.    Yes, sir.

11      Q.    Let me ask this, did it ever -- did

12   this event ever involve -- other than the Hard

13   Rock security and Biloxi police officers, did

14   it ever involve any non Keesler Air Force

15   personnel or private augmentee officer?

16      A.    As far as the incident goes?

17      Q.    The actual exchange of people inside

18   The Ledge.

19      A.    Not to my knowledge.

20      Q.    Of course, the Biloxi police didn't

21   go inside, except for the foyer.  So this

22   entire episode, this incident, exchange of --

23   whether verbal confrontations or any exchange

24   of blows or anything that occurred was all

25   Keesler personnel?

1     A.   Yes, sir.

2     Q.   Okay.  There was no outside person

3 who was an unknown assailant that came upon

4 someone and hurt them, was there?

5     A.   No, sir.

6     Q.   This wasn't a crime of opportunity?

7 Do you know what that means?

8     A.   Yes, sir.

9     Q.   In your training, you understand

10 that that's because of the location, someone

11 sneaks up and surprises and hurts somebody or

12 steals, it wasn't like that?

13     A.   That's how I interpreted the

14 individuals watching Jordan and his money.

15 That's how I --

16     Q.   Potential?

17     A.   Potential, yes, sir.

18     Q.   As a potential, but that didn't

19 happen in this case?

20     A.   No, sir, not to my knowledge.

21     Q.   This was an argument between two --

22     A.   Two individuals.  Yes, sir.

23     Q.   Potentially over a girl, maybe

24 mistakenly?

25     A.   Yes, sir.

¹          Q.    Okay.  You separated the two of them

²     and then tried get Jordan out of the

³     nightclub?

⁴          A.    Yes, sir.

⁵          Q.    Who all tried to get Jordan out of

⁶     the nightclub?

⁷          A.    Myself and David Reimer.

⁸          Q.    Did you go in the direction of the

⁹     exit door with them?

¹⁰          A.    Yes, sir.

¹¹          Q.    Did he cooperate?

¹²          A.    I believe to the best of his

¹³     ability, given being sleep deprived and

¹⁴     consumption of alcohol.

¹⁵          Q.    It wasn't just alcohol alone, it was

¹⁶     fatigue and alcohol?

¹⁷          A.    Yes, sir.

¹⁸          Q.    In your opinion?

¹⁹          A.    In my opinion, yes, sir.

²⁰          Q.    Are you aware of any blood testing

²¹     that was ever done on Jason Jordan --

²²          A.    No, sir.

²³          Q.    -- to determine his level of

²⁴     intoxication?

²⁵          A.    After the fact, I was informed that

0b9b1392-b98b-4486-976a-4ab912ebf648

1    -- I think Biloxi PD, but that was hearsay.

2         Q.    Did you ever hear a blood alcohol

3    level?

4         A.    No, sir.

5         Q.    You're a training police officer?

6         A.    Yes, sir.

7         Q.    Do you have any background in

8    alcohol crime investigation?

9         A.    Yes, sir.

10        Q.    Did you do any testing or analysis

11   of Mr. Jordan to determine whether he was

12   under the influence of alcohol?

13        A.    Nothing formal, but based off of my

14   observation, yes, sir.

15        Q.    What was your belief?

16        A.    I believe that he was impaired.  At

17   that point, based off of the nystagmus in his

18   eyes, some of the -- just behavior patterns

19   that was not indicative of what I knew on a

20   personal level with Mr. Jordan working for me.

21   He was a little bit more outspoken.  So, yeah,

22   the -- like slurred speech, motor skills was

23   impacted as well.

24        Q.    How long had you been working with

25   Mr. Jordan before this incident?

1      A.    I want to say a month or so.

2      Q.    Okay.  And in the course of that,

3  had you ever seen him in an informal setting

4  where there was alcohol?

5      A.    No, sir.

6      Q.    So you had never been out drinking

7  with him before?

8      A.    No, sir.  This is why I got invited,

9  just people were trying to get me to interact

10  on a social level with the shift, if you will.

11      Q.    That was your first time to do that,

12  particularly with Jason Jordan, right?

13      A.    Yes, sir.

14      Q.    So you never seen how he reacts to

15  alcohol?

16      A.    No, sir.

17      Q.    Do you have any idea whether he

18  ingested anything besides alcohol?

19      A.    I didn't know if he had or not.

20      Q.    In terms of impairment, you agree

21  that --

22      A.    Yes, sir.

23      Q.    -- you can't tell by looking at

24  someone, with the observations you made what

25  actually was causing impairment, right?

1     A.   That's correct.

2     Q.   And you can't tell when it started?

3     A.   That's correct.

4     Q.   Or what was consumed or ingested to

5  create it?

6     A.   That's correct.

7     Q.   Okay.  It says you separated Jordan

8  and the male airman by standing between them

9  and attempted to get him out of the nightclub

10  and that the two continued to be verbally

11  aggressive with each other?

12     A.   Yes, sir.

13     Q.   And then his wife arrived in the

14  area.  So all this occurred before Alyssa

15  Jordan responded to Jason Jordan's area,

16  correct --

17     A.   Yes, sir.

18     Q.   -- this verbal confrontation?

19          Do you recall how long this entire

20  verbal confrontation lasted?

21     A.   Several minutes.

22     Q.   Okay.  Again, two-sided --

23     A.   Yes, sir.

24     Q.   -- verbal --

25     A.   It -- it was -- it was two-sided,

1  but how I perceived it, Mr. Dorack was more

2  aggressive.

3       Q.   Did he try to pull away from people

4  and go toward Jason Jordan?

5       A.   Yes, sir.

6       Q.   Did people have to physically stop

7  him?

8       A.   I don't recall.  There was so many

9  people in the area.

10      Q.   Did Jason Jordan as you led him away

11  from the area turn and try to go back to

12  engage Mr. Dorack?

13      A.   Yes, sir.

14      Q.   Did you have to stop him?

15      A.   Yes, sir.

16      Q.   Did Sergeant Reimer stop him?

17      A.   We were attempting to do that.

18      Q.   Was Sergeant Reimer his superior

19  officer on the date of this incident?

20      A.   By rank, but not by title.

21      Q.   Did he have the authority to order

22  him to do anything at that point?

23      A.   Yes, sir.

24      Q.   Did he tell him to stop?

25      A.   I believe so.

1          Q.   And did Mr. Jordan, Airman Jordan

2    continue on toward and try to engage Dorack?

3          A.   It was mutual.  How I recall it,

4    they were coming together.  So Mr. Dorack was

5    trying to make contact with Jordan

6    simultaneously.

7          Q.   The person you identified with the

8    plaid shirt, what was his name again?

9          A.   Shawn Hargraves.

10          Q.   Was Shawn Hargraves involved in that

11    exchange at all?

12          A.   I remember him being in the area,

13    but I -- you know, people were talking.  I

14    don't know in what regard if he was I guess

15    taking place in any kind of verbal or

16    otherwise confrontation.

17          Q.   What shift was Shawn on?

18          A.   He was on my shift.

19          Q.   Okay.  And then all that happens,

20    and then Alyssa Jordan responds to the area?

21          A.   Yes, sir.

22          Q.   And then what happens?

23          A.   How I recall it, I recall Jason and

24    Alyssa at one point falling to the ground.

25    She was assisting or attempting to assist

0b9b1392-b98b-4486-976a-4ab912ebf648

1    myself and Mr. Reimer in, you know, trying to

2    get him up off of the ground and out of the

3    area.  Basically she was just trying to assist

4    us.

5         Q.   What did she say to Jason when she

6    first arrived?

7         A.   I don't recall.  I think she

8    identified herself to let him know --

9         Q.   Did you ever hear -- while you were

10   trying to control Jason and keep him from

11   going back over and reengaging with Dorack,

12   did you ever hear Jason use any curse words?

13        A.   Not to my recollection.

14        Q.   None at all?

15        A.   No, sir.

16        Q.   Is it possible that he did and you

17   just don't remember?

18        A.   It's possible.

19        Q.   Was he yelling?

20        A.   Yes, sir.

21        Q.   Was he bumping into other people?

22        A.   Not that I recall.

23        Q.   Did he make contact with anyone

24   else?

25        A.   Not that I recall.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.    What about Dorack, was he cursing?

2      A.    Yes, sir.

3      Q.    Did he knock over anyone or bump

4  into anyone else?

5      A.    It appeared that while he was trying

6  to get in proximity of Jordan, he was

7  maneuvering around people.  That's how I

8  recall it.

9      Q.    Did you at any point -- while this

10 initial confrontation was going on, did you

11 seek the assistance of Hard Rock security?

12     A.    I believe somebody had mentioned

13 getting a wheelchair, and I think that I

14 perceived somebody was doing that and working

15 on that process while I was attempting to make

16 contact with Jordan, but everything was just

17 so fast that I didn't leave the area to get

18 security or anything like that or staff.

19     Q.    It was very quick?

20     A.    Yes, sir.

21     Q.    And did you ultimately look at video

22 and see video of Hard Rock security personnel

23 bringing a wheelchair into that area?

24     A.    I vaguely recall.

25     Q.    Okay.  It says while attempting to

0b9b1392-b98b-4486-976a-4ab912ebf648

¹  gain control of Jordan, the male airman

²  reengaged Jordan prompting another

³  altercation.

⁴         A.    Yes, sir.

⁵         Q.    The first episode was described as a

⁶  verbal confrontation and visible agitation.

⁷  Are you describing that as a physical

⁸  altercation, that first episode?

⁹         A.    It was more verbal than anything,

¹⁰ just maybe a pushing match.

¹¹        Q.    Did they actually strike each other

¹²  with hands?

¹³        A.    It appeared that way.

¹⁴        Q.    Okay.  Like multiple strikes or

¹⁵  pushing?

¹⁶        A.    Yes, sir.

¹⁷        Q.    Not balled fists and punching, but

¹⁸  just --

¹⁹        A.    That's correct.  Just pushing.

²⁰        Q.    -- hands on the chest type of stuff?

²¹        A.    Yes, sir.

²²        Q.    Did anybody get knocked down or

²³  pushed back hard?

²⁴        A.    I don't recall.  I do remember

²⁵  seeing somebody like taking a few steps back,

1    but not pushing to the ground.

2         Q.    More like just chest bumping or --

3         A.    Yes, sir.

4         Q.    -- posturing?

5         A.    Yes, sir.

6         Q.    Okay.  No actual punching, fist

7    fight?

8         A.    That's correct.

9         Q.    Okay.  And then the second episode

10   you described as prompting -- reengaged Jordan

11   prompting another altercation.  What happened

12   there?

13        A.    It appeared that Dorack basically

14   took the opportunity seeing that Jordan was on

15   the ground and reengaged and looked like he

16   was attempting to put hands on him.

17        Q.    So that's when -- when Jordan and --

18   his wife had already come and they had fallen

19   down, that's when Dorack engaged him, is that

20   what you're saying?

21        A.    That's -- yes, sir.

22        Q.    Onto the floor there?

23        A.    Yes, sir.

24        Q.    Okay.  So after Alyssa responds to

25   Jason, does she physically come in contact

1   with him?

2        A.   With Dorack or Jason?

3        Q.   With Jason.

4        A.   Yes, sir.

5        Q.   Did she hug on him or just try to

6   get control of him?

7        A.   It appeared that way.  Yes, sir.

8        Q.   And then this is when Dorack -- they

9   fall down somehow?

10       A.   Yes.

11       Q.   Do you know how they fell down?

12       A.   I think it was just like they

13  stumbled, lost their footing.

14       Q.   There wasn't anything there that

15  caused them to fall?

16       A.   Maybe spilled alcohol or something

17  like that on the floor.

18       Q.   Did you see a substance on the

19  ground?  You said maybe.  Did you actually

20  see --

21       A.   I did not.  No, sir.  I could smell

22  alcohol everywhere, so I assume.

23       Q.   There were people there drinking

24  alcohol?

25       A.   Yes, sir.

1        Q.   Okay.  And people that may have just
2    been shoving each other.  Did they have drinks
3    in their hands?
4        A.   Not that I recall.
5        Q.   Do you recall the other people
6    around them?  Did they have drinks?
7        A.   Yes, sir, adjacent to the bar.
8        Q.   Okay.  Was it a carpeted area or a
9    hard floor?
10       A.   I believe it was hard floor.
11       Q.   The entire area, that you recall?
12       A.   To my knowledge, yes, sir.
13       Q.   Okay.  Did you actually see Jason
14   Jordan slip and fall in a liquid substance?
15       A.   No, sir.
16       Q.   Did you see Alyssa Jordan slip and
17   fall in a liquid substance?
18       A.   No, sir.
19       Q.   Did you at any point see a liquid
20   substance or any other substance on the
21   ground --
22       A.   Yes, sir.
23       Q.   -- causing the fall, in the same
24   area where they fell?
25       A.   Yes, sir, adjacent to the bar.

1      Q.    How big was that area of liquid?

2      A.    Maybe a square foot, like a tile.

3      Q.    Okay.  Do you know if either one of

4   them were injured in that process?

5      A.    Not to my knowledge.

6      Q.    Did they complain to you that they

7   needed medical assistance immediately after

8   that?

9      A.    Not to my knowledge.

10      Q.    Did Jason Jordan say time to go

11   home, Alyssa, let's go?

12      A.    I couldn't hear it.  At this point,

13   I was being engaged by, later to find out,

14   Hard Rock staff.

15      Q.    Okay.  Hard Rock staff responded

16   when Jason and Alyssa fell down initially, is

17   that your recollection?

18      A.    That's how I recall it.  Yes, sir.

19      Q.    And that's where the Dorack episode

20   occurred?

21      A.    Yes, sir.

22      Q.    And that was as they were stepping

23   away from the bar, right?

24      A.    Yes, sir.

25      Q.    Okay.  What did Dorack do in the

1  second -- when he reengaged Jordan, what
2  exactly happened?
3       A.   It looked like he was just trying to
4  grab him by his clothing, some more pushing,
5  some more verbal yelling.
6       Q.   No actual exchange of blows?
7       A.   Not that I could see from my
8  perspective.
9       Q.   Okay.  Has anyone told you that they
10 saw an exchange of blows between Dorack and
11 Jordan at that time?
12      A.   No.
13      Q.   Okay.  And then what happened after
14 that?
15      A.   I remember we were -- myself and
16 Reimer and Alyssa, we were attempting to get
17 Jason up, and at one point, I remember
18 somebody grabbing me, standing me up and
19 putting their hands around my neck, and then I
20 was placed up against the wall.  I assumed it
21 was staff, just based off of the attire and
22 what everybody else was wearing in terms of
23 street clothes.
24           As soon as I identified it as staff,
25 I put my hands up, and it was more of like a

<sup>1</sup>  compliance, and I just stood there.  I was

<sup>2</sup>  told to leave, and I was like, okay, you know,

<sup>3</sup>  let me try and get my people out, let me take

<sup>4</sup>  care of my people.  I remember seeing a hand

<sup>5</sup>  pointed towards the exit and being told to

<sup>6</sup>  leave.  I attempted to leave, and I remember

<sup>7</sup>  being engaged by three males.  At the time, I

<sup>8</sup>  couldn't identify them.

<sup>9</sup>       Q.   We're gonna come back to that.

<sup>10</sup>      A.   Sure.

<sup>11</sup>      Q.   This is in the foyer area where that

<sup>12</sup> occurred?

<sup>13</sup>      A.   Yes, sir.

<sup>14</sup>      Q.   Okay.  While we're still in the

<sup>15</sup> other area, where you said someone picked you

<sup>16</sup> up --

<sup>17</sup>      A.   Yes, sir.

<sup>18</sup>      Q.   -- what were you doing at the time?

<sup>19</sup>      A.   Attempting to get Jason off of the

<sup>20</sup> ground.

<sup>21</sup>      Q.   Were you physically engaged with

<sup>22</sup> Jason Jordan --

<sup>23</sup>      A.   Yes, sir.

<sup>24</sup>      Q.   -- at that point?

<sup>25</sup>           You had both of your hands on his

1   body?

2         A.    I recall, you know, trying to grab

3   him, so possibly both hands --

4         Q.    Was he resisting your efforts?

5         A.    Yes, sir.

6         Q.    Was he strongly resisting your

7   efforts?

8         A.    I would say so.  Yes, sir.

9         Q.    Did you increase force in response

10  to his resistance?

11        A.    Just by pulling -- trying to -- in

12  an attempt to pull him up.  Yes, sir.

13        Q.    Just to pull him up?

14        A.    Yes, sir.

15        Q.    But he didn't want any part of that,

16  right?

17        A.    No, sir.

18        Q.    So you continued to add force to try

19  to overcome his force, right?

20        A.    Yes, sir.

21        Q.    Okay.  Was there someone else

22  involved in that exchange?

23        A.    David Reimer, he was assisting me.

24        Q.    Was there anyone else involved in

25  that exchange?

1          A.   I recall Alyssa being there, but as
2     far as around me, I do recall Dorack, but we
3     were trying to separate them at that time.
4          Q.   Dorack wearing a white shirt was
5     involved in that exchange when you were
6     removed from --
7          A.   I believe so.
8          Q.   Okay.  And you eventually ended up
9     standing by a column; is that correct?
10         A.   Yes, sir.
11         Q.   In relation to that column, did that
12    occur next to that column, near that column?
13         A.   Adjacent to that area.  Yes, sir.
14         Q.   Was it right next to the column?
15         A.   I believe so.
16         Q.   Is that also an area where the
17    wheelchair was brought back and Jason was --
18    they tried to place Jason in a wheelchair; do
19    you recall that?
20         A.   I don't recall them trying to put
21    him in the wheelchair.  I remember vaguely
22    seeing a wheelchair in that area, but I didn't
23    see any attempt to put him in the wheelchair.
24         Q.   Okay.  There were Hard Rock security
25    personnel there with a wheelchair; do you

¹   recall that?

²         A.   After the fact.

³         Q.   Right.

⁴              So all this had happened before the

⁵   wheelchair, or you saw it after the fact?

⁶         A.   I saw it after the fact.

⁷         Q.   That they were actually there?

⁸         A.   Yes, sir.

⁹         Q.   Did you see a Hard Rock security

¹⁰  officer go and prop open the door to The Ledge

¹¹  so that the wheelchair could be rolled out?

¹²        A.   I don't recall that.

¹³        Q.   Do you know if Sergeant Reimer had

¹⁴  any conversation with Hard Rock security?

¹⁵        A.   I recall him trying to explain the

¹⁶  circumstance.  I don't know if it was staff or

¹⁷  security.

¹⁸        Q.   You indicated you were able to

¹⁹  verbally ascertain that Hard Rock at least

²⁰  employees were present, right?

²¹        A.   Visually.

²²        Q.   Visually?

²³        A.   Yes, sir.

²⁴        Q.   I'm sorry.  I said verbally.

²⁵              So you could tell by looking at them

<sup>1</sup> that they were security officers?

<sup>2</sup>     A.   Or staff.

<sup>3</sup>     Q.   Or staff.  Did they all have the

<sup>4</sup> same uniform on?

<sup>5</sup>     A.    It appeared that way, like a polo

<sup>6</sup> type shirt.

<sup>7</sup>     Q.   A polo shirt?

<sup>8</sup>     A.    The individual who had picked me up

<sup>9</sup> off the ground I believe was a polo type

<sup>10</sup> shirt.

<sup>11</sup>     Q.    Have you seen the other uniforms at

<sup>12</sup> Hard Rock -- do you recall a type of smock

<sup>13</sup> uniform that -- it's a pullover shirt, like a

<sup>14</sup> big pullover?

<sup>15</sup>     A.    Not really.

<sup>16</sup>     Q.    Okay.  Do you recall the color of

<sup>17</sup> the shirts?

<sup>18</sup>     A.   No, sir.

<sup>19</sup>     Q.   Do you recall if they had an

<sup>20</sup> insignia that said security?

<sup>21</sup>     A.   No, sir.

<sup>22</sup>     Q.   Do you recall if it said Hard Rock

<sup>23</sup> on the actual uniform?

<sup>24</sup>     A.   No, sir.

<sup>25</sup>     Q.   When you did visualize them, just

1  based on their size, did they appear to be

2  security officers?

3       A.   Yes, sir.

4       Q.   People that could handle themselves

5  pretty well?

6       A.   Yes, sir.

7       Q.   Did you have any doubt in their

8  ability to physically handle a person who

9  might be unruly?

10      A.   Yes, sir.

11      Q.   You did have that doubt?

12      A.   Just based off of my training

13 experience, just how it was handled -- I

14 didn't hear anybody identify themselves as

15 security, and based off of not being able to

16 recall seeing anything like labeled staff,

17 security or otherwise, I think that puts

18 individuals at a disadvantage.

19      Q.   So if there is a fight going on,

20 it's more important to identify yourself than

21 to protect the people?

22      A.   I think so initially.

23      Q.   Okay.  What good does identifying

24 yourself do?

25      A.   Outside individuals who may want to

1    interject or participate -- you know, just

2    basically it's a command and control

3    technique.  It identifies that, you know,

4    there's an authority presence.  So sometimes

5    all you have to say, based off of my

6    experience, stop, police, and once you

7    identify yourself as police and you're

8    recognized, based off of uniform or lettering

9    or words on the shirt, people will comply.

10        Q.   How many times did you announce

11   yourself as a police officer during that

12   episode?

13        A.   I don't recall.  I remember saying,

14   you know, these individuals work for me, I'm

15   their supervisor.

16        Q.   Did you ever say -- let me ask you

17   this, did you ever see Jason Jordan strike his

18   wife?

19        A.   No, sir.  I don't recall that.

20        Q.   Have you seen video that shows that?

21        A.   No, sir.

22        Q.   Have you ever looked for that in the

23   video?

24        A.   No, sir.

25        Q.   Did you ever say out loud in the

0b9b1392-b98b-4486-976a-4ab912ebf648

1    course of trying to subdue Jason that he

2    shouldn't hit a girl?

3         A.    I don't recall that.

4         Q.    Is it possible that you said that?

5         A.    It could be.

6         Q.    After the fact, has anyone told you

7    that they saw Jason Jordan strike a female,

8    his wife?

9         A.    In hearsay, rumor type setting.

10        Q.    Who told you that?

11        A.    Chris Penick.

12        Q.    What did he say?

13        A.    He phrased it as a question, much

14   like you're doing now.  It was like, Hey, do

15   you know if Jordan was striking his wife?

16        Q.    Did you ever actually talk to anyone

17   who actually said I saw Jason Jordan strike

18   his wife?

19        A.    No, sir.

20        Q.    And you didn't see that?

21        A.    No, sir.

22        Q.    And you haven't seen it on video?

23        A.    No, sir.

24        Q.    And you haven't looked for it on

25   video?

1        A.    No, sir.

2        Q.    Okay.  Did you speak with Alyssa

3    Jordan after this incident at all?

4        A.    Yes, sir.

5        Q.    Did she ever tell you that she was

6    struck by anyone?

7        A.    Not with an intent.  I recall that

8    she had mentioned something about being

9    mishandled by security personnel.

10       Q.    It was security personnel that she

11   attributed the mishandling to?

12       A.    Yes, sir.

13       Q.    Did she complain about Jason Jordan

14   pulling her to the ground?

15       A.    No, sir.

16       Q.    Did she complain about Jason Jordan

17   striking her in the face?

18       A.    No, sir.

19       Q.    Did she acknowledge that Jason at

20   any point struck her in the face?

21       A.    Not to me, sir.  No, sir.

22       Q.    Did she acknowledge that he swung at

23   her?

24       A.    No, sir.

25       Q.    Do you recall stating that you

¹  intended to handle this situation the way you

²  handled it in the military?

³         A.    Yes, sir.

⁴         Q.    What did that mean?

⁵         A.    Basically like keeping it at the

⁶  most minimum level without getting additional

⁷  leadership involved.  So an example, using

⁸  this particular circumstance, if there's two

⁹  airmen fighting, then you interject and

¹⁰  basically counsel them or verbally reprimand

¹¹  them or do paperwork, but not necessarily

¹²  arresting them or charging them, just

¹³  basically keeping it to a minimum.

¹⁴         Q.    So at the scene of this incident,

¹⁵  you said that, though, repeatedly?

¹⁶         A.    I remember saying like we're just

¹⁷  taking care of our own, let me take care of my

¹⁸  people.

¹⁹         Q.    So it's an Air Force fight, let's

²⁰  handle this the Air Force way?

²¹         A.    Yes, sir.

²²         Q.    Okay.  Up to the point that you were

²³  removed from interaction with Jason Jordan,

²⁴  were you able to get him under control?

²⁵         A.    I was attempting to do so.

1        Q.    Had you gotten him under control?

2        A.    No, sir.

3        Q.    He was not subdued at that point?

4        A.    No, sir.

5        Q.    He was continuing to struggle and

6    fight back?

7        A.    Yes, sir.

8        Q.    And he was fighting not just with

9    you but with how many other people?

10        A.    I recall David Reimer.

11        Q.    Just the two of y'all?

12        A.    And then Dorack.

13        Q.    At what point did Dorack enter that

14    second -- this is the third episode we're

15    talking about, right, because there was -- you

16    indicated Dorack was involved when Jason and

17    Alyssa fell down.

18        A.    Dorack was involved in the second.

19    I believe if there was a third altercation, I

20    was at that point being removed from the area.

21        Q.    Okay.  While you were standing

22    against the column, did you see any other

23    interaction with Jason Jordan, any other

24    people physically interacting with him?

25        A.    It appeared as if Alyssa and David

1    Reimer were still trying to help him.

2         Q.   Okay.  And that was not the Dorack

3    episode, you're talking -- Dorack was involved

4    when you were initially involved the two

5    times?

6         A.   Yes, sir.

7         Q.   The verbal confrontation and then

8    the second time that they engaged each other

9    with more chest bumping?

10        A.   That's correct.

11        Q.   But no swings?

12        A.   That's correct.

13        Q.   And then you engaged Jordan, Reimer

14   engaged Jordan.  Did you see Jordan punch

15   anyone --

16        A.   No, sir.

17        Q.   -- after that?

18        A.   No, sir.

19        Q.   Okay.  Did you see anyone else on

20   top of the pile with Jordan while you were on

21   the column looking at this altercation going

22   on?

23        A.   Not that I recall.

24        Q.   Okay.  Was Sergeant Reimer able to

25   control Jason Jordan by himself?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.    It did not look that way.  No, sir.

2      Q.    What did it take to get Jason Jordan

3    under control?

4      A.    I don't know.  I was out of the

5    area.  Basically what -- if we were to have

6    been able to get him up, get him in the

7    wheelchair and get him out of the area just

8    because he had fallen and it looked like on

9    his own accord -- at that point, just --

10   really just physically removing him from the

11   area, getting him out of a potentially violent

12   situation with Dorack and then just the amount

13   of people presence, you know, that could

14   attribute to safety-oriented issues while

15   you're trying to remove somebody.

16     Q.    And you gave Jason Jordan verbal

17   instructions?

18     A.    Yes, sir.

19     Q.    Would those be considered commands?

20     A.    Yes, sir.

21     Q.    Direct commands?

22     A.    Not so much direct like -- when you

23   refer to the military, like a lawful order,

24   direct orders, but direct as in, hey, we need

25   to leave.  Yes, sir.

1      Q.    You instructed him?

2      A.    Yes, sir.

3      Q.    And he knew you were his direct

4    supervisor?

5      A.    I would assume so.

6      Q.    Okay.  Did he comply with your

7    instructions?

8      A.    Not that point.  No, sir.

9      Q.    Had Jason Jordan complied with your

10   initial instruction that it was time to leave,

11   would any of this have happened?

12         MR. BELLINDER:  Object to the form.

13     A.    I don't believe.

14   MR. STEWART:

15     Q.    You don't believe?

16     A.    I don't believe so.

17     Q.    If Jason Jordan had responded to you

18   -- did you tell him to calm down and stop

19   being so out of control when he was trying to

20   reengage Dorack and Dorack was trying to

21   reengage him?

22     A.    Yes, sir.

23     Q.    Did he comply to that?

24     A.    No, sir.

25     Q.    Had he complied then, would any of

¹    this have happened?

²              MR. BELLINDER:  Object to the form.

³         A.    I don't believe so.

⁴    MR. STEWART:

⁵         Q.    And then at some point, you were

⁶    removed, and there was an additional

⁷    altercation that didn't involve you.  Do you

⁸    recall seeing that?  It was directly in front

⁹    of you if you were standing at the column.  Do

¹⁰   you recall that?

¹¹        A.    Vaguely.

¹²        Q.    And that involved -- continued to

¹³   involve Reimer and Jason Jordan's wife?

¹⁴        A.    That's how it appeared.

¹⁵        Q.    Do you know why Jason Jordan's wife

¹⁶   tried to engage him?

¹⁷             MR. BELLINDER:  Object to the form.

¹⁸   MR. STEWART:

¹⁹        Q.    Do you know?

²⁰        A.    No, sir.

²¹        Q.    Okay.  And at that point, there were

²²   security officers involved?

²³        A.    After the fact, I learned that's

²⁴   what their title position was.

²⁵        Q.    Hard Rock employees were involved?

1       A.   Yes, sir.

2       Q.   And they eventually broke that last

3   exchange up, correct?

4       A.   To my knowledge.

5       Q.   And by doing that, the way it ended

6   was to get Jason Jordan under control,

7   correct?

8       A.   Correct.

9       Q.   Not anyone else?

10      A.   Correct.

11      Q.   When other people were separated,

12  they didn't continue to struggle and fight,

13  did they?

14      A.   Not to my knowledge.

15      Q.   Is it fair to say that through the

16  course of this entire episode, Jason Jordan

17  was the one who continued to get progressively

18  agitated and fighting and resisting --

19      A.   That's correct.

20      Q.   -- and not taking instructions?

21      A.   Correct.

22      Q.   Okay.  You don't know if he was

23  disciplined from this at all?

24      A.   I believe he was put on a -- like

25  temporary relieved of duty.  So he wasn't on

1    my shift, but he was still working in another

2    capacity within the squadron.

3         Q.   Was there any report of domestic

4    violence made in the military?

5         A.   Not to my knowledge.

6         Q.   Would a person striking their wife

7    constitute domestic violence in the military?

8         A.   Yes, sir.

9         Q.   Do you have any option if you see

10   that as to whether you would have to report

11   that?

12        A.   No, sir, you have to report it.

13        Q.   Okay.  Did you personally make such

14   a report?

15        A.   No, sir.

16        Q.   What's your explanation for not

17   reporting that as it pertains to Alyssa

18   Jordan?

19        A.   I didn't see it warranted as a

20   domestic violence situation.

21        Q.   What did you think it was?

22        A.   I saw it as a wife trying to get her

23   husband up off the ground and out of a

24   dangerous situation.

25        Q.   Do you think -- had Alyssa stood

1  back, do you think the security officers would

2  have been able to continue to take him under

3  control?

4          MR. BELLINDER:  Object to the form.

5      A.   I'm not sure.

6  MR. STEWART:

7      Q.   They eventually did get him under

8  control without her assistance, right?

9      A.   I'm not sure.

10     Q.   Okay.  Do you know why she stopped

11  persisting to try to engage Jason physically?

12     A.   I think she was --

13          MR. BELLINDER:  Object to the form.

14     A.   -- physically removed.

15 MR. STEWART:

16     Q.   She was physically removed?

17     A.   Uh-huh (affirmative).

18     Q.   You don't think she got struck in

19  the face and sat backwards?

20     A.   I don't recall.

21          MR. BELLINDER:  Object to the form.

22 MR. STEWART:

23     Q.   You haven't seen that on the film?

24     A.   No, sir.

25     Q.   And by struck in the face, I mean

1    struck by Jason Jordan in the face?

2         A.   Correct.

3         Q.   You didn't see her --

4         A.   I did not see that.

5         Q.   You didn't see him swing --

6         A.   No, sir.

7         Q.   -- multiple times and then strike

8    her in the face?

9         A.   No, sir.

10        Q.   You didn't see the effects of her

11   head as if she had been struck?

12        A.   Not from my perspective.

13                        - - -

14              (Off the record.)

15   MR. STEWART:

16        Q.   Back on the narrative just a little

17   bit, couple questions about it and then move

18   on.

19              It indicates in your narrative that

20   you stated that Jordan fell under his own

21   accord bringing his wife to the ground with

22   him?

23        A.   Correct.

24        Q.   There was no -- you didn't reveal --

25   didn't explain to Officer Penick or Mr. Penick

¹ that there was any sort of slip and fall or --

²     A.    That's correct.  I think how he was

³ questioning me, he asked as if, you know, did

⁴ Dorack push him to the ground, and my answer

⁵ to that was it looked like on his -- he fell

⁶ on his own accord.

⁷     Q.    You didn't reveal any sources of --

⁸     A.    Correct.

⁹     Q.    -- slip and fall or anything?

¹⁰     A.    Correct.

¹¹     Q.    Okay.  Did you see how many drinks

¹² Jason Jordan received at the Hard Rock inside

¹³ The Ledge?

¹⁴     A.    I saw a few drinks, but I can't give

¹⁵ a number.  I don't recall the exact amount.

¹⁶     Q.    Are you sure he got off the same

¹⁷ time you did?

¹⁸     A.    As a shift supervisor, I get off

¹⁹ with changeover a little bit earlier.  That's

²⁰ why I was able to go to my residence and --

²¹     Q.    Do you know what time he got off?

²²     A.    I can only approximate, like maybe

²³ another 45 minutes after myself.

²⁴     Q.    So what time that night would he

²⁵ have gotten off -- that morning?

1    A.   Depending on where he was posted at,
2  maybe like 12:15, 12:20 timeframe.
3    Q.   Did he wear civilian clothes to
4  work?
5    A.   No, sir.
6    Q.   Do you know where he lived at that
7  time?
8    A.   I believe off-base housing.
9    Q.   Which is close to Keesler?
10   A.   That's correct.  Off Pass Road.
11   Q.   Kind of by the old V.A. property, in
12 that area?
13   A.   Yes, sir.
14   Q.   So he could have swung by and
15 changed --
16   A.   That's correct.
17   Q.   -- and come to the Hard Rock?
18   A.   Correct.
19   Q.   And you got there at 12:45?
20   A.   Correct.
21   Q.   Do you know what time this episode
22 occurred?
23   A.   Maybe within an hour or so.  I don't
24 recall the time.
25   Q.   Of your arrival?

 1        A.    Correct.

 2        Q.    Okay.  Did you see Alyssa Jordan

 3   drinking any alcohol that night?

 4        A.    No, sir.

 5        Q.    Do you know that she did or didn't?

 6        A.    I don't recall.

 7        Q.    As you walked into The Ledge that

 8   evening, do you recall there being staff

 9   personnel positioned at the doorway?

10        A.    I don't recall.

11        Q.    Do you recall seeing any staff

12   personnel inside The Ledge itself?

13        A.    Outside of bartender and cleaning

14   personnel, I didn't see any what I would

15   consider like security or like bouncers, if

16   you will like inside, but I do recall having

17   my ID checked when I was walking into the Hard

18   Rock.

19        Q.    Is it possible that was a security

20   person from Hard Rock who checked your ID?

21        A.    Could have been, or staff.  I don't

22   know how their operations work, if it has to

23   be security that checks ID.

24        Q.    Do you know how many of these

25   employees -- were they wearing blue shirts?

1    Do you remember that?

2         A.    It was dark.  I don't recall.

3         Q.    Do you remember how many -- of the

4    employees that you ultimately saw, do you know

5    how many actually responded?

6         A.    From my perspective, maybe four.

7         Q.    Could it have been as many as seven?

8         A.    Could be.

9         Q.    Have you watched the video to count

10   how many different security officers or Hard

11   Rock employees responded?

12        A.    How it was reviewed by me, I only

13   saw my portion of the event.

14        Q.    You didn't see the entire inside The

15   Ledge --

16        A.    No, sir.

17        Q.    Did you ever complain to the

18   employees who did respond that they should be

19   arresting or taking attention -- to spend

20   their attention on Airman Dorack?

21        A.    I don't recall specifically saying

22   his name because I didn't know his name at the

23   time.

24        Q.    Did you point out that guy over

25   there needs to be dealt with?

1        A.   I don't recall.

2        Q.   And eventually you were removed from

3    an episode and instructed to leave --

4        A.   Correct.

5        Q.   -- and pointed --

6        A.   Toward the exit.

7        Q.   Leave now?

8        A.   Correct.

9        Q.   And you said I've gotta get my guys

10   out of here --

11       A.   Correct.

12       Q.   -- or something like that?

13       A.   Correct.

14       Q.   You didn't say yes and leave, did

15   you?

16       A.   I think it was in the same motion as

17   making my way out and commenting I need, you

18   know, to get my people out of here.

19       Q.   Did you stop to watch your people to

20   make sure they got out, or did you

21   continuously walk out of the --

22       A.   Well, I was complying.  I was

23   walking out, but I was trying to like visually

24   assess where my people were because I lost

25   accountability of where everybody was at.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.   Did you stop walking?

2      A.   I was stopped by other individuals.

3      Q.   And then what happened?

4      A.   As -- how I recall it, as I was

5  walking through the main entry/exit to The

6  Ledge, multiple personnel grabbed me and like

7  physically pushed me up against the wall, and

8  how I would explain it, put me in a motion of

9  compliance as if you were going to place

10  handcuffs on somebody, wrist and elbow

11  manipulation to put my hands behind my back,

12  and I was just continually pushed up against

13  the wall.

14           I recall explaining like I'm

15  leaving, I was told to leave, like that's what

16  I'm doing.  And after that, I just -- as far

17  as dialogue goes, I don't recall much more

18  exchange.

19      Q.   Did you resist the effort to put on

20  the handcuffs?

21      A.   No, sir.

22      Q.   You freely passed your hands back --

23      A.   That's correct.

24      Q.   -- without tensing up or resisting?

25      A.   I may have tensed up because I

1    didn't know who the individuals were.  I

2    didn't recognize them as police or security.

3        Q.    What happened after that?

4        A.    I remember being placed in handcuffs

5    and taken in a different direction from that

6    primary entry/exit way into The Ledge, and it

7    was by an individual in a suit.  Based off of

8    my experience in law enforcement, I didn't

9    know if he was a plain-clothes officer maybe

10   working another case or an off-duty officer,

11   nor was he identified or explained any of

12   that.

13           So thus by compliance, I recall the

14   individual had control via the linking chain

15   on the handcuffs, and I was being led towards

16   a doorway, and I remember being corrected as

17   if I was walking too fast or like offset via

18   the linking chain, so basically, you know,

19   controlling my movement.

20           When we got out of the immediate

21   area of The Ledge, I recall being put in an

22   elevator, and I think how I was positioned in

23   the elevator, I had leaned up against the

24   back, and I felt the audible -- well, I heard

25   an audible click and the motion of the

1  handcuffs as if they were tightening down
2  still.  At that point, I recall asking and
3  stating, Hey, can I have these double locked?
4  I remember saying that multiple times because
5  the handcuffs were really just tightening down
6  on my wrists.  The placement didn't feel
7  correct as far as the handcuffs.  It felt a
8  little bit higher into the forearm versus the
9  actual wrist itself, and they just continued
10 to tighten down.  And I repeatedly asked, Can
11 you double lock these?  That never happened.
12            When we got to the -- what I assume
13 was a basement from the elevator, I recall
14 multiple like -- I didn't assume they were
15 staff based on how they were dressed.  It
16 looked like they were patrons with cell
17 phones.  It appeared as if they were taking
18 some sort of picture or video, and then I
19 recall their phones being pointed in my
20 direction.  And then I was placed in a small
21 room, what I would consider like an interview
22 room.
23      Q.   Was it marked as such, saying
24 interview room?
25      A.   I don't recall.

1     Q.   Did you believe that someone took

2  your picture?

3     A.   Yes, sir.

4     Q.   Were those patrons?

5     A.   Yes, sir.  The individuals standing

6  at the base -- wherever -- I don't know if it

7  was a basement, what floor we were on, but in

8  that immediate area as we were talking towards

9  what I would perceive as the interview room.

10     Q.   At any point, did the person who

11  took you down there ever adjust your

12  handcuffs?

13     A.   No.

14     Q.   He never did?

15     A.   Nuh-uh (negative).

16     Q.   Did he ever put a key in your

17  handcuffs?

18     A.   No.

19     Q.   Never happened?

20     A.   I don't recall it.

21     Q.   You never saw that in the video?

22     A.   No.

23     Q.   How long were you in handcuffs do

24  you think?

25     A.   It felt like over an hour.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.   Did you ever measure the time

2  looking at the video?

3      A.   No, sir.

4      Q.   How did you get out of the

5  handcuffs?

6      A.   I believe it was during the chain of

7  custody or transfer of custody from Hard Rock

8  to Biloxi PD.

9      Q.   At any point, did you have any

10  discussion with anyone from Hard Rock from the

11  time that you were told to leave by the column

12  -- have you told us the complete conversation

13  there already?

14      A.   To my knowledge.

15      Q.   Okay.  From that point forward, did

16  you talk to any other Hard Rock employees?

17      A.   I only remember the individual in a

18  suit.  That was my primary interaction.

19      Q.   What did you say to him?

20      A.   I was requesting if I was gonna be

21  placed in handcuffs, to have them double

22  locked.

23      Q.   Okay.  Did you say anything else to

24  him?

25      A.   I recall reemphasizing like I was

¹  told to leave, I was trying to leave, I'm

²  trying to get my people out, and that was

³  pretty much all that I recall, just really

⁴  emphasizing, like we're trying to get out of

⁵  here, I'm trying to get my people out, this is

⁶  how we do things, you know, we're just

⁷  attempting to leave.

⁸        Q.   Do you know as part of his -- as an

⁹  active duty airman, are they issued bayonets?

¹⁰       A.   As airmen?

¹¹       Q.   Yeah.

¹²       A.   Not in a nondeployable setting.

¹³       Q.   Is there any circumstance where they

¹⁴  would have one of those because of the

¹⁵  military?

¹⁶       A.   In my experience in multiple

¹⁷  deployments and active duty, I've never been

¹⁸  issued a bayonet.

¹⁹       Q.   That's not something -- that's old

²⁰  school to have one?

²¹       A.   Correct.

²²       Q.   Do you know if Jason Jordan has one?

²³       A.   Not to my knowledge.

²⁴       Q.   Did you ever hear him say that he

²⁵  was gonna cut somebody's head off if he had

1   his bayonet?

2       A.   No, sir, I don't recall that.

3       Q.   Inside the interview area or at any

4   point, tell me about any other conversations

5   you had with the person in a suit.

6       A.   I remember being in there -- it felt

7   like I was alone.  I don't recall any like

8   questioning or anything like that.  I just

9   felt like I was being just held there.

10      Q.   Was there anybody else ever in there

11   with you?

12      A.   I recall the door opening and

13   closing, but I don't recall specific

14   individuals.  I just assumed it was like a

15   protocol, like make sure I'm still there.

16      Q.   Was anyone with you on the night of

17   this incident that arrived and left with you?

18      A.   My wife.

19      Q.   Is your wife depicted in any of

20   these photographs I showed you?

21      A.   I didn't see her in there.

22      Q.   Is she standing behind you at the

23   column?

24      A.   Can I see that picture?

25      Q.   Absolutely.

1        A.    And it may have been by quality, I

2   just -- I don't recall it.

3        Q.    (Provides photograph.)

4        A.    Based off of the angle, this could

5   be her, but I just -- I do remember there was

6   a lot of people in the area.

7        Q.    Let me see those, please.

8        A.    (Witness complies.)

9        Q.    That is Exhibit A.  Look at Exhibit

10  B.  Behind the area, not inside the circle,

11  but up against the column it appears to be a

12  female.  Is that your wife?

13        A.    It could be.

14        Q.    Your wife was present?

15        A.    She was.

16        Q.    And she was in The Ledge?

17        A.    Correct.

18        Q.    Is there any reason why you didn't

19  list her as a witness?

20        A.    At one point, I thought she had

21  left.  She doesn't drink, you know.  So she

22  had mentioned about going down and playing

23  slots or something, and I don't recall --

24        Q.    Was she present in the interview

25  room after this incident?

1      A.    She may have been.  I don't recall.

2      Q.    Did you produce identification

3  inside the interview room?

4      A.    I don't recall.  I think at some

5  point somebody may have asked me for it, but I

6  don't recall off hand.

7      Q.    Did you describe the reason why you

8  were trying to subdue Mr. Jordan inside the

9  interview room?

10     A.    I don't recall.  I do remember

11 stating it several times during the course of

12 that --

13     Q.    What did you say?

14     A.    Trying to get my people out, this is

15 how we do it, just like let me get my people

16 out.

17     Q.    No complaints about him striking his

18 wife and that you were reacting to that, I'm

19 gonna take care of that?

20     A.    I don't recall that.

21     Q.    Is it possible that you said that?

22     A.    It could be, but I don't recall it.

23     Q.    How many people had you handcuffed

24 in your career?  A lot?

25     A.    I would say so.

0b9b1392-b98b-4486-976a-4ab912ebf648

1          Q.    What is your criticism of the way
2     the handcuffs -- I understand the double lock.
3     You described that.  As it continued to
4     tighten, is that a criticism of it?
5          A.    Yes, sir.
6          Q.    Is that something you do every time?
7          A.    Yes, sir.
8          Q.    Okay.  Is there any other criticism
9     of the way you were handcuffed?
10         A.    Placement.
11         Q.    How so?
12         A.    Typically when we place handcuffs
13    on, we would put it directly on the wrist.  I
14    felt that it was higher, going into my
15    forearm.  Those were the big indicators.  The
16    double locking was key mainly because in our
17    career field when we qualify on searching and
18    handcuffing, failure to double lock equals
19    decertification.
20         Q.    At what point did you feel -- or did
21    you at any point feel any acute pain in either
22    of your hands or wrists?
23         A.    I noticed it almost immediately
24    while being corrected while we were walking
25    towards the exit.

1      Q.    Inside The Ledge?

2      A.    I believe so.  Yes, sir.

3      Q.    Or in the walk down to the interview

4  room?

5      A.    Correct.

6      Q.    Do you know if it was inside The

7  Ledge or if it was in the walking down?

8      A.    It was while we were walking down.

9      Q.    Before you got to the elevator or

10  after?

11      A.    Before and during.

12      Q.    And then was it relieved when the

13  handcuffed were removed?

14      A.    Partially.  I didn't feel the

15  tension.

16      Q.    Did you complain to the Hard Rock

17  personnel about any pain or injury?

18      A.    I think more so like just to fix the

19  handcuffs.  I don't recall saying like this

20  hurts or, you know, this is painful, but I do

21  remember stating that I felt they were

22  improperly placed.

23      Q.    Did the Hard Rock security officer

24  offer you any medical assistance?

25      A.    No, sir.

0b9b1392-b98b-4486-976a-4ab912ebf648

1        Q.   You didn't request it either,
2   though, right?
3        A.   No, sir, not to my recollection.
4        Q.   Did the police officer ask if you
5   were injured?
6        A.   I don't recall.
7        Q.   Is that typical, that they would ask
8   you if you were injured in your experience?
9        A.   In my experience, when we do like a
10  chain of custody, there's a remark section in
11  the form that we use, and it is pretty
12  typical, you know, released without further
13  incident or injury.  I don't know what their
14  protocols were.  I don't recall having that
15  as --
16        Q.   Your opinions and experience is
17  based as a sworn police officer, correct?
18        A.   Correct.
19        Q.   Do you have any experience with
20  private security?
21        A.   Yes, sir.
22        Q.   What is that?
23        A.   With Triple Canopy, it's a like
24  armed security type position, so --
25        Q.   Would you agree that private

0b9b1392-b98b-4486-976a-4ab912ebf648

<sup>1</sup> security in a forward base in Afghanistan is
<sup>2</sup> different than private security in a business
<sup>3</sup> in South Mississippi?
<sup>4</sup>      A.   For the most part.
<sup>5</sup>      Q.   I mean, it's two different missions,
<sup>6</sup> right?
<sup>7</sup>      A.   Correct.
<sup>8</sup>      Q.   Do you have any experience with
<sup>9</sup> regard to private security in the state of
<sup>10</sup> Mississippi or anything related to --
<sup>11</sup>      A.   Not in Mississippi, but in other
<sup>12</sup> states I do.
<sup>13</sup>      Q.   Doing what?
<sup>14</sup>      A.   A family member on my wife's side,
<sup>15</sup> so her cousin.  He's a certified protection
<sup>16</sup> specialist with Executive Security
<sup>17</sup> International.  We've talked, trained, you
<sup>18</sup> know, kind of consulted with each other on
<sup>19</sup> different job prospects.
<sup>20</sup>      Q.   Have you consulted with him about
<sup>21</sup> this case?
<sup>22</sup>      A.   No, sir.
<sup>23</sup>      Q.   You haven't discussed it with him at
<sup>24</sup> all?
<sup>25</sup>      A.   No, sir.

0b9b1392-b98b-4486-976a-4ab912ebf648

1    Q.   Have you ever actually worked in
2    private security other than what you described
3    in Afghanistan?
4    A.   I've done some volunteer work in
5    churches.
6    Q.   Were you acting as a police officer
7    in that process?
8    A.   Not as a police officer.  No, sir.
9    Q.   So no weapons?
10   A.   No, sir.
11   Q.   You ultimately got transported, you
12   were taken into Biloxi police custody,
13   correct?
14   A.   Correct.
15   Q.   Did the officer put you in handcuffs
16   at any point?
17   A.   I remember being handcuffed.
18   Q.   By him?
19   A.   There were several people out there.
20   I don't recall a specific individual.
21   Q.   Do you believe it was a Biloxi
22   police officer?
23   A.   I do believe so.  Yes, sir.
24   Q.   That placed you in a patrol car?
25   A.   Yes, sir.

0b9b1392-b98b-4486-976a-4ab912ebf648

1    Q.   And you were transported to where?

2    A.   I'm assuming it was the Biloxi

3  Police Department.

4    Q.   Okay.  And then what happened after

5  that?

6    A.   I was placed in an interview room,

7  the typical admin. for like processing.  I

8  recall while there an individual made the

9  comment of the Hard Rock security personnel

10 not having the appropriate paperwork, and they

11 were waiting for that individual to bring

12 their report or something in that regard.

13   Q.   Was that in regard to signing

14 charges, or do you know?

15   A.   I just heard paperwork, but from my

16 experience, that's what I'm assuming, it was

17 regarding charges.

18   Q.   Do you know who actually signed

19 charges against you?

20   A.   I believe it was Hard Rock.

21   Q.   Do you know who actually signed

22 them?

23   A.   No, sir, I don't recall.

24   Q.   How did you -- how was it resolved

25 that night?  Did you stay in custody, or did

1    you bond out, or what happened?

2         A.    I was released.

3         Q.    Just released, OR?

4         A.    Say again, sir.

5         Q.    On your own recognizance, or was

6    there a bond?

7         A.    I don't recall bond, but I do recall

8    like my wife being there, so if she took care

9    of it, I don't -- I really don't recall.

10        Q.    Okay.  Do you know if any bond money

11   was paid?

12        A.    Not to my knowledge, no.

13        Q.    What's your knowledge of any charges

14   that were brought against you, the nature of

15   the charges?

16        A.    I believe it was disorderly conduct

17   or something to that extent.

18                          - - -

19                 (Off the record.)

20   MR. STEWART:

21        Q.    Did you go to an initial appearance?

22        A.    Yes, sir.

23        Q.    And what happened there?

24        A.    Initially I showed up and -- when I

25   had my inquiry about date and location, I

¹  showed up, and it was not the correct date, so

²  I went a second time, and I think for

³  administrative purposes, Mr. Penick showed up

⁴  because it was an off-base incident, and two

⁵  individuals from Hard Rock were present, and

⁶  ultimately the charges were dropped, and that

⁷  was it.

⁸       Q.   Were they passed to the files?

⁹       A.   Say again, sir.

¹⁰      Q.   Did you sign a Plea Agreement?

¹¹      A.   I don't recall.

¹²      Q.   Can I show you a form?  It's

¹³  produced by Hard Rock.  It's HR005.

¹⁴           MR. BELLINDER:  You're gonna make it

¹⁵  an exhibit?

¹⁶           MR. STEWART:  Yeah.  I'll make the

¹⁷  entire packet an exhibit, or actually I'll

¹⁸  separate that out.

¹⁹  MR. STEWART:

²⁰      Q.   Do you recognize your signature on

²¹  that document?

²²      A.   I do.  Yes, sir.

²³      Q.   Is that a Plea Agreement?

²⁴      A.   Yes, sir.

²⁵      Q.   Is that what led to the resolution

1    of the charges?

2        A.   I believe so.

3        Q.   In exchange for that, you agreed to

4    certain conditions, correct?

5        A.   Yes, sir.

6        Q.   And it was passed to the files,

7    conditioned on good behavior?

8        A.   Yes, sir.

9        Q.   And you were banned from Hard Rock?

10       A.   Yes, sir, for like six months.  I

11    believe it says it.

12       Q.   Six months good behavior, and then

13    barred from Hard Rock property.  It doesn't

14    say barred from Hard Rock for six months.  It

15    says six months good behavior, right?

16       A.   Yes, sir.

17       Q.   And that's what you agreed to?

18       A.   Yes, sir.

19       Q.   In exchange for that, there was a

20    plea, and the charges were passed to the file?

21       A.   Sure.

22       Q.   You did not have a trial?

23       A.   Correct.

24       Q.   And this is how it was resolved?

25       A.   Yes, sir.

1            MR. STEWART:  We'll make that

2    Exhibit 3.

3                     - - -

4            (Exhibit 3 was marked.)

5                (Off the record.)

6    MR. STEWART:

7        Q.    Have you seen that document that was

8    produced by Hard Rock?

9        A.    Maybe briefly.  I think when Mr.

10   Penick was conducting his interview with me, I

11   think he had it, and he just briefly --

12       Q.    Showed it to you?

13       A.    Yes, sir.

14       Q.    Did it have a notation from the

15   clerk on there that referenced the outcome,

16   the disposition?  Do you see there's a very

17   small handwritten section about mid page that

18   says -- reflects the terms of the Plea

19   Agreement?

20            If you lay it down, I'll point it to

21   you.  Passed to file, condition six months GB,

22   good behavior, barred from Hard Rock.  Do you

23   see that?

24       A.    I see that.  Yes, sir.

25       Q.    And that's consistent with your Plea

0b9b1392-b98b-4486-976a-4ab912ebf648

1    Agreement?

2         A.   Yes, sir.

3         Q.   And you accepted that Plea Agreement

4    voluntarily, right?

5         A.   Yes, sir.

6         Q.   In exchange for having the charges

7    passed to the file?

8         A.   Yes, sir.

9         Q.   Did you appeal that decision at any

10   point?

11        A.   No, sir.

12        Q.   Did you have an attorney in that

13   process?

14        A.   No, sir.

15        Q.   Mr. Penick was there with you in

16   what capacity?

17        A.   He was a supervisor.  I think he was

18   still conducting his investigation in the

19   entire circumstance, and I believe he was

20   there to witness, you know, any kind of

21   disposition.

22        Q.   Okay.  Did he have any conversations

23   with the court?

24        A.   No, sir.

25        Q.   Was Jason Jordan or Alyssa Jordan

0b9b1392-b98b-4486-976a-4ab912ebf648

1    present for that at that time?

2         A.   No, sir.

3         Q.   Were you wearing dress blues?

4         A.   I was on duty, but I had a coat over

5    anything that said police, badge and stuff

6    like that.

7         Q.   Your typical uniform?

8         A.   Yes, sir.

9              MR. STEWART:  We referred to -- or I

10   asked you about the clerk's notation on the

11   City of Biloxi Uniform Arrest/Booking Form

12   HR001, we'll make Exhibit Number 4.

13                        - - -

14             (Exhibit 4 was marked.)

15   MR. STEWART:

16        Q.   You've been married before, sir?

17        A.   Yes, sir.

18        Q.   To whom?

19        A.   Julia Landry.

20        Q.   Where does she live?

21        A.   I don't know.

22        Q.   Is it in Florida?

23        A.   At the time, she was in Florida.

24        Q.   Have you ever been charged with any

25   form of domestic violence or abuse by anyone?

1      A.   No, sir.

2      Q.   Have you ever been convicted of a

3  felony in the last ten years?

4      A.   No, sir.

5      Q.   Have you ever had any drug or

6  alcohol convictions for anything?

7      A.   No, sir.

8      Q.   Have you ever had a restraining

9  order placed on you for any reason?

10      A.   No, sir.

11      Q.   Have you ever been removed from a

12  casino or any other place of business?

13      A.   No, sir.

14      Q.   Were you ever deployed in the

15  military anywhere?

16      A.   Yes, sir.

17      Q.   To where?

18      A.   We were a part of a mobile team, so

19  I -- we were in Kuwait.  We were in Saudi

20  Arabia, Qatar.

21      Q.   Did you ever go into direct

22  hostilities?

23      A.   Yes, sir.

24      Q.   Where was that?

25      A.   We took contact in Kuwait.

0b9b1392-b98b-4486-976a-4ab912ebf648

```
 1        Q.   As part of the --
 2        A.   Is this active duty or just in
 3   general have I ever been in direct --
 4        Q.   Active duty.
 5        A.   Yes, sir.  That was in that
 6   particular situation.
 7        Q.   And obviously in Afghanistan there
 8   was hostile --
 9        A.   Yes, sir.
10        Q.   Anywhere else?
11        A.   That's it.
12        Q.   Have you ever gotten any awards or
13   medals in the military?
14        A.   Yes, sir.
15        Q.   For what?
16        A.   I received an Outstanding Unit With
17   Valor, humanitarian aid for deploying for
18   Katrina relief.
19        Q.   While you were here stationed in
20   Biloxi?
21        A.   I was in Georgia.  We deployed from
22   Georgia down here for that.
23        Q.   Where were you stationed at that
24   point?
25        A.   Robins Air Force Base in Georgia.
```

1          Q.    Have you ever been suspended from
2     duty by the military?
3          A.    No, sir.
4          Q.    Do you know if anybody else was
5     interviewed in the preparation of the
6     investigative report that was Exhibit 2?
7          A.    Not to my knowledge.
8          Q.    Do you have any relatives who live
9     in South Mississippi?
10         A.    Say again, sir.
11         Q.    Do you have any relatives who live
12    in South Mississippi?
13         A.    Not to my knowledge.
14         Q.    Have you ever quantified the amount
15    of wages you contend you've lost as a result
16    of this incident?
17         A.    Say again.
18         Q.    Have you ever added up how much you
19    believe you've lost in terms of wages?
20         A.    Just by if I was still assigned to
21    Keesler, but that's not something that I've
22    documented or anything like that.
23         Q.    And you make how much; $10 an hour?
24    Do you have any idea how much that's gonna
25    translate into annual income now?

1      A.   It's by shift, so I think it's gonna
2   be variable to hours because it's a non-profit
3   ambulance company.
4      Q.   You also receive income from your
5   family?
6      A.   Correct.
7      Q.   How much do you get from your family
8   now?
9      A.   I work three days out of the week on
10  like nightshift.  That comes out to about $150
11  a day.
12     Q.   On top of the income, you're gonna
13  continue to do that?
14     A.   Yes, sir.
15     Q.   Other than what you've described,
16  what about this incident affected your ability
17  to earn money physically?
18     A.   Physically I've noticed that
19  sometimes like my -- like my wrist my elbow,
20  it just gets weak, but that's more so like in
21  an administrative aspect.
22     Q.   When did you first notice -- when
23  did you first get medical treatment after this
24  incident?
25     A.   I think some time had passed.  I

1    thought it was just gonna be like a swelling

2    and that was it, but I just have the

3    personality type of just kind of pushing

4    through it, like just not getting anything

5    documented or -- I didn't see that there was a

6    need for like immediate surgery or anything

7    like that.

8         Q.   Have you been told that there was a

9    need for surgery at any point?

10        A.   During my appointment when they --

11   they identified a possibility, and that was

12   through the V.A. here in Biloxi.

13        Q.   When was that?

14        A.   I don't recall the exact date.

15             MR. STEWART:  Thomas, have you

16   produced V.A. records in Biloxi?

17             MR. BELLINDER:  We have.  There was

18   an e-mail to you scanned in.  Now, there's a

19   possibility the same way as when we were

20   trying to get these bills on Alyssa that

21   there's additional records out there.  They

22   sent us another set of Alyssa's records.

23   There ended up being more that wasn't

24   previously produced.  The billing, as we said

25   in our e-mail, all goes through a separate

¹ entity, and so we're working on that as well.

² MR. STEWART:

³     Q.   Was there a particular provider,

⁴ doctor that saw you at the V.A.?

⁵     A.   Ortho, but he wasn't like my primary

⁶ care physician.

⁷     Q.   What's your understanding of the

⁸ medical condition that you contend occurred as

⁹ a result of this incident?

¹⁰     A.   I'm sorry, sir?

¹¹     Q.   What's your understanding of medical

¹² injury or condition that you have as a result

¹³ of this incident --

¹⁴     A.   I would say --

¹⁵     Q.   -- or had, have or had?

¹⁶     A.   I guess I'm not understanding the

¹⁷ question.

¹⁸     Q.   How were you hurt?

¹⁹     A.   Basically I was told during the

²⁰ initial appointment that I could have had a

²¹ dislocated tendon or some possible joint --

²² not necessarily breaks but just some stress on

²³ it.

²⁴     Q.   Do you recall having an MR and an

²⁵ arthrogram of your shoulder and wrist?

1      A.   Yes.

2      Q.   -- and your elbow?

3      A.   Uh-huh (affirmative).

4      Q.   Do you recall the results of that?

5      A.   They told me that they were gonna

6  call me, and I never heard anything back.

7      Q.   Have you seen a copy of the results

8  that said you have intact flexor and extensor

9  tendons, normal medial and lateral collateral

10  ligament complexes, normal MR appearance of

11  neurovascular structures?  Have you seen that?

12      A.   I have not seen that.

13      Q.   To me that would indicate all normal

14  findings.

15      A.   Sure.

16      Q.   No one communicated that to you?

17      A.   No, sir.

18      Q.   Have you continued to have any

19  problems?

20      A.   Nothing damaging of my opinion.

21      Q.   When did your complaints cease after

22  this incident?

23      A.   I continued to wear a wrist brace

24  for approximately a month, but it was as

25  needed.

0b9b1392-b98b-4486-976a-4ab912ebf648

1     Q.   So off and on you wore a wrist brace

2  for a month?

3     A.   Correct.

4     Q.   Anything else?

5     A.   That was it.

6     Q.   No additional problems beyond the

7  month on any part of your body that you

8  attribute to this incident?

9     A.   Correct.

10     Q.   Do you have any idea how much your

11  medical expenses were related to this

12  incident?

13     A.   I do not.

14     Q.   And do you have not in your -- to your

15  knowledge, have you incurred any mental health

16  treatment as a result of this incident?

17     A.   I have not.

18     MR. STEWART:  Knowing that she's

19  gonna go an hour, I better shut up.

20     MS. STEEL:  It probably won't be

21  that long.

22     MR. STEWART:  Let me check one more

23  thing.

24               - - -

25          (Off the record.)

1        MR. STEWART:  That's all I have for

2   now.

3                    - - -

4            (Off the record.)

5             EXAMINATION

6   BY MS. STEEL:

7        Q.   My name is Tere Steel.  I represent

8   the City of Biloxi in this lawsuit.  I'm gonna

9   ask you some questions.  I don't have a lot to

10  ask, but if you don't understand what I'm

11  asking, please tell me and put it on the

12  record.  If you go ahead and answer my

13  question, I'm going to assume that the answer

14  you gave was correct because you understood my

15  question, correct?

16       A.   Yes, ma'am.

17       Q.   Does that sound fair?

18       A.   Yes, ma'am.

19       Q.   All right.  A lot of these questions

20  are just gonna be clearing things up that

21  maybe I don't understand, so bear with me.

22            In the complaint, you claim that you

23  have a broken right wrist.  Did any doctor

24  ever tell you you had a broken right wrist?

25       A.   No, ma'am.

1      Q.   Okay.  Your wrist wasn't broken, was

2  it?

3      A.   No, ma'am.

4      Q.   All right.  Now, what about -- did

5  any doctor tell you you had a dislocated left

6  shoulder?

7      A.   Not left shoulder.  They said that

8  they were going to look into elbow.

9      Q.   All right.  A dislocated left elbow,

10  who told you that?

11      A.   It was at the V.A.  I don't recall

12  the doctor's name.

13      Q.   Wasn't your left elbow Xrayed at the

14  V.A.?

15      A.   Yes, sir.

16      Q.   And wasn't that Xray normal?

17      A.   I'm finding that out --

18           MR. BELLINDER:  Object to the form.

19      A.   I'm finding that out.  Nobody had

20  discussed results with me.

21  MS. STEEL:

22      Q.   All right.  Have you received

23  treatment from any doctor or other medical

24  provider for a dislocated left elbow?

25      A.   No.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.   Okay.  And do you have problems --
2  any lingering problems with your left elbow?
3      A.   It feels like there's ongoing
4  inflammation, depending on if I'm lifting --
5  like as I'm bending it, there's an audible
6  popping sound and weakness from time to time.
7      Q.   And do you see a doctor for that?
8      A.   No, ma'am.
9      Q.   Do you have any -- have you sought
10 any kind of medical treatment for that?
11     A.   Just at the V.A.  That was it.
12     Q.   Okay.  Do you have any photographs
13 of any injuries that you claim to have
14 suffered?
15     A.   I do not.
16     Q.   Who are you married to?
17     A.   Kayla Soukup.
18     Q.   Spell her first name.
19     A.   K-A-Y-L-A.
20     Q.   Are you still married --
21     A.   Yes, ma'am.
22     Q.   -- at present?
23          Now, Julia Landry, where is she now?
24     A.   I don't know.
25     Q.   Where did you live when y'all were

 1    married?

 2         A.   Georgia.

 3         Q.   Was that in the military?

 4         A.   Yes, ma'am.

 5         Q.   So that's been some time ago?

 6         A.   Yes, ma'am.

 7         Q.   Was the marriage dissolved by

 8    divorce?

 9         A.   Yes, due to the timeframe because I

10    was deployed, so we couldn't get an annulment.

11         Q.   You did get an annulment?

12         A.   No.  It was by divorce.

13         Q.   Okay.  And when was that divorce?

14         A.   I don't even recall.  It was so long

15    ago, several years ago.

16         Q.   Kayla Soukup, where does she work?

17         A.   She works at The Retreat.

18         Q.   What retreat?

19         A.   That's the name of the business.

20    And that's an Ely.  It's a coffee shop.

21         Q.   Do you have any children?

22         A.   No.

23         Q.   Have you ever filed a lawsuit

24    before?

25         A.   No, ma'am.

0b9b1392-b98b-4486-976a-4ab912ebf648

1      Q.   Have you ever been sued by anyone?

2      A.   No, ma'am.

3      Q.   Have you ever received money on a

4  claim that you might have had against someone

5  without having to bring a lawsuit?

6      A.   No, ma'am.

7      Q.   Did you look at any documents to

8  prepare for this deposition?

9      A.   No, ma'am.

10     Q.   Do you have a diary or a journal

11 that you kept about this incident?

12     A.   No, ma'am.

13     Q.   Did you bring any documents with you

14 to the deposition?

15     A.   No, ma'am.

16     Q.   To Mississippi?

17     A.   No, ma'am.

18     Q.   Now, you were married when you were

19 in Mississippi, correct?

20     A.   Yes, ma'am.

21     Q.   When did you marry Kayla?

22     A.   April 10th of 2010.

23     Q.   So she was with you in Mississippi?

24     A.   Yes, ma'am.

25     Q.   And did she work in Mississippi?

1      A.   Yes, ma'am.

2      Q.   Where?

3      A.   Camp Shelby.

4      Q.   What did she do there?

5      A.   She was a transitional counselor for

6  active duty military.

7      Q.   Now, you stayed in Mississippi for

8  two years?

9      A.   Yes, ma'am.

10      Q.   And you left voluntarily?

11      A.   Yes, ma'am.

12      Q.   Because you still had your job when

13  you left Keesler, you could have kept that

14  job?

15      A.   Yes, ma'am.

16      Q.   You were not terminated?

17      A.   No, ma'am.

18      Q.   And technically you weren't formally

19  disciplined?

20      A.   No, ma'am.

21      Q.   Now, what was your pay when you were

22  serving as a field training officer and shift

23  supervisor at Keesler?

24      A.   The paid grade is GS6, Step 2.

25      Q.   And can you give me a monetary

0b9b1392-b98b-4486-976a-4ab912ebf648

1    figure for that?

2         A.    Approximately 30,000 annual.

3         Q.    30 annual.

4              Now, you talked about how much money

5    you make a day.  That seems to be how you --

6    do you know how much a day you made a Keesler?

7         A.    Not for that.  The contracting side

8    of the house is usually set up like on a --

9    like a daily rate.

10        Q.    So you made 30,000 a year?

11        A.    Roughly, correct.

12        Q.    After your post was changed -- did I

13   say that correctly?

14        A.    Correct.

15        Q.    After the 11/27/11 incident, did

16   your pay change?

17        A.    No, ma'am.

18        Q.    Did your chain of command change?

19        A.    No, ma'am.

20        Q.    I have read somewhere that you were

21   a police officer in Pascagoula, a federal

22   police officer?

23        A.    That's not correct.

24        Q.    That is not correct?

25        A.    No.

1      Q.   You were not?

2      A.   No.

3      Q.   So when you were in Mississippi, you

4   worked exclusively at Keesler Air Force Base?

5      A.   Correct.

6      Q.   And after you left the Mississippi

7   Gulf Coast, is that when you deployed?

8      A.   Yes, ma'am.

9      Q.   To Kuwait and to Afghanistan?

10     A.   No.  We staged in Kuwait and then

11  went directly to Afghanistan.

12     Q.   Okay.  And what was your job there?

13     A.   Armed security.

14     Q.   And did you carry a weapon?

15     A.   Yes, ma'am.

16     Q.   What were your job duties?

17     A.   Basically secure forward operating

18  bases, combat outpost, contingent upon attack

19  provide tactical combat casualty care.

20     Q.   Like during the day, did you have a

21  post that you manned?

22     A.   Certain days.

23     Q.   Was it indoors or outdoors?

24     A.   Outdoors.

25     Q.   Okay.  And what equipment did you

0b9b1392-b98b-4486-976a-4ab912ebf648

1    carry?

2         A.    Depending on the post, we had Mark

3    19 automatic grenade launchers, 50-caliber

4    machine guns.  The normal what we would call

5    loadout gear, so like our medical equipment,

6    plate carriers, ammunition, rifle, pistol,

7    helmet.  So just like your standardized

8    equipment, communications, radios, stuff like

9    that.

10        Q.    And were you able to carry all that

11   gear?

12        A.    Yes.

13        Q.    Okay.  And were you able physically

14   to perform all the duties of your position as

15   armed security in Afghanistan?

16        A.    Yes.

17        Q.    Before you went to Afghanistan, you

18   took a predeployment physical?

19        A.    Yes.

20        Q.    And I'm assuming you passed that

21   physical?

22        A.    Yes.

23        Q.    Were you hospitalized for any injury

24   that you suffered as a result of the Hard Rock

25   incident?

0b9b1392-b98b-4486-976a-4ab912ebf648

1          A.    No, ma'am.

2          Q.    You have a high school degree?

3          A.    Yes.

4          Q.    Where did you get that?

5          A.    Linn-Mar High School, and that's in

6     Marion, Iowa.

7          Q.    Spell that first word, Linn-Mar.

8          A.    That's L-I-N-N dash M-A-R.

9          Q.    Okay.  And then you said -- do you

10    have any college courses?

11         A.    Yes.

12         Q.    What?

13         A.    The paramedic course, and that's

14    through Kirkwood Community College.

15         Q.    And when did you get the paramedic

16    certification?

17         A.    It's the EMT certification,

18    paramedic course of study, so it's still

19    ongoing, and that was -- I want to say I

20    completed that course roughly July of 2013.

21         Q.    When did you begin the course?

22         A.    That was the -- I'd say May of 2013.

23         Q.    Did you enlist in the Air Force?

24         A.    Yes.

25         Q.    When did you enlist?

0b9b1392-b98b-4486-976a-4ab912ebf648

1          A.    June 2003.

2          Q.    And when did you graduate from high

3     school?

4          A.    June 2003.

5          Q.    So no college between high school

6     and enlistment?

7          A.    No, ma'am.

8          Q.    And did you take any college courses

9     while you were in the Air Force?

10         A.    Yes.

11         Q.    What did you take?

12         A.    We take courses that basically are

13    in alignment with your job, so criminal

14    justice courses.

15         Q.    Did you get a degree?

16         A.    It's -- credits is kind of how it's

17    set up, just elective credits.

18         Q.    Okay.  Now, after the 11/27/11

19    incident, did you miss any days of work while

20    you were stationed at Keesler?

21         A.    In terms of -- I'm not

22    understanding.  Did I miss --

23         Q.    Did you miss any days of work as a

24    result of this Hard Rock incident?

25         A.    I took -- I was informed to take two

1   days off.

2        Q.   Were you paid for that?

3        A.   No.

4        Q.   And you were told by who?

5        A.   My program manager.

6        Q.   And tell me again.

7        A.   Zastrow Perkins.

8        Q.   So you took two days off.  Was this

9   during the investigation?

10       A.   Yes.

11       Q.   Was this at the beginning of the

12  investigation?

13       A.   Probably within a week or so.

14       Q.   Okay.  And why did he tell you to

15  take two days off?

16            MR. BELLINDER:  Object to the form.

17  To the extent you know why he --

18       A.   Just -- there was tension within the

19  unit.

20  MS. STEEL:

21       Q.   All right.  So after those two days,

22  you returned back to work?

23       A.   Correct.

24       Q.   At Keesler?

25       A.   Yes, ma'am.

¹      Q.   And what was your duty post then?
²   What was your post?
³      A.   I went back to being a shift
⁴   supervisor.
⁵      Q.   Okay.  And how long did you remain a
⁶   shift supervisor?
⁷      A.   Probably for a few months.  And then
⁸   I was placed in more of an administrative
⁹   training position.
¹⁰      Q.   For a few months, so that would be
¹¹   in January of '13?
¹²      A.   Roughly.
¹³      Q.   All right.  And then in January of
¹⁴   '13, you were put in the -- that's when your
¹⁵   post was changed?
¹⁶      A.   No.  It was the day after that
¹⁷   incident, but when I returned to being a shift
¹⁸   supervisor, as a result of tension within the
¹⁹   unit or within my shift and the active duty
²⁰   leadership, they decided to put me in the
²¹   training section.
²²      Q.   What kind of tension?  What are you
²³   referring to?
²⁴      A.   There were --
²⁵      Q.   Were you tense?

```
 1        A.   I felt that way mainly because there
 2   was a lot of like basic rumor stuff,
 3   individuals calling my judgment into question,
 4   individuals saying that I had no longer like
 5   the respect of my troops, individuals saying
 6   that the reason why I wasn't placed on the
 7   SWAT team was because like I can't make, you
 8   know, judgment calls, basically saying that I
 9   can't function under the pressure of what
10   happened at Hard Rock, so that transferred
11   into on-duty...
12        Q.   Tension?
13        A.   Correct.
14        Q.   Now, who -- you said these were
15   rumors that were going around.  Who was
16   questioning -- who was saying these things?
17        A.   Other shift supervisors, the --
18        Q.   Who?
19        A.   I don't recall their names because
20   they worked days and mids.  One individual who
21   worked on my shift, Jeffrey Thatcher was the
22   one who made my initial post change the day
23   after the incident when I returned to work.
24        Q.   Okay.  So the only person you can
25   tell me who was saying these things that you
```

¹ felt tension over was Jeffrey Thatcher?

²     A.   And I mentioned earlier Master

³ Sergeant Lisa Phillips and Captain Porta.

⁴        MR. STEWART:  Is that Phillips?

⁵        THE WITNESS:  Yes, sir.

⁶ MS. STEEL:

⁷     Q.   Okay.  So after the Hard Rock

⁸ incident, you went back to being a security

⁹ officer?

¹⁰     A.   A police officer, yes.

¹¹     Q.   Police officer.  When did you change

¹² job responsibilities and duties?

¹³     A.   In terms of working for the Air

¹⁴ Force, like when did I go contracting?

¹⁵     Q.   No.  After the Hard Rock incident,

¹⁶ when after the Hard Rock incident did your

¹⁷ duties and responsibilities change?

¹⁸     A.   The next tour of duty, so the next

¹⁹ shift day.

²⁰     Q.   When was that?

²¹     A.   Within 24 hours, so I would guess

²² the 28th or 29th.

²³     Q.   Okay.  And your pay did not change?

²⁴     A.   Correct, did not change.

²⁵     Q.   You said you wanted to start your

1    own business in Cedar Rapids, a consulting
2    business.  Have you taken any steps --
3         A.   Yes.
4         Q.   -- to set up that business?
5         A.   Yes, ma'am.
6         Q.   What's the name of it?
7         A.   React Concepts, LLC.
8         Q.   Say it again.
9         A.   React Concepts, LLC.
10        Q.   And when did you start that
11   business?
12        A.   March of 2013, when I came back from
13   deployment.
14        Q.   Are you in partnership with
15   anyone --
16        A.   No, ma'am.
17        Q.   -- in the business?
18        A.   No.
19        Q.   Do you have contracts with this
20   business?
21        A.   I have proposal bids.
22        Q.   Okay.  So you said you missed two
23   days of work.  Did you miss any other days of
24   work at Keesler because of the Hard Rock
25   incident?

 1          A.    Just for the medical appointments.

 2          Q.    Okay.  And were you paid for those

 3    days?

 4          A.    No.

 5          Q.    Now, how many medical appointments?

 6          A.    It was one at the V.A., but -- and

 7    they're just consult referrals.

 8          Q.    And how long of a period of time

 9    were you at the V.A.?

10          A.    Several hours.

11          Q.    Did you go back to work after you

12    were done?

13          A.    I went back to my section to see if

14    they needed me to work, but they did not.

15          Q.    So you just took the rest of the day

16    off?

17          A.    Yes.

18          Q.    All right.  Did your days and hours

19    of employment change after the Hard Rock and

20    after your post change?

21          A.    No.

22          Q.    So you still worked that mid --

23          A.    The swing shift.

24          Q.    The swing shift?

25          A.    Yes.

0b9b1392-b98b-4486-976a-4ab912ebf648

1        Q.    And how many days a week did you
2    work?
3        A.    I want to say we were on a like six
4    and three schedule, six days on, three,
5    something to that extent.
6        Q.    That was your regular schedule both
7    before and after --
8        A.    Yes, ma'am.
9        Q.    -- the Hard Rock?
10        A.    Yes, ma'am.
11        Q.    Okay.  Now, how much in salary did
12    you earn approximately each payday?
13        A.    I don't recall.  Per payday?
14        Q.    Yes.
15        A.    Without doing the math, I don't
16    recall.
17        Q.    Do you have any calculations of lost
18    wages?
19        A.    I have not calculated that.
20        Q.    Do you have any paychecks at home
21    that you can provide?
22        A.    We would get an electronic -- I
23    don't have access to those usernames and
24    passwords, but I could probably attempt to get
25    that.

1          MS. STEEL:  I would ask that

2    anything regarding lost wages be produced.

3    MS. STEEL:

4          Q.   So you told me about two days when

5    you were told to take off work and then one

6    appointment at the V.A.

7          A.   Yes, ma'am.

8          Q.   Were there any other days when you

9    were employed at Keesler that you missed work

10   because of the Hard Rock incident?

11         A.   I lost hours because I went from

12   working as a shift supervisor to a training

13   position, an administrative training position,

14   so I was not able to get overtime or the same

15   amount of hours as if I was working as a shift

16   supervisor.

17         Q.   Well, how many hours did you

18   normally work as a shift supervisor?

19         A.   We would normally -- for pay period,

20   I want to say it's like 90 or something to

21   that extent because we had to put in request

22   for overtime, and it was just a standard

23   setup.

24         Q.   And what was overtime, anything in

25   excess of what?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.    I think it was anything in excess of

2    90.

3      Q.    Okay.  So your normal duty hours

4    were 90 hours?

5      A.    Roughly.

6      Q.    Okay.  And then once you -- your

7    post was changed, what were your normal duty

8    hours?

9      A.    When they put me in the training

10   section, it was reduced to eight-hour days

11   versus ten-hour days, so...

12     Q.    Okay.  When were your paydays?

13     A.    We were offset from active duty, but

14   they usually fell close to the 1st and 15th,

15   so biweekly.

16     Q.    I'd ask that if you have a paystub,

17   that that be produced, whether electronically

18   or not.

19     A.    Yes, ma'am.

20     Q.    Okay.  Now, have you ever been

21   arrested prior to 11/27/11?

22     A.    No, ma'am.

23     Q.    You talked about going back to the

24   police department after you were arrested,

25   November 27, '11.  You went to the police

1    station, correct?

2         A.   My workplace or Biloxi --

3         Q.   No, no.  Sorry.  On November 27,

4    2011, after you were arrested at the Hard Rock

5    Casino, you were taken to the Biloxi Police

6    Department --

7         A.   Yes, ma'am.

8         Q.   -- correct?

9         A.   Yes, ma'am.

10        Q.   Okay.  Now, once you were taken to

11   the police department, where were you taken?

12        A.   I believe I -- administrative

13   processing and then probably a holding cell.

14        Q.   And were the handcuffs removed?

15        A.   I believe so at one point.

16        Q.   I'm talking about at the police

17   station --

18        A.   Yes, ma'am.

19        Q.   -- in the booking room.

20        A.   I don't recall offhand.  At this

21   point, I was so tired and just -- I was just

22   like out of it.

23        Q.   Okay.  So you don't recall if you

24   were in cuffs or not?

25        A.   I don't recall.  During transport, I

1    recall being handcuffed --

2         Q.    Certainly.

3         A.    -- but afterwards, I don't recall.

4         Q.    And that's certainly not unusual, is

5    it, to have someone in handcuffs while they're

6    being transported?

7         A.    Correct.

8         Q.    Okay.  That's good police practice,

9    correct?

10        A.    Yes.

11        Q.    Do you recall when you left the

12   police department?

13        A.    It was several hours.

14        Q.    Do you recall when you left --

15        A.    No, ma'am.

16        Q.    -- the time?

17        A.    No, ma'am.

18        Q.    At any time since 11/27/11, have you

19   been arrested?

20        A.    No, ma'am.

21        Q.    Now, you said -- I believe you said

22   that you went home after your shift ended?

23        A.    Yes, ma'am.

24        Q.    And that would have been on

25   11/27/11?

1          A.    Yes, ma'am.

2          Q.    Okay.  What did you do at home?

3          A.    I changed clothes.

4          Q.    Did you have anything to drink?

5          A.    No, ma'am.

6          Q.    Did you have anything to drink at

7     the Hard Rock?

8          A.    Yes, ma'am.

9          Q.    What did you drink?

10         A.    Mixed drinks.  I don't recall what

11    exactly it was.

12         Q.    You don't recall what you were

13    drinking?

14         A.    Maybe like a whiskey and ice.

15         Q.    How many?

16         A.    I had two or three at that point.

17         Q.    Were you intoxicated?

18         A.    I don't believe so.  I was tired.  I

19    know that much.

20         Q.    Did you tell the investigating

21    officer Penick that you were intoxicated and

22    that you don't recall clearly what occurred at

23    the Hard Rock because of alcoholic beverages?

24         A.    Certain aspects, like the very end

25    of the situation being in the interview room,

1    things, I don't recall specifics.

2         Q.    How did you get to the Hard Rock?

3         A.    My wife drove.

4         Q.    Where did you live on the coast?

5         A.    Near D'Iberville.

6         Q.    In an apartment or a house?

7         A.    It was a rental home, rental house.

8         Q.    Who did you rent from?

9         A.    They were a Navy couple.  I don't

10   recall their names.

11        Q.    What was the address of the home?

12        A.    It was 14401 Harley Drive or

13   something to that extent with the numerics.

14        Q.    Harley Drive in D'Iberville?

15        A.    It was a Biloxi address, but it was

16   near D'Iberville.

17        Q.    Which side of the bay was it on?

18        A.    It was north of --

19        Q.    North of the bridge?

20        A.    Yes.  So near 15.

21        Q.    Near Highway 15?

22        A.    Yes.

23        Q.    How would I get there?

24        A.    Just --

25        Q.    Where on 15 was that house?

1       A.    If you go from 110 to 15, there's a
2  four-way intersection.  Approximately a mile,
3  there's a gas station, you'll take a right,
4  and then you'll take another right on Maddie
5  Drive, and then you'll take a right
6  approximately two or three blocks on Harley.
7  The road comes to an end, and it's the last
8  house on the left.
9       Q.    Is it in a subdivision?
10      A.    Yes.
11      Q.    What's the name of that subdivision?
12      A.    I don't know.  I know they just
13 recently put something up.  I drove by there
14 the other day, and I didn't recognize the
15 stone stuff from when I lived there.
16      Q.    And you don't recall the name of it?
17      A.    No.
18      Q.    Had you ever had any problems with
19 Jason Jordan prior to November 27 --
20      A.    No, ma'am.
21      Q.    -- '11?
22            You said that you told Officer
23 Penick that Jason Jordan was mildly
24 intoxicated when you arrived, correct?
25      A.    Correct.

1      Q.   Now, did you see him become more

2   intoxicated?

3      A.   By characteristic, is that what

4   you're asking, or did I witness him consume

5   alcohol?

6      Q.   Did you witness him consume alcohol?

7      A.   Yes, ma'am.

8      Q.   How many drinks?

9      A.   At that time, maybe one or two.

10      Q.   You characterized him as being

11   mildly intoxicated when you arrived.  By the

12   time that you left the area, how would you

13   describe his level of intoxication?

14      A.   It's kind of hard to say because the

15   actions of people trying to get control over

16   him, it could have been emotional, like

17   physical response or impairment, but I would

18   say that had progressed, you know, since

19   initially seeing him.

20      Q.   Okay.  And Alyssa Jordan, how many

21   drinks did she have?

22      A.   I didn't see her drink.

23      Q.   Did you smell alcohol on her person,

24   her breath?

25      A.   I smelled alcohol emitting from

1   everywhere, but not directly talking to her.

2   I don't recall.

3        Q.   What time did the fight break out?

4        A.   I would say maybe 1:00 in the

5   morning or shortly thereafter.

6        Q.   How long had you been at the Hard

7   Rock before the fight started?

8        A.   Maybe less than one hour, if I

9   recall correctly.

10       Q.   And was Jason Jordan already there

11  when you arrived at the Hard Rock?

12       A.   I think close to that time.  I don't

13  know if he was downstairs or whatnot.

14       Q.   Did you see him enter The Ledge?

15       A.   I did not.  Like walk in The Ledge,

16  no.

17       Q.   I don't mean to be repetitive, but

18  did you see Jason Jordan throw a punch at

19  anyone?

20       A.   I did not.

21       Q.   Did you throw a punch at anyone?

22       A.   No.

23       Q.   Did you see anyone throw a punch at

24  Jason Jordan?

25       A.   No.

1    Q.    Did anyone throw a punch at you?

2    A.    No.

3    Q.    Were you hit by anyone?

4    A.    Not like closed fist, but bumping

5  and pushing.

6    Q.    Who bumped and pushed?

7    A.    I don't know.  While I was trying to

8  get control over Jason, I felt -- you know, I

9  felt movement and then being engaged by my

10  throat and neck, but I don't -- nobody punched

11  me or anything like that, that I recall.

12    Q.    You said that when you initially saw

13  Jason Jordan displaying sums of money, that

14  you were in a certain area of the Hard Rock.

15  What was this area?

16    A.    It was The Ledge at the bar.

17    Q.    Near the bar?

18    A.    Yes.  I think it was while he was

19  ordering drinks, so...

20    Q.    You said that -- you testified that

21  you were told that you were given a post

22  change as an informal learning lesson?

23    A.    Yes, ma'am.

24    Q.    What was the lesson that you were

25  supposed to be learning?

1    A.   How it was explained to me was to

2  respect the active duty side of the house.

3    Q.   So what did the military feel you

4  had done wrong?

5    A.   Engaged their members, getting

6  involved, intervening.

7    Q.   They felt that you shouldn't have

8  intervened at the Hard Rock?

9    A.   It wasn't formally addressed, but

10  this was at the point where there was a lot of

11  speculation, and this was just certain

12  individuals, like Master Sergeant Lisa Green,

13  Captain Porta.

14    Q.   You were led to believe that active

15  duty military felt that you should not have

16  become involved at the Hard Rock?

17    A.   Correct.

18    Q.   Who handcuffed you?  Was it the man

19  in the suit or --

20    A.   I believe so.

21    Q.   -- someone else?

22    A.   I believe so.  How I was positioned,

23  my face was against the wall while my arms

24  were placed behind my back, but that's who I

25  assume it was, the man in the suit.

1      Q.   After you were handcuffed, how long
2  before you were taken out of the area?
3      A.   It seemed like several minutes.
4      Q.   Now, when you were placed in
5  handcuffs and during that couple of minutes
6  before you were taken out of the area, where
7  was Jason Jordan?
8      A.   I believe I was in the entryway, and
9  I believe he was either behind me or, you
10  know, to my left, just kind of adjacent to me.
11      Q.   Was he standing up, or was he on the
12  floor?
13      A.   I believe he was on the ground.
14      Q.   Okay.  Was he under the control and
15  custody of Hard Rock security at that point?
16      A.   I couldn't see from my perspective.
17      Q.   Okay.  Was he on the floor -- when
18  you left the area, was he on the floor as the
19  result of the initial fight?
20      A.   That's what it looked like.
21      Q.   So he was still rolling around on
22  the floor?
23      A.   Correct.
24      Q.   And where was Alyssa Jordan when you
25  left the area?

0b9b1392-b98b-4486-976a-4ab912ebf648

1      A.    I think still with him at that

2   point.

3      Q.    Okay.  You would agree with me that

4   you did not see Biloxi police arrive?

5      A.    Correct.

6      Q.    You did not see Jason Jordan

7   tasered?

8      A.    Correct.

9      Q.    And you did not see Jason Jordan

10  being taken from The Ledge through the casino

11  and out to a police vehicle?

12     A.    Correct.

13     Q.    And when you left, Jason Jordan was

14  very much conscious?

15     A.    To my knowledge, correct.

16     Q.    You saw him moving around?

17     A.    Correct.  Correct.

18     Q.    Give me an estimate of how many

19  people were in The Ledge.

20     A.    Because of the adjoining like dance

21  floor, I would guess near a hundred or maybe

22  even more than that.  It was very crowded.

23     Q.    All right.  In the room where you

24  were taken by the man in the suit, you said at

25  some point you were kind of left by yourself

0b9b1392-b98b-4486-976a-4ab912ebf648

1    in that room?

2         A.   Correct.

3         Q.   And then do you recall when officer

4    -- Sergeant Lessner from the Biloxi Police

5    Department arrived to that room?

6         A.   Vaguely.

7         Q.   Do you recall him removing your

8    handcuffs?

9         A.   Vaguely.

10        Q.   Okay.  So you do --

11        A.   I recall -- I recall something to --

12   yes.  Correct.

13        Q.   And you were not hit by a Biloxi

14   police officer?

15        A.   No, ma'am.

16        Q.   You have no complaints with the

17   Biloxi Police Department?

18        A.   The only thing that I referenced

19   when being place in the car, I just asked to

20   be put in a seat belt, and I was told I'm not

21   gonna need one, we're just right around the

22   corner, and that was that.

23        Q.   So that's your only complaint?

24        A.   Correct.

25        Q.   Okay.  And the drive from Hard Rock

0b9b1392-b98b-4486-976a-4ab912ebf648

1    to the Biloxi Police Department was fairly

2    short; was it not?

3        A.    That's how I recall it.  Correct.

4        Q.    You said you wore a wrist brace as

5    needed.  Who prescribed that?

6        A.    The V.A.

7        Q.    What was the doctor's name?

8        A.    I don't recall.  It was like a

9    consult.  They just sent me down where they

10    had them, and I think it was like a nurse tech

11    or something like that who sized it, and I was

12    on my way, just like here you go.

13            MS. STEEL:  That's all I have.

14            MR. CLARK:  I just want to be a

15    little bit more specific.  I have one or two

16    questions.

17                    - - -

18              EXAMINATION

19    BY MR. CLARK:

20        Q.    My name is Austin Clark.  I'm

21    representing Josh Hamilton.  You sued him in

22    his official capacity as he was a police

23    officer at the time and individually.

24            And I believe you probably just

25    cleared this up, but do you in any way have

1   any -- attribute any of your allegations, your

2   pain and suffering or anything that's

3   contained in this complaint against Josh

4   Hamilton?

5         A.   No, sir.

6              MR. CLARK:  That's all I have.

7              MR. STEWART:  Just a couple quick

8   ones that came up through Tere.  I promise I

9   have like two.

10                       - - -

11                   EXAMINATION

12  BY MR. STEWART:

13        Q.   When you transferred post to the

14  administrative job, you got paid to work eight

15  hours.  You got paid the same amount of money

16  annually, correct?

17        A.   Without overtime --

18        Q.   Right.

19        A.   -- that I would normally get on

20  shifts.

21        Q.   Instead of working 90, you dropped

22  down to 8 hours a day?

23        A.   Correct.

24        Q.   Instead of 90 hours per pay period?

25        A.   Correct.

1        Q.   So you got paid the same and worked
2   less hours?
3        A.    Well, this is how that particular
4   position worked.  I wasn't given overtime, but
5   I was still tasked out to be there and
6   complete work, so my hours were reduced in
7   pay, but I was doing more like actual
8   on-station working.  So, for example, teaching
9   an active shooter course and staying for 12,
10  14 hours a day, I was putting in the work, but
11  I was only getting paid --
12       Q.   Did you -- excuse me.  Go ahead.
13       A.    No.  Go ahead, sir.
14       Q.   Did you make a complaint against
15  Keesler for violation of the Fair Labor Act
16  for not paying for overtime?
17       A.    I brought it up and was told it's
18  not gonna go anywhere.
19       Q.   Who did you tell that to?
20       A.    Seth Giddons.
21       Q.   He said that's not violation of --
22       A.    Oh, he brought it up, but our
23  program manager said it wasn't gonna go
24  anywhere, so...
25       Q.   That's Seth or someone else?

1      A.    The program manager was Zastrow

2  Perkins.

3      Q.    Okay.  Did you have any injury to

4  your throat or neck as a result of this

5  incident in any way?

6      A.    No, nothing that was documented or

7  anything like that.

8          MR. STEWART:  That's all.

9                   - - -

10                EXAMINATION

11  BY MR. BELLINDER:

12      Q.    Just one thing to clarify.  Your

13  overtime as a shift supervisor prior to the

14  incident, that was paid -- that was above the

15  80 hours a week, correct?

16      A.    Correct.

17          MR. STEWART:  Object to the form.  I

18  think he said 90.

19  MR. BELLINDER:

20      Q.    What I mean was any time above 80 --

21  you said you averaged 90 hours a week.  You

22  would have been compensated for --

23      A.    Correct.

24      Q.    And so then when you went down to

25  the eight-hour days, your pay would have

0b9b1392-b98b-4486-976a-4ab912ebf648

<sup>1</sup> reflected --

<sup>2</sup>      A.   Doing more hours and no additional

<sup>3</sup> pay, correct.

<sup>4</sup>      MS. STEEL:  And, Thomas, you're

<sup>5</sup> gonna give us documentation for that, right?

<sup>6</sup>      MR. BELLINDER:  Right.  He's gonna

<sup>7</sup> look for the electronic paystubs that he has,

<sup>8</sup> and we may send out subpoena to the entity

<sup>9</sup> that he worked for to try to get it maybe

<sup>10</sup> directly from them and to the extent he kind

<sup>11</sup> find a paystub.

<sup>12</sup>      MR. STEWART:  If you could specify

<sup>13</sup> the address and supervisor of that entity

<sup>14</sup> that --

<sup>15</sup> MR. BELLINDER:

<sup>16</sup>      Q.   Tell us -- you referenced it.  I

<sup>17</sup> think I wrote it down.  Was it the -- the

<sup>18</sup> Active Duty Investigations Unit, or was it the

<sup>19</sup> Civilian Police Program?  Tell us who exactly

<sup>20</sup> it was you were working for at the time when

<sup>21</sup> this incident happened.

<sup>22</sup>      A.   Department of the Air Force Civilian

<sup>23</sup> Police Program.

<sup>24</sup>      Q.   Okay.  Department of the Air Force?

<sup>25</sup>      A.   Correct.

0b9b1392-b98b-4486-976a-4ab912ebf648

<sup>1</sup>            And with the pay, you had to use

<sup>2</sup>   like your common access card, your military ID

<sup>3</sup>   to log in, and because I'm not affiliated, I

<sup>4</sup>   might be able to find those earning

<sup>5</sup>   statements, but it's just a matter of if I can

<sup>6</sup>   log in.

<sup>7</sup>        Q.    Department of Air Force Civilian

<sup>8</sup>   Police Program, is that Keesler's address?

<sup>9</sup>   Are they located within the base, or was that

<sup>10</sup>  a separate --

<sup>11</sup>       A.    No, they're within the base.

<sup>12</sup>       Q.    Okay.

<sup>13</sup>       A.    So the 81st Security Forces Squadron

<sup>14</sup>  is where we worked.

<sup>15</sup>       Q.    And that's the -- Penick was a part

<sup>16</sup>  of that --

<sup>17</sup>       A.    Correct.

<sup>18</sup>       Q.    -- squadron?

<sup>19</sup>       A.    Correct.

<sup>20</sup>            MR. BELLINDER:  Off the record.

<sup>21</sup>                       - - -

<sup>22</sup>             (Off the record.)

<sup>23</sup>            MS. STEEL:  I have one more

<sup>24</sup>  question, if you will let me ask it.

<sup>25</sup>            MR. BELLINDER:  I will.

1                         - - -

2                      EXAMINATION

3    BY MS. STEEL:

4         Q.    After the post change, you said you

5    were assigned to training --

6         A.    Correct.

7         Q.    -- administrative training.  What

8    duties did you have?

9         A.    I was responsible for conducting

10   training, setting up instructional system

11   development for the entire squadron, active

12   duty and civilian.  So I took a position where

13   I was supervising roughly 40 to being

14   responsible for training and records

15   management for like near 300 people assigned.

16        Q.    Training for who?

17        A.    Active duty Security Forces and the

18   Civilian Police Program.

19        Q.    Okay.  And how many people did you

20   conduct training for?

21        A.    Close to 300.

22        Q.    300 people after the post change?

23        A.    Correct.

24        Q.    And how long did you perform that

25   job before you left Keesler?

¹          A.    Few months.

²          Q.    When exactly did you leave Keesler?
³    Was it in August?

⁴          A.    Roughly, because I was on delay due
⁵    to weather to report to training.

⁶          Q.    And that would be August of '13 --
⁷    excuse me, August of '12?

⁸          A.    Correct.

⁹          Q.    All right.  So you had an
¹⁰   administrative training position in records
¹¹   management?

¹²         A.    Correct.

¹³         Q.    All right.  Was that an office job?

¹⁴         A.    Correct.

¹⁵         Q.    And was there anything wrong with
¹⁶   this job?

¹⁷         A.    It's not where I wanted to be.

¹⁸         Q.    Okay.  But, I mean, it's not like
¹⁹   they had you cleaning floors, it was --

²⁰         A.    Well, it was more administrative
²¹   work.

²²               MR. BELLINDER:  Object to the form.

²³               MS. STEEL:  Sure.

²⁴   MS. STEEL:

²⁵         Q.    And you preferred not to be on the

0b9b1392-b98b-4486-976a-4ab912ebf648

1    administrative side?

2         A.    Correct.  More patrol work.

3         Q.    Okay.  Because that's just what you

4    liked?

5         A.    Correct.

6              MS. STEEL:  Thank you.

7                          - - -

8         (Deposition concluded at 1:44 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             CERTIFICATE OF COURT REPORTER

2         I, Jennifer West Ray, Court Reporter,

3 and Notary Public in and for the County of Harrison,

4 State of Mississippi, hereby certify that the

5 foregoing pages, and including this page, contain a

6 true and correct transcript of the testimony of the

7 witness, as taken by me at the time and place

8 heretofore stated, and later reduced to typewritten

9 form by computer-aided transcription under my

10 supervision and to the best of my skill and ability.

11         I further certify that I placed the

12 witness under oath to truthfully answer the

13 questions in this matter under the power vested in

14 me by the State of Mississippi.

15         I further certify that I am not in the

16 employ of or related to any counsel or party in this

17 matter, and have no interest, monetary or otherwise,

18 in the final outcome of the proceedings.

19         Witness my signature this the _____ day

20 of _____, 2014.

21

22       _____
       JENNIFER WEST RAY, RPR
       My Commission Expires on 4/24/17

23

24

25

0b9b1392-b98b-4486-976a-4ab912ebf648

1                        ERRATA SHEET
2            I, CHRISTOPHER SOUKUP, do hereby certify
   that I have read the foregoing deposition and that
3  the same is a true and accurate transcript of my
   testimony, with the exception of the changes noted
4  below, if any:
5  PAGE        WORD(S) TO BE     CORRECT      REASON FOR
   /LINE       CHANGED           WORD(S)      CHANGE
6
7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

                   _____
17                 CHRISTOPHER SOUKUP
18 State of _____
   County of _____
19
   Sworn to and subscribed before me
20 this _____ day of _____ 2014.
   _____
21 Notary public
   My commission expires:
22
23
24
25

0b9b1392-b98b-4486-976a-4ab912ebf648